IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------x
| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Rural/Metro Corporation, et al., [1] | : | Case No. 13-11952 (   ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

-------------------------------------------------x

## DECLARATION OF STEPHEN FARBER IN
## SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Stephen Farber, declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that:

1.      I am the Executive Vice President and Chief Financial Officer of Rural/Metro Corporation ("**Rural/Metro**"), which is incorporated under the laws of the State of Delaware.  I have acted as Executive Vice President since May 8, 2013 and Chief Financial Officer since June 25, 2013 of Rural/Metro, and as Secretary and Director for the other debtors and debtors in possession in the above-captioned cases (collectively, with Rural/Metro, the "**Debtors**" or the "**Company**") since July 19, 2013.  As part of my employment and service in such capacities, I have become familiar with the history, day-to-day operations, business and financial affairs of the Debtors.[2]

2.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

[2]     The Company's corporate structure is set forth in the chart annexed hereto as Exhibit A.

"**Bankruptcy Code**"). The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession.

3.      Following extensive negotiations with both its senior secured and its unsecured debt holders, the Company has reached an agreement on a consensual financial restructuring that will reduce the Company's outstanding debt by approximately 50% and cut future interest payments nearly in half. The Company commenced these cases as the necessary first step to implement the pre-negotiated deal, which will see the Company emerge from these chapter 11 cases in short order as a financially healthier company. The financial restructuring commenced with these cases includes the full financial support of the Company's prepetition capital structure. The prepetition secured lenders have exhibited their support for the restructuring by committing $75 million of debtor-in-possession financing, and the Company's bondholders have exhibited their belief in this Company's future by promising to infuse $135 million of new equity upon the Company's emergence from chapter 11. Most importantly, the support exhibited by the Company's major creditor constituencies ensures that the Company will continue to provide vital emergency services, critical care transport and fire protection services to the communities that rely on it with no interruption.

4.      To enable the Debtors to operate effectively postpetition and to minimize the adverse effects of the chapter 11 filings, the Debtors have requested various types of relief in "first day" applications and motions (the "**First Day Motions**") filed with the Court, including a motion seeking to jointly administer the Debtors' chapter 11 cases (the "**Joint Administration Motion**").

5.      I submit this declaration pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") in support of the relief requested in the First

Day Motions and to explain to the Court and other interested parties the circumstances that compelled the Debtors to seek relief under the Bankruptcy Code. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, the knowledge I have acquired from those who report to me (including outside consultants), consultation with other officers and directors of the Debtors, my review of relevant documents, and my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am duly authorized to submit this declaration.

6.      Part I of this declaration provides background with respect to the Debtors' businesses and capital structure and the events leading to the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of the Debtors' First Day Motions.

## I.      BACKGROUND

### A.      General

7.      The Company, a privately held corporation, is one of the largest providers of ambulance services in the United States, providing emergency and non-emergency medical transportation services, as well as a variety of fire protection services.

8.      Rural/Metro was founded in 1948 as an Arizona private fire protection business providing services to residential and commercial property owners on a subscription fee basis. In 1983, the Company began its expansion into the ambulance services industry, which involved the acquisitions of various ambulance service providers throughout the United States. The Company went public through an initial public offering on July 16, 1993.

9.      On March 28, 2011, two affiliates of Warburg Pincus, LLC, WP Rocket Holdings LLC and WP Rocket Merger Sub, Inc. (combined, the "**Sponsors**"), entered into an agreement to acquire 100 percent of the Company's equity for approximately $738 million. The

purchase, which was consummated on June 30, 2011, was funded in part with the proceeds of approximately $525 million in new debt financing, with the remainder of the purchase price funded by the Sponsors. Pursuant to the terms of the Agreement and Plan of Merger, the Company's stockholders received $17.25 per share in cash for each share of the Company's common stock owned.

10.     The Company's customers include municipalities, fire districts, government agencies, hospitals, nursing homes, specialty healthcare facilities and, in certain instances, individual patients. The Company serves numerous communities in the following states: Alabama, Arizona, California, Colorado, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Jersey, New York, North Dakota, Ohio, Oregon, South Dakota, Tennessee, Texas and Washington.

**B.     Services**

11.     The Company provides two main services: ambulance services, which consist of emergency and non-emergency response services, and fire protection services.

(i)     *Ambulance Services*

12.     The Company offers two primary levels of ambulance services: Advanced Life Support ("**ALS**") and Basic Life Support ("**BLS**"). The Company typically staffs the ALS ambulances with paramedics and an Emergency Medical Technician ("**EMT**"), and equips them with ALS equipment, pharmaceuticals and medical supplies. The Company typically staffs the BLS ambulances with two EMTs and equips them with necessary medical supplies and equipment. Ambulance services encompass both emergency response and non-emergency response services, including critical care, inter-facility and, to a lesser extent, wheelchair transports. The Company also provides critical care transfer services to medically unstable

patients (such as cardiac patients and neonatal patients) who require critical care while being transported between healthcare facilities.

(a) *Emergency Response Services*

13.     The Company provides emergency response services primarily under exclusive contracts with counties, municipalities, fire districts and other governmental agencies, which govern the Company's right to provide emergency ambulance services. These contracts typically require the Company to respond to all emergency calls in a designated area within a specific response time.

14.     The contracts also typically set forth performance criteria, such as response times, staffing levels, service type (ALS or BLS), types of vehicles and equipment, quality assurance, indemnity and insurance coverage. The rates the Company charges for emergency ambulance services depend largely on the nature of services rendered and whether any applicable federal, state or county authority regulates rates.

15.     Counties, municipalities, fire districts and other governmental agencies award emergency ambulance service contracts through a competitive bidding process. Generally, the Company's emergency contracts extend for an initial term with options for earned extensions, and also in certain markets, on an evergreen basis. The Company also provides services for stadium-based and other large-scale events.

16.     Under many of the contracts, the local fire department is the first responder to an emergency scene. In these situations, the fire department begins stabilization of the patient. Upon arrival, the Company's crew members deploy portable life support equipment, ascertain the patient's medical condition and, if required, administer ALS interventions. The crew may also perform BLS services, including cardiopulmonary resuscitation, basic airway

management and basic first aid.  As soon as medically appropriate, the patient is placed on a

portable gurney and transferred into the ambulance.  Upon arrival at the hospital, care is

transferred to the hospital staff.

(b) *Non-Emergency Response Services*

17.     The Company also provides non-emergency response services and critical

care transfers to and between healthcare facilities, hospitals, nursing homes and other specialty

care providers at the request of a patient.  These services are typically managed by the facility

discharge planners, nurses or physicians who are responsible for requesting ambulance services.

Non-emergency medical transportation services are either scheduled in advance or provided on

an as-needed basis.  The Company typically utilizes either ALS or BLS ambulance units to

provide non-emergency ambulance services based on the nature of the patient's medical

condition.

(ii)  *Fire Protection Services*

18.     The Company also provides subscription fire protection services to

residential and commercial property owners in emerging communities or unincorporated areas

where neither a public sector nor volunteer fire department operates.  The Company provides

such services to industrial sites, airports and other self-contained facilities on a national basis.

These services comprise roughly ten percent (10%) of the Company's revenue.

## C.     Industry Competition

19.     As a provider of emergency and non-emergency transport services, the

Company faces different competitive pressures.  For instance, in providing emergency services,

the Company's main competitors are mid-sized regional ambulance companies, fire departments,

which in many cases act as the first responder during emergencies and in many communities will

provide the on-scene emergency medical care and pre-hospital ambulance transports, and various

health care organizations. Competition in the emergency services industry is primarily based on: delivering a high quality of patient care, which is driven by highly trained and motivated EMTs and paramedics; meeting contracted emergency response time; and integrating operations with municipal safety departments and personnel.

20.    In providing non-emergency services, the Company faces competition primarily from other private providers and hospital-based ambulance providers. In certain markets, these providers may include one or more national, regional or local hospital ambulance companies. A portion of the non-emergency transportation services are provided under preferred provider agreements with a variety of healthcare systems, hospitals, nursing homes, other medical facilities, and health maintenance organizations. The balance of non-emergency transportation business is earned through effective marketing of services to non-contracted facilities that utilize multiple transport providers. Competition in the non-emergency services industry is primarily based on: quality of patient care; pre-scheduled response time reliability; and community name recognition.

**D.    Employees**

21.    The Company employs approximately 9,500 full-time and part-time permanent employees. Roughly half of all permanent employees are represented by various labor unions. The Company has entered into twenty three (23) collective bargaining agreements with such labor unions that require the Company to, among other things, contribute to various health and employee benefit funds and pension funds.

**E.    Regulation**

22.    The Company, as a participant in the healthcare industry, is subject to various federal, state and local regulations. Federal and state regulations and programs affect the Company's revenues in many ways as the Company derives a significant portion of its revenue

from services rendered to beneficiaries of Medicare, Medicaid and other government-sponsored healthcare programs. To participate in these programs, the Company must comply with stringent and often complex enrollment and reimbursement requirements of federal and state agencies. The Company is also subject to governmental reviews and audits, which can result in retroactive adjustments to amounts previously reimbursed under these programs. In addition, these programs are subject to statutory and regulatory changes, administrative rulings, interpretations and determinations, all of which could materially increase or decrease the payments the Company receives for services and affect the cost of providing such services.

23.     State and local governments also regulate the services the Company provides. For example, in certain service areas in which the Company is the exclusive provider of ambulance services, the local government sets the rates for emergency ambulance services pursuant to an ordinance or master contract and also establishes the rates for non-emergency ambulance services that the Company is permitted to charge.

## F.     The Company's Capital Structure

### (i)     *Senior Secured Credit Facility*

24.     Rural/Metro is a borrower under (a) a $110 million revolving credit facility, including a letter of credit sub-facility of $65 million (the "**Revolving Facility**") and (b) a $325 million term loan facility (the "**Term Loan Facility**"; and, together with the Revolving Facility, the "**Senior Secured Credit Facility**"), each pursuant to that certain Credit Agreement, dated as of June 30, 2011 (as amended, supplemented or otherwise modified from time to time), by and among Rural/Metro, as borrower, WP Rocket Holdings, Inc., as a guarantor ("**Holdings**"), the lenders party thereto from time to time, Credit Suisse AG, as administrative agent, Credit Suisse Securities (USA) LLC, as joint lead arranger and joint bookrunner, CitiGroup Global Markets Inc., as joint lead arranger, joint bookrunner and syndication agent,

and Jeffries Finance LLC, as joint bookrunner and documentation agent (the "**Credit Agreement**").

25.     There is approximately $318.5 million in principal outstanding under the Term Loan Facility and $109 million outstanding under the Revolving Facility, including issued and outstanding letters of credit.  The Revolving Facility matures on June 30, 2016 and the Term Loan Facility matures on June 30, 2018.

26.     Rural/Metro is required to pay cash interest on the principal amount of the Senior Secured Credit Facility (a) on the last business day of each March, June, September and December with respect to any prime rate loan and (b) with respect to any LIBOR loan, on the last day of the applicable interest period (provided that for any LIBOR loan with an interest period of more than three months, interest thereon is payable every three months).

27.     Indebtedness under the Senior Secured Credit Facility is guaranteed by Holdings, the parent of Rural/Metro, and substantially all of Rural/Metro's subsidiaries, and is secured by a first priority security interest in substantially all of the assets of Rural/Metro and the guarantors.

    (ii)  *Senior Unsecured Notes*

28.     Rural/Metro has issued $308 million in aggregate principal amount of 10.125% unsecured senior notes due 2019 (the "**Notes**").  $200 million of the Notes were issued pursuant to that certain Indenture, dated as of June 30, 2011, among WP Rocket Merger Sub, Inc. (which was merged with and into Rural/Metro, with Rural/Metro as the survivor, "**Merger Sub**"), as issuer, Rural/Metro, which assumed the obligations of Merger Sub as issuer, certain of Rural/Metro's subsidiaries, as guarantors, and Wells Fargo Bank, National Association, as trustee (as amended, supplemented or otherwise modified from time to time, the "**First Notes**

**Indenture**"). $108 million of the Notes were issued pursuant to that certain Indenture, dated as of February 3, 2012, among Rural/Metro, as issuer, certain of Rural/Metro's subsidiaries, as guarantors, and Wells Fargo Bank, National Association, as trustee (as amended, supplemented or otherwise modified from time to time, the "**Second Notes Indenture**"; and, together with the First Notes Indenture, the "**Indentures**"). The Notes are unsecured and mature on July 15, 2019.

29.    Rural/Metro is required to pay cash interest on the principal amount of the Notes semi-annually in arrears on January 15 and July 15 of each year. On July 15, 2013, Rural/Metro did not make its scheduled interest payment on the Notes in the amount of $15.6 million.

**G.    Events Leading to the Commencement of the Chapter 11 Cases**

30.    Leading up to the commencement of these chapter 11 cases, the Debtors have had significant accounting, financial and other challenges. The Company has a highly leveraged capital structure with significant interest payment obligations. The Company also has significant recurring capital expenditure and other cash obligations. Together, these essentially fixed obligations approximate $70 million to $80 million annually. As described below, these obligations materially exceed the Company's cash flow and available liquidity.

31.    The Company has experienced significant challenges and disruptions operating its billing and collection functions, which rely on various technologies and approximately 600 employees in several locations, which has resulted in reduced revenue and delayed cash collections. The Company has also had great difficulty appropriately accounting for revenue, which has resulted in negative adjustments to revenue aggregating approximately $60 million recognized for accounting purposes from June 2012 through March 2013.

32.    The Company's difficulties with revenue relate, in part, to changes in the sources of payment for its services, both actual and estimated. The Debtors' actual cash receipts

01:13977078.1

depend on whether patients are uninsured, hold commercial insurance or have medical expenses covered by Medicare or Medicaid – this is commonly referred to in the industry as the "payor mix." The Company is often not aware of a patient's insured status until after the transport is complete and a bill is issued and processed, but the Company records revenue following each transport. Historically, the Debtors have calculated anticipated revenue based on average receipts from transports in each geographic region in which the Debtors operate. This method is generally dependable in environments where payor mix is stable. However, many factors relating to the Debtors' payor mix, reimbursement levels, reimbursement timing and other elements have changed over time. The Company's accounting systems, which predicted anticipated receipts based on regional historical averages rather than the underlying payor mix, were ill equipped to account for such shifts. Compounding the problem, from time to time, the Company raised prices and factored these increases into its accounting estimates, but was not able, in many cases, to collect the additional amounts, which had the effect of increasing the difference between estimated accounting revenue and actual cash receipts.

33.    In addition, in fiscal 2012, the Company made two large acquisitions, for which many estimates were made for revenue recognition purposes. These estimates proved to be inaccurate, with the net effect of further skewing the difference between accounting revenue and cash receipts. These acquisitions also significantly increased the volume of claims to be processed by the Company's billing and collection operation, which overwhelmed the system and resulted in significant operational issues that impacted the timing and level of cash collections.

34.    As a result of the foregoing factors and various other challenges to the Company's level of revenue, cash flow and profitability, the Debtors realized that they had

(a) materially lower cash receipts than what was predicted by their accounting practices, (b) an acute deficiency of cash receipts compared with cash expenditures and (c) nearly exhausted their liquidity.

35.    To help address these issues, the Debtors hired FTI Consulting Inc. ("**FTI**") and Alvarez & Marsal Healthcare Industry Group, LLC ("**A&M**") in early March 2013.[3]  Prior to this time, the Debtors calculated their trailing twelve months ("**TTM**") EBITDA, including various pro forma adjustments, to be approximately $90 million.  After completing its analysis of the Company's revenue recognition system in April 2013, FTI adjusted the Debtors' revenue such that TTM EBITDA, as adjusted on a pro forma basis for various factors, was approximately $70 million.  The Company has since further reviewed other elements of its accounting statements and cash flow, and as further adjusted on a pro forma basis for various factors, the Debtors' annual cash EBITDA is now estimated to be between $50 million to $60 million.  This is materially less than the $70 million to $80 million of fixed annual cash obligations described above.

36.    In May 2013, Moody's Investors Service ("**Moody's**") and Standard & Poor's ("**S&P**"), citing the Company's liquidity crunch, highly leveraged capital structure and declining EBITDA, lowered their corporate credit ratings on Rural/Metro from B3 to Caa2, and from B to CCC, respectively.  In July 2013, S&P further lowered its corporate credit rating from CCC to Selective Default, and Moody's issued a press release stating that Rural/Metro's failure

---

[3]    The Debtors have also hired FTI for various other projects on other occasions, as early as June 19, 2012.

to make the July 15, 2013 interest payment on the Notes could lead to a future downgrade on their corporate credit rating.

37.     The Debtors are parties to numerous customer contracts, many of which require significant periodic investment in equipment and other expenditures by the Company to comply with such contracts and to retain the business. Every market has its own compliance requirements including levels of patient care, mandatory vehicles and equipment, response times, and licensing and/or franchising fees. When the Company enters a new market, it incurs significant expenditures both immediately, to ensure the Company's services and fleet of vehicles are compliant, and during the term of the contract, to monitor performance adjustments as necessary and pay the associated periodic fees.

38.     Certain of the customer contracts also require the Debtors to post surety bonds to guarantee their obligations under the contracts. Failure to maintain the surety bonds may result, in certain cases, in a material breach under those contracts, allowing the counterparties to terminate and exercise various rights and remedies at law or in equity under the contracts. In response to the Company's shrinking liquidity, various sureties threatened cancellation or requested that surety bonds be cash collateralized. Similarly, certain vendors and suppliers, concerned about the downgrade of the corporate credit rating, began to request cash on delivery — further stretching the Debtors' available resources.

39.     Finally, as detailed above, the Debtors' capital structure includes approximately $735 million in outstanding funded indebtedness. The Debtors, following downward revisions to their TTM EBITDA and hampered by limited cash and liquidity, cannot bear the cost of principal and interest payments associated with all of this debt going forward.

The Debtors' capital structure does not allow the Debtors' sufficient flexibility to operate profitably given their revised cash position.

40.    The Company, in May 2013, announced the hiring of Scott A. Bartos, as the new President and Chief Executive Officer, as well as myself.  The new management worked with internal and external advisors, including FTI and A&M, to determine if it was possible to operate the business with sufficient profit to service its debt burden and maintain liquidity.

41.    When the filing of these cases became a more likely outcome, the Debtors expanded A&M's and FTI's role and hired experienced restructuring advisors to determine the best way to preserve the value of the Company's businesses.  On June 17, 2013, Willkie Farr & Gallagher LLP ("**WF&G**") was retained by the Debtors as legal counsel to represent them in connection with general restructuring matters, including the preparation and commencement of these cases.  The Debtors also hired Lazard Frères & Co. L.L.C. ("**Lazard**") on June 25, 2013 as investment banker to provide advice in connection with the Debtors' attempts to complete a strategic restructuring, reorganization and/or recapitalization and to prepare for the commencement of these cases.

**H.    Execution of the Restructuring Support Agreement**

42.    In the period leading up to the Petition Date, the Company simultaneously pursued a consensual out-of-court restructuring and, in the event an out-of-court financing or other transaction could not be reached in time, debtor-in-possession financing to facilitate an in-court restructuring.  The Debtors conducted arm's-length, good-faith negotiations with various potential financing sources, including all levels of their capital structure and targeted third-parties that possess a recognized sophistication in the distressed financing community and could negotiate on an expedited basis.  It quickly became clear, however, that obtaining third-party financing without the consent of the Company's senior secured lenders would be impracticable

given the Company's lack of substantial unencumbered assets.  Furthermore, the agent to the secured lenders advised the Company that they would not consent to the granting of senior or *pari passu* liens to an unaffiliated party, and they were not willing to permit the incurrence of junior secured debt.

        43.     On July 11, 2013 certain of the Company's prepetition senior secured lenders (the "**Bank Group**") provided the Company with a term sheet for debtor-in-possession financing.  Around the same time, certain of the holders of the Company's Notes (the "**Noteholders**") approached the Company and agreed to enter into confidentiality agreements in connection with investigating a junior financing transaction.  On July 20, 2013, the Company received both a standalone debtor-in-possession financing term sheet and a term sheet outlining a restructuring proposal from the Noteholders.  The Noteholders proposed to fund a brief bankruptcy case if the Company committed itself to a particular plan and an expedited time frame.  The Noteholders also sent their restructuring term sheet to the Bank Group, and the Company, the Noteholders and the Bank Group began to explore the possibility of a consensual balance sheet restructuring.

        44.     From the time the Bank Group and the Noteholders delivered their separate standalone proposals to the Debtors until the Petition Date, the Debtors and their advisors simultaneously negotiated three separate deals: (a) a standalone financing from the Bank Group; (b) the Noteholders' standalone financing proposal; and (c) a consensual out-of-court restructuring that morphed into an agreement that outlines the terms and mechanics of, and timeline for, a pre-arranged restructuring.  The back and forth competitive process substantially improved the terms of each of the three deals form the Company's perspective, and it became clear that both groups, believing in the future prospects of the business, had a vested interest in

seeing this Company's balance sheet corrected.  Rather than pit its major creditor constituencies against one another, the Company determined that the best way to preserve the value of the business would be to reach a consensual deal that would allow both the Bank Group and the Noteholders to protect their investments in the Company and at the same time best position the company for success in the future.  Thus, the competitive process ultimately resulted in the execution of the Restructuring Support Agreement (attached hereto as **Exhibit B**, the **"RSA"**), which commits the Debtors, the Bank Group and the Noteholders to a pre-negotiated plan designed to implement a comprehensive balance sheet restructuring that will solve the Company's liquidity issues, reduce the Debtors' funded indebtedness by approximately 50% and cut interest payments nearly in half.  This financial, balance sheet restructuring includes a cash infusion of $135 million form certain of the Noteholders upon the Company's exit from chapter 11, which will, among other things, allow the Company  to better serve the communities that rely on its uninterrupted provision of emergency services.  The consensual deal was made possible by the substantial financial commitments of the Bank Group and the Noteholders, who, together, represent a majority of the Company's prepetition capital structure.  Absent the Company's stakeholders' confidence in the prospects of the Company's underlying business, no consensual restructuring would have been possible.

45.    The pre-negotiated financial restructuring negotiated by and among the Company, the Bank Group and the Noteholders contemplates, among other things:[4]

---

[4]    This summary is qualified in its entirety by reference to the RSA.  In the event of a conflict between this summary and the RSA, the RSA shall control.  Capitalized terms used in the summary, if not otherwise defined herein, have the meanings given them in the RSA.

01:13977078.1

- a DIP Loan to be provided by the Consenting Secured Lenders in an amount equal to $75 million, which shall be available to the Debtors (a) in a single draw of $40 million on the date an interim order approving the DIP Loan is entered by the Bankruptcy Court, and (b) in one or more draws of $35 million (in the aggregate) on a date or dates following the entry of final and non-appealable order of the Bankruptcy Court approving the DIP Loan;

- a paydown of the senior secured credit facility by $50,000,000;

- the conversion of the Senior Notes, on the Effective Date, into 100% of the common stock of Holdings (subject to dilution by the Warrants issued to those Noteholders providing the exit financing, and the management incentive plan);

- the cancellation of the Investors' equity interests; and

- commitment by the Noteholders, on the Effective Date, to invest $135 million additional dollars of new equity upon exit from chapter 11.

46.    The RSA also contains several milestones designed to expedite the duration of these cases while accommodating the Debtors' restructuring efforts. The Debtors intend to file the pre-arranged plan, along with a proposed disclosure statement, prior to September 15, 2013. The Debtors are also required to obtain approval of the disclosure statement and confirmation of the pre-arranged plan by November 8, 2013 and December 20 2013, respectively. This timeline strikes the right balance between respecting the substantial commitments of the Company's stakeholders and the Company's need for stability and financial support for its operations, capital expenditures and these cases.

47.    Accordingly, to implement the process contemplated by the RSA, the Debtors commenced these chapter 11 cases on the Petition Date. These cases will allow the Company to continue to serve its communities and simultaneously provide the breathing spell necessary for the Company to effectuate the consensual restructuring that will best position the Company for success in the future.

## II.    SUMMARY OF FIRST DAY MOTIONS[5]

48.    To enable the Debtors to operate effectively and to minimize the adverse effects of the chapter 11 filings, the Debtors have filed, or will file, the motions described below.

49.    In connection with the preparation for these bankruptcy cases, I have reviewed each of the First Day Motions referenced below.  The First Day Motions were prepared with my input and assistance, or the input and assistance of employees working under my supervision.  I believe the information contained in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtors' ability to preserve the value of their estates and assist in their reorganization efforts.

### A.    Motions Related to Case Management

(i)    *Joint Administration Motion*

50.    The Debtors seek the joint administration of their chapter 11 cases, 66 in total, for procedural purposes only.  I believe that it would be far more practical and expedient for the administration of these chapter 11 cases if the Court were to authorize their joint administration.  Many of the motions, hearings, and other matters involved in these chapter 11 cases will affect all of the Debtors.  Hence, joint administration will reduce costs and facilitate the administrative process by avoiding the need for duplicative hearings, notices, applications, and orders.  It is my understanding that no prejudice will befall any party by the joint administration of the Debtors' cases as the relief sought therein is solely procedural and is not intended to affect substantive rights.

---

[5]    Capitalized terms used but not defined in this section have the meanings given them in the relevant First Day Motion.

(ii)  *Motion to Extend Deadline to File Schedules and Statements*

51.    The Debtors have filed, or intend to file, a motion seeking a 60-day extension of time to file their Schedules of Assets and Liabilities (the "**Schedules**") and Statements of Financial Affairs ("**Statements**").

52.    Due to the complexity of the Debtors' businesses, the number of Debtor entities, and the breadth of their financial and contractual arrangements, the Debtors will be unable to complete their Schedules and Statements by the deadline set forth pursuant to the Bankruptcy Rules.  Therefore, I believe that good cause exists for extending the deadline by which the Debtors must file their Schedules and Statements.  I understand that granting this motion is in the best interest of the Debtors' estates as it will enable the Debtors and their professionals to concentrate their resources towards an efficient and timely reorganization process.

**B.    Applications and Motion Related to the Retention of Professionals.**

(i)  *Application to Employ and Retain Donlin, Recano & Company, Inc.*

53.    The Debtors have filed a motion for an order appointing Donlin, Recano & Company, Inc. ("**Donlin**") as this Court's notice and claims agent for the Debtors' chapter 11 cases pursuant to sections 156(c) and 105(a) of the Bankruptcy Code, Rule 2002(f) of the Bankruptcy Rules, and Rule 2002-1(f) for the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.  I believe that the retention of Donlin is critical because of the large number of creditors identified in these cases.

54.    I understand that Donlin is a data processing firm with extensive experience in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases.  The Debtors solicited bids from three prominent bankruptcy claims and noticing agents prior to selecting Donlin and believe Donlin's rates are reasonable given the quality of Donlin's

services and Donlin's prior bankruptcy expertise.  Given the need for the services described

above and Donlin's expertise in providing such services, I believe that retaining Donlin will

expedite service of notices, streamline the claims administration process, and permit the Debtors

to focus on their reorganization efforts.

**C.**     **Motions Related to Financing of Operations.**

(i)      *Motion to Authorize Continued Use of the Debtors'*
         *Cash Management System, Bank Accounts and Business Forms*

55.     In the ordinary course of their businesses prior to the Petition Date, and as

is typical with business organizations of similar size and scope, the Debtors maintain a

centralized cash management system to collect, transfer, and disburse funds generated through

their operations efficiently and to record such transactions accurately (the "**Cash Management**

**System**").

56.     It is my understanding that the U.S. Trustee Guidelines require chapter 11

debtors to, among other things, close all existing bank accounts and open new accounts which

must be designated debtor in possession bank accounts and obtain, establish and maintain

separate debtor in possession accounts, and utilize new checks for all debtor in possession

accounts, which bear the designation "Debtor in Possession" and contain certain other

information related to the chapter 11 case.  The Debtors intend to request a waiver of the

requirement that the Debtors close all existing bank accounts and open new bank accounts.

57.     I believe that the Debtors' existing cash management and intercompany

accounting procedures are essential to the orderly operation of the Debtors' businesses.  The cost

and expense of changing bank accounts and related business forms and creating a new Cash

Management System  could cause confusion, disrupt payroll, introduce inefficiency when

efficiency is most essential, and strain the Debtors' relationships with critical third parties, each

of which could diminish the prospects for a successful reorganization. Thus, by the motion, the Debtors seek authorization to continue the management of their cash receipts and disbursements in the manner in which they were handled immediately prior to the Petition Date.

58.    In addition, I understand that section 345(b) of the Bankruptcy Code contains certain deposit, investment and reporting requirements. While the Debtors believe their current Cash Management System largely meets those requirements, the Debtors have requested an interim waiver of such requirements for a period of 30 days to allow the Debtors to work with the U.S. Trustee to confirm their compliance with section 345(b).

59.    I believe that allowing the Debtors to maintain their Cash Management System would be in the best interests of the Debtors' estates, creditors and other parties in interest.

(ii)    *Motion Authorizing Debtor-in-Possession Financing*

(a) *Debtor-in-Possession Financing and Use of Cash Collateral*

60.    Concurrently herewith, the Debtors have filed a motion (the "**DIP Motion**") seeking authority to obtain postpetition loans, advances and other financial accommodations pursuant to the DIP Credit Agreement and use cash constituting Prepetition First Lien Collateral (the "**Cash Collateral**"), as well as to grant replacement liens and superpriority administrative expense claims to provide "adequate protection" to the Prepetition First Lien Secured Parties, all as more fully described in the DIP Motion. The DIP Motion also requests that a Final Hearing be scheduled with respect to the relief requested.

61.    The Debtors intend to enter into a senior secured, superpriority debtor-in-possession multiple draw term credit facility in the amount of up to $75 million, of which $40 million will be available upon entry of the Interim Order. I understand that the proposed DIP

Facility and use of the Cash Collateral are the Debtors' best available option to fund operating and working capital expenditure needs during the course of these chapter 11 cases.

### (b) *Adequate Protection*

62.     In consideration of the Prepetition First Lien Secured Parties' consent to the Debtors' use of the Prepetition First Lien Collateral, the Debtors have agreed to provide certain adequate protection to the Prepetition First Lien Secured Parties. To that end, the Debtors and the DIP Lenders have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections of the Prepetition First Lien Secured Parties' interest in the Prepetition First Lien Collateral from the diminution in value, including from the use of the Cash Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. Such protections include granting of replacement liens and superpriority claims to the Prepetition First Lien Secured Parties, as well as the Debtors' payment-in-kind of interest, fees and expenses (including fees and expenses of counsel and financial advisors) owing under the Prepetition First Lien Loan Documents.

### (c) *Alternatives to the DIP Facility*

63.     As described above, the Debtors, along with their advisors, underwent a broad marketing process to attract and secure the funding necessary to facilitate a comprehensive restructuring in chapter 11. The Debtors conducted arm's-length, good-faith negotiations with various potential sources, including the DIP Lenders, the Noteholders and outside third-party sources. After it became clear that there was not any viable outside financing source, the Debtors and their advisors focused on negotiations with the DIP Lenders and the Noteholders, both on a separate, individual basis and on a consensual basis, which culminated in the signing of the RSA. The RSA commits the Debtors, the DIP Lenders and the Noteholders to a pre-

negotiated plan designed to implement a comprehensive balance sheet restructuring that will allow the Company to better serve the communities that rely on its uninterrupted provision of emergency services.

64.     I believe that several compelling reasons justify approval of the DIP Financing. First, the DIP Financing, and the consensual pre-arranged plan it supports, is the best offer to emerge from extensive negotiations and a competitive process, and has left the Debtors with the most favorable terms under the circumstances. Second, the terms of the DIP Financing are reasonable and provide the Debtors with the necessary flexibility to operate and emerge from these Chapter 11 cases. For example, the DIP Financing includes favorable pricing terms, reasonable adequate protection measures for the Prepetition First Lien Secured Parties' interests and reasonable fees for the DIP Lenders' professionals. Third, the DIP Financing allows the Debtors to pursue a consensual restructuring with the support of the Debtors' largest creditor constituents.

65.     For the foregoing reasons, I believe that the postpetition financing proposal submitted by the DIP Lenders is the best available under these circumstances and that entry into the DIP Credit Agreement is in the best interests of the Debtors and their estates.

**D.     Motion for Authorization to Pay Certain Prepetition Claims of Employees and Continue Employee Benefit Programs**

66.     The Debtors have also filed a motion seeking authority to, among other things, satisfy certain of their prepetition obligations to their current employees (the "**Employees**"), reimburse Employees for prepetition expenses that were incurred on behalf of the Debtors, pay prepetition payroll-related taxes and withholdings associated with the Company's employee wage claims and the employee benefit obligations, and other similar tax obligations, and to continue any employee benefit programs in place as of the Petition Date (including

satisfying any prepetition obligations associated with such programs) (the "**Wage Motion**").

This relief is critical to the Debtors' businesses and reorganization efforts.

67.     In order to achieve a successful reorganization, it is essential that the

Employees work with the same or greater degree of commitment and diligence as they did prior

to the Petition Date.  The requested authority to continue to pay the Employees' prepetition

salaries and wages and to maintain the current employee benefits programs is critical to ensure

that:  (a) the Debtors can retain personnel knowledgeable about the Debtors' businesses; (b) the

Debtors' Employees continue to provide quality services to the Debtors at a time when they are

needed most; and (c) the Debtors remain competitive with comparable employers.

68.     If the Wage Motion were not granted, I believe that it would result in a

significant deterioration in morale among Employees, which undoubtedly would have a

devastating impact on the Debtors, their customers, the value of estate assets and the Debtors'

ability to reorganize.  The total amount to be paid if the relief sought in the motion is granted is

modest compared with the size of the Debtors' estates and the importance of the Employees to

the restructuring effort.

69.     I believe authorizing the Debtors to pay these obligations in accordance

with the Debtors' prepetition business practices is in the best interests of the Debtors, their

creditors, and all parties in interest, and will enable the Debtors to continue to operate their

businesses without disruption in an economic and efficient manner.  For the reasons set forth

above, I believe that granting the requested relief is in the best interests of the Debtors, their

creditors, and all parties in interest.

## E.      Certain Other Motions.

      (i)            *Motion to Authorize Payment of Prepetition Claims of Critical Vendors*

      70.      In order to continue operating their businesses, the Debtors must rely on certain suppliers (the "**Critical Vendors**") that provide the Debtors with certain specialized goods and services that are critical to the Debtors' operations.  Absent these Critical Vendors, the Debtors may be unable to continue their operations without materially inflated costs or substantial interruptions.  In connection with determining which vendors are actually essential to the Debtors' business operations, the Debtors considered the following criteria: (a) whether the vendor in question is a sole source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in significantly higher costs to the Debtors; (c) whether quality requirements, customer specifications, or other specifications prevent the Debtors from obtaining products or services from alternative sources within a reasonable timeframe, given the anticipated length of operations; (d) whether, if a vendor is not a sole source provider, the Debtors have sufficient product inventory or in-house capabilities to continue operations while a replacement vendor is found and put in place; (e) whether a vendor is otherwise contractually obligated to continue to provide goods or services to the Debtors; and (f) whether a vendor is likely to refuse to ship product or provide services to the Debtors postpetition if its prepetition balances are not paid.

      71.      Based on  the foregoing considerations, the Debtors identified Critical Vendors whose cessation of services or provision of goods could cripple in short order the Debtors' businesses and, therefore, result in irreparable harm.  The Debtors believe that the Critical Vendors will refuse to supply the Debtors postpetition unless some or all of these claims are paid, and that immediate replacement of the Critical Vendors would be impracticable or, in some cases, impossible.  Without authority to pay the Critical Vendors, the Debtors could be

forced to suspend operations immediately, which would be highly destructive to the Debtors' efforts to maximize the value of their assets, and monetize as much as possible of their inventory and work-in-process. Accordingly, the Debtors seek authorization to pay the Critical Vendors in the ordinary course of business.

72. For the reasons stated above, and explained more fully in the motion, I believe that the relief sought therein is necessary for a successful reorganization and is in the best interests of the Debtors and their estates.

(ii) *Motion to Authorize Debtors to Continue Insurance Policies and Premium Financing Agreements Related Thereto*

73. In connection with the operation of their businesses, the Debtors maintain various insurance programs that insure against claims and losses relating to, among other things, general liability, automobile liability, fiduciary liability and property loss. If these insurance policies are allowed to lapse, the Debtors would be exposed to substantial liability for any damage or loss resulting to persons and/or property of the Debtors and others. In addition, absent certain types of coverage the Debtors would not be able to continue to conduct business. Moreover, maintenance of the directors' and officers' liability policy is necessary to retain the Debtors' senior management who are critical to the success of the Debtors' businesses and reorganization. Furthermore, certain amounts of the premiums under the insurance policies are financed pursuant to a premium financing agreement. Payment of all outstanding prepetition amounts and any amounts that come due postpetition under the premium financing agreement is required in order to ensure the continuing coverage under the various insurance policies. Accordingly, I believe that the relief requested in the Debtors' motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

(iii)    *Motion to Authorize Certain Prepetition Practices and Payment of Sales Taxes and Regulatory Fees*

74.    The Debtors' ability to transition seamlessly through these chapter 11 cases and preserve the value of their estates is dependent upon the continuing loyalty and goodwill of their customers and vendors. The Debtors, in the ordinary course of their businesses, engage in certain practices that are critical to maintaining continued support from customers and vendors, including refunding erroneous overpayments and honoring prepayments made by customers and vendors (collectively, the "**Prepetition Practices**"). In most instances, the Debtors are contractually obligated to refund any overpayments received in error, and to perform necessary services for payments received in advance. The common goals of the Prepetition Practices have been to meet competitive pressures, ensure customer and vendor satisfaction and generate goodwill for the Debtors, thereby allowing the Debtors to retain current customers and vendors, and ultimately enhance revenue and profitability.

75.    To preserve the value of their businesses and maintain the trust of the various parties the Debtors conduct business with, the Debtors believe they need to continue honoring the Prepetition Practice obligations without interruption or modification. Considering the critical importance of the Prepetition Practices to the Debtors' continued viability as a going concern, I believe that the relief sought is necessary and in the best interest of the Debtors and their estates.

76.    In addition, the Debtors seek entry of an order authorizing them to pay various prepetition sales taxes (the "**Sales Taxes**") to various federal, state and local authorities (collectively, the "**Taxing Authorities**"), as well as certain regulatory, licensing and permitting fees (the "**Regulatory and Licensing Fees**" and together with the Sales Taxes, the "**Taxes**") to certain state and local government agencies (collectively, the "**Regulatory Authorities**" and

together with the Taxing Authorities, the "**Applicable Authorities**"). In the ordinary course of their businesses, the Debtors collect Sales Taxes from customers and hold them for a period of time before remitting them to the Taxing Authorities. The Debtors are also required to pay Regulatory Fees, including, but not limited to, business and licensing fees required to obtain a license or permit in order to operate the Debtors' businesses within the applicable Regulatory Authority's jurisdiction.

77.     Payment of the prepetition Taxes is critical to the Debtors' continued, uninterrupted operations. The Debtors' failure to pay these obligations may cause the Applicable Authorities to take precipitous action, including, but not limited to, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Failure to pay the prepetition Taxes could also have a negative impact on the Debtors' existing permits and licenses, which are among the Debtors' most essential assets. In addition, the Debtors believe that most, if not all, of the prepetition Taxes are entitled to priority, and thus permitting the Debtors to pay prepetition Taxes would affect only the timing of the payments, and not the amount of the ultimate recovery.

78.     I believe that the authority to pay the Applicable Authorities in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors and their estates.

(iv)     *Motion to Provide for Adequate Assurance to Utilities*

79.     In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, natural gas, water, telecommunications, waste disposal and other similar utility products and services (collectively, the "**Utility Services**") from various utility companies (collectively, the "**Utility Companies**"). The Debtors are seeking an

order of this Court prohibiting the Utility Companies from altering or discontinuing services and deeming the Utility Companies adequately assured of future performance by virtue of the Debtors' proposed adequate assurance.

80.     To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to provide a deposit equal to 50% of the Debtors' estimated monthly cost of the Utility Services into a segregated account maintained by the Debtors (the "**Adequate Assurance Deposit**").  I believe that the Debtors' Adequate Assurance Deposit constitute sufficient adequate assurance to the Utility Companies.  However, in light of the severe consequences to the Debtors of any interruption in services by the Utility Companies and the recognition that Utility Companies have the right to evaluate the proposed adequate assurance on a case-by-case basis, if any Utility Companies believes additional assurance is needed, the Debtors have proposed procedures for the Utility Companies to request additional adequate assurance.  I believe these procedures, as outlined in the motion, are not only fair and reasonable, but also necessary for the Debtors' stability.  Furthermore, the Debtors fully intend to timely comply with their postpetition obligations to Utility Companies.

81.     I believe that without the relief requested in the motion, the Debtors could be harmed by having to address numerous requests by Utility Companies in a disorganized manner at a critical period in their reorganization efforts.

## CONCLUSION

In furtherance of their reorganization efforts, the Debtors respectfully request that orders granting the relief requested in the First Day Motions be entered.


Dated:   August  4 , 2013

Rural/Metro Corporation, and its affiliated
Debtors and Debtors in Possession

_____

Stephen Farber
Executive Vice President and Chief Financial
Officer

**Schedule 1**

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| Arizona EMS Holdings, Inc. (AZ) (7244) | Rural/Metro of Brewerton, Inc. (NY) (0912) |
| Beacon Transportation, Inc. (NY) (4028) | Rural/Metro of California, Inc. (DE) (8164) |
| Bowers Companies, Inc. (CA) (6465) | Rural/Metro of Central Alabama, Inc. (DE) (5348) |
| ComTrans Ambulance Service, Inc. (AZ) (6923) | Rural/Metro of Central Colorado, Inc. (DE) (6583) |
| Corning Ambulance Service, Inc. (NY) (5659) | Rural/Metro of Central Ohio, Inc. (DE) (2407) |
| Donlock, Ltd. (PA) (0659) | Rural/Metro of Greater Seattle, Inc. (WA) (6902) |
| E.M.S. Ventures, Inc. (GA) (3254) | Rural/Metro of Indiana, L.P. (DE) (9954) |
| Eastern Ambulance Service, Inc. (NE) (7359) | Rural/Metro of New York, Inc. (DE) (0083) |
| Eastern Paramedics, Inc. (DE) (1102) | Rural/Metro of Northern California, Inc. (DE) (3227) |
| Emergency Medical Transport, Inc. (AZ) (3878) | Rural/Metro of Northern Ohio, Inc. (DE) (8398) |
| EMS Ventures of South Carolina, Inc. (SC) (4174) | Rural/Metro of Ohio, Inc (DE) (0488) |
| Gold Cross Ambulance Service of PA, Inc. (OH) (9869) | Rural/Metro of Oregon, Inc. (DE) (3435) |
| Gold Cross Ambulance Services, Inc. (DE) (4792) | Rural/Metro of Rochester, Inc. (NY) (0148) |
| Lasalle Ambulance, Inc. (NY) (4422) | Rural/Metro of San Diego, Inc. (CA) (4132) |
| Medical Emergency Devices and Services (Meds), Inc. (AZ) (2218) | Rural/Metro of Southern California, Inc. (DE) (1679) |
| Mercury Ambulance Service, Inc. (KY) (8659) | Rural/Metro of Southern Ohio, Inc. (OH) (9303) |
| Metro Care Corp. (OH) (3994) | Rural/Metro of Tennessee, L.P. (DE) (3714) |
| National Ambulance & Oxygen Service, Inc. (NY) (9150) | Rural/Metro Operating Company, LLC (DE) (7563) |
| North Miss. Ambulance Service, Inc. (MS) (4696) | San Diego Medical Services Enterprise, L.L.C. (CA) (4136) |
| Pacific Ambulance, Inc. (CA) (7781) | Sioux Falls Ambulance, Inc. (SD) (4797) |
| Professional Medical Transport, Inc. (AZ) (6661) | Southwest Ambulance and Rescue of Arizona, Inc. (AZ) (9229) |
| R/M Arizona Holdings, Inc. (AZ) (6302) | Southwest Ambulance of Casa Grande, Inc. (AZ) (2807) |
| R/M Management Co., Inc. (AZ) (3444) | Southwest Ambulance of New Mexico, Inc. (NM) (5701) |
| R/M of Tennessee G.P., Inc. (DE) (0819) | Southwest Ambulance of Southeastern Arizona, Inc. (AZ) (8415) |
| R/M of Tennessee L.P., Inc. (DE) (0821) | Southwest Ambulance of Tucson, Inc. (AZ) (3618) |
| RMC Corporate Center, L.L.C. (AZ) (4546) | Southwest General Services, Inc. (AZ) (7537) |
| Rural/Metro (Delaware) Inc. (DE) (1572) | SW General Inc. (AZ) (4455) |
| Rural/Metro Corporation (AZ) (4388) | The Aid Ambulance Company, Inc. (DE) (4432) |
| Rural/Metro Corporation (DE) (6929) | The Aid Company, Inc. (IN) (8091) |
| Rural/Metro Corporation of Florida (FL) (4668) | Towns Ambulance Service, Inc. (NY) (8281) |
| Rural/Metro Corporation of Tennessee (TN) (9245) | Valley Fire Service, Inc. (DE) (6188) |
| Rural/Metro Fire Dept., Inc. (AZ) (3445) | W & W Leasing Company, Inc. (AZ) (1806) |
| Rural/Metro Mid-South, L.P. (DE) (4413) | WP Rocket Holdings, Inc. (DE) (9609) |