IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------x
In re                             :   Chapter 11
                                  :
Rural/Metro Corporation, et al.,¹ :   Case No. 13-11952 (   )
                                  :
             Debtors.             :   (Joint Administration Pending)
-----------------------------------------------x
```

### DEBTORS' MOTION FOR ORDER:
### (I) AUTHORIZING DEBTORS TO PAY (A) PREPETITION EMPLOYEE WAGES, SALARIES AND OTHER COMPENSATION, (B) PREPETITION EMPLOYEE BUSINESS EXPENSES AND (C) OTHER MISCELLANEOUS EMPLOYEE EXPENSES AND EMPLOYEE BENEFITS AND (II) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order (the "**Proposed Order**"), substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 507(a), 1107(a) and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"):

(i) authorizing the Debtors to pay (a) prepetition employee wages, salaries and other compensation, (b) prepetition employee business expenses and (c) other miscellaneous employee expenses and employee benefits; and (ii) granting related relief. In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Stephen Farber in Support of Chapter 11 Petitions and First Day Pleadings (the "**Farber Declaration**"), which was filed with the Court concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed co-counsel, respectfully represent:

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1. The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

01:13977057.1

## BACKGROUND

1.        On the date hereof (the "**Petition Date**"), Rural/Metro Corporation

("**Rural/Metro**") and each of the other Debtors filed a voluntary petition for relief under chapter

11 of the Bankruptcy Code.  The Debtors intend to continue in the possession of their respective

properties and the management of their respective businesses as debtors in possession pursuant

to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors have requested that these

chapter 11 cases be consolidated for procedural purposes.  As of the date hereof, no trustee,

examiner or official committee has been appointed in any of the Debtors' cases.

2.        The events leading up to the Petition Date and the facts and circumstances

supporting the relief requested herein are set forth in the Farber Declaration.

## JURISDICTION

3.        This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C.

§§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  The statutory predicates for the relief requested herein are sections 105(a), 363(b),

507(a), 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rule 6003.

## RELIEF REQUESTED

4.        Prior to the Petition Date, the Debtors paid their employees' wages, salaries

and other compensation and benefits in the ordinary course of business.  Because employee

obligations accrue on an ongoing basis, but are paid periodically in arrears, as of the Petition Date

there are accrued but unpaid prepetition wages, salaries and/or other compensation owed to the

Debtors' employees.

5. By this Motion, the Debtors seek entry of an order, pursuant to sections 105(a), 363(b) and 507(a) of the Bankruptcy Code: (a) authorizing, but not directing, the Debtors to: (i) pay and/or perform, as applicable, certain prepetition obligations with respect to the Debtors' current employees (the "**Employees**") consisting of accrued prepetition wages, salaries and other cash and non-cash compensation claims, as well as (collectively, the "**Employee Wage Claims**"); (ii) pay accrued and unpaid obligations relating to the Independent Contractors (as such term is defined below) (the "**Independent Contractor Claims**"); (iii) reimburse the Employees for business expenses incurred prepetition by the Employees on behalf of the Debtors in the ordinary course of their duties (the "**Employee Expense Obligations**"); (iv) administer employee benefit plans, policies and programs (collectively, the "**Employee Benefit Programs**" and, together with the Employee Wage Claims, Independent Contractor Claims and Employee Expense Obligations, the "**Prepetition Employee Obligations**"); (v) continue the Debtors' generally applicable severance policy for Employees who are not insiders and do not otherwise have employment agreements with the Debtors and who may be terminated after the Petition Date; (vi) continue the Debtors' obligations to certain former employees under COBRA; and (vii) pay all related prepetition withholdings and payroll-related taxes (the "**Withholdings**") associated with the Employee Wage Claims and the Employee Benefit Programs; (b) authorizing and directing the Payroll Banks (as defined below) to receive, process, honor and pay all of the Debtors' prepetition checks and fund transfers on account of any of the Prepetition Employee Obligations and any Withholdings; and (c) authorizing, but not directing, the Debtors to issue new postpetition checks or effect new postpetition fund transfers to replace any prepetition checks or

fund transfer requests on account of Prepetition Employee Obligations that may be dishonored or rejected inadvertently.[2]

6.      The Employees are crucial to the Debtors' businesses and are among the Debtors' most valuable assets. The Debtors' success is dependent on their Employees who, among other things, provide ambulance transport and fire protection services on an emergency and non-emergency basis, and necessary administrative and financial support services attendant thereto. The Employees' knowledge and understanding of the Debtors' services, operations, and network infrastructure are essential to the Debtors' effective reorganization. Absent the relief requested herein, not only would the Employees suffer enormous personal hardship, but the Debtors' businesses would be immediately and irreparably harmed. Without the uninterrupted efforts of their Employees, the Debtors would be unable to continue to operate their businesses.

7.      The filing of a chapter 11 petition is a stressful and uncertain time for a debtor's employees. Such stress and uncertainty often damages employee morale at a critical time when a debtor most needs its employees' loyalty. Honoring the Prepetition Employee Obligations will minimize the hardship the Employees may otherwise endure if payroll and Employee Benefit Programs are interrupted. Honoring such obligations also would prevent the wholesale loss of Employees if they lose the reasonable expectation that they will be compensated for their services. Accordingly, the Debtors believe that the continued payment of the Prepetition Employee Obligations is both critical and justified because of the vital importance of the Employees to the Debtors.

---

[2]     Out of an abundance of caution, the proposed order provides that the relief granted therein shall not constitute or be deemed an assumption pursuant to section 365(a) of the Bankruptcy Code of any employment and service agreements to which the Debtors may be a party or any of the Debtors' employee benefit policies, plans, programs, practices and procedures.

A.      **Prepetition Wages, Salaries and Other Compensation**

(a)     *Wages*

8.      As of the Petition Date, the Debtors employ approximately 9,500 full-time and part-time permanent employees (who are paid on an hourly or salary basis), of which approximately 50% are members of unions (the "**Union Employees**") who are subject to various collective bargaining agreements.[3][4]

9.      The Debtors' Employees provide a variety of services to support the Debtors' operations, including field support services such as emergency medical transportation, non-emergency medical transportation and specialty safety and fire protection, as well as all related administrative, financial support and technical support services.  The aggregate average monthly payroll for all Employees is approximately $29 million.  In the ordinary course of business, the Debtors owe wages, salary and other payments to their employees (the "**Payroll Obligations**").  The Debtors estimate that as of the Petition Date, the prepetition Employee Wage Claims with respect to all Employees will equal approximately $10 million.  As of the Petition Date, no Employee holds an Employee Wage Claim in an amount exceeding $12,475.

10.     The Debtors pay the majority of their Employees through their payroll disbursement account (the "**Payroll Account**").[5]  The Debtors administer a bi-weekly payroll,

---

[3]     A schedule of the unions the company contracts with (the "**Unions**"), including the number of Employees in each Union, is attached hereto as Schedule 2.

[4]     The Debtors have twenty three (23) collective bargaining agreements in force with various Unions.  The Debtors are also currently negotiating four (4) collective bargaining agreements with the following Unions: ICEP Arizona PMT; UEMSW/ACFCME NorCal GT EMT/Medic;  UEMSW/ACFCME Santa Clara County 911; and UEMSW/ACFCME Santa Clara County 911 Admin.

[5]     The Debtors engage Automatic Data Processing, Inc. ("**ADP**") to administer the Debtors' payroll and the Employee Benefit Programs (the "**Administration Costs**").  The Debtors expend, on an aggregate basis, approximately $120,000 on a monthly basis for the Administration Costs.  As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Administration Costs is approximately $175,000.

that begins on every other Saturday.  On the Wednesday following the end of a payroll cycle, the

Debtors transfer requisite funds to the Payroll Account for distribution to Employees the Friday

of that same week.  The vast majority of disbursements to Employees are made via direct

deposit.  A small percentage of employees are issued physical checks from separate accounts.

(b)    <em>Independent Contractors</em>

11.    From time to time, the Debtors utilize the services of certain independent

contractors provided by various human resources and temporary staffing agencies (the

"**Independent Contractors**"), many of whom provide temporary personnel to the Debtors.  The

Independent Contractors provide software support personnel, temporary employees to fill short-

term personnel needs and payroll support personnel.  In addition, the Debtors use the services of

Business & Decision Group ("**B&D**") to provide computer help desk and information technology

support services.

12.    The Debtors pay the temporary personnel for services rendered by

remitting compensation to the Independent Contractors through which the temporary personnel

are hired.  The Independent Contractors cost the Debtors approximately $200,000 per month.  As

of the Petition Date, the Debtors estimate that approximately $300,000 is owed on account of

accrued and unpaid obligations relating to the Independent Contractors.  The Debtors believe it is

necessary to pay all outstanding obligations to the Independent Contractors so that they will

continue to provide personnel and adequate support services to the Debtors, and hereby request

authority to pay, at the Debtors' discretion and as necessary, any outstanding Independent

---

By this Motion, the Debtors seek authority to continue paying the Administration Costs to ADP  in the
ordinary course of business, regardless of when such amounts accrued.

Contractor Claims and continue to utilize the services provided postpetition in the ordinary course of business.

(c)     *Withholdings*

13.     In addition to the Employee Wage Claims, the Debtors routinely deduct from Employee paychecks amounts that the Debtors are required or directed to transmit to third parties, including Social Security, FICA, federal and state income taxes, and garnishments (the "**Withholdings**"). A portion of such payments represents amounts withheld from Employees' paychecks, and the remainder of such payments represents required employer contributions. Typically, approximately $3.8 million in Withholdings per payroll cycle arise in connection with the Debtors' payroll for all Employees.

14.     Prior to each payroll, the Debtors calculate the Withholdings and other deductions to be made from such payroll and the Debtors then fund their payroll accounting for such calculated figures. Thereafter, ADP, on behalf of the Debtors, remit the Withholdings to the appropriate third parties. While the Debtors calculate the Withholdings at the time of the applicable pay period, amounts withheld are actually remitted by the Debtors to the applicable third party weekly, monthly or quarterly, depending on state and local laws. Consequently, as of the Petition Date, the Debtors may be in possession of Withholdings relating to the prepetition period. As the Withholdings are held in trust, they likely do not constitute property of the Debtors' estates. Moreover, the Withholdings likely give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code if not paid. The Debtors estimate that as of the Petition Date, the amount of accrued but unpaid Withholdings equals approximately $4 million. Accordingly, the Debtors request authority to pay any accrued but unpaid Withholdings that may relate to the prepetition period as and when they become due in the ordinary course of the Debtors' businesses.

15.    The Debtors believe that all of their Employees have priority claims with respect to their accrued but unpaid prepetition wages or salaries pursuant to section 507(a)(4) of the Bankruptcy Code.  Due to the critical importance of the Employees to the Debtors' businesses and the inability of the Debtors to replace such Employees, the Debtors hereby request authority to pay the Employee Wage Claims described above as well as any Withholdings associated with those claims.

B.    **Employee Expense Obligations**

16.    The Debtors, as of the Petition Date, owe Employees reimbursement for business expenses that were incurred prepetition.  Certain of these Employee Expense Obligations were charged to corporate credit cards that are provided to certain Employees for approved business-related expenses incurred in the ordinary course of performing their duties for the Debtors.  In certain cases if the Debtors do not promptly pay the bill for the company credit card, the credit card company may have the right to seek payment from the individual employee who made the purchase in the course of his duties.  The monthly average cost to the Debtors for the corporate credit cards is approximately $210,000.

17.    The Debtors also provide certain Employees with pre-paid corporate purchasing cards which are used to purchase goods and services directly from vendors and suppliers in the ordinary course of business.  The monthly average cost to the Debtors for the pre-paid corporate purchasing cards is approximately $60,000.

18.    In other cases, Employees incur Employee Expense Obligations on an out-of-pocket basis.  In those instances, the Employees are responsible for submitting an expense report, which is reviewed within several days of submission, and, if proper, reimbursement is approved.  The Employee will then receive a direct deposit payment or check from the Debtors for the Employee Expense Obligation, outside of the regular payroll cycle.  To the extent that

out-of-pocket Employee Expense Obligations have been incurred but not reported, or reported and are pending approval, the Debtors may owe prepetition Employee Expense Obligations directly to their Employees. Accordingly, by this Motion, the Debtors request that they be authorized to satisfy such out-of-pocket Employee Expense Obligations. In any given month, the Debtors typically incur an aggregate of $50,000 in respect of out-of-pocket Employee Expense Obligations due to their Employees.

19. In addition, the Debtors provide a car allowance to one employee functioning in a specific job title within the Company to reduce the financial burden of operating a personally owned vehicle in the course of normal business activities and assignments (**"Car Allowance"**). This employee is responsible for operations and business development in the various markets the Debtors operate in. As an integral part of their duties, this employee spends significant time traveling to manage relationships with the customer base. Car Allowance is paid on a monthly basis as part of payroll. The monthly average cost to the Debtors is approximately $550.

20. From time to time, the Debtors may request that an Employee permanently relocate to a different work site due to the needs of the business. Upon such a request, the Debtors may reimburse the Employee for expenses incurred as a result of the initial move and any subsequent moves (the **"Relocation Payment"**). As of the Petition Date, the Debtors believe that there are no outstanding Relocation Payments due to any Employees.[6]

---

[6] There are currently three (3) Employees with written commitments from the Debtors for Relocation Payments if and when they actually relocate, which will occur, at the earliest, post-petition. The aggregate amount of these Relocation Payments will be $42,500. The Debtors, by this Motion, request that all such Relocation Payment continue to be honored in the ordinary course of business regardless of when such obligations arose.

21.     As of the Petition Date, the Debtors estimate that they owe approximately $240,000 in outstanding Employee Expense Obligations.  Outstanding Employee Expense Obligations, if any, were incurred in connection with each Employee's employment by the Debtors and in reliance upon the understanding that such expenses would be reimbursed.  The Debtors' ability to pay such expenses reaffirms the Employees' reliance on the Debtors and, thereby, has a significant effect on Employee morale.  It would be patently inequitable to require Employees to bear any expenses that they incurred in furtherance of their responsibilities to the Debtors.  Accordingly, to avoid harming the individual Employees who have incurred such costs, the Debtors request authority, in their discretion and in the exercise of their business judgment, to continue to honor their Employee Expense Obligations in the ordinary course of business regardless of when such obligations arose.

C.     **Employee Benefit Programs**

22.     In the ordinary course of business, as is customary with most large businesses, the Debtors have established various employee benefit plans and programs, including:  health insurance; dental insurance; vision insurance; wellness program; employee assistance program; life insurance; disability coverage; workers' compensation; life insurance and supplemental long term disability coverage for executives; retirement plans; and vacation, holidays and miscellaneous paid time-off.  The primary Employee Benefit Programs are described below.[7]

---

[7]     Any descriptions of Employee Benefit Programs in this Motion are intended as summaries only.  To the extent there are any inconsistencies between the summary descriptions of Employee Benefit Programs contained herein and the terms and conditions of any documentation governing such programs, the terms of such documentation shall control.

   (a)  *Medical and Dental Insurance*

  23.  The Debtors provide all of their permanent full-time Employees with medical and dental benefits and prescription drug coverage (the "**Health Benefits**") through either fully insured or self-insured plans that are administered by various providers.

  24.  The Debtors offer all regular full-time Employees the option to choose a self-insured medical benefit plan administered by United Healthcare (the "**Self-Insured Plan**"). Of the approximately seventy percent (70%) of Employees electing coverage for Health Benefits through the Debtors, approximately eighty-five percent (85%) of the Employees are covered under the Self-Insured Plan.  Under the Self-Insured Plan, United Healthcare provides stop loss coverage for any expenses in excess of the $375,000 self-insured limit per Employee (the "**Stop Loss Insurance**").

  25.  The Debtors alternatively offer certain Employees the option to enroll in one of three fully insured medial benefit plans administered by Excellus BlueCross BlueShield, Kaiser Permanente and Univera Healthcare (the "**Fully Insured Plans**," and combined with the Self-Insured Plan, the "**Medical Plans**").  Of the seventy percent (70%) of Employees electing coverage for Health Benefits through the Debtors, approximately fifteen percent (15%) of the Employees are covered under the Fully Insured Plans. The Debtors allow Employees in Ohio, Colorado, Georgia, California, Oregon and Washington the option to choose the fully-insured plan administered by Kaiser Permanente.  Only Union Employees belonging to the Freight Drivers, Helpers, Dockmen, and Allied Workers Teamsters Local Union No. 375 are offered the option of choosing the Univera health benefits plan, and only the Union Employees belonging to the Service Employees' International Union Local 200 United can enroll in the Excellus BlueCross BueShield health benefits plan.

26.    In addition, all regular full-time Employees are eligible to enroll in a self-insured dental plan administered by MetLife (the "**MetLife Dental Plan**"). Union Employees belonging to the ICEP Arizona PMT Union (the "**PMT Union**") can opt to enroll in a fully-insured dental plan administered by Premier (the "**Premier Dental Plan**," and combined with the MetLife Dental Plan, the "**Dental Plans**"). Of the seventy percent (70%) of Employees electing coverage for Dental Plans through Debtor, approximately ninety-seven percent (97%) of the Employees are covered under the MetLife Dental Plan and three percent (3%) under the Premier Dental Plan.

27.    In the administration of the Health Benefits, once an Employee visits the doctor or dentist and incurs an expense, either the Employee or the medical or dentist  provider submits a claim directly to the medical or dental administrator, respectively.  Typically, once a claim is submitted and processed, the Debtors either: (a) reimburse the Employee for the cost of the Health Benefits services; or (b) pay the medical or dental Administrators for services rendered to the Employee.  For the Self-Insured Plan as well as the Dental Plans, the administrators debit the Debtors' account on a daily basis for claim payments.  Co-pays and/or deductibles for the Health Plans are billed by the medical provider or dental provider directly to the covered Employee.

28.    The Medical Plans cost the Debtors approximately $3.15 million per month, which includes administrative costs and the Stop Loss Insurance premium.  The Dental Plan costs the Debtors approximately $215,000 per month including any related administrative costs.  The Debtors estimate that approximately $3.0 million is currently outstanding on account of the Health Benefits attributable to the prepetition period, including claims for health and dental services provided to Employees prior to the Petition Date, for which the Debtors have not

yet been billed by the medical and dental administrators. The Debtors' failure to pay and

provide the Health Benefits would impose a great hardship on the Employees. Accordingly, the

Debtors hereby seek authority to maintain their Health Plans, including paying, in their

discretion, any amounts owed in the ordinary course of their businesses, regardless of when the

costs related to such Health Plans accrued.

29.    Permanent Employees may additionally elect to withhold amounts from

their paychecks to fund a flex spending account (the "**FSA Payments**") or health savings

account (the "**HSA Payments**") both administered by United HealthCare. The Debtors estimate

that monthly they withhold approximately $45,000 of FSA Payments and $120,000 of HSA

Payments in the aggregate. The Debtors submit that any FSA Payments and HSA Payments

withheld from Employees' wages are not property of the estate and therefore the Debtors seek

authority to remit such amounts to the applicable Employee, in the ordinary course of business.

(b)    *Vision Plan*

30. The Debtors also provide all of their permanent full-time Employees with an

opportunity to enroll in an optional vision plan (the "**Vision Plan**"), provided and administered

by either United HealthCare or Sight Care (combined, the "**Vision Administrators**"). The

Vision Plan costs the Debtors approximately $40,000 per month. As of the Petition Date, the

Debtors estimate that they owe approximately $85,000 in connection with the Vision Plan.

31.    The Debtors hereby seek authority to maintain the Vision Plan,

including paying any amounts owed to the Vision Administrators, regardless of when such

amounts accrued. Additionally, the Debtors respectfully submit that any amounts withheld from

Employees' wages with respect to the Vision Plan are not property of the Debtors' estates.

(c)    *Wellness Program*

32.    The Debtors also provide its Employees with a wellness program administered by Vitality (the "**Wellness Program**").  The Wellness Program educates, assists and motivates the Employees to engage in healthier lifestyles.  In connection with the Wellness Program, the Debtors provide biometric screenings (the "**Biometric**"), which are evaluations intended to identify past, current and potential medical problems, administered by Quest Diagnostics ("**Quest**").  The Wellness Program and Biometric cost the Debtors approximately $55,000 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $320,000 in connection with the Wellness Program and the Biometric.  The Debtors hereby seek authority to maintain both programs.

(d)    *Employee Assistance Program*

33.    The Debtors also provide a confidential counseling service to help address behavioral health and other personal issues facing Employees and their family members (the "**Employee Assistance Program**").  The Employee Assistance Program provides all permanent Employees with licensed counselors 24 hours a day to assist with elder care, child care, parenting, legal issues, alcohol and substance abuse, financial counseling and planning and certain crisis situations.  The Employee Assistance Program is provided by American Behavioral.  The Employee Assistance Program costs the Debtors approximately $13,550 per month.  As of the Petition Date, the Debtors estimate that they owe approximately $18,800 in connection with the Employee Assistance Program.  The Debtors hereby seek authority to maintain the Employee Assistance Program.

(e)     *Basic and Supplemental Life Insurance, Disability Insurance and Workers' Compensation*

34.     The Debtors provide life insurance benefits to all permanent full-time Employees ("**Life Insurance Benefits**"), administered by CIGNA, Guardian or UNUM.  The Debtors pay all premiums for the Life Insurance Benefits, estimated at $37,000 per month, due in arrears.  Full-time Employees may also enroll in a supplemental life insurance plan and elect additional coverage in $10,000 increments with a minimum benefit amount of $10,000 and a maximum benefit coverage of $500,000 (the "**Supplemental Life Insurance**").  The Debtors do not contribute to premiums for the Supplemental Life Insurance.  Amounts due in respect of the Supplemental Life Insurance are deducted from an electing Employee's paycheck, the amount of which depends on the Employee's age and level of elected coverage.

35.     The Debtors  also offer all permanent full-time Employees long-term disability ("**Long Term Disability**") insurance benefits administered by CIGNA, estimated at $76,000 per month, due in arrears.  Long-Term Disability benefits ensure that Employees who become totally disabled due to illness or injury will receive insurance payments until the Employee is either no longer totally disabled or reaches the maximum age permitted for coverage.  The Debtors contribute approximately $95,000 towards premiums for Long Term Disability on a monthly basis.  As of the Petition Date, the Debtors estimate that they owe approximately $90,000 on account of the benefits provided under Long Term Disability.

36.     In addition, the Debtors offer short-term disability insurance coverage ("**Short-Term Disability**," and combined with Long Term Disability, the "**Disability Coverage**") only to full-time Employees belonging to the PMT Union.  Short-Term Disability ensures that Employees who become disabled for more than fifteen days due to a disability receive monetary benefits.  The maximum benefit payment period available under Short-Term

Disability is eleven (11) weeks. The Debtors contribute approximately $15,000 towards premiums for Short Term Disability on a monthly basis. As of the Petition Date, the Debtors estimate they owe approximately $12,000 on account of the benefits provided under Short Term Disability.

37.     The Debtors are required under the laws of the various states in which they operate to maintain workers' compensation insurance that provides their employees with coverage for injuries arising from or related to their employment with the Debtors. The Debtors (a) maintain workers' compensation liability insurance in each of the states in which they do business, and (b) provide employees with workers' compensation coverage for employment related claims that arise in any jurisdiction (the **"Workers' Compensation Program"**). To implement the Workers' Compensation Program, the Debtors maintain two workers' compensation insurance policies with ACE American Insurance Company (**"ACE"**) , both of which are scheduled to expire on May 1, 2014.

38.     First, the Debtors maintain a high-deductible workers' compensation policy which covers workers' compensation claims of the Debtors' Employees in 21 out of the 22 states the Debtors operate in (the "**WC Policy**").[8] The WC Policy requires the Debtors to pay a deductible of $1 million before losses are paid under such policy. The Debtors pay an annual premium of approximately $1.85 million (in the aggregate) on account of the WC Policy. The Debtors pay ACE quarterly installments of approximately $342,000 on account of premiums under the WC Policy.

---

[8]     The WC Policy covers Employees in Alabama, Arizona, California, Colorado, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Jersey, New York, North Dakota, Oregon, South Dakota, Tennessee, Texas, Washington and Wyoming.

01:13977057.1

39.     The Debtors' Employees in Ohio participate in self-insured workers' compensation programs administered by the Ohio Bureau of Workers' Compensation (the "**Self-Insured Program**"). In connection with the Self-Insured Program, the Debtors maintain an excess workers' compensation policy (the "**Excess Workers' Compensation Policy**") with ACE, which provides stop-loss coverage to the extent any workers' compensation claims under the Self-Insured Program exceed $1 million (i.e., the amount of the self-insured retention ("**SIR**") under the Excess Workers' Compensation Policy). The Debtors pay an annual premium of approximately $19,888. The Debtors pay ACE quarterly installments of approximately $4,972 on account of premiums under the Excess Workers' Compensation Policy.

40.     By this Motion, the Debtors seek to continue the Workers' Compensation Programs and permit Employees holding prepetition claims, if any, under such program to proceed with such claims.

41.     The Debtors expend, on an aggregate basis, approximately $540,000 per month on account of the Life Insurance Benefits, Disability Coverage and Workers' Compensation, which costs are paid monthly in arrears on or around the first of the month. As of the Petition Date, the Debtors estimate that they owe approximately $540,000 in connection with the Life Insurance Benefits, Disability Coverage and Workers' Compensation. The Debtors hereby seek authority to maintain their Workers' Compensation benefits, Disability Coverage, Life Insurance Benefits, Supplemental Life Insurance and Workers' Compensation programs, and to make any payments necessary with respect thereto in the ordinary course of the Debtors' business, regardless of when such amounts accrued.

(f)    *Executive Life Insurance and Supplemental Long Term
Disability Insurance*

42.    The Debtors offer executive life insurance and supplemental long term disability insurance (combined, the "**Executive Coverage**") administered by MetLife to approximately thirty (30) executives (the "**Executives**"). For those that elect coverage, the Debtors pay the monthly premium during the Executives' employment with the Debtors, which costs the Debtors, on an aggregate basis, approximately $8,830 per month. As of the Petition Date, the Debtors estimate that they owe approximately $4,600 in connection with the Executive Coverage.

(g)    *Retirement Plans*

(i)    *401(k) Plans*

43.    The Debtors maintain various 401(k) plans (the "**401(k) Plans**") all administered by Fidelity for permanent full-time Employees. After ninety (90) days of employment, the Employees have the option to enroll in the 401(k) Plans and set their contribution level as a percentage of their compensation per payroll period. Employees may make their contributions to the 401(k) Plans up to the annual statutory limit, and may change their percentage contribution quarterly. As a benefit to the Employees, the Debtors contribute matching funds to the 401(k) Plans from two (2) percent to eight (8) percent depending on the 401(k) Plan. On an annual basis, the Debtors contribute up to $3 million to the 401(k) Plans.[9]

---

[9]    Under the corporate 401(k) plan, the Debtors do not pay Employees participating in the corporate plan any contributed matching funds (the "**Match Funds**") until the end of the subsequent calendar year (the "**401(k) Policy**"). For example, all accrued Match Funds for calendar year 2012 will be paid to eligible Employees at the end of calendar year 2013. By this Motion, the Debtors seek authority to pay all accrued but outstanding Match Funds in accordance with the 401(k) Policy in the ordinary course of business, regardless of when such amounts accrued. Honoring the 401(k) Policy will minimize any hardships imposed on the Employees by failure to pay out the Match Funds.

44.     As of the Petition Date, the Debtors estimate that they are holding $2.9 million in accrued but unremitted contributions to the 401(k) Plan made prepetition. The Debtors hereby seek authority to: (a) maintain their 401(k) Plans, including paying any amounts owed to the 401(k) Plans, regardless of when such amounts accrued; and (b) continue to honor their matching obligations under the 401(k) Plans. Additionally, the Debtors respectfully submit that amounts withheld from Employees' wages for contribution to the 401(k) Plans are not property of the Debtors' estates, and should be remitted to the 401(k) Plans.

(ii)     *Pension Plan*

45.     The Debtors also contribute to a pension plan (the "**Pension Plan**") for Employees belonging only to the I-60 IAFF Maricopa Union (the "**I-60 Union**").[10] The Pension Plan is financially managed by Towers Watson. The annuity amount upon retirement is dependent on several factors, including but not limited to, the Employee's time in the Pension Plan, age and salary. By this Motion, the Debtors seek the authority, to the extent necessary, to continue to honor any obligations under the Pension Plan in the ordinary course.[11]

(h)     *Vacation, Holidays and Other Time Off*

(i)     *Vacation & Sick Time*

46.     The Debtors use an accumulated anniversary plan whereby time off for vacations and illness is earned by all permanent full-time Employees according to the length of service with the Debtors. Time off for vacation ("**Vacation Time**") is fully vested and one week may be carried over from year to year. Further, any unused but accrued Vacation Time is paid to

---

[10]     The Debtors are currently in negotiations with the I-60 Union to terminate the Pension Plan.

[11]     By requesting authority to continue the Pension Plan, the Debtors are not assuming or affirming any contracts, agreements, programs or applicability of any law related to the Pension Plan. The Debtors reserve all of their rights with regard to the Pension Plan.

the applicable Employee at termination.  As of the Petition Date, the Debtors estimate that they

owe approximately $50,000 in accrued but outstanding paid time off on account of Vacation

Time.[12]  Time off for illness ("**Sick Time**," and combined with Vacation Time, "**ACC Leave**"),

however, does not carry over from year to year and any unused Sick Time is not paid to the

applicable Employee at termination.  As the Debtors will continue to operate their businesses as

debtors in possession, Employees will be able to take their ACC Leave in the ordinary course of

business.

47.    By this Motion, the Debtors seek the authority to continue their ACC

Leave policy, including payment to satisfy any departing Employee's claims for unused

Vacation Time regardless of when such Vacation Time accrued.

(ii)    *Holidays*

48.    It is the Debtors' policy to provide all permanent full-time Employees

with several paid holidays (each, a "**Holiday**") per calendar year, including, but not limited to,

New Year's Day, Martin Luther King Day, Memorial Day, Independence Day, Labor Day,

Thanksgiving Day, Day after Thanksgiving, Christmas Eve, and Christmas Day.

(iii)    *Miscellaneous Paid Time-Off*

49.    In addition to the benefits described herein, the Debtors offer certain other

benefits to various groups of Employees, including, but not limited to, paid jury duty, military

leave, and paid bereavement leave to permanent full-time Employees, that the Debtors request

---

[12]    Additionally, eleven (11) of the Employees have accrued substantial Vacation Time that have not yet been
used, the value of which may exceed the $12,475 priority cap as outlined in 11 U.S.C. § 507.  By this
Motion, as set forth herein, the Debtors also seek the authority to honor all paid time off that was accrued
prepetition pursuant to the Vacation Time, when and if the Employees choose to use it.

authority to continue providing in the ordinary course of business (the "**Miscellaneous Paid Time-Off**"). The Debtors do not accrue Miscellaneous Paid Time-Off for their Employees.

50.     The Debtors believe these programs are important to maintaining employee morale and assisting in the retention of the Debtors' workforce. The Debtors submit that failing to honor such programs would adversely affect the Debtors' Employees. Therefore, the Debtors hereby seek authority to honor their obligations with respect to ACC Leave, Holidays and/or Miscellaneous Paid Time-Off (collectively, the "**Non-Working Days Policies**"), including (a) permitting Employees to use time accrued but unused under the Debtors' Non-Working Days Policies, and (b) paying, in their discretion, any amounts owed on account of the Non-Working Days Policies in the ordinary course of their businesses, regardless of when such amounts accrued.

D.    **Severance**

51.     Upon certain Employees' termination without cause, the Debtors have, on a case-by-case basis, provided such Employees with one (1) week pay for every year of service capped at four (4) weeks of pay (the "**Severance Policy**"). The Debtors hereby seek authority to continue to maintain and pay obligations arising under the Severance Policy during the pendency of these cases.[13] To the extent that any employees are terminated during these cases, the Debtors request authority to continue, on a case-by-case basis, the Severance Policy and to pay, in their discretion, obligations arising under the Debtors' Severance Policy to eligible non-insider Employees who are terminated without cause after the Petition Date.

---

[13]    The Debtors submit that the payment of certain prepetition obligations arising under the Severance Policy is in accordance with section 507(a)(4) of the Bankruptcy Code, which provides employees with a priority claim for "wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual[.]" 11 U.S.C. § 507(a)(4).

E.      **COBRA Obligations**

52.      Under sections 601 – 606 of the Employee Retirement Income Security Act of 1974 ("**ERISA**") and section 4980B of the Internal Revenue Code, an employer that maintains a group health plan must offer premium reductions and additional election opportunities for health benefits under the Consolidated Budget Reconciliation Act of 1986 ("**COBRA**"). COBRA provides continuation coverage rights to each qualified beneficiary whose losses are covered as a result of a qualifying event (such as termination of employment, divorce, death, disability, Medicare entitlement, or loss of dependent eligibility status).

53.      The Debtors have COBRA responsibilities (the "**COBRA Obligations**") with respect to existing COBRA qualified participants. The Debtors currently have thirty nine (39) former employees participating in a COBRA benefits plan. The Debtors' aggregate monthly premium costs for COBRA Obligations is approximately $5,000 per month for medical and dental coverage. The Debtors hereby seek authority to continue to maintain and pay obligations, including claims incurred prior to the Petition Date, relating to the COBRA Obligations. As of the Petition Date, the Debtors estimate that they owe approximately $3,500 in outstanding COBRA Obligations.

F.      **Banks and Payroll Accounts**

54.      The Debtors also request that the court: (a) authorize and direct any and all banks with which the Debtors maintain payroll or other accounts from which the Debtors make payments related to the Prepetition Employee Obligations (the "**Payroll Banks**") to receive, process, honor and pay all checks drawn on payroll, benefit and general disbursement accounts and fund transfers on account of the Prepetition Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments and the Debtors identify all checks that have been

issued, but not yet processed, attributable to Prepetition Employee Obligations in writing within two (2) business days of the date of the Proposed Order in respect of this Motion; and (b) authorize the Debtors to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected. Such relief is integral in order to implement the relief sought by this Motion.

## BASIS FOR RELIEF

55.     The Debtors request authority to pay the Prepetition Employee Obligations and related expenses in the ordinary course of their businesses. Any delay in paying any of their Employees could severely disrupt the Debtors' relationship with their Employees and irreparably harm their morale at the very time that Employee dedication, confidence, support and cooperation proves most critical. If the Debtors do not obtain immediate authority to pay the Prepetition Employee Obligations, the Debtors' operations may be severely impaired. At this critical stage, the Debtors cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure, or worse, inability to pay the Prepetition Employee Obligations.

56.     Accordingly, by this Motion, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and the "necessity of payment" doctrine, the Debtors seek authority to pay their outstanding Prepetition Employee Obligations. Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides in pertinent part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, this Court is authorized to grant the relief requested.

01:13977057.1

57.     "The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the Debtors is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989); see also, In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (noting that "necessity of payment doctrine . . . permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid") (citations and internal quotations omitted); In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987); 2 Collier on Bankruptcy ¶ 105.01 at 105-3 (L. King 15th ed. 1996) (purpose of section 105(a) of the Bankruptcy Code is to "assure the Bankruptcy Court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction"). This equitable common law principle "was first articulated by the United States Supreme Court in Miltenberger v. Logansport C. & S.W. R. Co., 106 U.S. 286 (1882), and is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule." In re Ionosphere Clubs, Inc., 98 B.R. at 175-76. "This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." Id. at 176; see In re Just For Feet, Inc., 242 B.R. 821, 825-26 (D. Del. 1999) ("[n]ecessity of payment doctrine recognizes that paying certain prepetition claims may be necessary to realize the goal of chapter 11 - a successful reorganization").

58.     Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay certain critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. See In re Columbia Gas Sys. Inc., 136 B.R. 930, 939 (Bankr. D. Del. 1992) (citing In re Lehigh & New England Ry. Co., 657

F.2d at 581 (recognizing that "[if] payment of a pre-petition claim 'is essential to the continued operation of [the debtor], payment may be authorized'")). Courts have recognized that the "necessity of payment" rule squarely applies where a debtor's employees must be paid on time to assure their continued service and loyalty during a chapter 11 case. E.g., Ionosphere Clubs, 98 B.R. at 174 (permitting Eastern Air Lines to pay its employees' prepetition wages, salaries, medical benefits and business expense claims under the "necessity of payment" doctrine). In a number of reported cases, debtors have been permitted to pay prepetition wages, salaries and employee benefits, even where those claims are substantial. See Chateaugay Corp., 80 B.R. at 281 (authorizing payment of employee wages and workers' compensation obligations aggregating in excess of $250 million and rejecting appeal of creditor that argued that the debtor should have been required to pay all similarly situated prepetition claimants); see also In re Gulf Air, Inc., 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (authorizing the debtor to pay certain prepetition employee claims for wages, health and life insurance and workers' compensation premiums). The court in Gulf Air found that such payments were in the best interests of creditors, the debtor and the debtor's employees and were essential to a successful reorganization. See Gulf Air, 112 B.R. at 153-54. The Debtors submit that, as illustrated below, application of the "necessity of payment" doctrine is wholly warranted in these cases.

59.     In order to achieve a successful reorganization, the Debtors require their Employees to work with the same or greater degree of commitment and diligence as they did prior to the Petition Date. The requested authority to continue to pay the Debtors' Employees and to maintain the current Employee Benefits Programs is necessary to ensure that the Debtors can retain personnel knowledgeable about the Debtors' businesses, and to provide an incentive

for the Debtors' Employees to continue to provide quality services to the Debtors at a time when they are clearly needed.

60.     The wage and benefit obligations for which the Debtors request authority to pay herein would constitute prepetition employee wage claims or prepetition claims for contributions to an employee benefits plan entitled to priority under sections 507(a)(4) and (5) of the Bankruptcy Code.  Courts have recognized future priority status as a valid basis for allowing the payment of wage claims.  See, e.g., In re Braniff, Inc., 218 B.R. 628, 633 (Bankr. M.D. Fla. 1998) (explaining that prepetition wage and wage-related claims are often allowed to be paid postpetition where such wages are subject to priority because "in all but the direst of circumstances, the debtor will ultimately pay the prepetition wages because of their very high priority [and, therefore, the] court authorizes their payment early in the case rather than requiring that the employees wait for payment at the end of the case").  Accordingly, the Debtors respectfully submit that granting the relief requested will not adversely affect the Debtors' other unsecured creditors.

61.     Similarly, the remittance of the Employee contributions toward Withholdings, the 401(k) Plan, the FSA Payments, or the HSA Payments also will not prejudice the Debtors' creditors because such withholdings are held in trust for the benefit of the related payees, and thus, do not constitute property of the Debtors' estates under section 541 of the Bankruptcy Code.  See Begier v. IRS, 496 U.S. 53, 65 (1990) (taxes such as excise taxes, FICA taxes and withholding taxes are property held by debtor in trust for another and as such do not constitute property of estate); In re Am. Int'l Airways, Inc., 70 B.R. 102, 103 (Bankr. E.D. Pa. 1987) (funds held in trust for federal excise and withholding taxes are not property of debtor's estate and, therefore, not available for distribution to creditors); Shipley Co., Inc. v. Darr (In re

Tap, Inc.), 52 B.R. 271, 278 (Bankr. D. Mass. 1985) (funds paid by employer to debtor for payment of employer's federal taxes were returnable to employer and not part of debtor's estate).

62.    The Debtors' Employees are essential to the success of the Debtors' businesses.  Consequently, it is critical that the Debtors continue the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date.  If the checks issued and fund transfers requested in payment of the Prepetition Employee Obligations are dishonored, or if such accrued obligations are not timely paid postpetition, the Debtors' Employees may suffer extreme personal hardship and certain of them may be unable to pay their daily living expenses.  Likewise, it would be inequitable to require the Debtors' Employees to bear personally the business expenses that were incurred on behalf of the Debtors with the expectation that they would be reimbursed.

63.    Authorizing, but not directing, the Debtors to pay the Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors, the creditors, and all parties in interest, and will enable the Debtors to continue to operate their businesses efficiently without disruption.  A significant deterioration in morale among Employees at this critical time would have a devastating impact on the Debtors, their customers, the value of the assets and businesses and the outcome of these cases.  The total amount to be paid if the relief sought herein is granted is modest compared with the size of the Debtors' estates and the importance of the Debtors' Employees to the restructuring effort. Further, many of these obligations are not immediate but, rather, will be satisfied over an extended period of time and, in some cases, without any monetary expenditures (e.g., accrued ACC Leave used by certain Employees).

64.    Pursuant to section 363 of the Bankruptcy Code, a bankruptcy court is empowered to authorize a chapter 11 debtor to expend funds in the bankruptcy court's discretion outside the ordinary course of business.  Payment of prepetition wage and salary claims in order to preserve and protect a debtor's business and to ultimately reorganize, retain their employees and maintain positive employee morale, even if such payment were deemed to be outside the ordinary course of business, is a sufficient business justification for such an authorization.  See Ionosphere Clubs, 98 B.R. at 175.

65.    Furthermore, with respect to obligations described herein, including, but not limited to, Employee Wage Claims and Withholdings, failure by the Debtors to fulfill such obligations could potentially result in claims being asserted directly against the Debtors' officers and directors.  Not only would such claims against the Debtors' officers and directors distract such individuals at a time when it is critical that their full attention be focused on the reorganization efforts of the Debtors, but such officers and directors would likely be entitled to indemnification by the estates.

66.    This Court has permitted the postpetition payment of prepetition wage and salary obligations on the first day or in the early stages of other chapter 11 bankruptcy cases. See, e.g., In re Highway Technologies, Inc., Case No. 13-11326 (KJC) (Bankr. D. Del. May 23, 2013); In re The Scooter Store Holdings, Inc., Case No. 13-10904 (PJW) (Bankr. D. Del. Apr. 16, 2013); In re SuperMedia Inc., Case No. 13-10545 (KG) (Bankr. D. Del. Mar. 19, 2013; In re Carey Limousine L.A., Inc., Case No. 12-12664 (BLS) (Bankr. D. Del. Sept. 27, 2012); In re WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); In re AFA Investment Inc., Case No. 12-11127 (MFW) (Bankr. D. Del. Apr. 3, 2012); In re Trident Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del. Jan. 30, 2012); In re Spheris Inc.,

Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 4, 2010); In re Telogy, LLC, Case No. 10-10206 (MFW) (Bankr. D. Del. Jan. 26, 2010).

68. Accordingly, for the foregoing reasons, the Debtors respectfully submit that cause exists for granting the relief requested herein.

68. The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

69. To successfully implement the foregoing, the Debtors respectfully seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

70. Notice of this Motion will be given to: (a) the U.S. Trustee; (b) Credit Suisse, AG, as the administrative agent under the Debtors' prepetition secured credit agreement and its counsel; (c) Wells Fargo, indenture trustee for the Debtors' senior unsecured notes and its counsel; (d) counsel to certain of the Debtors' senior unsecured noteholders; (e) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; and (f) the Debtors' existing banks. The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Order, substantially in the form annexed hereto as Exhibit A, granting the relief requested in the

Motion and such other and further relief for the Debtors as may be just and proper.

Dated: August 4, 2013          YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                              Edmon L. Morton (No. 3856)
                              Maris J. Kandestin (No. 5294)
                              Rodney Square
                              1000 North King Street
                              Wilmington, Delaware 19801
                              Telephone: (302) 571-6600
                              Facsimile: (302) 571-1253

                              emorton@ycst.com
                              mkandestin@ycst.com

                                -and-

                              WILLKIE FARR & GALLAGHER LLP
                              Matthew A. Feldman
                              Rachel C. Strickland
                              Daniel I. Forman
                              787 Seventh Avenue
                              New York, New York 10019
                              Telephone: (212) 728-8000
                              Facsimile: (212) 728-8111

                              mfeldman@willkie.com
                              rstrickland@willkie.com
                              dforman@willkie.com

                              *Proposed Co-Counsel to the Debtors and Debtors in Possession*

## Schedule 1

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| Arizona EMS Holdings, Inc. (AZ) (7244) | Rural/Metro of Brewerton, Inc. (NY) (0912) |
| Beacon Transportation, Inc. (NY) (4028) | Rural/Metro of California, Inc. (DE) (8164) |
| Bowers Companies, Inc. (CA) (6465) | Rural/Metro of Central Alabama, Inc. (DE) (5348) |
| ComTrans Ambulance Service, Inc. (AZ) (6923) | Rural/Metro of Central Colorado, Inc. (DE) (6583) |
| Corning Ambulance Service, Inc. (NY) (5659) | Rural/Metro of Central Ohio, Inc. (DE) (2407) |
| Donlock, Ltd. (PA) (0659) | Rural/Metro of Greater Seattle, Inc. (WA) (6902) |
| E.M.S. Ventures, Inc. (GA) (3254) | Rural/Metro of Indiana, L.P. (DE) (9954) |
| Eastern Ambulance Service, Inc. (NE) (7359) | Rural/Metro of New York, Inc. (DE) (0083) |
| Eastern Paramedics, Inc. (DE) (1102) | Rural/Metro of Northern California, Inc. (DE) (3227) |
| Emergency Medical Transport, Inc. (AZ) (3878) | Rural/Metro of Northern Ohio, Inc. (DE) (8398) |
| EMS Ventures of South Carolina, Inc. (SC) (4174) | Rural/Metro of Ohio, Inc (DE) (0488) |
| Gold Cross Ambulance Service of PA, Inc. (OH) (9869) | Rural/Metro of Oregon, Inc. (DE) (3435) |
| Gold Cross Ambulance Services, Inc. (DE) (4792) | Rural/Metro of Rochester, Inc. (NY) (0148) |
| Lasalle Ambulance, Inc. (NY) (4422) | Rural/Metro of San Diego, Inc. (CA) (4132) |
| Medical Emergency Devices and Services (Meds), Inc. (AZ) (2218) | Rural/Metro of Southern California, Inc. (DE) (1679) |
| Mercury Ambulance Service, Inc. (KY) (8659) | Rural/Metro of Southern Ohio, Inc. (OH) (9303) |
| Metro Care Corp. (OH) (3994) | Rural/Metro of Tennessee, L.P. (DE) (3714) |
| National Ambulance & Oxygen Service, Inc. (NY) (9150) | Rural/Metro Operating Company, LLC (DE) (7563) |
| North Miss. Ambulance Service, Inc. (MS) (4696) | San Diego Medical Services Enterprise, L.L.C. (CA) (4136) |
| Pacific Ambulance, Inc. (CA) (7781) | Sioux Falls Ambulance, Inc. (SD) (4797) |
| Professional Medical Transport, Inc. (AZ) (6661) | Southwest Ambulance and Rescue of Arizona, Inc. (AZ) (9229) |
| R/M Arizona Holdings, Inc. (AZ) (6302) | Southwest Ambulance of Casa Grande, Inc. (AZ) (2807) |
| R/M Management Co., Inc. (AZ) (3444) | Southwest Ambulance of New Mexico, Inc. (NM) (5701) |
| R/M of Tennessee G.P., Inc. (DE) (0819) | Southwest Ambulance of Southeastern Arizona, Inc. (AZ) (8415) |
| R/M of Tennessee L.P., Inc. (DE) (0821) | Southwest Ambulance of Tucson, Inc. (AZ) (3618) |
| RMC Corporate Center, L.L.C. (AZ) (4546) | Southwest General Services, Inc. (AZ) (7537) |
| Rural/Metro (Delaware) Inc. (DE) (1572) | SW General Inc. (AZ) (4455) |
| Rural/Metro Corporation (AZ) (4388) | The Aid Ambulance Company, Inc. (DE) (4432) |
| Rural/Metro Corporation (DE) (6929) | The Aid Company, Inc. (IN) (8091) |
| Rural/Metro Corporation of Florida (FL) (4668) | Towns Ambulance Service, Inc. (NY) (8281) |
| Rural/Metro Corporation of Tennessee (TN) (9245) | Valley Fire Service, Inc. (DE) (6188) |
| Rural/Metro Fire Dept., Inc. (AZ) (3445) | W & W Leasing Company, Inc. (AZ) (1806) |
| Rural/Metro Mid-South, L.P. (DE) (4413) | WP Rocket Holdings, Inc. (DE) (9609) |

## Schedule 2

### Debtors' Unions

| Union | Approximate Number of Employees in Union |
|---|---|
| *UEMSW/AFSCME Local 4* | *361* |
| *Local 763-Teamsters Sno/King* | *69* |
| *I.A.F.F. Local I-60* | *752* |
| *Knox Metro Fire Fighters Association* | *91* |
| *International Association of EMTs and Paramedics Local 083* | *124* |
| *Teamsters Union Local 375 - Buffalo* | *403* |
| *Salem EMT & Firefighters Local R12-30* | *60* |
| *Local 200C SEIU – Rochester* | *247* |
| *I.A.F.F. Local 3878* | *153* |
| *San Diego Dispatchers* | *23* |
| *Emergency Medical Local I-82* | *44* |
| *Knox EMS – NAGE/SCIU R5-421* | *316* |
| *SWA Fleet – Teamsters Local 104* | *23* |
| *NEMSA – San Diego EMS* | *399* |
| *Yuma EMS/Fire – UYCFA* | *57* |
| *Teamsters Local 962 – Valley Fire Services* | *42* |
| *BU – Old Pueblo Firefighters* | *166* |
| *Sno/King Nurses Teamsters 763 – RNs* | *13* |
| *Orlando Union R5-084* | *173* |
| *Local 200B SEIU* | *59* |
| *ICEP Arizona PMT* | *273* |
| *Eugene EMT & Paramedics* | *19* |
| *IAEP Seattle Dispatchers* | *12* |

01:13977056.1

| Union | Approximate Number of Employees in Union |
|-------|------------------------------------------|
| *Sumter EMT & Paramedics* | *19* |
| *UEMSW/ACFCME NorCal GT EMT/Medic* | *183* |
| *UEMSW/ACFCME Santa Clara County 911* | *333* |
| *UEMSW/ACFCME Santa Clara County 911 Admin* | *20* |

## EXHIBIT A

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
In re                                    :    Chapter 11
                                         :
Rural/Metro Corporation, et al., [1]     :    Case No. 13-11952 (    )
                                         :
                 Debtors.                :    (Joint Administration Pending)
-----------------------------------------------------x
```

### ORDER:  (I) AUTHORIZING DEBTORS TO PAY (A) PREPETITION EMPLOYEE WAGES, SALARIES AND OTHER COMPENSATION, (B) PREPETITION EMPLOYEE BUSINESS EXPENSES, AND (C) OTHER MISCELLANEOUS EMPLOYEE EXPENSES AND EMPLOYEE BENEFITS AND; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "**Motion**") of the debtors and debtors in possession in the

above-captioned cases (collectively, the "**Debtors**"), requesting entry of an order (the "**Order**"),

pursuant to sections 105(a), 363(b) and 507(a) of title 11 of the United States Code (the

"**Bankruptcy Code**") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"):  (i) authorizing, but not directing, the Debtors to pay (a) prepetition

employee wages, salaries and other compensation, (b) prepetition employee business expenses,

and (c) other miscellaneous employee expenses and employee benefits; and (ii) granting related

relief, as set forth therein; and upon the Declaration of Stephen Farber in Support of Chapter 11

Petitions and First Day Pleadings (the "**Farber Declaration**"); and due and sufficient notice of

the Motion having been given; and it appearing that no other or further notice need be provided;

and it appearing that the relief requested by this Motion is necessary to avoid immediate and

irreparable harm to the Debtors, and is in the best interests of the Debtors, their estates, their

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as Schedule 1 to the Declaration of Stephen Farber in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 2] and at www.donlinrecano.com/rmc.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

creditors and other parties in interest; and it appearing that the relief requested is essential to the

continued operation of the Debtors' businesses and the preservation of the value of their assets;

and the Court having jurisdiction over this matter pursuant to the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware dated as of February

29, 2012; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED and DECREED that:

1.      The Motion is granted to the extent set forth herein.

2.      Capitalized terms not otherwise defined herein have the meanings ascribed

to such terms in the Motion.

3.      The Debtors shall be and hereby are authorized (a) to pay, in their sole

discretion, the Prepetition Employee Obligations, including, but not limited to, Employee Wage

Claims and prepetition obligations that have accrued under the Employee Benefit Programs,

Employee Expense Obligations, and Independent Contractor Claims, (b) to pay costs and

expenses incidental to the payment of Prepetition Employee Obligations, including all

administration and processing costs and payments to outside professionals in order to facilitate

the administration and maintenance of the Debtors' programs and policies related to the

Prepetition Employee Obligations and (c) to remit all Withholdings to the appropriate third

parties, as and when such obligations are due, upon entry of this Order, in an aggregate amount

not to exceed $22 million.

4.      The Debtors shall be and hereby are authorized, in their sole discretion, to

honor and continue their Employee Benefit Programs that were in effect as of the Petition Date.

5.     The Debtors shall be and hereby are authorized, but not directed, to remit premiums to the applicable providers under the Employee Benefit Programs in the ordinary course of business.

6.     The Debtors shall be and hereby are authorized, in their sole discretion, to honor and continue their Non-Working Days Policies that were in effect as of the Petition Date.

7.     The Debtors shall be and hereby are authorized, but not required, to pay costs and expenses arising under the Severance Policy in the ordinary course of business, and the Debtors shall be and hereby are authorized to maintain, at their discretion, the Severance Policy for non-insider Employees terminated after the Petition Date.  Nothing contained herein, however, shall authorize the Debtors to pay costs and expenses under the Severance Policy to any insider Employees, except as otherwise provided by further order of this Court.

8.     Former employees shall retain the right to coverage under the Debtors' Health Plans in accordance with the requirements of COBRA, and the Debtors are authorized, but not directed, to pay any portion of the amounts due under the Health Plans, if any, with respect to such former employees.

9.     No payments made with respect to Employee Wage Claims or the Non-Working Days Policies pursuant to this Order shall exceed the $12,425 per Employee priority cap of section 507(a)(4) of the Bankruptcy Code; provided, however, that the Debtors are permitted to cash out unpaid time with respect to the Non-Working Days Policies upon termination of an Employee in excess of the cap set forth in section 507(a)(4) of the Bankruptcy Code if applicable state law requires such payment; provided, further that nothing contained herein shall prejudice the Debtors' right to seek approval to pay the Non-Working Days Policies time in excess of the statutory cap.

10.    All Payroll Banks shall be and hereby are authorized to receive, process, honor and pay all checks drawn on the Debtors' accounts with the Payroll Banks and fund transfers on account of the Prepetition Employee Obligations, whether presented before or after the Petition Date, provided that (a) sufficient funds are on deposit in the applicable accounts to cover such payments, and (b) within two (2) business days from the date hereof, the Debtors provide the Banks with a list of checks that are outstanding as of the Petition Date, which relate to Prepetition Employee Obligations.

11.    The Debtors shall be and hereby are authorized to issue, in their sole discretion, new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected; provided, however, that any check drawn or issued by the Debtors before the Petition Date may be honored by any Payroll Bank to the extent provided herein or by another order of this Court.

12.    Notwithstanding any other provision of this Order, no Payroll Bank that honors a prepetition check or other item drawn on any account that is the subject of this Order: (a) at the direction of the Debtors; (b) in a good faith belief that the Court has authorized payment of such prepetition check or item; or (c) as the result of a good faith error made despite implementation of reasonable item handling procedures, shall be deemed to be liable to the Debtors or their estates or otherwise in violation of this Order.

13.    Nothing contained herein or in the Motion shall impair the Debtors' ability to contest the validity and amount of any payment made pursuant to this Order.

14.    Neither this Order nor any payment or performance by the Debtors authorized hereunder shall be deemed an assumption of any executory contract, including any

Employee Benefit Programs, or otherwise affect the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract with an Employee.

15.     Notwithstanding anything to the contrary contained herein, (a) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any order regarding debtor-in-possession financing or the use of cash collateral, and (b) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtors' estates shall be and is subject and subordinate to any and all claims, liens, security interests and priorities granted to the Debtors' secured prepetition and postpetition lenders (and their respective agents) pursuant to any other order of the Court (including any order regarding debtor-in-possession financing or the use of cash collateral), and no payment shall be made on any such claim except as permitted under any order regarding debtor-in-possession financing or the use of cash collateral.

16.     Authorizations given to the Debtors in this Order empower but do not direct the Debtors to effectuate the payments specified herein, and the Debtors shall retain the business judgment to make or not make such payments, in all instances subject to the condition that funds are available to effect any payment.  In no event shall any person (director, creditor, officer, manager, member, Employee or otherwise of the Debtors) be personally liable for any amounts authorized for payment herein but not paid, and nothing in this Order shall be deemed to increase, reclassify, elevate to administrative expense status or otherwise effect such claims.

17.     Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.  The requirements of Bankruptcy Rules 6004(a) and 6004(h) are waived.

18.   This Court shall retain jurisdiction over any and all matters arising from or related to the implementation or interpretation of this Order.

Dated: _____, 2013
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE