IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------x
In re                                             :    Chapter 11
                                                  :
Rural/Metro Corporation, et al.,[1]               :    Case No. 13-11952 (    )
                                                  :
                        Debtors.                  :    (Joint Administration Pending)
--------------------------------------------------------x

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004, AUTHORIZING DEBTORS TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS AND SUPPLIERS OF GOODS ENTITLED TO ADMINISTRATIVE PRIORITY

The debtors and debtors in possession in the above-captioned cases (collectively,

the "**Debtors**") hereby move for entry of an interim order (the "**Proposed Interim Order**") and

a final order (the "**Proposed Final Order**," and, together with the Proposed Interim Order, the

"**Proposed Orders**"), pursuant to sections 105(a), 363(b), 503(b), 507(a), 1107(a) and 1108 of

title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors to pay

prepetition claims of critical vendors, including certain claims of suppliers of goods entitled to

administrative priority (the "**Motion**").  In addition, the Debtors are seeking to schedule a final

hearing (the "**Final Hearing**") on the Motion to be held on or before the day that is twenty-five (25)

days after the Petition Date (as defined below).  In support of the Motion, the Debtors rely upon

and incorporate by reference the Declaration of Stephen Farber In Support of Chapter 11

Petitions and First Day Pleadings (the "**Farber Declaration**"), which was filed with the Court

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

concurrently herewith. In further support of the Motion, the Debtors, by and through their undersigned proposed co-counsel, respectfully represent:

## BACKGROUND

1.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes. As of the date hereof, no trustee, examiner or official committee has been appointed in any of the Debtors' cases.

2.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Farber Declaration.

## JURISDICTION

3.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363(b), 503(b), 507(a), 1107(a) and 1108 of the Bankruptcy Code, as complemented by Bankruptcy Rules 6003 and 6004.

## RELIEF REQUESTED

4.      In the ordinary course of operations, the Debtors rely on certain vendors for the delivery of certain goods and services. By this Motion, the Debtors seek entry of the Proposed Orders, the forms of which are annexed hereto as Exhibits B and C, authorizing the

01:13977046.1

- 2 -

Debtors, in their sole discretion, to pay prepetition amounts (the "**Critical Vendor Claims**") due and owing to certain vendors that provide services and materials essential to the Debtors' business operations (the "**Critical Vendors**").  Certain of such Critical Vendor Claims are entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code, to the extent they represent the value of goods received by the Debtors within the twenty (20) days prior to the Petition Date.  As of the Petition Date, the Debtors estimate that the Critical Vendor Claims total approximately $6,000,000.[2]  The Proposed Interim Order, if entered, will grant the Debtors the authority to pay only a portion of the Critical Vendor Claims up to a maximum of $3,000,000.  The Debtors believe this limited relief requested on an interim basis is the minimum amount necessary to avoid the immediate and irreparable harm that would befall the Debtors' estates if no Critical Vendor Claims were able to be paid until the Final Hearing.  While the Debtors are seeking limited relief on an interim basis, they submit that the full relief requested pursuant to the Proposed Final Order is critical to maximizing the value of the Debtors' estates beyond the initial interim period.

A.    Identification of Critical Vendors

5.    To ensure that only those vendors that provide goods and services that are actually essential to the Debtors' remaining business operations are the subject of the relief requested herein, the Debtors conducted an extensive analysis and review of their immediate business needs.  In doing so, the Debtors evaluated the following criteria:  (a) whether the vendor in question is a sole source provider; (b) whether the Debtors receive advantageous pricing or other terms from a vendor such that replacing the vendor postpetition would result in

---

[2]    Further, approximately $1,500,000 of the Critical Vendor Claims represent obligations owed in respect of goods that the Debtors received in the ordinary course of business within twenty (20) days prior to the Petition Date, which are entitled to administrative priority under sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code.

significantly higher costs to the Debtors; (c) whether quality requirements, customer specifications, or relevant state and local authority specifications prevent the Debtors from obtaining products or services from alternative sources within a reasonable timeframe to prevent any cessation of vital emergency services; (d) whether, if a vendor is not a sole source provider, the Debtors have sufficient product inventory or in-house capabilities to continue operations while a replacement vendor is found and put in place; (e) whether a vendor is otherwise contractually obligated to continue to provide goods or services to the Debtors; and (f) whether a vendor is likely to refuse to ship product or provide services to the Debtors postpetition if its prepetition balances are not paid. The Debtors are confident that this process has appropriately identified only those vendors that are critical to the estates and their near-term operational requirements.[3]

6.      Based on the foregoing considerations, the Debtors identified Critical Vendors whose cessation of services or provision of goods could cripple in short order the Debtors' businesses and, therefore, result in irreparable harm. The Debtors believe that the Critical Vendors will refuse to supply the Debtors postpetition unless some or all of these claims are paid, and that immediate replacement of the Critical Vendors would be impracticable or, in some cases, impossible. Without authority to pay the Critical Vendors, the Debtors could be

---

[3]    As the Debtors believe that keeping the Critical Vendor list confidential may assist them in reducing the number of prepetition claims of Critical Vendors that they must pay now in order to continue receiving the key services described below, a schedule of the Critical Vendors has not been filed with this Motion. Instead, a schedule has been or will be provided on a confidential basis to: (a) the United States Trustee for the District of Delaware (the "**U.S. Trustee**"); (b) counsel to the agents for the Debtors' prepetition senior secured lenders; (c) Wells Fargo, indenture trustee for the 10.125% Senior Notes due 2019 issued under (i) that certain Indenture dated as of June 30, 2011 among WP Rocket Merger Sub Inc., Rural/Metro, the guarantors party thereto and Wells Fargo, as Trustee, and (ii) that certain Indenture dated as of February 3, 2012 among Rural/Metro, the guarantors party thereto and Wells Fargo, as Trustee; and (d) upon request, the chambers of the United States Bankruptcy Judge assigned to these cases. In addition, upon request, a copy of this schedule will be provided to counsel to the official committee of unsecured creditors that may be appointed in these cases (the "**Committee**"). Due to the sensitivity of the list, the copy provided to counsel for the Committee shall be transmitted for "Professional Eyes Only."

01:13977046.1

forced to suspend certain operations immediately, which could result in an inability to provide the emergency services contracted for by the Debtors' municipal customers. The goods and services provided by the Critical Vendors are described in greater detail below.

7.      The Debtors have bifurcated the relief requested herein into the Proposed Interim Order and the Proposed Final Order to allow sufficient time for a committee to be appointed and to provide parties-in-interest the opportunity to review the requested relief before the Final Hearing.

8.      Several aspects of the emergency services industry require that the Debtors maintain relationships with a variety of critical vendors and underscore the importance of the relief requested herein. First, there are very few individual suppliers of the many specialty medical products required by the Debtors' ambulance service operations. Also, as a result of the limited supply, it is not uncommon for the Debtors to have to place orders with certain suppliers far in advance. Second, many of the supplies and equipment that the Debtors receive are specially tailored to the specific requirements of individual communities, certain local hospitals and other healthcare institutions. Replacing vendors with this institutional knowledge would be time consuming and detrimental to the Debtors' reorganization efforts. Third, several of the Critical Vendors are the sole source providers of their respective materials, providing goods to the Debtors in multiple jurisdictions. Therefore, losing a single Critical Vendor relationship would disrupt the Debtors' operations in several locations nationwide.

9.      Fourth, and most importantly, the emergency transport services industry— perhaps more than any other industry—is predicated on timeliness, efficiency and synchronization, where one hiccup can derail the entire process. For example, if the Debtors experience any delay in the delivery of medical supplies or the maintenance of their vehicles, the

Debtors' would not be able to continue providing services to municipalities, counties, fire districts, government agencies, hospitals, nursing homes, specialty healthcare facilities and individual patients in 21 states and nearly 700 communities. Such delays would not only put lives in jeopardy, but also hamper the Debtors' reorganization efforts. For all of the foregoing reasons, the Debtors identified numerous vendors for which the relief requested herein is justified and essential.

B.    Categories of Critical Vendors

**1.    Medical Supplies Critical Vendors**

10.    Certain Critical Vendors (the "**Medical Supplies Critical Vendors**") provide medical supplies that are essential to the Debtors' operations — particularly their emergency response sector. Several of the Debtors' vehicles are fully stocked with the medical supplies necessary to assist in the transport and care of the Debtors' patients. Such supplies include oxygen tanks, needles, epi pens, cardiovascular medication (such as epinephrine, atropine, beta blockers, and aspirin) and respiratory medications (such as abluterol). Accordingly, the Medical Supplies Critical Vendors play a vital role in the Debtors' ability to administer medications and intravenous solutions in addition to other emergency response services.

11.    Moreover, certain of the Medical Supplies Critical Vendors are sole source providers of their respective materials and cannot be easily replaced by smaller suppliers, or at competitive prices. In addition, many of the medical supplies and equipment provided by the Medical Supplies Critical Vendors are tailored to the specific requirements of certain local hospitals. Having to replace vendors with this institutional knowledge would be time consuming and would delay the Debtors' reorganization efforts. Therefore, the Debtors believe that if they fail to pay the Critical Vendor Claims owed to the Medical Supplies Critical Vendors

on a timely basis, existing relationships with such vendors would be negatively impacted, and many, if not all of these vendors would stop shipping entirely. The cessation of shipments from the Medical Supplies Critical Vendors would have an immediate and devastating impact on the Debtors' businesses, especially their emergency response division.

### 2.    Equipment Supplies Critical Vendors

12.    Other Critical Vendors provide non-medical supplies and technical equipment that are essential to the Debtors' operations (the "**Equipment Supplies Critical Vendors**"). As one of the nation's largest providers of emergency services, the Debtors' operations—in particular, their fleet of approximately 2,500 vehicles—must be fully equipped at all times with the equipment necessary to administer first aid and basic medical treatment. These materials include two-way radios, blankets, linens , towels, bandages, triage bags, masks, gloves, gowns, stretchers, gurneys and wheelchairs. In addition, the Debtors' advanced life support ambulances are specially equipped with cardiac monitors and defibrillators, pacemakers, nebulizers, advanced airway equipment and oxygen delivery systems. These supplies are necessary for the Debtors' crew members to deploy portable life support equipment, ascertain a patient's medical condition and, if required, administer live-saving interventions, including tracheal intubation, cardiac monitoring, defibrillation of certain cardiac dysrhythmias and the administration of medications and intravenous solutions under the direction of a physician. Additional equipment is also needed in connection with the Debtors' fire protection services, such as helmets and axes.

13.    Given that the Debtors do not have ample time to immediately replace these vendors, and given that any such replacement would be costly, the loss of the Debtors' Equipment Supplies Critical Vendors could be devastating to the Debtors' estates, creditors and other parties in interest. Moreover, many of these suppliers, like the Medical Supplies Critical

Vendors, provide goods that are tailored to the specific needs of certain hospitals and other healthcare institutions. Bringing in a new vendor to supply the Debtors' specialized equipment would involve extensive training of new personnel. Even if the Debtors desired to accommodate such an endeavor, the resulting value-eroding costs of implementation would derail the company's restructuring efforts. Simply put, the services rendered by the Equipment Supplies Critical Vendors are necessary to ensure that the Debtors operate at maximum efficiency. Therefore, due to the critical need to mobilize the Debtors' fleet, the continued provision of supplies and equipment by the Equipment Supplies Critical Vendors is essential to the Debtors' efforts to continue uninterrupted operations and to maximize the value of their assets.

### 3.    Fleet Critical Vendors

14.    The Debtors utilize various third party mechanics to provide essential maintenance to the Debtors' ambulances and specialized vehicles, and the Debtors maintain relationships with various parts dealers that are familiar with the Debtors' needs and offer bulk pricing discounts. These Critical Vendors (the "**Fleet Critical Vendors**") provide vital assistance to the Debtors in connection with the continued operation of the Debtors' fleet of vehicles. The Debtors operate approximately 2,500 vehicles, which include ambulances, wheelchair vans, fire apparatus vehicles and other support vehicles, all of which require routine and non-routine maintenance and replacement parts. The Debtors' entire business model is dependent on the successful, uninterrupted operation of their fleet. The Debtors use a combination of in-house and outsourced maintenance services to maintain their fleet to ensure maximum efficiency in each particular market. The Debtors' ability to maintain their current relationships with their preferred mechanics is critical to ensuring the Debtors receive the fastest and most reliable service possible on their vehicles.

15.    In addition to the foregoing, often the Fleet Critical Vendors remove the vehicles they are repairing from the Debtors' facilities.  Because the value of the equipment held by the Fleet Critical Vendors greatly outweighs the amount of their prepetition claims, the Debtors believe that it is advisable to satisfy certain prepetition claims to avoid the assertion of possessory liens by certain of their Fleet Critical Vendors under applicable state law with respect to any goods in their possession.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code,[4] is expressly excluded from the automatic stay otherwise imposed by section 362(a) of the Bankruptcy Code.  Therefore, notwithstanding the automatic stay, many of the Fleet Critical Vendors may be entitled to assert and perfect liens against the Debtors' property, which would entitle them to payment ahead of other general unsecured creditors in any event, and may hold the property subject to the asserted liens pending payment, to the direct detriment of the communities the Debtors serve, the Debtors' estates and their creditors.

16.    Certain of the Fleet Critical Vendors also provide spare parts and replacement tires, among other things, to the Debtors.  The Debtors enjoy bulk discounts with many of these vendors, in some cases paying 30% below market terms.  Furthermore, the Debtors cannot waste precious time and resources sourcing spare parts from alternative vendors, especially during their bankruptcy cases where every distraction from their business operations and restructuring efforts will be costly.  While there may be alternative vendors that could provide comparable parts, establishing new relationships is cost prohibitive and would disrupt

---

[4]    Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection . . . ." 11 U.S.C. § 546(b)(1)(A).

the Debtors' operations by creating administrative delays in replacing hundreds of accounts nationwide.

**4.    Information Technology Critical Vendors and Collection Agencies**

17.    As a national provider of ambulance and fire protection services in 21 states and nearly 700 communities, the Debtors' operations depend on precise synchronization. In this respect, the Debtors benefit greatly from third-party vendors (the "**IT Critical Vendors**"), which provide electronic patient records, automatic billing and dispatch services.

18.    The Debtors' dispatch centers utilize sophisticated communications systems to direct ambulance deployment and utilization in response to emergency medical calls. Efficient communication and disbursement of the Debtors' fleet is essential to their business operations. The equipment that the IT Critical Vendors supply, maintain and regularly service (with the support of certain IT personnel provided by the IT Critical Vendors) analyze data on traffic patterns, demographics, usage frequency and other factors to determine optimal ambulance deployment and selection through the use of their computer-aided dispatch systems, as well as automated vehicle locator technology in the vehicles to enhance the Debtors' dispatch system. In emergency response situations, the agent that receives emergency calls either dispatches the Debtors' ambulances directly from the public communication center or communicates information regarding the location and type of medical emergency to the Debtors' communication center, which in turn dispatches ambulances to the scene. The Debtors' communication systems allow the ambulance crew to communicate directly with the destination hospital to alert medical personnel of the arrival of a patient and a patient's condition and to receive instructions directly from emergency department personnel on specific pre-hospital medical treatment. These systems also facilitate coordination with other emergency service providers, such as the appropriate police and fire departments that also may be responding to a

call. There are few, if any, replacements available for the IT Critical Vendors where the Debtors operate, and any replacement would be costly and disruptive to the Debtors' ongoing operations. The Debtors must continue to receive the services from the IT Critical Vendors in order to ensure their ability to operate efficiently.

19.    In addition to directing ambulance deployment, the Debtors' computer-aided dispatch systems act as a repository for certain patient demographic information that is ultimately used in the Debtors' billing process. This information is transferred electronically to the Debtors' billing system and provides an accurate and complete record with which to obtain proper reimbursement. The Debtors believe that the continued combination of systems used in the dispatch, patient care and billing processes not only ensures the best patient care, but also allows the Debtors to maximize reimbursement for their services through fewer denials, better documentation of medical necessity and reduced uncompensated care.

20.    This integrated billing, records and dispatch service enhances the Debtors' collection efforts. The Debtors maintain five billing processing centers across the United States as well as a centralized-self pay collection center (the "**Collection Centers**"). The Debtors also maintain relationships with outsourced billing and collecting firms (the "**Collection Agencies**") that assist the Collection Centers with submitting claims to third-party payors and collecting amounts due from such payors. The Collection Centers and the Collection Agencies provide an invaluable service to the Debtors by collecting payment from Medicare and Medicaid, insurance companies and individual patients. For the reasons cited above, the synergy between the IT Critical Vendors, Collection Centers and Collection Agencies are vital to the success of the Debtors' reorganization efforts as failure to collect payments for services rendered will dramatically affect the Debtors' revenue streams.

C.      Proposed Terms and Conditions of Payment of Critical Vendor Claims

21.     The Debtors respectfully request that the Court authorize, but not direct, the Debtors to pay those Critical Vendor Claims that the Debtors, in their sole discretion, determine must be paid in order to continue receiving the goods and services provided by the Critical Vendors.  Subject to the terms set forth below, the Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to supply goods and services to the Debtors on the most favorable trade terms that such Critical Vendor offered to the Debtors in the twelve months prior to the Petition Date (the "**Customary Trade Terms**").  The Debtors reserve the right to negotiate new (more favorable) trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

22.     To ensure that the Critical Vendors continue to deal with the Debtors on the Customary Trade Terms, the Debtors propose that a letter agreement (a "**Trade Agreement**")[5] substantially in the form attached hereto as Exhibit A be sent to the Critical Vendors for execution, together with a copy of the Proposed Interim Order (or the Proposed Final Order, if such order has been entered) granting this Motion.

23.     The Debtors propose that each Trade Agreement include, without limitation:

(a)     the amount of the relevant Critical Vendor's estimated Critical Vendor Claims (and the timing of payment thereof), accounting for any setoffs, other credits and discounts thereto; provided, however, such amount shall be used only for the purposes of determining such Critical Vendor's claim under the Proposed Orders and shall not be deemed a claim allowed by the Court, and the rights of all

---

[5]     The Debtors' entry into a Trade Agreement shall not change the nature or priority of the underlying Critical Vendor Claims, and shall not constitute an assumption or rejection of any executory contract or unexpired lease, or an admission that any such agreement is an executory contract or unexpired lease, between a Debtor and a Critical Vendor.

interested persons to object to such claim shall be fully preserved until further order of this Court;

(b) the Customary Trade Terms applicable to such Critical Vendor, or such other terms as the Critical Vendor and the Debtors may agree on that are at least as favorable as those that were in effect immediately prior to the Petition Date, and the Critical Vendor's agreement to provide goods and/or services to the Debtors pursuant to such terms during the pendency of the Debtors' bankruptcy cases, unless the Debtors fail to make timely payments under the agreed-upon terms;

(c) the Critical Vendor's agreement not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "**Lien**"), claim for reclamation (a "**Reclamation Claim**"), or claim under section 503(b)(9) of the Bankruptcy Code (a "**503(b)(9) Claim**") regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Critical Vendor by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent the Critical Vendor has already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, the Critical Vendor shall take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim;

(d) the Critical Vendor's acknowledgment that it has reviewed the terms and provisions of the Proposed Orders sought hereby and is bound thereby; and

(e) the Critical Vendor's agreement that it will not separately seek payment for Reclamation Claims outside the terms of the Proposed Orders sought hereby unless the Critical Vendor's participation in the program to pay Critical Vendor Claims pursuant to such Proposed Order is terminated by the Debtors.

24.     By this Motion, the Debtors seek only the authority to enter into Trade Agreements when the Debtors determine, in their sole discretion, that payment of such Critical Vendor Claims is necessary and that such agreements are advisable. The Debtors also hereby seek authority to make payments in the ordinary course on account of Critical Vendor Claims, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment,

01:13977046.1

that failure to pay such Critical Vendor Claims in the ordinary course is likely to result in irreparable harm to the Debtors' business operations and that they are not reasonably likely to be able to reach agreement on a Trade Agreement with the relevant Critical Vendor.[6]

25.    In the event a Critical Vendor refuses to supply goods and services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its Critical Vendor Claim, or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors hereby seek authority, in their discretion and without further order of the Court:  (a) to declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated (if applicable); (b) to declare that payments made to such Critical Vendor on account of its Critical Vendor Claims be deemed to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of this Court or action by any person or entity; and (c) to recover any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceeded the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense.  In sum, if a Trade Agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms (or such other terms as have been agreed by the parties) following receipt of payment on its Critical Vendor Claim, the Debtors seek authority to return the parties to the positions they held immediately prior to the entry of the Proposed Interim Order approving this Motion with respect to

---

[6]    Nothing in this Motion should be construed as a waiver by any of the Debtors of their rights to contest any claim of a Critical Vendor under applicable law.

all prepetition claims.  In addition, the Debtors reserve the right to seek damages or other appropriate

remedies against any breaching Critical Vendor.

26.    The Debtors further propose that any Trade Agreement terminated as a

result of a Critical Vendor's refusal to comply with the terms thereof may be reinstated in the

Debtors' sole discretion if:

(a)    the underlying default under the Trade Agreement is fully cured by
the Critical Vendor not later than five (5) business days following
the Debtors' notification to the Critical Vendor of such a default;
or

(b)    the Debtors, in their discretion, reach a favorable alternative
agreement with the Critical Vendor.

27.    Some of the Critical Vendors, including, but not limited to, the Fleet

Critical Vendors, may also have obtained mechanics' liens, possessory liens, or other similar

state law trade liens ("**Trade Liens**") on the Debtors' (or other parties') assets, based upon

Critical Vendor Claims held by such vendors.  As a further condition of receiving payment on a

Critical Vendor Claim, a Critical Vendor must agree to take whatever action is necessary to

remove, to the Debtors' satisfaction, any such Trade Lien, at such Critical Vendor's sole cost

and expense.

28.    The Debtors also request that the Court: (a) authorize and direct any and

all banks with which the Debtors maintain accounts that the Debtors use to make payments

related to the Critical Vendor Claims to receive, process, honor and pay all checks drawn on

such accounts and fund transfers for payments with respect to the Critical Vendor Claims,

whether presented before or after the Petition Date, provided that sufficient funds are on deposit

in the applicable accounts to cover such payments; and (b) authorize the Debtors to issue new

postpetition checks or effect new postpetition fund transfers on account of the Critical Vendor

Claims to replace any prepetition checks or fund transfer requests that may be dishonored or rejected. Such relief is integral in order to implement the relief sought by this Motion.

## FINAL HEARING DATE

29.    The Debtors request that the Court schedule a final hearing on the Motion on or before the day that is twenty-five (25) days after the Petition Date.

## BASIS FOR RELIEF

30.    The relief requested in this Motion is supported by several provisions of the Bankruptcy Code that authorize a debtor to honor prepetition obligations in certain circumstances. Courts have recognized each of these statutory provisions as valid authority for such payments.

A.    This Court May Authorize Payment of the Critical Vendor
       Claims Pursuant to Sections 105 and 363 of the Bankruptcy Code

31.    The relief requested in this Motion is authorized pursuant to sections 105 and 363 of the Bankruptcy Code. See In re MPC Computers, LLC, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to section 363 of the Bankruptcy Code, the payment of prepetition claims of certain suppliers). Section 363(b)(1) of the Bankruptcy Code authorizes the trustee to use property of the estate other than in the ordinary course of business after notice and a hearing. Furthermore, the debtor's decision to use property of the estate outside the ordinary course of business must be based upon sound business judgment. See In re Chateaugay Corp., 973 F.2d 141, 143 (2d. Cir. 1992); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d. Cir. 1983). The relief sought herein contemplates payments to be made to Critical Vendors who agree to extend postpetition credit or other valuable consideration in exchange for such payment. As a result, the payment

of such Critical Vendor Claims is consistent with and appropriate under sections 105 and 363 of the Bankruptcy Code.

32.    Pursuant to Bankruptcy Rule 6003(b), authorization to utilize property of the estate, "including a motion to pay all or part of a claim that arose before the filing of the petition . . .[,]" may not be granted in the first twenty days of a bankruptcy case, except "to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). As detailed above, the goods and services that the Critical Vendors provide are integral to the Debtors' uninterrupted operations, and the ability to pay the Critical Vendor Claims during the first twenty five (25) days of these chapter 11 cases is necessary to avoid immediate and irreparable harm to the Debtors. For the reasons set forth herein, the Debtors submit that the requirements of Bankruptcy Rule 6003 have been satisfied.

33.    Courts in this Circuit and others have granted similar critical vendor relief in other bankruptcy cases. See, e.g., In re Synagro Technologies, Inc., Case No. 13-11041 (BLS) (Bankr. D. Del. May 23, 2013); In re Ormet Corp., Case No. 13-10334 (MFW) (Bankr. D. Del. Mar. 20, 2013); In re School Specialty, Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Feb. 25, 2013); In re AES Eastern Energy, L.P., Case No. 11-14138 (KJC) (Bankr. D. Del. Jan. 26, 2012); In re Appleseed's Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); In re Constar International, Inc., Case No. 11-10109 (CSS) (Bankr. D. Del. Jan. 13, 2011); In re American Safety Razor Co., LLC, Case No. 10-12351 (MFW) (Bankr. D. Del. July 30, 2010); In re Middlebrook Pharmaceuticals, Inc., Case No. 10-11485 (MFW) (Bankr. D. Del. May 4, 2010).

B.    The Court May Rely on the "Necessity of Payment"
       Doctrine and Its General Equitable Powers to Grant The Motion

34.    The "doctrine of necessity" or "necessity of payment" rule "is a well-settled doctrine that recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989); see also In re Financial News Network, Inc., 134 Bankr. 732, 736 (Bankr. S.D.N.Y. 1991) (to invoke the doctrine, debtor must show that the payment is "critical to the debtor's reorganization"). This doctrine is consistent with the paramount goal of chapter 11 — "facilitating the continued operation and rehabilitation of the debtor." In re Ionosphere Clubs, 98 B.R. at 176.

35.    The court's general equitable powers are codified in section 105(a) of the Bankruptcy Code, which empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. at 175. Under section 105(a) of the Bankruptcy Code, a court "can permit pre-plan payment of a prepetition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); see also In re Chateaugay Corp., 80 B.R. 279, 285-86 (S.D.N.Y. 1987). Maintaining access to the goods and services supplied by the Critical Vendors is absolutely critical to maximizing the value of the Debtors' assets and is in the best interests of the Debtors' estates and their creditors. That access would be jeopardized by non-payment of the Critical Vendor Claims. Hence, granting the Debtors authority to pay the Critical Vendor Claims is vital to ensuring that the Debtors continue to

receive the goods and services required for operations.  This Court should therefore exercise its

equitable powers to grant the relief requested in this Motion.

C.      Payment of Certain Critical Vendor Claims Is Justified
        Pursuant to Section 503(b)(9) of the Bankruptcy Code

            36.    Furthermore, the Debtors have received goods from certain Critical

Vendors in the ordinary course of business within twenty (20) days prior to the Petition Date.

Under section 503(b)(9) of the Bankruptcy Code, a claim shall be accorded administrative

expense priority where such claim is for the value of any goods received by the debtor within 20

days before the Petition Date if such goods were sold to the debtor in the ordinary course.  11

U.C.S. § 503(b)(9).  Furthermore, under section 507(a)(2) of the Bankruptcy Code, administrative

expenses allowed under section 503(b)(9) of the Bankruptcy Code are granted priority status.  See

11 U.S.C. § 507(a)(2).  Therefore, the Debtors must pay these claims in full to confirm a plan of

reorganization.  See 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to

priority under section 507(a)(2) of the Bankruptcy Code).

            37.    A substantial amount of the Critical Vendor Claims the Debtors seek to pay

by this Motion are entitled to priority status under sections 503(b)(9) and 507(a)(2) of the

Bankruptcy Code.  As of the Petition Date, the Debtors estimate that such Critical Vendor

Claims total approximately $1,500,000.  Accordingly, payment of such Critical Vendor Claims

should affect only the timing, and not the priority or amount, of payment to the applicable

Critical Vendors, and will not prejudice the Debtors' other stakeholders.

            38.    Courts in this Circuit and others have approved the payment of similar

claims pursuant to section 503(b)(9) of the Bankruptcy Code.  See, e.g., In re School Specialty,

Inc., Case No. 13-10125 (KJC) (Bankr. D. Del. Feb. 25, 2013); In re Overseas Shipholding

Group, Inc., Case No. 12-20000 (PJW) (Bankr. D. Del. Dec. 7, 2012); In re Javo Beverage

01:13977046.1

- 19 -

Company, Inc., Case No. 11-10212 (BLS) (Bankr. D. Del. Jan. 25, 2011); In re Appleseed's

Intermediate Holdings LLC, Case No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011); In re

Leslie Controls, Inc., Case No. 10-12199 (CSS) (Bankr. D. Del. Aug. 9, 2010); In re Trade

Secret, Inc., Case No. 10-12153 (KG) (Bankr. D. Del. July 7, 2010); In re Middlebrook

Pharmaceuticals, Inc., Case No. 10-11485 (MFW) (Bankr. D. Del. May 4, 2010); In re SP Wind

Down, Inc., Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 4, 2010).

      39.    Accordingly, for all of the foregoing reasons, the Debtors submit that

cause exists for granting the relief requested herein.  To successfully implement the foregoing,

the Debtors respectfully seek a waiver of the notice requirements under Bankruptcy Rule

6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

## NOTICE

      40.    Notice of this Motion will be given to:  (a) the U.S. Trustee; (b) Credit

Suisse, AG, as the administrative agent under the Debtors' prepetition secured credit agreement

and its counsel; (c) counsel to Wells Fargo,  indenture trustee for the Debtors' senior unsecured

notes and its counsel; (d) counsel to certain of the Debtors' senior unsecured noteholders;

(e) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; and (f) the

Debtors' existing banks.  The Debtors submit that, under the circumstances, no other or further

notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request: (i) entry of an order

substantially in the form of the Proposed Interim Order annexed hereto as <u>Exhibit B</u>; (ii) after the

Final Hearing, entry of the Proposed Final Order substantially in the form annexed hereto as

<u>Exhibit C</u>; and (iii) such other and further relief as may be just or proper.

Dated: August 4, 2013
      Wilmington, Delaware

           YOUNG CONAWAY STARGATT & TAYLOR, LLP

           Edmon L. Morton (No. 3856)
           Maris J. Kandestin (No. 5294)
           Rodney Square
           1000 North King Street
           Wilmington, DE  19801
           (302) 571-6600
           (302) 571-1253 (Fax)
           emorton@ycst.com
           mkandestin@ycst.com

                    -and-

           WILLKIE FARR & GALLAGHER LLP
           Matthew A. Feldman
           Rachel C. Strickland
           Daniel I. Forman
           787 Seventh Avenue
           New York, New York 10019
           (212) 728-8000
           (212) 728-8111 (Fax)
           mfeldman@willkie.com
           rstrickland@willkie.com
           dforman@willkie.com

           *Proposed Co-Counsel to the Debtors and*
           *Debtors in Possession*

### Schedule 1

The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:

| | |
|---|---|
| Arizona EMS Holdings, Inc. (AZ) (7244) | Rural/Metro of Brewerton, Inc. (NY) (0912) |
| Beacon Transportation, Inc. (NY) (4028) | Rural/Metro of California, Inc. (DE) (8164) |
| Bowers Companies, Inc. (CA) (6465) | Rural/Metro of Central Alabama, Inc. (DE) (5348) |
| ComTrans Ambulance Service, Inc. (AZ) (6923) | Rural/Metro of Central Colorado, Inc. (DE) (6583) |
| Corning Ambulance Service, Inc. (NY) (5659) | Rural/Metro of Central Ohio, Inc. (DE) (2407) |
| Donlock, Ltd. (PA) (0659) | Rural/Metro of Greater Seattle, Inc. (WA) (6902) |
| E.M.S. Ventures, Inc. (GA) (3254) | Rural/Metro of Indiana, L.P. (DE) (9954) |
| Eastern Ambulance Service, Inc. (NE) (7359) | Rural/Metro of New York, Inc. (DE) (0083) |
| Eastern Paramedics, Inc. (DE) (1102) | Rural/Metro of Northern California, Inc. (DE) (3227) |
| Emergency Medical Transport, Inc. (AZ) (3878) | Rural/Metro of Northern Ohio, Inc. (DE) (8398) |
| EMS Ventures of South Carolina, Inc. (SC) (4174) | Rural/Metro of Ohio, Inc (DE) (0488) |
| Gold Cross Ambulance Service of PA, Inc. (OH) (9869) | Rural/Metro of Oregon, Inc. (DE) (3435) |
| Gold Cross Ambulance Services, Inc. (DE) (4792) | Rural/Metro of Rochester, Inc. (NY) (0148) |
| Lasalle Ambulance, Inc. (NY) (4422) | Rural/Metro of San Diego, Inc. (CA) (4132) |
| Medical Emergency Devices and Services (Meds), Inc. (AZ) (2218) | Rural/Metro of Southern California, Inc. (DE) (1679) |
| Mercury Ambulance Service, Inc. (KY) (8659) | Rural/Metro of Southern Ohio, Inc. (OH) (9303) |
| Metro Care Corp. (OH) (3994) | Rural/Metro of Tennessee, L.P. (DE) (3714) |
| National Ambulance & Oxygen Service, Inc. (NY) (9150) | Rural/Metro Operating Company, LLC (DE) (7563) |
| North Miss. Ambulance Service, Inc. (MS) (4696) | San Diego Medical Services Enterprise, L.L.C. (CA) (4136) |
| Pacific Ambulance, Inc. (CA) (7781) | Sioux Falls Ambulance, Inc. (SD) (4797) |
| Professional Medical Transport, Inc. (AZ) (6661) | Southwest Ambulance and Rescue of Arizona, Inc. (AZ) (9229) |
| R/M Arizona Holdings, Inc. (AZ) (6302) | Southwest Ambulance of Casa Grande, Inc. (AZ) (2807) |
| R/M Management Co., Inc. (AZ) (3444) | Southwest Ambulance of New Mexico, Inc. (NM) (5701) |
| R/M of Tennessee G.P., Inc. (DE) (0819) | Southwest Ambulance of Southeastern Arizona, Inc. (AZ) (8415) |
| R/M of Tennessee L.P., Inc. (DE) (0821) | Southwest Ambulance of Tucson, Inc. (AZ) (3618) |
| RMC Corporate Center, L.L.C. (AZ) (4546) | Southwest General Services, Inc. (AZ) (7537) |
| Rural/Metro (Delaware) Inc. (DE) (1572) | SW General Inc. (AZ) (4455) |
| Rural/Metro Corporation (AZ) (4388) | The Aid Ambulance Company, Inc. (DE) (4432) |
| Rural/Metro Corporation (DE) (6929) | The Aid Company, Inc. (IN) (8091) |
| Rural/Metro Corporation of Florida (FL) (4668) | Towns Ambulance Service, Inc. (NY) (8281) |
| Rural/Metro Corporation of Tennessee (TN) (9245) | Valley Fire Service, Inc. (DE) (6188) |
| Rural/Metro Fire Dept., Inc. (AZ) (3445) | W & W Leasing Company, Inc. (AZ) (1806) |
| Rural/Metro Mid-South, L.P. (DE) (4413) | WP Rocket Holdings, Inc. (DE) (9609) |

## EXHIBIT A

### Trade Agreement

TO:    [Critical Vendor]
      [Name]
      [Address]

Dear Valued Supplier:

      As you may be aware, on [____], 2013 (the "**Petition Date**"), Rural/Metro Corporation, together with certain of its affiliates identified on Schedule 1 hereto (collectively, the "**Debtors**"), filed voluntary petitions under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Cases**" and the "**Bankruptcy Court**," respectively).  On the Petition Date, we requested the Bankruptcy Court's authority to pay certain critical service providers and suppliers (the "**Critical Vendors**") in recognition of the importance of our relationship with them and our desire that the Bankruptcy Cases have as little effect on them as possible.  [On [  ], 2013, the Bankruptcy Court entered an interim order (the "**Order**")/On [  ], 2013, the Bankruptcy Court entered the final order (the "**Order**"] authorizing us, under certain conditions, to pay prepetition claims of Critical Vendors that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

      To receive payment on prepetition claims, we require each Critical Vendor to agree to continue supplying services and/or goods to the Debtors based on "Customary Trade Terms."  In the Order Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowance, rebates and availability and other applicable terms and programs) in effect between such Critical Vendor and the Debtors on a historical basis prior to the Petition Date (the "**Prepetition Trade Terms**") or such other trade terms, practices and programs that are at least as favorable to the Debtors as the Prepetition Trade Terms.

      For purposes of administration of this trade program as authorized by the Bankruptcy Court, the Debtors and you agree as follows:

1.      The estimated balance of the prepetition trade claim to be paid by the Debtors (net of any setoffs, credits or discounts) is $_____ (the "**Trade Claim**").  **Your Trade Claim does not constitute a claim allowed by the Bankruptcy Court in the Bankruptcy Cases.  Furthermore, signing this Trade Agreement does not excuse you from any requirement of filing a proof of claim in the Bankruptcy Cases on account of prepetition amounts that may remain unpaid.**

2.      The open trade balance or credit line that you will extend to the Debtors for shipment of postpetition goods is $_____ (which shall not be less than the greater of:  (a) the open trade balance outstanding on _____, 2013;

or (b) the most favorable trade terms offered to the Debtors in the twelve months prior to the Petition Date).

3.  In consideration for the payment described herein, you agree not to file or otherwise assert against any or all of the Debtors, their estates or any other person or entity or any of their respective assets or property (real or personal) any lien (a "**Lien**"), claim for reclamation ("**Reclamation Claim**") or claim under section 503(b)(9) of the Bankruptcy Code (a "**503(b)(9) Claim**"), regardless of the statute or other legal authority upon which such Lien, Reclamation Claim or 503(b)(9) Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to you by the Debtors arising from agreements or other arrangements entered into prior to the Petition Date and, to the extent you have already obtained or otherwise asserted such a Lien, Reclamation Claim or 503(b)(9) Claim, you shall (at your own expense) take whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or 503(b)(9) Claim.

4.  You will hereafter extend to the Debtors all Customary Trade Terms, which are:

[ADD INDIVIDUALIZED SET OF CUSTOMARY TRADE TERMS]

Payment of your Trade Claim in the manner set forth in subsection (f) below may occur upon execution of this letter by a duly authorized representative of your company and the return of this letter to the Debtors. Your execution of this letter agreement and the return of the same to the Debtors constitutes an agreement between you and the Debtors:

(a)  to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Trade Claim set forth above;

(b)  that, during the pendency of the Bankruptcy Cases, you will continue to supply the Debtors with goods and/or services, pursuant to the terms hereof and that the Debtors will pay for such goods in accordance with the terms hereof;

(c)  that you have reviewed the terms and provisions of the Order and acknowledge that you are bound by such terms;

(d)  that you will not separately seek payment for Reclamation Claims, 503(b)(9) Claims or similar claims outside of the terms of the Order unless your participation in the trade payment program authorized by the Order (the "**Trade Payment Program**") is terminated;

(e)     that if either the Trade Payment Program or your participation therein terminates as provided in the Order, any payments received by you on account of your Trade Claim will be deemed to have been in payment of postpetition obligations owed to you and you will immediately repay to the Debtors any payments made to you on account of your Trade Claim to the extent that the aggregate amount of such payments exceed the postpetition obligations, without the right of any setoffs, claims, provision for payment of reclamation or trust fund claims, or other defense; and

(f)     that, subject to the terms and conditions set forth herein, your Trade Claim will be paid in accordance with the following schedule:

| Date | Amount of Payment |
|------|-------------------|
|      |                   |

The Debtors and you also hereby agree that any dispute with respect to this agreement, the Order and/or your participation in the Trade Payment Program shall be determined by the Bankruptcy Court, notwithstanding any provision of any other contract between you and the Debtors to the contrary (whether such contract exists now or is entered into in the future).

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call [Name] at (___)_____ or [Name] (___)_____.

Sincerely,

[Debtor]

By:

Its:

Agreed and Accepted by:
[Name of Critical Vendor]

By:

Its:

Dated:

## EXHIBIT B

**Proposed Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

In re                                                  :    Chapter 11
                                                       :
Rural/Metro Corporation, et al.,[1]                    :    Case No. 13-11952 (    )
                                                       :
                        Debtors.                       :    (Jointly Administered)
                                                       :
                                                       :    **Re: Docket No. _____**

-------------------------------------------------------x

### INTERIM ORDER, PURSUANT TO
### SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY
### CODE AND BANKRUPTCY RULES 6003 AND 6004, AUTHORIZING
### DEBTORS TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS
### AND SUPPLIERS OF GOODS ENTITLED TO ADMINISTRATIVE PRIORITY

Upon the motion (the "**Motion**") of the debtors and debtors in possession in the

above-captioned cases (collectively, the "**Debtors**") for an Interim Order[2] and Final Order,

pursuant to sections 105(a), 363(b), 503(b), 507(a), 1107(a) and 1108 of title 11 of the United

States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), authorizing Debtors to pay prepetition claims of critical

vendors, including certain claims entitled to administrative priority, and scheduling a final hearing on

the Motion; and upon the Declaration of Stephen Farber in Support of Chapter 11 Petitions and

First Day Pleadings; and it appearing that jurisdiction is proper pursuant to 28 U.S.C. §§ 157 and

1334, and the Amended Standing Order of Reference from the United States District Court for

the District of Delaware dated as of February 29, 2012; and due and sufficient notice of the

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer
       identification number is attached as Schedule 1 to the Declaration of Stephen Farber in Support of Chapter
       11 Petition and First Day Pleadings [Docket No. 2] and at www.donlinrecano.com/rmc. The Debtors'
       headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

[2]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

01:13977046.1

Motion having been given; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by this Motion is in the best interest of these estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefore, it is, hereby

ORDERED, ADJUDGED, AND DECREED that:

1.      The Motion is granted on an interim basis, as set forth herein.

2.      The Debtors are authorized, but not directed to pay, in their sole discretion, in the ordinary course of their businesses, the Critical Vendor Claims, in an amount not to exceed $3,000,000 in the aggregate.

3.      The Debtors are authorized, but not directed, to undertake appropriate efforts to cause Critical Vendors to enter into Trade Agreements with the Debtors substantially similar to that annexed as Exhibit A to the Motion, as a condition of payment of each such Critical Vendor's Critical Vendor Claim.

4.      The Debtors are authorized, in their discretion, to make payments on account of a Critical Vendor Claim, subject to the other limits set forth herein, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment, that failure to pay such Critical Vendor Claim is likely to harm the Debtors' business operations.

5.      If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, in their discretion and without further order of the Court: (a) declare that any Trade Agreement between the Debtors

and such Critical Vendor is terminated; (b) declare that payments made to such Critical Vendor on account of its Critical Vendor Claims shall be deemed to have been in payment of then-outstanding or subsequently accruing postpetition claims of such Critical Vendor; and (c) recover any payment made to such Critical Vendor on account of its Critical Vendor Claims to the extent that such payments exceeded the postpetition claims of such Critical Vendor, without giving effect to any rights of setoff, claims, provision of payment of reclamation or trust fund claims or other defense.  Nothing herein shall constitute a waiver of the Debtors rights to seek damages or other appropriate remedies against any breaching Critical Vendor.

6.    Notwithstanding the foregoing, the Debtors may, in their sole discretion, reinstate a Trade Agreement if:

> (a)    the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such default had occurred; or

> (b)    the Debtors, in their sole discretion, reach a favorable alternative agreement with the Critical Vendor.

7.    Nothing herein shall be construed to limit, or in any way affect, the Debtors' ability to dispute any Critical Vendor Claim.

8.    Nothing contained in the Motion or this Interim Order, or the Debtors' payment of any claims pursuant to this Interim Order, shall be deemed or construed: (a) as an admission as to the validity of any claim or Lien against the Debtors or their estates; (b) as a waiver of the Debtors' right to dispute any claim or Lien; (c) as approval or assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code between a Debtor and a Critical Vendor; (d) as an admission of the priority status of any claim, whether under section 503(b)(9) of the Bankruptcy Code or otherwise; (e) to require the Debtors to make any of the payments authorized herein; or (f) to prejudice the

01:13977046.1

Debtors' rights to seek relief under any section of the Bankruptcy Code on account of any amounts owed or paid to any Critical Vendor.

9.      The authorization granted hereby to pay Critical Vendor Claims shall not create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on account of any decision by the Debtors not to pay a Critical Vendor Claim, and nothing contained in this Interim Order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

10.     The amount of any Critical Vendor Claim set forth in a Trade Agreement shall be used only for purposes of determining a Critical Vendor's claim under this Interim Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Interim Order shall not excuse such Critical Vendor from filing a proof of claim in these cases on account of prepetition amounts that may remain unpaid.

11.     No claimant who receives payment on account of a Critical Vendor Claim (whether or not such claimant signs a Trade Agreement) is permitted to:  (a) file or perfect a Lien on account of such claim, and any such claimant shall take all necessary action to remove any existing Lien relating to such claim, even if the Lien is against property of a non-Debtor; or (b) seek payment for a Reclamation Claim, 503(b)(9) Claim or similar claim outside of the terms of this Interim Order.

12.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

13.     Nothing in this Interim Order shall prohibit the Debtors from seeking Court approval to increase the prepetition amounts authorized to be paid hereunder.

14.     The execution of a Trade Agreement by the Debtors shall not be declared a waiver of any other cause of action, including avoidance actions, which may be held by the Debtors.

15.     All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under this Interim Order whether presented prior to or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.  Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Interim Order.

16.     The Motion and this Interim Order shall be served by overnight mail, hand delivery or fax on each Critical Vendor the Debtors believe could be affected by the relief requested in the Motion and all other parties required to receive service under Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") within three (3) business days of entry of this Interim Order.

17.     Any responses or objections to entry of the Final Order must (a) be made in writing, (b) state with particularity the grounds therefor, (c) conform to the Bankruptcy Rules

and the Local Rules, (d) be filed with the clerk of this Court, and (e) be served upon (i) the Office of The United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, (ii) counsel to any official committee appointed in these cases, (iii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon Morton, Esq. and Maris J. Kandestin, Esq., (iv) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Rachel C. Strickland, Esq. and Daniel I. Forman, Esq., and (v) counsel to the administrative agent under the Debtors' prepetition and postpetition secured credit agreement (collective, the "**Notice Parties**").

18.    The deadline by which objections to the Motion and the Final Order must be filed and received by the Notice Parties is _____, 2013 at 4:00 p.m. (prevailing Eastern Time).  A final hearing, if required, on the Motion will be held on _____ 2013 at _____ .m. (prevailing Eastern Time).  If no objections are filed to the Motion and entry of the Final Order, the Court may enter the Final Order without further notice or a hearing.

19.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Interim Order.

20.    Notwithstanding anything to the contrary contained herein, (a) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any order regarding debtor-in-possession financing or the use of cash collateral, and (b) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtors' estates shall be and is subject and subordinate to any and all claims, liens, security interests and priorities granted to the Debtors'

secured prepetition and postpetition lenders (and their respective agents) pursuant to any other order of the Court (including any order regarding debtor-in-possession financing or the use of cash collateral), and no payment shall be made on any such claim except as permitted under any order regarding debtor-in-possession financing or the use of cash collateral.

21.    Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

22.    Notwithstanding Bankruptcy Rule 6004(h), this Interim Order shall be effective and enforceable immediately upon entry hereof.

23.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Interim Order.

Dated:  Wilmington, Delaware
        _____, 2013

_____
UNITED STATES BANKRUPTCY JUDGE

## **EXHIBIT C**

**Proposed Final Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
In re                                    :    Chapter 11
                                         :
Rural/Metro Corporation, et al.,[1]      :    Case No. 13-11952 (    )
                                         :
                      Debtors.           :    (Jointly Administered)
                                         :
                                         :    **Re: Docket No. _____**
-------------------------------------------------------x

### FINAL ORDER, PURSUANT TO
### SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY
### CODE AND BANKRUPTCY RULES 6003 AND 6004, AUTHORIZING
### DEBTORS TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS
### AND SUPPLIERS OF GOODS ENTITLED TO ADMINISTRATIVE PRIORITY

Upon the motion (the "**Motion**") of the debtors and debtors in possession in the

above-captioned cases (collectively, the "**Debtors**") for an Interim Order[2] and Final Order,

pursuant to sections 105(a), 363(b), 503(b), 507(a), 1107(a) and 1108 of title 11 of the United

States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"), authorizing Debtors to pay prepetition claims of critical

vendors, including certain claims entitled to administrative priority [Docket No. _____]; and the

Court having entered the *Interim Order, Pursuant to Sections 105(a), 363(b), 503(b) and 507(a)*

*of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, Authorizing Debtors to Pay*

*Prepetition Claims of Critical Vendors and Suppliers of Goods Entitled to Administrative*

*Priority* [Docket No. ____] (the "**Interim Order**"); and upon the Declaration of Stephen Farber in

Support of Chapter 11 Petitions and First Day Pleadings; and due and sufficient notice of the

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number is attached as <u>Schedule 1</u> to the Declaration of Stephen Farber in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 2] and at www.donlinrecano.com/rmc.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

[2]    Capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Motion.

Motion and the Interim Order having been given; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by this Motion is in the best interest of these estates, their creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefore, it is, by the United States Bankruptcy Court for the District of Delaware, hereby

ORDERED, ADJUDGED, AND DECREED that:

1.      The Motion is granted on a final basis.

2.      The Debtors are authorized, but not directed to pay, in their sole discretion, in the ordinary course of their businesses, the Critical Vendor Claims, in an amount not to exceed $6,000,000 in the aggregate.

3.      The Debtors are authorized, but not directed, to undertake appropriate efforts to cause Critical Vendors to enter into Trade Agreements with the Debtors substantially similar to that annexed as <u>Exhibit A</u> to the Motion, as a condition of payment of each such Critical Vendor's Critical Vendor Claims.

4.      The Debtors are authorized, in their discretion, to make payments on account of a Critical Vendor Claim, subject to the other limits set forth herein, even in the absence of a Trade Agreement, if the Debtors determine, in their business judgment, that failure to pay such Critical Vendor Claim is likely to harm the Debtors' business operations.

5.      If a Critical Vendor refuses to supply goods and/or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its Critical Vendor Claim (regardless of whether such Critical Vendor has entered into a Trade Agreement), or fails to comply with any Trade Agreement entered into between such Critical Vendor and the Debtors, then the Debtors may, in their discretion and

2

without further order of the Court: (a) declare that any Trade Agreement between the Debtors

and such Critical Vendor is terminated; (b) declare that payments made to such Critical Vendor

on account of its Critical Vendor Claims shall be deemed to have been in payment of then-

outstanding or subsequently accruing postpetition claims of such Critical Vendor; and (c)

recover any payment made to such Critical Vendor on account of its Critical Vendor Claims to

the extent that such payments exceeded the postpetition claims of such Critical Vendor, without

giving effect to any rights of setoff, claims, provision of payment of reclamation or trust fund

claims or other defense.  Nothing herein shall constitute a waiver of the Debtors rights to seek

damages or other appropriate remedies against any breaching Critical Vendor.

      6.     Notwithstanding the foregoing, the Debtors may, in their sole discretion,

reinstate a Trade Agreement if:

      (a)     the underlying default under the Trade Agreement is fully cured by the Critical Vendor not later than five (5) business days following the Debtors' notification to the Critical Vendor of such default had occurred; or

      (b)     the Debtors, in their sole discretion, reach a favorable alternative agreement with the Critical Vendor.

      7.     Nothing herein shall be construed to limit, or in any way affect, the

Debtors' ability to dispute any Critical Vendor Claim.

      8.     Nothing contained in this Final Order shall be deemed to constitute an

assumption or rejection of any executory contract or unexpired lease between a Debtor and a

Critical Vendor or to require the Debtors to make any of the payments authorized herein.

      9.     The authorization granted hereby to pay Critical Vendor Claims shall not

create any obligation on the part of the Debtors or their officers, directors, attorneys or agents to

pay the Critical Vendor Claims, none of the foregoing persons shall have any liability on

3

account of any decision by the Debtors not to pay a Critical Vendor Claim, and nothing contained in this Final Order shall be deemed to increase, reclassify, elevate to an administrative expense status or otherwise affect the Critical Vendor Claims to the extent they are not paid.

10.    The amount of any Critical Vendor Claim set forth in a Trade Agreement shall be used only for purposes of determining a Critical Vendor's claim under this Final Order and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court.  Further, signing a Trade Agreement containing a claim amount for purposes of this Final Order shall not excuse such Critical Vendor from filing a proof of claim in these cases on account of prepetition amounts that may remain unpaid.

11.    No claimant who receives payment on account of a Critical Vendor Claim (whether or not such claimant signs a Trade Agreement) is permitted to:  (a) file or perfect a Lien on account of such claim, and any such claimant shall take all necessary action to remove any existing Lien relating to such claim, even if the Lien is against property of a non-Debtor; or (b) seek payment for a Reclamation Claim, 503(b)(9) Claim or similar claim outside of the terms of this Final Order.

12.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained herein shall create, nor is it intended to create, any rights in favor of, or enhance the status of any claim held by, any person.

13.    Nothing in this Final Order shall prohibit the Debtors from seeking Court approval to increase the prepetition amounts authorized to be paid hereunder.

4

14.    The execution of a Trade Agreement by the Debtors shall not be declared a waiver of any other cause of action, including avoidance actions, which may be held by the Debtors.

15.    All applicable banks and other financial institutions are hereby authorized to receive, process, honor, and pay any and all checks and transfer requests evidencing amounts paid by the Debtors under this Final Order whether presented prior to or after the Petition Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments. Such banks and financial institutions are authorized to rely on the representations of the Debtors as to which checks are issued or authorized to be paid pursuant to this Final Order.

16.    The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Final Order.

17.    Notwithstanding anything to the contrary contained herein, (a) any payment made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under any order regarding debtor-in-possession financing or the use of cash collateral, and (b) any claim for which payment is authorized pursuant to this Order that is treated as an administrative expense of the Debtors' estates shall be and is subject and subordinate to any and all claims, liens, security interests and priorities granted to the Debtors' secured prepetition and postpetition lenders (and their respective agents) pursuant to any other order of the Court (including any order regarding debtor-in-possession financing or the use of cash collateral), and no payment shall be made on any such claim except as permitted under any order regarding debtor-in-possession financing or the use of cash collateral.

18.    Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

5

19.    Notwithstanding Bankruptcy Rule 6004(h), this Final Order shall be effective and enforceable immediately upon entry hereof.

20.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or interpretation of this Final Order.

Dated: Wilmington, Delaware
_____, 2013

_____
UNITED STATES BANKRUPTCY JUDGE

6

01:13977046.1