IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| Rural Metro Corporation, et al.,[1] | : | Case No. 13-11952 (    ) |
| | : | |
| Debtors. | : | (Joint Administration Pending) |

-------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS:  (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION FIRST LIEN SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)

Rural/Metro Corporation, ("**Rural Metro**" or "**Borrower**"), WP Rocket Holdings, Inc. ("**Holdings**") and the subsidiaries of Rural Metro and Holdings which have filed chapter 11 petitions (the "**Subsidiary Debtors**"), as debtors and debtors in possession (collectively, the "**Debtors**"), in the above-referenced cases (the "**Cases**") hereby move (the "**DIP Motion**") for entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 365, 507 and 552 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that, among other things:

---

[1]     The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

(i)      authorizes the Borrower to obtain, and authorizes each of Holdings and the Subsidiary Debtors (collectively, "**Guarantors**") to guarantee, jointly and severally, the Borrower's obligations in respect of a senior secured, super-priority, multiple draw term credit facility (such facility, the "**DIP Facility**") of up to $75 million in aggregate principal amount pursuant to the terms of (x) the Interim Order, (y) that certain Senior Secured Super Priority Debtor in Possession Credit Agreement in substantially the form attached to the Interim Order as Exhibit 1 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**")[2] among Borrower, the Guarantors, Credit Suisse AG as administrative agent and collateral agent (in such capacities, and including any successor administrative agent and collateral agent, the "**DIP Administrative Agent**") for itself and (A) certain financial institutions party thereto on the date of entry of the Interim Order as lenders (the "**Initial DIP Lenders**") and (B) certain financial institutions from time to time party thereto following the date of entry of the Interim Order as lenders (the "**Syndicated DIP Lenders**" and together with the Initial DIP Lenders who remain party to the DIP Credit Agreement, the "**DIP Lenders**" and together with the DIP Administrative Agent, collectively, the "**DIP Secured Parties**") and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement) (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"), which, if approved on a final basis, would consist of $75 million in respect new money funding (the "**DIP Loans**"), of which up to $40 million shall be available upon entry of the Interim Order, subject to the terms and conditions of the Interim Order, the Final Order (as defined below) and the DIP Loan Documents (all DIP Loans made to or for the benefit or account of, and all guaranties

---

[2]      Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.  The term "Event of Default" as used herein shall have the meaning given to such term in the DIP Credit Agreement or the New L/C Facility Agreement (as defined below), as applicable.

01:13977138.1

issued by, the respective Debtors pursuant to the DIP Loan Documents, and all other obligations

and liabilities of the Debtors arising under the DIP Loan Documents, including, without

limitation, all Loan Document Obligations as defined in the DIP Credit Agreement, collectively,

the "**DIP Obligations**");

(ii)　　authorizes the Borrower to obtain, and authorizes each of the Guarantors

to guarantee, jointly and severally, the Borrower's obligations in respect of a senior secured,

super-priority letter of credit facility (the "**New L/C Facility**") pursuant to the terms of (x) the

Interim Order, (y) that certain Senior Secured Super Priority Debtor in Possession Letter of

Credit Reimbursement and Security Agreement in substantially the form attached to the Interim

Order as Exhibit 2 (as the same may be amended, restated, supplemented or otherwise modified

from time to time, the "**New L/C Facility Agreement**") among Borrower as applicant, and

Credit Suisse AG, Cayman Islands Branch as issuer (in such capacity, the "**New Issuing Bank**"),

and (z) any and all other DIP Loan Documents, as such documents apply to the New L/C Facility

Agreement and/or the New Issuing Bank (together with the New L/C Facility Agreement,

collectively, the "**New L/C Facility Documents**"), which, if approved on a final basis, would

consist of up to $30 million in available new letters of credit issued pursuant to the New L/C

Facility Documents (the "**New Letters of Credit**"), of which up to $15 million shall be available

upon entry of the Interim Order, subject to the terms and conditions set forth in the New L/C

Facility Documents (all obligations of the Borrower and the Guarantors in respect of the New

Letters of Credit, and all other obligations and liabilities of the Debtors arising under the New

L/C Facility Documents, collectively, the "**New L/C Obligations**");

(iii)　　approves the terms of, and authorizes the Debtors to execute and deliver,

and perform under, the DIP Loan Documents and the New L/C Facility Documents and to

perform such other and further acts as may be required in connection with the DIP Loan Documents and the New L/C Facility Documents;

(iv)    authorizes each Debtor to grant, in accordance with the relative priorities set forth herein (x) to the DIP Administrative Agent (for the benefit of itself and the other DIP Secured Parties) and to the New Issuing Bank, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) but shall be junior to the Prepetition Senior Liens (as defined below) and (y) to the DIP Secured Parties and the New Issuing Bank super-priority administrative expense claims having recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired (which, upon entry of the Final Order, will include Avoidance Actions (as defined below)) and proceeds thereof;

(v)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the Prepetition First Lien Secured Parties (as defined below), the DIP Secured Parties and/or the New Issuing Bank have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or otherwise;

(vi)    grants, as of the Petition Date and in accordance with the relative priorities set forth herein, certain adequate protection to the Prepetition First Lien Secured Parties (as defined below), consisting of, among other things, Adequate Protection Liens (as defined below), the Adequate Protection Super-Priority Claims, and payment-in-kind, on a current basis, of accrued and unpaid prepetition and post-petition interest (at the applicable default interest rate for ABR Borrowings, as defined in the Prepetition First Lien Credit Agreement), and cash

payment, on a current basis, of reimbursable fees and expenses of the Prepetition First Lien

Agent (as defined below);

(vii)    vacates the automatic stay imposed by section 362 of the Bankruptcy

Code in accordance with Paragraphs 5, 14(a), and 14(c) of the Interim Order to the extent

necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, the

New L/C Facility Documents and the Interim Order;

(viii)    schedules a final hearing on the DIP Motion to be held within 45 days

after the entry of the Interim Order (the **"Final Hearing"**) to consider entry of a final order

acceptable in form and substance to the DIP Administrative Agent and New Issuing Bank that

grants all of the relief requested in the DIP Motion on a final basis (the **"Final Order"**); and

(ix)    waives any applicable stay (including under Bankruptcy Rule 6004) and

provides for immediate effectiveness of the Interim Order.

In support of the DIP Motion, the Debtors rely upon and incorporate by reference

the Declaration of Stephen Farber In Support of Chapter 11 Petitions and First Day Pleadings

(the **"First Day Declaration"**) and the Declaration of Brandon Aebersold in support of the DIP

Motion (the **"Aebersold Declaration"**), which were filed with the Court concurrently herewith.

In further support of the Motion the Debtors, by and through their undersigned proposed co-

counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.    The Debtors commenced these Cases to implement a consensual balance

sheet restructuring that will reduce the Debtors' funded indebtedness by approximately 50% and

cut interest payments nearly in half.  Over the last several weeks the Debtors have engaged their

prepetition senior secured lenders and senior unsecured bondholders in negotiations designed to

address the Debtors' over-levered balance sheet while simultaneously minimizing the impact on

01:13977138.1

the Debtors' business and preserving the Debtors' ability to provide uninterrupted emergency

services to its customer base. The negotiations culminated in the Restructuring Support

Agreement (as defined below), which commits the Debtors, their lenders and their bondholders

to a pre-negotiated plan designed to address the Debtors' current liquidity contraction and

ongoing cash flow issues. The first step in the consensual restructuring following the

commencement of these cases is the approval of the DIP Facility. The Debtors have obtained a

commitment for a $75 million credit facility from the DIP Lenders that, if approved by the Court,

will fund the Debtors' operations during these Cases and allow the Debtors to provide

uninterrupted emergency services to the communities that rely on them. The DIP Facility is a

product of a fulsome marketing process that involved all of the Debtors' major stakeholders in

addition to potential lenders that are outside of the Debtors' current capital structure. This

process yielded a DIP Facility with fair terms – namely, the facility provides significant

availability, competitive pricing, and an appropriate maturity date. The DIP Facility allows the

Debtors to effectuate the pre-negotiated restructuring by providing the Debtors with needed

liquidity through the end of the year. More immediately, however, approximately 9,500

employees and the hundreds of communities that rely on the Debtors daily for the provision of

emergency service are depending on the Debtors' continued operation, which is only possible

with access to the DIP Facility. The lenders' cash is critical because it will stabilize operations,

preserve the value of the Debtors' business as a going concern and permit the Debtors'

emergency fleet to continue running without any unwarranted delay. All of this while

simultaneously providing the necessary breathing spell for the Debtors and their major

stakeholders to consummate the pre-negotiated balance sheet restructuring.

2.        Several compelling reasons justify approval of the DIP Facility.  First, the

DIP Facility is the best offer to emerge from extensive negotiations and a competitive process,

and has left the Debtors with the most favorable terms under the circumstances.  Second, the

terms of the DIP Facility are reasonable and provide the Debtors with the necessary flexibility to

operate and emerge from these Chapter 11 cases.  For example, the DIP Facility includes

favorable pricing terms, reasonable adequate protection measures for the Prepetition First Lien

Secured Parties' interests and reasonable fees for the DIP Lenders' professionals.  Third, the DIP

Facility is the first step in the implementation of the intended consensual balance sheet

restructuring and the vast majority of the Debtors' capital structure supports the relief requested

herein pursuant to the terms of the Restructuring Support Agreement.

3.        By this Motion the Debtors hereby seek entry of two orders.  First, the

Debtors seek entry of the Interim Order in the form annexed hereto as <u>Exhibit A</u>.  Second,

following notice of the Motion and the Interim Order and the Final Hearing on the relief

requested herein, the Debtors seek entry of the Final Order granting the relief requested herein on

a final basis.[3]  The entry of the Interim Order is necessary to satisfy the conditions to borrowing

under the DIP Credit Agreement.

**<u>JURISDICTION</u>**

4.        This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue before this

Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief

requested herein are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code,

Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1 and 4001-2.

---

[3]        A copy of the proposed Final Order will be filed at least fourteen (14) days prior to the Final Hearing (<u>i.e.</u>, seven (7) days before the Objection Deadline (as defined below)).

## BACKGROUND

### A.    General Background

5.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The Debtors have requested that these chapter 11 cases be consolidated for procedural purposes. As of the date hereof, no official committee of unsecured creditors has been appointed.

6.    The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration.

### B.    Summary of Prepetition Indebtedness and Capital Structure

(i)    *Senior Secured Credit Facility*

7.    As of the Petition Date, Rural Metro, as borrower, Holdings, as guarantor, the Subsidiary Debtors as guarantors, the financial institutions parties thereto from time to time as lenders (the "**Prepetition First Lien Lenders**"), and Credit Suisse AG as administrative agent and collateral agent for the Prepetition First Lien Lenders (in such capacity, and including any successor agents, the "**Prepetition First Lien Agent**" and together with the Prepetition First Lien Lenders, the "**Prepetition First Lien Secured Parties**"), were parties to that certain Credit Agreement, dated as of June 30, 2011 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**" and together with the other Loan Documents (as defined in the Prepetition First Lien Credit Agreement), in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the "**Prepetition First Lien Loan Documents**" and the credit facility contemplated therein, the "**Prepetition First Lien Credit Facility**").

01:13977138.1

8.    As of the Petition Date, the aggregate outstanding Loan Document Obligations (as defined in the Prepetition First Lien Credit Agreement) arising under the Prepetition First Lien Loan Documents was no less than $427,302,230, consisting of (i) Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) of no less than $68,000,000 (the "**Prepetition Revolving Loans**"), (ii) Term Loans (as defined in the Prepetition First Lien Credit Agreement) of no less than $318,500,000 (the "**Prepetition Term Loans**"), (iii) issued and outstanding Letters of Credit (as defined in the Prepetition First Lien Credit Agreement) of no less than $40,802,230 (the "**Prepetition Letter of Credit Exposure**"), and (iv) accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition First Lien Loan Documents) and other obligations owing to the Prepetition First Lien Secured Parties or affiliates thereof (all Loan Document Obligations under, and as defined in the Prepetition First Lien Credit Agreement, together with all other Secured Obligations under, and as defined in the Prepetition First Lien Credit Agreement, and any other amounts owing by the applicable Debtors under the Prepetition First Lien Loan Documents, collectively, the "**Prepetition First Lien Indebtedness**").

9.    Rural Metro is required to pay cash interest on the principal amount of the Prepetition Term Loans (a) on the last business day of each March, June, September and December with respect to any prime rate loan and (b) with respect to any LIBOR loan, on the last day of the applicable interest period (provided that for any LIBOR loan with an interest period of more than three months, interest thereon is payable every three months).

01:13977138.1

10.    Prepetition First Lien Indebtedness is guaranteed by Holdings, the parent of Rural Metro, and substantially all of Rural Metro's subsidiaries, and is secured by a first priority security interest in substantially all of the assets of Rural Metro and the guarantors.

(ii)    *Senior Unsecured Notes*

11.    Rural Metro has issued $308 million in aggregate principal amount of 10.125% unsecured senior notes due 2019 (the "**Notes**").  $200 million of the Notes were issued pursuant to that certain Indenture, dated as of June 30, 2011, among WP Rocket Merger Sub, Inc. (which was merged with and into Rural Metro, with Rural Metro as the survivor, "**Merger Sub**"), as issuer, Rural Metro, which assumed the obligations of Merger Sub as issuer, certain of Rural Metro's subsidiaries, as guarantors, and Wells Fargo Bank, National Association, as trustee (as amended, supplemented or otherwise modified from time to time, the "**First Notes Indenture**").  $108 million of the Notes were issued pursuant to that certain Indenture, dated as of February 3, 2012, among Rural Metro, as issuer, certain of Rural Metro's subsidiaries, as guarantors, and Wells Fargo Bank, National Association, as trustee (as amended, supplemented or otherwise modified from time to time, the "**Second Notes Indenture**"; and, together with the First Notes Indenture, the "**Indentures**"). The Notes are unsecured and mature on July 15, 2019.

12.    Rural Metro is required to pay cash interest on the principal amount of the Notes semi-annually in arrears on January 15 and July 15 of each year.  On July 15, 2013, Rural Metro did not make its scheduled interest payment on the Notes in the amount of $15.6 million.

## C.    The Restructuring Support Agreement

13.    Prior to the Petition Date, the Debtors, the Prepetition First Lien Agent, a group of Prepetition First Lien Lenders holding greater than 50% of both the Prepetition Revolving Loans and Prepetition Term Loans, and a group of holders of the Debtors' Notes (the "**Noteholders**") holding more than 2/3rds of the principal amount of the Notes negotiated and

01:13977138.1

executed the Restructuring Support Agreement dated as of August 4, 2013 (the "**Restructuring**

**Support Agreement**"). If consummated, the restructuring transactions contemplated in the

Restructuring Support Agreement will substantially de-lever the Debtors by partially paying

down the Prepetition First Lien Indebtedness and converting the Notes to equity. Moreover,

pursuant to the Restructuring Support Agreement, the Noteholders have committed to invest

$135 million additional dollars of new equity upon exit from chapter 11 to complete the financial

restructuring.

14.    The proposed restructuring will be accomplished through a pre-arranged

plan, which the Debtors have committed to file, along with a proposed disclosure statement,

prior to September 15, 2013. The milestones set forth in the restructuring term sheet attached to

the Restructuring Support Agreement are designed to both pace these cases with a view to

minimizing the Debtors' stay in chapter 11, but also to provide the necessary runway to ensure a

thorough restructuring. The Debtors submit that the milestones are appropriate because they

protect the committed investments of a majority of the Debtors' prepetition capital structure in

the Debtors' future, and also allow the Debtors sufficient time to responsibly address all of its

restructuring goals. Following entry of the Interim Order, the Debtors intend to file a motion to

assume the Restructuring Support Agreement.

**D.    The Debtors' Decision to Enter into the DIP Credit Agreement**

15.    The debtor-in-possession financing marketing process that the Company

implemented over the last several weeks was one of, if not the primary drivers behind the

ultimate consensual deal, and the Restructuring Support Agreement that binds the majority of the

Debtors' capital structure to the pre-negotiated balance sheet restructuring. As a bankruptcy

filing became more likely, the Debtors, along with their advisors, began a broad marketing

process to attract and secure the funding necessary to facilitate a comprehensive restructuring in

01:13977138.1

chapter 11. While the Debtors weighed their restructuring alternatives and tested the market for financing proposals, the Debtors conducted arm's-length, good-faith negotiations with various potential sources, including the DIP Lenders, certain of the holders of the Notes (the "**Noteholders**") and outside third-party sources. The Debtors, however, soon realized that obtaining a third-party, postpetition financing without the consent of their secured lenders would be impracticable given the Debtors' lack of substantial unencumbered assets to which non-priming liens could attach. The secured lenders advised the Debtors that they would not consent to the granting of senior or *pari passu* liens to an unaffiliated debtor-in-possession lender. Nor were the secured lenders willing to amend the Prepetition First Lien Credit Facility to permit the incurrence of junior debt.

16.    In the absence of any viable outside financing source, to procure the most favorable possible terms for postpetition financing, the Debtors and their advisors engaged in multi-track negotiations with the DIP Lenders and the Noteholders. This effort involved simultaneous revisions to multiple term sheets and credit agreements and responding to rounds of diligence requests. Essentially, the Debtors and their advisors simultaneously negotiated three separate deals: (a) a standalone financing to be provided by the Prepetition First Lien Secured Parties; (b) a standalone financing to be provided by the Noteholders; and (c) a consensual restructuring which was initially contemplated to be a possible out-of-court deal, and then morphed into this pre-arranged bankruptcy plan and consensual in-court restructuring.

17.    This process brought the Debtors' various creditor constituencies from across the capital structure together and ultimately facilitated the pre-negotiated deal that resulted in the Restructuring Support Agreement. In addition, the multi-track negotiation allowed the Debtors to negotiate for the best available debtor-in-possession financing. As a result of the

competitive process, both the terms of the DIP Lenders' and the Noteholders' initial standalone

proposals were substantially improved. Ultimately, as the negotiation of a consensual deal

gained traction, the Debtors, with the consent of the Noteholders, settled on pursuing a financing

transaction with the DIP lenders designed to support the restructuring set forth in the

Restructuring Support Agreement. Because the DIP Lenders' proposal for the consensual deal

was built upon their final offer on a standalone basis, the competitive process helped the Debtors

secure the most favorable financing available under the circumstances. The proposed DIP

Facility adequately addresses the Debtors' foreseeable liquidity needs, provides the necessary

runway to complete the pre-negotiated restructuring, and, pursuant to the Restructuring Support

Agreement, the Noteholders have consented to the Debtors' entry into the DIP Facility.

18.     In comparison with either the prepetition First Lien Secured Parties' or the

Noteholders' standalone proposals, the DIP Facility includes substantially lower fees than

initially contemplated, fair pricing terms, and reasonable adequate protection measures for the

Prepetition First Lien Secured Parties' interests. For the foregoing reasons, the Debtors submit

that entry of the Interim and Final Orders approving the terms of the DIP Credit Agreement is in

the best interests of their estates, their respective creditors and other parties in interest.

### TERMS AND CONDITIONS OF THE
### POSTPETITION FINANCING ARRANGEMENTS

**A.    Terms of the DIP Credit Agreement and Orders**

19.     The principal terms of the proposed DIP Facility, including the provisions

of the DIP Credit Agreement and Interim Order required to be highlighted in this Motion

pursuant to Bankruptcy Rule 4001(c) and Local Rule 4001-2 are summarized below.[4]  The

---

[4]     This summary is qualified in its entirety by reference to the provisions of the DIP Loan Documents. The
DIP Loan Documents will control in the event of any inconsistency between this motion and the DIP Loan

01:13977138.1

material provisions addressed below were heavily negotiated and the DIP Administrative Agent

and the DIP Lenders have indicated that they are necessary for the Debtors to procure the

financing made available under the DIP Credit Agreement in a sufficient amount and on a timely

basis.

| **Borrower:** | Rural Metro |
|---|---|
| **Guarantors:** | Holdings and the Subsidiary Debtors |
| **Agent:** | Credit Suisse AG as administrative agent and collateral agent |
| **Lenders:** | A syndicate of Prepetition First Lien Lenders (and, in certain cases, affiliates of Prepetition First Lien Lenders) that choose to participate in the DIP Facility |
| **DIP Facility:** <br> *FBR 4001(c)(1)(B)* <br> *LBR 4001-2(a)(ii)* | $75 million senior secured, super-priority, multiple draw term credit facility, of which $40 million shall be available upon entry of the Interim Order. |
| **New L/C Facility** | In connection with the DIP Facility, upon entry of the Interim Order, the DIP Administrative Agent will provide a facility of up to $15 million, and from and after the Final Order Entry Date, up to $30 million, for letters of credit issued by the DIP Administrative Agent for the benefit of the Borrower on terms satisfactory to the DIP Administrative Agent. Any letters of credit issued under such facility shall be cash collateralized by the Borrower, using cash or proceeds of the DIP Loans, in an amount equal to 105% of the aggregate principal amount of letters of credit issued. |
| **Maturity:** <br> *DIP Credit Agreement 2.10* <br> *FBR 4001(c)(1)(B)* <br> *LBR 4001-2(a)(ii)* | The earliest of (i) March 1, 2014, (ii) the effective date of any chapter 11 plan of the Debtors, (iii) the date that is forty-five (45) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (iv) the date of acceleration of the Loans and termination of the Commitments hereunder (including, without limitation, as a result of the occurrence of any |

Documents. Unless otherwise defined herein, capitalized terms used in this section have the meanings ascribed to them in the DIP Loan Documents.

| | Event of Default) |
|---|---|
| **Interest:**<br>*DIP Credit Agreement 2.13*<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(ii)* | DIP Loans will bear interest, at the option of the Borrower, at one of the following rates:<br><br>(i) the Applicable Rate (as defined below) *plus* the Alternate Base Rate; or<br><br>(ii) the Applicable Rate *plus* the Adjusted LIBO rate; <u>provided</u> that the LIBO Rate with respect to DIP Loans will at no time be less than 1.50% *per annum*.<br><br>**"Applicable Rate"** means<br><br>(i) 8.50% *per annum*, in the case of ABR Loans, of which 7.50% shall be paid in cash and 1.00% shall be Paid-in-Kind, or (ii) 9.50% *per annum*, in the case of Eurocurrency Loans, of which 8.50% shall be paid in cash and 1.00% shall be Paid-in-Kind.<br><br>Not more than six LIBO Rate interest periods may be in effect at any one time. |
| **Default Interest:**<br>*DIP Credit Agreement 2.13* | An additional 2.00% *per annum* on any overdue principal and/or interest |
| **Fees:**<br>*DIP Credit Agreement 2.12* | <u>OID</u><br><br>The DIP Loans will be subject to an original issue discount of 1.00% of the aggregate principal amount thereof, payable to each Lender upon the extension of such DIP Loans.<br><br><u>Backstop Fees</u><br><br>2.0% of the DIP Loans payable to the Lenders backstopping the funding of the DIP Loans. |
| **Priority and Liens:**<br>*Interim Order ¶¶ 2(f), 2(j), 5*<br>*FBR 4001(c)(1)(B)(i), (ii), (iii), (vii), (xi)*<br>*LBR 4001-2(a)(ii)* | *Administrative Priority.* All DIP Loans and other obligations of the Borrower and the Guarantors owed to the DIP Administrative Agent and the DIP Lenders under the DIP Facility and the New L/C facility shall have superpriority administrative expense status pursuant to Section 364(c)(1) of the Bankruptcy Code (the "**DIP Superpriority Claims**"), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the |

Bankruptcy Code, subject and subordinate only to the Carve-Out (defined below).

*Postpetition Liens.* The Interim DIP Order grants the DIP Administrative Agent, for the benefit of itself and the other DIP Lenders, effective as of the entry of the Interim Order, the following Liens (which shall immediately, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable and non-avoidable) on all property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Administrative Agent, the New Issuing Bank or otherwise), and any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries (subject to the restriction set forth below), tax refunds, insurance proceeds, commercial tort claims (without the need to comply with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any such commercial tort claim), membership interests and other equity ownership interests, in joint ventures (collectively, the **"Joint Venture Entities"**) (subject to the restrictions set forth below), all other Collateral (as defined in the DIP Credit Agreement) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing; provided, however, that notwithstanding any provision herein or in any DIP Loan Documents or New L/C Facility Documents to the contrary, no Debtor organized under U.S. law shall be required to pledge in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock of its indirect foreign subsidiaries (all of the

foregoing collateral collectively referred to as the "**DIP Collateral**," and all such Liens granted to (i) the DIP Administrative Agent as provided in the DIP Loan Documents and for the ratable benefit of the DIP Secured Parties in respect of the Secured Obligations under, and as defined in the DIP Credit Agreement, and (ii) the New Issuing Bank as provided in the New L/C Facility Documents, each as pursuant to the Interim Order, the DIP Loan Documents, and the New L/C Facility Documents, as applicable, the "**DIP Liens**"):

(I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral, including the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 and 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law ("**Avoidance Actions**") (subject to entry of the Final Order), whether received by judgment, settlement or otherwise, but excluding the Avoidance Actions themselves;

(II)      pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral (including, without limitation, Cash Collateral) that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition First Liens, and (y) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition First Liens, other than, in the case of clause (II)(x) or (II)(y), Liens which are expressly stated to be primed by the Liens to be granted to the DIP Administrative Agent and the New Issuing Bank described in clause (III) below (subject to such exception, the "**Prepetition Senior Liens**"); and

(III)      pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral that is senior to (x) the existing Prepetition First Liens in favor of the Prepetition First Lien Secured Parties and securing the Prepetition First Lien Indebtedness

| | |
|---|---|
| | (including all Obligations as defined in the Prepetition First Lien Loan Documents), or (y) any existing Liens in favor of any other person or entity (other than the Prepetition Senior Liens), including, without limitation, all Liens junior to the Prepetition First Liens (the Liens referenced in clauses (x) and (y), collectively, the **"Primed Liens"**), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be primed by and made subject and subordinate to the perfected first priority senior priming DIP Liens. |
| **Carve-Out Expenses:** <br> *Interim Order ¶ 7* | Each of the DIP Liens, DIP Super-Priority Claims, Prepetition First Liens, Adequate Protection Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below) solely in the event of the delivery of a Carve-Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents or the New L/C Facility Documents: <br><br> **"Carve-Out"** means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. §1930(a)(6), whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) fees, disbursements, costs and expenses which are incurred after the Petition Date and before the delivery of a Carve-Out Trigger Notice in an amount not to exceed the amounts set forth in the Budget for each Professional (as defined below), less any amount actually paid to each such Professional retained by the Debtors and any Committee pursuant to Bankruptcy Code sections 327, 330, 363 and 1103 (collectively, the **"Professionals"**), to the extent allowed at any time by this Court and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs and expenses of Professionals in an aggregate amount not to exceed $2,000,000 that are incurred after the delivery of a Carve-Out Trigger Notice and which are ultimately allowed by this Court (the **"Carve-Out Cap"**). The term **"Carve-Out Trigger Notice"** shall mean a written notice delivered by either the DIP Administrative Agent or the New Issuing Bank to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and |

| | |
|---|---|
| | during the continuation of any Event of Default under the DIP Loan Documents or the New L/C Facility Documents, expressly stating that the Carve-Out (and the Carve-Out Cap) is invoked.<br><br>Following the delivery of the Carve-Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents or the New L/C Facility Documents, any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103 or otherwise, to Professionals shall (i) not be paid from the proceeds of any DIP Loan, New Letter of Credit, DIP Collateral, Prepetition First Lien Collateral or Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (iii) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis. |
| **Conditions Precedent:**<br>*DIP Credit Agreement 4.01*<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(ii)* | Closing and the initial funding under the DIP Facility will be subject to the satisfaction of usual and customary conditions precedent, including but not limited to:<br><br>• Execution and delivery of the DIP Loan Documents;<br><br>• The DIP Administrative Agent shall have received such legal opinions, officer certificates, organizational documents, resolutions and other documents and instruments as are customary for transactions of this type;<br><br>• Material third party and governmental consents necessary shall have been obtained;<br><br>• The DIP Administrative Agent shall have received all fees and other amounts contemplated by the DIP Loan Documents due and payable to the DIP Lenders on or prior to the Effective Date;<br><br>• The Collateral and Guarantee Requirement shall have been satisfied, and the DIP Administrative Agent and the DIP lenders shall have received a completed Perfection Certificate in form and substance satisfactory to the DIP Administrative Agent and the DIP Lenders; |

01:13977138.1

- Certificates of insurance, including without limitation, flood insurance policies, shall be delivered to the DIP Administrative Agent evidencing the existence of insurance to be maintained by Holdings, the Borrower and its Subsidiaries pursuant to Section 5.07 of the DIP Credit Agreement;

- The DIP Administrative Agent and the DIP Lenders shall have received (i) the Budget, (ii) a forecast for the period of thirteen (13) months following the Effective Date, (iii) duly executed copies of all engagement letters and/or work letters for each of its financial advisors and/or legal counsels and (iv) such additional information (financial or otherwise) reasonably requested by the Administrative Agent or the Lenders, any such item set forth herein to be in form and substance satisfactory to the DIP Administrative Agent and the DIP Lenders;

- The DIP Administrative Agent and the DIP Lenders shall have received a fully executed copy of the Restructuring Support Agreement, and such Restructuring Support Agreement shall be in full force and effect;

- No Default or Event of Default shall exist or would result from the extension of the DIP Loans on the Effective Date;

- The representations and warranties set forth in Article III of the DIP Credit Agreement shall be true and correct on and as of the Effective Date;

- The Administrative Agent shall have received, at least five (5) days prior to the Effective Date, all documentation and other information about the Loan Parties as shall have been reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act;

- Entry by the Court of the Interim Order in form and substance reasonably satisfactory to the DIP Administrative Agent and the DIP Lenders;

- The Interim Order shall not have been reversed,

|  | modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Administrative Agent and the DIP Lenders;<br><br>• Holdings, the Borrower and the Subsidiary Loan Parties shall be in compliance in all respects with the Interim Order;<br><br>• The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Cases or shortly thereafter shall have been reviewed in advance by the DIP Administrative Agent and the DIP Lenders and shall be satisfactory in form and substance to the Administrative Agent and the Lenders;<br><br>• No trustee or examiner shall have been appointed with respect to the Debtors or their respective properties;<br><br>• A cash management order satisfactory to the DIP Administrative Agent and the DIP Lenders shall be in full force and effect, and cash management arrangements satisfactory to the DIP Administrative Agent and the DIP Lenders shall have been implemented;<br><br>• No material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the commencement of the Cases) shall have occurred;<br><br>• All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions among the Loan Parties and the Lenders contemplated by the Loan Documents shall be satisfactory in form and substance to the DIP Administrative Agent and the DIP Lenders, and the Lenders shall have received all information and copies of all documents or papers requested by any of them. |
|---|---|
| **Representations and Warranties**<br>*DIP Credit Agreement Article III* | Include (without limitation) the representations and warranties under the Prepetition First Lien Credit Agreement with such changes as agreed in the DIP Loan Documents with the approval of the DIP Administrative Agent, and additional representations and warranties, |

| | |
|---|---|
| | including without limitation: a representation as to labor matters; orders of the Bankruptcy Court shall continue to be effective; and the Loan Parties have not failed to disclose any material assumptions with respect to the Budget and affirm the accuracy of the Budget in all material respects. |
| **Case Milestones:**<br>*DIP Credit Agreement 5.13*<br>*FBR 4001(c)(1)(B)(v), (vi)* | The Bankruptcy Court shall have entered an order approving the Restructuring Support Agreement (as it may be amended, restated, modified or otherwise supplemented) on or before the date that is 35 days following the petition Date, which order shall become final and non-appealable within fifteen (15) days thereafter;<br><br>Filing of a disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code in respect of a chapter 11 plan for all Debtors (the "Plan") on or prior to September 15, 2013;<br><br>The Bankruptcy Court shall have entered an order approving the Disclosure Statement on or before November 8, 2013;<br><br>The Bankruptcy Court shall have entered an order confirming the Plan on or prior to December 20, 2013;<br><br>The Confirmation Order shall have become final and non-appealable on or prior to December 31, 2013; and<br><br>The effective date of the Plan shall have occurred on or prior to December 31, 2013, if the milestone directly above shall have been waived, or January 7, 2014 if such milestone is not waived;<br><br>provided, that each of the foregoing deadlines may be extended in accordance with the terms of the Restructuring Support Agreement. |
| **Mandatory Prepayments:**<br>*DIP Credit Agreement 2.11* | The following mandatory prepayments shall be required:<br><br>• Excess Cash: Commencing with the month of November 2013, repayments of the DIP Loans in an amount equal to 100% of the "Excess Cash" (defined in Annex III) of the DIP Credit Parties (excluding cash collateral under the LC Facility) in excess of $75 million calculated as of the end of |

each month;

- Asset Sales:  Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of the sale or other disposition of any property or assets of the DIP Credit Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Loan Documents, including customary reinvestment rights within 180 days of receipt and an ability of the Borrower to use up to $10.5 million of asset sale proceeds as cash collateral under the LC Facility;

- Insurance Proceeds:  Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets of the DIP Credit Parties or any of their respective subsidiaries subject to exceptions to be agreed on in the DIP Loan Documents, including customary rights to repair, restore or replace damaged property within 180 days of receipt with aggregate insurance proceeds not to exceed $10 million; and

- Incurrence of Indebtedness:  Prepayments of the DIP Loans in an amount equal to 100% of the net cash proceeds of any indebtedness incurred by the DIP Credit Parties or any of their respective subsidiaries after the Closing Date (other than indebtedness otherwise permitted under the DIP Loan Documents), payable no later than the date of receipt.

| | |
|---|---|
| **Events of Default:**<br>*DIP Credit Agreement Article VII*<br>*Interim Order ¶ 14*<br>*FBR 4001(c)(1)(B)*<br>*LBR 4001-2(a)(ii)* | Usual and customary events of default, including but not limited to:<br><br>- Default in payment of principal or interest of any DIP Loan or Reimbursement Obligation;<br><br>- Any representation or warranty made by any Loan Party shall prove to have been incorrect in any material respect when made or deemed made;<br><br>- Events of default related to the failure to observe or perform certain covenants, conditions or agreements contained in the DIP Loan Documents, including, without limitation, covenants to use |

proceeds of the DIP Loans in accordance with the Budget, meet minimum financial metrics and comply with case milestones;

- The occurrence of an "Event of Default" under, and as such term is defined in, the New L/C Facility Agreement;

- Defaults under any prepetition or postpetition agreement that involves the failure to make any payment when due in respect of any Indebtedness which causes such Indebtedness, or permits the holder of such Indebtedness to cause such Indebtedness to become due prior to its stated maturity or prior to its regularly scheduled dates of payment;

- Any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid perfected Lien on any Collateral having, in the aggregate, a fair market value in excess of $100,000, with the priority required by the applicable Security Document;

- Occurrence of any Change in Control;

- Events of default relating to events in the Cases (including, without limitation, dismissal of any of the Cases, appointment of a trustee or an examiner with expanded powers, or any motion seeking such appointment is filed by a Loan Party, conversion of any of the Cases to a chapter 7 case, the filing of any chapter 11 plan, or the entry of an order approving any such chapter 11 plan that is not acceptable to the DIP Administrative Agent and the DIP Lenders, or any termination or modification of the exclusivity periods); and

- The commencement of any action against the Administrative Agent or any Lender or any Related Party of any of them or against the Existing Agent or any of the Existing Lenders by or on behalf of any Loan Party or any of its Affiliates, officers or employees;

- The Restructuring Support Agreement shall cease

01:13977138.1

| | |
|---|---|
| | to be in full force and effect or shall have been amended or otherwise modified without the prior written consent of the DIP Administrative Agent and the DIP Lenders, and, in each case, a period of 15 days has lapsed.<br><br>The exercise of any remedies with respect to Events of Default shall be subject to a five (5) business day time period, within which the Borrower, the Noteholders and any Committee may seek relief from the Bankruptcy Court to prevent the exercise of any remedies against the Collateral. |
| **Debtors' Stipulations:**<br>*Interim Order ¶ D*<br>*FBR 4001(c)(1)(B)(iii)*<br>*LBR 4001-2(a)(i)(B)* | Pursuant to the Interim Order, the Debtors stipulate to the following without limitation:<br><br>Prepetition First Lien Indebtedness.  As of the Petition Date, the aggregate outstanding Loan Document Obligations (as defined in the Prepetition First Lien Credit Agreement) arising under the Prepetition First Lien Loan Documents was no less than $427,302,230, consisting of (i) Prepetition Revolving Loans of no less than $68,000,000; (ii) Term Loans of no less than $318,500,000, (iii) issued and outstanding Letters of Credit of no less than $40,802,230, and (iv) accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition First Lien Loan Documents) and other obligations owing to the Prepetition First Lien Secured Parties or affiliates thereof.  As of the Petition Date, (x) the Prepetition First Lien Indebtedness constitutes legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition First Lien Indebtedness exists, and (z) no portion of the Prepetition First Lien Indebtedness or any payments made to any or all of the Prepetition First Lien Secured Parties is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law. |

| | |
|---|---|
| | Prepetition First Liens and Prepetition First Lien Collateral. The Prepetition First Lien Indebtedness is secured by Liens granted to, or for the benefit of, Prepetition First Lien Secured Parties (the "**Prepetition First Liens**") on the real property of the Debtors and Cash Collateral to the extent required by the Prepetition First Lien Loan Documents, and on substantially all of the personal property of the Debtors, as further described in the Prepetition First Lien Loan Documents (the "**Prepetition First Lien Collateral**"). As of the Petition Date, the Prepetition First Liens (w) are valid, binding, enforceable, and perfected Liens to the extent required by the Prepetition First Lien Loan Documents, (x) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (y) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the lien subordination contemplated herein), and (z) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out, and (C) valid, perfected and unavoidable Liens permitted under the applicable Prepetition First Lien Loan Documents, but only to the extent that such Liens are permitted by the applicable Prepetition First Lien Loan Documents to be senior to or *pari passu* with the applicable Prepetition First Liens. |
| **Waiver of Automatic Stay:** <br> *Interim Order ¶ 14* <br> *FBR 4001(c)(1)(B)(iv)* | Upon the occurrence of an event of default, the automatic stay shall be modified to the extent necessary, without requiring prior notice to or authorization of, this Court, to permit the DIP Secured Parties or the New Issuing Bank to exercise all rights and remedies under the Interim Order, the DIP Loan Documents and the New L/C Facility Documents, <u>provided</u>, that, with respect to all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents, the New L/C Facility Documents or applicable law, the Debtors shall receive five business days' prior written notice, during which time the Debtors and any Committee shall be entitled to an emergency hearing before this Court. Subject to any order of the Court that is entered during such five business-day period, the automatic stay, as to the DIP Secured Parties and the New Issuing Bank, shall automatically terminate at the end of such notice period. |
| **Use of Proceeds** | No proceeds from the DIP Facility, the New L/C Facility, |

| | |
|---|---|
| *Interim Order ¶ 15*<br>*FBR 4001(c)(1)(B)(v)*<br>*LBR 4001-2(a)(ii)* | DIP Collateral or proceeds thereof, Cash Collateral, Prepetition First Lien Collateral or proceeds thereof (including any prepetition retainer funded by the Prepetition First Lien Collateral), or any portion of the Carve-Out may be used by any of the Debtors, any Committee, and any trustee or other estate representative appointed in the Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties and the New Issuing Bank; (b) investigate (except as set forth below), assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the New Issuing Bank, the Prepetition First Lien Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses, any Avoidance Actions or other actions arising under chapter 5 or section 724(a) of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of the DIP Obligations, the New L/C Obligations and/or the Prepetition First Lien Indebtedness, or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, or the Adequate Protection Liens (or the value of any of the Prepetition First Lien Collateral or DIP Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the Adequate Protection Liens or the other Prepetition First Lien Secured Parties' Adequate Protections; (v) except as permitted in Paragraph 14(a) of the Interim Order, any action seeking, or having the effect of, preventing, hindering or otherwise delaying any or all of the DIP Secured Parties', the New Issuing Bank's and the Prepetition First Lien Secured Parties' assertion, enforcement or realization on the Cash |

| | |
|---|---|
| | Collateral or the DIP Collateral in accordance with the DIP Loan Documents, the New L/C Facility Documents, the Prepetition First Lien Loan Documents or the Interim Order; and/or (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents, the New L/C Facility Documents or the Prepetition First Lien Loan Documents; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by a Committee to investigate the Prepetition First Lien Indebtedness and Prepetition First Liens. |
| **Affect on Equities of the Case Exception**<br>*Interim Order ¶ G*<br>*LBR 4001-2(a)(i)(H)* | In light of the subordination of their Liens and super-priority administrative expense claims to (i) the Carve-Out in the case of the DIP Secured Parties and the New Issuing Bank, and (ii) the Carve-Out and the DIP Liens and DIP Super-Priority Claims in the case of the Prepetition First Lien Secured Parties, pursuant to the terms of the Interim Order, each of the DIP Secured Parties, the New Issuing Bank, and the Prepetition First Lien Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply. |
| **Release**<br>*Interim Order ¶ D(iv)*<br>*FBR 4001(c)(1)(B)(viii)* | Pursuant to the Interim Order, each Debtor and its estate shall be deemed to have waived, discharged and released the Prepetition First Lien Secured Parties, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors and employees (all of the foregoing, the "**Prepetition First Lien Secured Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment or other offset rights against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, including, without limitation, (I) any recharacterization, subordination, avoidance or other claim arising under or pursuant to the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity or enforceability of the Prepetition First Lien Indebtedness, or the validity, enforceability, priority or |

01:13977138.1

| | |
|---|---|
| | non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Indebtedness. |
| **Indemnification:** *DIP Credit Agreement 9.03(b)* *FBR 4001(c)(1)(B)(ix)* | The Borrower shall indemnify the DIP Administrative Agent, each DIP Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by the Borrower, Holdings or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Credit Agreement, any Loan Document or any other agreement or instrument contemplated thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Owned Real Property or any other property currently or formerly owned or operated by Holdings, the Borrower or any Subsidiary, or any other Environmental Liability related in any way to Holdings, the Borrower or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment). |
| **Waiver of Rights under Section 506(c):** *Interim Order ¶ 8* *FBR 4001(c)(1)(B)(x)* | Subject to entry of the Final Order, as a further condition of the DIP Facility and the New L/C Facility and any obligation of the DIP Secured Parties and the New Issuing Bank to make credit extensions pursuant to the DIP Loan Documents and the New L/C Facility Documents, respectively, (and their consent to the payment of the |

|  | Carve-Out to the extent provided in the Interim Order), no costs or expenses of administration of the Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Secured Parties, the New Issuing Bank, the Prepetition First Lien Secured Parties, the DIP Collateral, the Prepetition First Lien Collateral and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Administrative Agent, the New Issuing Bank or the Prepetition First Lien Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties. |
|---|---|

**B.      Use of Cash Collateral**

20.      During the ordinary course of their operations, the Debtors generate revenue and fund operations primarily through the use of the cash pledged under the Prepetition First Lien Credit Facility.  Without the use of Cash Collateral (coupled with the liquidity that the Debtors anticipate will be available under the DIP Facility), the Debtors will be unable to meet their working capital needs and therefore unable to perform under their customer contracts and provide emergency services to the communities that rely on them.  Such a result would undoubtedly derail the Debtors' restructuring, to the detriment of the Debtors and their estates and creditors.

**C.      Adequate Protection**

21.      In exchange for their consent for the Debtors to use Cash Collateral and enter into the DIP Facility, the Debtors have agreed to grant the Prepetition First Lien Secured Parties the following (the "**Proposed Adequate Protection**") as adequate protection of their interests in the Prepetition First Lien Collateral:

| | |
|---|---|
| **Adequate Protection Liens:** | Solely to the extent of any aggregate post-petition Diminution in Value (as defined in the Interim Order) of the prepetition interests of the Prepetition First Lien Secured Parties in the |

Prepetition First Lien Collateral, the Interim Order grants the Prepetition First Lien Secured Parties, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, valid, perfected and unavoidable senior Liens (including replacement Liens) upon all of the DIP Collateral (the "**Adequate Protection Liens**"), which Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Senior Liens, and the payment of the Carve-Out to the extent expressly provided in the DIP Loan Documents, the New L/C Facility Documents and the Interim Order.

**Adequate Protection Super-Priority Claims:**

Solely to the extent of any aggregate post-petition Diminution in Value, the Interim Order grants the Prepetition First Lien Secured Parties, subject to the payment of the DIP Super-Priority Claims and the Carve-Out to the extent provided herein, in the DIP Loan Documents and in the New L/C Facility Documents, allowed super-priority administrative expense claims (the "**Adequate Protection Super-Priority Claims**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the DIP Super-Priority Claims and payable from and having recourse to all prepetition and post-petition property of the Debtors, including (subject to the entry of the Final Order) Avoidance Actions, and all proceeds thereof; provided, however, that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Super-Priority Claims unless and until (x) all DIP Obligations and New L/C Obligations have indefeasibly been paid in full in cash or, in the case of New Letters of Credit which survive termination, cash collateralized at 105% of face amount, and (y) all Commitments under the DIP Loan Documents have been irrevocably terminated, and the Issuance Period (as defined in the New L/C Facility Agreement) has terminated (the conditions described in clauses (x) and (y), collectively, "**Paid in Full**" or "**Payment in Full**"). Subject to the relative priorities set forth above, the Adequate Protection Super-Priority Claims against each Debtor shall be against each Debtor on a joint and several basis.

**Adequate Protection Payments:**

In addition to the foregoing, the Prepetition First Lien Secured Parties shall receive from the Debtors additional adequate protection in the forms of (i) payment-in-kind, accrued monthly in arrears, of all interest under the Prepetition First Lien Credit Agreement (at the applicable default interest rate for ABR Borrowings, as defined in the Prepetition First Lien Credit Agreement), and (ii) subject to the provisions and procedures

contained in Paragraph 18(a) of the Interim Order, cash payment for all reimbursable fees, costs and expenses (including, without limitation, the fees and expenses of counsel and all fees and expenses for financial advisors), in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents and retention agreements permitted thereunder, during the period from and including the Petition Date through and including the Termination Date, and without the need to file (or for the applicable professionals to file) any applications for payment of same (all payments referenced in this sentence, collectively, the "**Adequate Protection Payments**").

The Prepetition First Lien Agent and over 50% of the Prepetition First Lien Lenders have consented to the foregoing Adequate Protection arrangements.

### BASIS FOR RELIEF

**A.      The DIP Credit Agreement Should Be
         Approved Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.**

22.      The Debtors propose to obtain financing under the DIP Credit Agreement by providing security interests and liens as set forth above pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Bankruptcy Code section 364(c) provides:

If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

Bankruptcy Code section 364(d)(1) provides:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if —

01:13977138.1

(A) the [debtor in possession] is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

Bankruptcy Rule 4001(c)(2) provides, in relevant part:

The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

23.     The DIP Credit Agreement satisfies applicable standards for approval under sections 364(c) and 364(d) of the Bankruptcy Code. Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); In re The Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

24.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). As stated above and detailed in the Aebersold Declaration, the Debtors contacted potential third party lenders who have historically been active in the debtor in possession financing market. However, the

Prepetition First Lien Lenders would not consent to any postpetition credit facility that primed

their prepetition liens (i.e., a non-consensual priming fight would be required), and none of the

lenders contacted were willing to provide financing on an unsecured basis or on a secured basis

junior to the Prepetition Secured Lenders.

        25.     In addition to contacting outside sources, the Debtors also engaged the

Noteholders to explore the possibility of financing on a junior basis from lenders that were

already part of the Debtors' capital structure. That effort culminated in the three-party

negotiation between the Debtors and their senior and junior lenders that resulted in the execution

of the Restructuring Support Agreement. As the three-party negotiation progressed it became

clear to both the Debtors and Noteholders, that the financing provided under the terms of the DIP

Facility was the only feasible postpetition financing available that could support the consensual

deal embodied in the Restructuring Support Agreement. The benefits of entering chapter 11 with

the terms of a comprehensive balance sheet restructuring negotiated and agreed to by the

majority of the Debtors' capital structure far outweighs the benefit a contentious junior financing

would have provided. Thus, the Debtors submit that the requirement of section 364(c) of the

Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors

is satisfied.

        26.     The financing provided under the DIP Credit Agreement is necessary to

preserve the assets of the Debtors' estates, because it provides the Debtors with the liquidity

necessary to continue to operate their businesses and provide uninterrupted emergency services

to their customer base. Without the DIP Facility, the Debtors operations would grind to a halt,

which could render the Debtors unable to meet their direct operating expenses and suffer

irreparable harm and jeopardize their chances at a successful reorganization. Moreover, the DIP

Facility is tailored to finance and support the pre-negotiated, consensual balance sheet restructuring.

27.    Finally, the Debtors negotiated the DIP Credit Agreement at arm's length and have determined, in the exercise of their sound business judgment, that it is the best proposal under the circumstances and that its terms are fair and reasonable.  The Debtors believe that the terms of the DIP Facility, including the pricing, fees, term, and milestones are competitive based on the current market for debtor-in-possession financing.  Indeed, the competitive posture of the negotiations leading up to the commencement of these cases, ensured that the terms of the DIP Facility are the best available.  Moreover, the Debtors believe that the DIP Facility and the Budget will provide the Debtors with adequate liquidity to continue their operations uninterrupted, preserve the value of the Debtors' businesses, and effectuate the consensual restructuring.

28.    The DIP Facility also includes priming liens on all DIP Collateral for the benefit of the DIP Lenders, and therefore is subject to approval under section 364(d) of the Bankruptcy Code as well.  Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured priming liens if: (a) the debtor is unable to obtain such credit otherwise, and (b) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected.  See 11 U.S.C. §§ 364(d)(1).  As described above, the Debtors are unable to obtain viable financing on terms more favorable than the DIP Facility.  In addition, as described in section C below, the Interim Order contemplates a fair adequate protection package which was consented to by the Prepetition First Lien Agent and more than 50% of the Prepetition First Lien Lenders.  Accordingly the Debtors submit that the proposed DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code.

01:13977138.1

**B.**    **The Use of Cash Collateral Should Be Approved.**

29.    Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Prepetition First Lien Secured Parties have consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the Interim Order.

30.    In addition to the need for debtor-in-possession financing, the Debtors require immediate use of their Cash Collateral pending a Final Hearing on this Motion. The Debtors' use of Cash Collateral is critical to the Debtors' ability to pay operating expenses, including payroll and the costs of administration of their chapter 11 cases. Such use prejudices no one; to the contrary, it directly benefits the estates and creditors by preserving the value of the Debtors' business and ongoing operations pending the consummation of the balance sheet restructuring. The Interim Order is the product of extensive negotiations with the DIP Lenders and reflects the terms under which they would consent to the use of the Cash Collateral.

31.    Based upon the foregoing, the Debtors request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

**C.**    **The Proposed Adequate Protection Should Be Approved.**

32.    Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates certain forms of adequate protection, which include periodic

cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.

What constitutes adequate protection must be decided on a case-by-case basis.  See In re

O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir.

1985); Shaw Indus., Inc. v. First Nat'l Bank (In re Shaw Indus., Inc.), 300 B.R. 861, 865-66

(Bankr. W.D. Pa. 2003) (quoting In re Sharon Steel Corp., 159 B.R. 165, 169 (Bankr. W.D. Pa.

1993)).  The focus of adequate protection is to protect a secured creditor against diminution in

the value of its interest in the particular collateral during the period of use.  See In re Swedeland

Bev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("the whole purpose of adequate protection for

a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy."

(citation omitted)).

33.     In exchange for the Debtors' use of the Prepetition First Lien Collateral,

the Debtors have agreed to provide certain adequate protection to the Prepetition First Lien

Secured Parties, as the holders of secured claims that will be primed to secure the obligations

under the DIP Credit Agreement.[5]  To that end, the Debtors and the Prepetition First Lien

Secured Parties negotiated, and the Debtors request that the Court approve, as of the Petition

Date, the Proposed Adequate Protection.

34.     The Debtors believe that the proposed Adequate Assurance is fair and

reasonable and in accord with section 361 of the Bankruptcy Code.  The Prepetition First Lien

Agent and over 50% of the Prepetition First Lien Lenders have agreed that the Proposed

Adequate Protection is sufficient to allow the Debtors to use the Cash Collateral as the Debtors

proceed through chapter 11 and simultaneously to protect their interest in the Prepetition First

---

[5]     Section 364(d) of the Bankruptcy Code requires that adequate protection be provided where the liens of secured creditors are being primed to secure the obligations under a debtor-in-possession financing facility. See 11 U.S.C. § 364(d).

01:13977138.1

Lien Collateral.  Based upon the foregoing, the Debtors request that the Court authorize the

Debtors to access the Prepetition First Lien Collateral and the DIP Collateral, including, without

limitation, the Cash Collateral, and to provide adequate protection in accordance with the terms

set forth in the Interim Order.

**D.      The DIP Lenders are Entitled to the
         Protections of Section 364(e) of the Bankruptcy Code.**

    35.  Section 364(e) of the Bankruptcy Code provides that the "reversal or

modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect

the validity of any debt so incurred or any priority or lien so granted, to an entity that extended

such credit in good faith."  11 U.S.C. § 364(e).  As previously discussed herein, the DIP Loan

Documents are the product of extensive arm's length, good faith negotiations between the

Debtors and the DIP Lenders.  Moreover, the terms and conditions of the DIP Facility are fair

and reasonable, and the Debtors' entry into the DIP Loan Documents is in the best interests of

their estates and creditors.  Accordingly, the Debtors respectfully submit that the Court should

find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the

Bankruptcy Code, and are entitled to all of the protections afforded by that section.

**E.      Consent of the Prepetition First Lien Secured Parties.**

    36.  As discussed above, the Prepetition First Lien Agent and more than 50%

of the Prepetition First Lien Lenders have consented to the Debtors' use of Cash Collateral and

the Debtors' entry into the DIP Credit Agreement.  Therefore, the incurrence of debt under the

DIP Facility, the attachment of senior, priming liens to certain Prepetition First Lien Collateral,

and all other relief sought hereunder, has been consented to by the requisite majority of

Prepetition First Lien Secured Parties.  Moreover, to compensate the Prepetition First Lien

Secured Parties to the extent that their interests in the Prepetition First Lien Collateral is

diminished due to the Debtors' use of such collateral, the Debtors propose to provide such

lenders the Proposed Adequate Assurance, including monthly interest, paid in kind, of all interest

under the prepetition First Lien Credit Agreement. Therefore, the Prepetition First Lien Secured

Parties are not prejudiced by the granting of relief requested herein.

**F.    The Section 506(c) Waiver in the Final Order Should Be Approved.**

37.    Under the DIP Facility, the Debtors agree to waive any rights to charge

costs and expenses against the DIP Collateral or Prepetition First Lien Collateral. The Debtors

request that the Court approve the waiver, upon entry of the Final Order. Such waivers and

provisions are standard under financings between sophisticated parties. As one court noted, "the

Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under

§ 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in

exchange for concessions to the estates (including a substantial carve-out for the benefit of

administrative creditors)." In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D.

Mass. 2000). See also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa. 1995)

(noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re

Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving

settlement between debtor and certain lenders wherein debtor waived certain rights (including

506(c) rights) against the lenders in exchange for valuable consideration). The waiver of

surcharge rights is appropriate where, as here, the Prepetition First Lien Secured Parties have

consented to the continued use of Cash Collateral and the proceeds of the Prepetition First Lien

Collateral to fund the administration of the Debtors' estates in accordance with the Budget.

**G.    Modification of Automatic Stay.**

38.    The proposed DIP Agreement and Interim Order contemplate the

modification of the automatic stay to the extent necessary to permit the Debtors and the DIP

01:13977138.1

Administrative Agent and DIP Lenders to take all actions necessary to implement the DIP

Agreement and the Interim Order.  However, the DIP Lenders will provide five (5) business

days' notice to the Debtors, U.S. Trustee and the respective lead counsel to any statutory

committee of unsecured creditors after an event of default before enforcing remedies under the

DIP Loan Documents.

   39. Stay modification provisions of this type are customary components of

postpetition debtor-in-possession financing facilities and, in the Debtors' business judgment, are

reasonable under the circumstances.  The provision provides the Debtors and other parties

reasonable time to cure an event of default if possible and entitles the Debtors and any committee

to an emergency hearing before this Court.  Accordingly, the Debtors request that the Court

authorize the modification of the automatic stay in accordance with the terms set forth in the

Interim Order.

**H.** **Liens on Avoidance Actions.**

   40. The Final Order, if approved by the Court, will grant the DIP

Administrative Agent and DIP Lenders liens on all unencumbered DIP Collateral, including "the

proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548,

549, 550, 551 and 553 and 724(a) of the Bankruptcy Code, and any other avoidance or similar

action under the Bankruptcy Code or similar state law." Here, the DIP Administrative Agent and

DIP Lenders require the granting of such liens as a necessary condition to extending financing

under the DIP Facility.  The Debtors require the financing under the DIP Facility to ensure

uninterrupted provision of emergence services.  Accordingly, it is appropriate to grant the liens

on avoidance actions.  Courts in this District have approved the granting of such liens under

similar circumstances. See, e.g., In re Bicent Holdings LLC, Case No. 12-11304 (KG) (May 16,

2012); In re Capitol Infrastructure, LLC, Case No. 12-11362 (KG) (May 15, 2012); In re Solar

Trust of America, LLC, Case No. 12-11136 (KG) (Apr. 26, 2012); In re Delta Petroleum Corp.,

Case No. 11-14006 (KJC) (Jan. 11, 2012); In re Townsends, Inc., Case No. 10-14092 (CSS)

(Jan. 28, 2011).

**H.      Interim Approval Should Be Granted**

41.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a

motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral

pursuant to section 363 may not be commenced earlier than fourteen (14) days after the service

of such motion.  Upon request, however, the Court is empowered to conduct a preliminary

expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral

to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

42.      The Debtors request that the Court hold and conduct a preliminary hearing

on the DIP Motion to consider entry of the Interim Order authorizing the Debtors from and after

entry of the Interim Order until the Final Hearing to borrow an amount sufficient to fund

operating expenses and to use Cash Collateral.  This relief will enable the Debtors to ensure no

interruption of emergency services, to operate their business in a manner that will permit them to

preserve and maximize value, and, therefore, to avoid immediate and irreparable harm and

prejudice to their estates and all parties in interest, pending the Final Hearing.

**I.      Notice Procedures and the Final Hearing**

43.      Pursuant to Local Rule 4001-2(c), the Final Order may only be entered

after notice and a hearing and the Debtors may not schedule a hearing to consider the Final Order

until at least seven (7) days after the organizational meeting of the Official Committee of

Unsecured Creditors ("**Creditors' Committee**") contemplated by section 1102 of the

Bankruptcy Code.  The Debtors shall, within three (3) business days of the entry of the Interim

Order by the Court, serve by overnight mail on (a) the U.S. Trustee, (b) the DIP Administrative

01:13977138.1

Agent, (c) the DIP Lenders, (d) counsel to the DIP Administrative Agent and the DIP Lenders,

(e) the New Issuing Bank, (f) counsel to Wells Fargo, indenture trustee for the Debtors' senior

unsecured notes, (g) counsel to the Noteholders, (h) the Debtors' fifty (50) largest unsecured

creditors on a consolidated basis, (i) the Internal Revenue Service, (j) all appropriate state taxing

authorities, (k) all landlords, owners, and/or operators of premises at which any of the Debtors'

inventory and/or equipment is located and (l) any other party that files a request for notices with

the Court as of the date of such service (collectively, the "**Noticed Parties**"), a copy of the

Interim Order and a notice of the Final Hearing (the "**Final Hearing Notice**") to consider entry

of the Final Order on the date established by the Court.  The Final Hearing Notice will also

inform recipients that any party in interest objecting to the relief sought at the Final Hearing will

be required to serve and file an objection, which objection shall: (i) be in writing; (ii) conform to

the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the United States

Bankruptcy Court for the District of Delaware by no later than 4 p.m. on the day that is not less

than seven (7) calendar days before the Final Hearing (the "**Objection Deadline**"); and (iv) be

served upon the following parties so as to be received by the Objection Deadline:  (a) the U.S.

Trustee: 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801; (b) co-counsel for

the Debtors:  Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn:

Rachel C. Strickland, Esq. and Daniel I. Forman, Esq.) and Young Conaway Stargatt & Taylor,

LLP, 1000 North King Street, Wilmington, DE 19801 (Attn: Edmon L. Morton, Esq. and Maris

J. Kandestin, Esq.); (c) counsel to the DIP Secured Parties: Gibson Dunn & Crutcher LLP, 200

Park Avenue, New York, NY 10166 (Attn: David M. Feldman, Esq. and Matthew K. Kelsey,

Esq) and Pepper Hamilton LLC, Hercules Plaza, Suite 5100, 1313 N. Market Street,

01:13977138.1

42

Wilmington, Delaware 19899 (Attn: David B. Stratton, Esq.); and (d) counsel to any Creditors'
Committee appointed in these cases.

44.     The Debtors respectfully request that the Court schedule the Final Hearing
on this Motion no later than thirty (30) days after the date of entry of the Interim Order.  Such
relief is necessary in order to maintain the value of the Debtors' assets and avoid immediate and
irreparable harm and prejudice to the Debtors' respective estates.

## **NOTICE**

45.     Notice of this Motion will be given to the Noticed Parties.  The Debtors
submit that, under the circumstances, no other or further notice is required.

46.     No previous motion for the relief sought herein has been made to this or
any other court.

## CONCLUSION

WHEREFORE the Debtors respectfully request: (i) entry of an order substantially

in the form of the proposed Interim Order annexed hereto as <u>Exhibit A</u>; (ii) after the Final

Hearing, entry of the Final Order substantially in the form that shall be filed with the Court; and

(iii) such other and further relief as may be just or proper.

Dated:  August 4, 2013
       Wilmington, Delaware

           YOUNG CONAWAY STARGATT & TAYLOR, LLP

           Edmon L. Morton (No. 3856)
           Maris J. Kandestin (No. 5294)
           Rodney Square
           1000 North King Street
           Wilmington, DE  19801
           (302) 571-6600
           (302) 571-1253 (Fax)
           emorton@ycst.com
           mkandestin@ycst.com

                    -and-

           WILLKIE FARR & GALLAGHER LLP
           Matthew A. Feldman
           Rachel C. Strickland
           Daniel I. Forman
           787 Seventh Avenue
           New York, New York 10019
           (212) 728-8000
           (212) 728-8111 (Fax)
           mfeldman@willkie.com
           rstrickland@willkie.com
           dforman@willkie.com

           *Proposed Co-Counsel to the Debtors and*
           *Debtors in Possession*

01:13977138.1

# EXHIBIT A

## Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RURAL/METRO CORPORATION, et al., | : | Case No. 13-11952 (___) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | **Re: Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION FIRST LIEN SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

Upon the motion, dated August 4, 2013, (the **"DIP Motion"**), of Rural/Metro Corporation, (**"Rural Metro"** or **"Borrower"**), WP Rocket Holdings, Inc. ("**Holdings**") and the subsidiaries of Rural Metro and Holdings which have filed chapter 11 petitions (the "**Subsidiary Debtors**"), as debtors and debtors in possession (collectively, the "**Debtors**"), in the above-referenced cases (the "**Cases**"), seeking entry of an interim order (this **"Interim Order"**) pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 365, 507 and 552 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the **"Bankruptcy Code"**), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that, among other things:

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1 to the DIP Motion. The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

(i)        authorizes the Borrower to obtain, and authorizes each of Holdings and the Subsidiary Debtors (collectively, "**Guarantors**") to guarantee, jointly and severally, the Borrower's obligations in respect of a senior secured, super-priority, multiple draw term credit facility (such facility, the "**DIP Facility**") of up to $75 million in aggregate principal amount pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Super Priority Debtor in Possession Credit Agreement in substantially the form attached hereto as <u>Exhibit 1</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**") [2] among Borrower, the Guarantors, Credit Suisse AG as administrative agent and collateral agent (in such capacities, and including any successor administrative agent and collateral agent, the "**DIP Administrative Agent**") for itself and (A) certain financial institutions party thereto on the date of entry of this Interim Order as lenders (the "**Initial DIP Lenders**") and (B) certain financial institutions from time to time party thereto following the date of entry of this Interim Order as lenders (the "**Syndicated DIP Lenders**" and together with the Initial DIP Lenders who remain party to the DIP Credit Agreement, the "**DIP Lenders**" and together with the DIP Administrative Agent, collectively, the "**DIP Secured Parties**") and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement) (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"), which, if approved on a final basis, would consist of $75 million in respect new money funding (the "**DIP Loans**"), of which up to $40 million shall be available upon entry of this Interim Order, subject to the terms and conditions of this Interim Order, the Final Order (as defined below) and the DIP Loan Documents (all DIP Loans made to or for the benefit or account of, and all guaranties issued by, the respective Debtors pursuant to the DIP Loan Documents, and all other obligations

---

[2]        Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement. The term "Event of Default" as used herein shall have the meaning given to such term in the DIP Credit Agreement or the New L/C Facility Agreement (as defined below), as applicable.

and liabilities of the Debtors arising under the DIP Loan Documents, including, without limitation, all Loan Document Obligations as defined in the DIP Credit Agreement, collectively, the "**DIP Obligations**");

        (ii)      authorizes the Borrower to obtain, and authorizes each of the Guarantors to guarantee, jointly and severally, the Borrower's obligations in respect of a senior secured, super-priority letter of credit facility (the "**New L/C Facility**") pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement in substantially the form attached hereto as Exhibit 2 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**New L/C Facility Agreement**") among Borrower as applicant, and Credit Suisse AG, Cayman Islands Branch as issuer (in such capacity, the "**New Issuing Bank**"), and (z) any and all other DIP Loan Documents, as such documents apply to the New L/C Facility Agreement and/or the New Issuing Bank (together with the New L/C Facility Agreement, collectively, the "**New L/C Facility Documents**"), which, if approved on a final basis, would consist of up to $30 million in available new letters of credit issued pursuant to the New L/C Facility Documents (the "**New Letters of Credit**"), of which up to $15 million shall be available upon entry of this Interim Order, subject to the terms and conditions set forth in the New L/C Facility Documents (all obligations of the Borrower and the Guarantors in respect of the New Letters of Credit, and all other obligations and liabilities of the Debtors arising under the New L/C Facility Documents, collectively, the "**New L/C Obligations**");

        (iii)      approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and the New L/C Facility Documents and to

perform such other and further acts as may be required in connection with the DIP Loan Documents and the New L/C Facility Documents;

(iv)     authorizes each Debtor to grant, in accordance with the relative priorities set forth herein (x) to the DIP Administrative Agent (for the benefit of itself and the other DIP Secured Parties) and to the New Issuing Bank, Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) but shall be junior to the Prepetition Senior Liens (as defined below) and (y) to the DIP Secured Parties and the New Issuing Bank super-priority administrative expense claims having recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired (which, upon entry of the Final Order, will include Avoidance Actions (as defined below)) and proceeds thereof;

(v)     authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the Prepetition First Lien Secured Parties (as defined below), the DIP Secured Parties and/or the New Issuing Bank have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(vi)     grants, as of the Petition Date and in accordance with the relative priorities set forth herein, certain adequate protection to the Prepetition First Lien Secured Parties (as defined below), consisting of, among other things, Adequate Protection Liens (as defined below), the Adequate Protection Super-Priority Claims, and payment-in-kind, on a current basis, of accrued and unpaid prepetition and post-petition interest (at the applicable default interest rate for ABR Borrowings, as defined in the Prepetition First Lien Credit Agreement), and cash

payment, on a current basis, of reimbursable fees and expenses of the Prepetition First Lien Agent (as defined below);

(vii)    vacates the automatic stay imposed by section 362 of the Bankruptcy Code in accordance with Paragraphs 5, 14(a), and 14(c) below to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, the New L/C Facility Documents and this Interim Order;

(viii)    schedules a final hearing on the DIP Motion to be held within 45 days after the entry of this Interim Order (the **"Final Hearing"**) to consider entry of a final order acceptable in form and substance to the DIP Administrative Agent and New Issuing Bank that grants all of the relief requested in the DIP Motion on a final basis (the **"Final Order"**); and

(ix)    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the Declaration of Stephen Farber in Support of Chapter 11 Petitions and First Day Pleadings, the DIP Credit Agreement, the New L/C Facility Agreement and the evidence submitted at the emergency interim hearing (the "**Interim Hearing**") on the DIP Motion; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on _____ __, 2013; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED[3], that:**

A. **Petition Date**. On August 4, 2013 (the **"Petition Date"**), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the **"Court"**). The Debtors have continued in the management and operation of their business and property as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the **"Committee"**), trustee or examiner has been appointed in the Cases.

B. **Jurisdiction and Venue**. This Court has core jurisdiction over the Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

C. **Notice**. The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001. Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on [_____], 2013, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the United States Securities and Exchange Commission, (iii) the Office of the United States Attorney for the District of Delaware, (iv) the Internal Revenue Service, (v) those entities or individuals included on the Debtors' list of largest unsecured creditors on a consolidated basis, (vi) counsel to the Prepetition First Lien Agent (as

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

defined below), (vii) the Prepetition First Lien Agent, (viii) counsel to the DIP Administrative Agent and the New Issuing Bank, and (ix) Wells Fargo, indenture trustee for the Debtors' senior unsecured notes. Such notice of the DIP Motion, the relief requested therein and the Interim Hearing is sufficient under the circumstances.

D. **Debtors' Stipulations Regarding the Prepetition First Lien Credit Facility**. Without prejudice to the rights of parties in interest to the extent set forth in Paragraph 6 below, the Debtors admit, stipulate, acknowledge and agree (Paragraphs D(i) through D(iv) hereof shall be referred to herein collectively as the **"Debtors' Stipulations"**) as follows:

(i)    Prepetition First Lien Credit Facility. As of the Petition Date, Rural/Metro Corporation, as borrower, Holdings, as guarantor, the Subsidiary Debtors as guarantors, the financial institutions parties thereto from time to time as lenders (the **"Prepetition First Lien Lenders"**), and Credit Suisse AG as administrative agent and collateral agent for the Prepetition First Lien Lenders (in such capacity, and including any successor agents, the **"Prepetition First Lien Agent"** and together with the Prepetition First Lien Lenders, the **"Prepetition First Lien Secured Parties"**), were parties to that certain Credit Agreement, dated as of June 30, 2011 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the **"Prepetition First Lien Credit Agreement"** and together with the other Loan Documents (as defined in the Prepetition First Lien Credit Agreement), in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the **"Prepetition First Lien Loan Documents"** and the credit facility contemplated therein, the **"Prepetition First Lien Credit Facility"**).

(ii)    Prepetition First Lien Indebtedness. As of the Petition Date, the aggregate outstanding Loan Document Obligations (as defined in the Prepetition First Lien Credit

Agreement) arising under the Prepetition First Lien Loan Documents was no less than $427,302,230, consisting of (i) Revolving Loans (as defined in the Prepetition First Lien Credit Agreement) of no less than $68,000,000 (the "**Prepetition Revolving Loans**"), (ii) Term Loans (as defined in the Prepetition First Lien Credit Agreement) of no less than $318,500,000 (the "**Prepetition Term Loans**"), (iii) issued and outstanding Letters of Credit (as defined in the Prepetition First Lien Credit Agreement) of no less than $40,802,230 (the "**Prepetition Letter of Credit Exposure**"), and (iv) accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition First Lien Loan Documents) and other obligations owing to the Prepetition First Lien Secured Parties or affiliates thereof (all Loan Document Obligations under, and as defined in the Prepetition First Lien Credit Agreement, together with all other Secured Obligations under, and as defined in the Prepetition First Lien Credit Agreement, and any other amounts owing by the applicable Debtors under the Prepetition First Lien Loan Documents, collectively, the "**Prepetition First Lien Indebtedness**").  As of the Petition Date, (x) the Prepetition First Lien Indebtedness constitutes legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition First Lien Indebtedness exists, and (z) no portion of the Prepetition First Lien Indebtedness or any payments made to any or all of the Prepetition First Lien Secured Parties is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii)    Prepetition First Liens and Prepetition First Lien Collateral.    The

Prepetition First Lien Indebtedness is secured by Liens granted to, or for the benefit of,

Prepetition First Lien Secured Parties (the "**Prepetition First Liens**") on the real property of the

Debtors and Cash Collateral to the extent required by the Prepetition First Lien Loan Documents,

and on substantially all of the personal property of the Debtors, as further described in the

Prepetition First Lien Loan Documents (the "**Prepetition First Lien Collateral**").  As of the

Petition Date, the Prepetition First Liens (w) are valid, binding, enforceable, and perfected Liens

to the extent required by the Prepetition First Lien Loan Documents, (x) were granted to, or for

the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably

equivalent value, (y) are not subject to avoidance, recharacterization or subordination pursuant to

the Bankruptcy Code or applicable non-bankruptcy law (except for the lien subordination

contemplated herein), and (z) are subject and subordinate only to (A) the DIP Liens (as defined

below), (B) the Carve-Out (as defined below), and (C) valid, perfected and unavoidable Liens

permitted under the applicable Prepetition First Lien Loan Documents, but only to the extent that

such Liens are permitted by the applicable Prepetition First Lien Loan Documents to be senior to

or *pari passu* with the applicable Prepetition First Liens.

(iv)    Release of Claims.  Each Debtor and its estate shall be deemed to have

waived, discharged and released the Prepetition First Lien Secured Parties, together with their

respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors and

employees (all of the foregoing, the "**Prepetition First Lien Secured Party Releasees**") of any

and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses,

setoff, recoupment or other offset rights against any and all of the Prepetition First Lien Secured

Party Releasees, whether arising at law or in equity, including, without limitation, (I) any

recharacterization, subordination, avoidance or other claim arising under or pursuant to the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity or enforceability of the Prepetition First Lien Indebtedness, or the validity, enforceability, priority or non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Indebtedness.

      E.      **Findings Regarding the DIP Facilities**.

      (i)      <u>Need for Post-petition Financing</u>. The Debtors have an immediate need to obtain the DIP Facility and the New L/C Facility and use Cash Collateral, among other things, to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operation needs. The Debtors' access to sufficient working capital and liquidity through the use of borrowing under the DIP Facility, the issuance of New Letters of Credit and through the use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

      (ii)      <u>No Credit Available on More Favorable Terms</u>. The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties and the New Issuing Bank under the DIP Loan Documents and the New L/C Facility Documents, respectively. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without incurring prohibitive litigation and/or execution expenses that would erode the value of the Debtors' estates and harm all parties in interest. The Debtors are also unable to

obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Secured Parties and the New Issuing Bank the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents and the New L/C Facility Documents, respectively, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (as defined below) (all of the foregoing, including the DIP Liens and the DIP Super-Priority Claims, collectively, the "**DIP Protections**").

F.      **Adequate Protection for Prepetition Secured Parties**.  The Prepetition First Lien Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition First Lien Collateral (including the Cash Collateral) to permit the continued operation of the Debtors' businesses.  The Prepetition First Lien Agent, for the Prepetition First Lien Secured Parties, has agreed to permit the Debtors to use the Prepetition First Lien Collateral, including the Cash Collateral, for the period through the Termination Date (as defined below), subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 363(m) of the Bankruptcy Code.  The Prepetition First Lien Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any Diminution in Value (as defined below).  Based on the Motion and on the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and use of the Cash Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition First Lien Agent's consent thereto. The Prepetition First Lien Agent and the Prepetition First Lien Lenders consented to the entry of this Interim Order and relief provided herein.

G.    **Section 552.**    In light of the subordination of their Liens and super-priority administrative expense claims to (i) the Carve-Out in the case of the DIP Secured Parties and the New Issuing Bank, and (ii) the Carve-Out and the DIP Liens and DIP Super-Priority Claims in the case of the Prepetition First Lien Secured Parties, each of the DIP Secured Parties, the New Issuing Bank, and the Prepetition First Lien Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.

H.    **Business Judgment and Good Faith Pursuant to Section 364(e).**

(i)    The DIP Secured Parties and the New Issuing Bank have indicated a willingness to provide post-petition secured financing via the DIP Facility and the New L/C Facility, respectively, to the Borrower in accordance with the DIP Loan Documents, the L/C Facility Documents and this Interim Order.

(ii)    The terms and conditions of the DIP Facility and the New L/C Facility pursuant to the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

(iii)    Based on the record presented to the Court at the Interim Hearing, the DIP Facility, the New L/C Facility, DIP Loan Documents and the New L/C Facility Documents were negotiated in good faith and at arms' length among the Debtors, on the one hand, and the DIP Secured Parties and the New Issuing Bank, on the other hand, each with the assistance and counsel of their respective advisors, and all of the DIP Obligations and the New L/C Obligations shall be deemed to have been extended by the DIP Secured Parties and the New Issuing Bank, as

applicable, and their respective affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

I.    **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates and their ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facility and the New L/C Facility in accordance with this Interim Order, the DIP Loan Documents and the New L/C Facility Documents is therefore in the best interests of the Debtors' estates consistent with their fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Secured Parties, the DIP Secured Parties and the New Issuing Bank to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted**.  The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order, the DIP Loan Documents and the New L/C Facility Documents.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, are hereby denied and overruled.

2.    **DIP Loan Documents, New L/C Facility Documents and DIP Protections**.

(a)    Approval of DIP Loan Documents and New L/C Facility Documents.    The Debtors are expressly and immediately authorized to (i) establish the DIP Facility and the New L/C Facility, (ii) execute, deliver and perform under the DIP Loan Documents and the New L/C Facility Documents and to incur the DIP Obligations and the New L/C Obligations in accordance with, and subject to, the terms of this Interim Order, the New L/C Facility Documents, and the DIP Loan Documents, and (iii) execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required or necessary for the performance by the applicable Debtors under the DIP Facility and the New L/C Facility and the creation and perfection of the DIP Liens described in, and provided by, this Interim Order, the DIP Loan Documents and the New L/C Facility Documents.    The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents and the New L/C Facility Documents as such become due pursuant to the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, including, without limitation, all closing fees, administrative fees, arrangement fees, fronting fees, commitment or backstop fees, letter of credit fees and reasonable attorneys' and financial advisors' fees and disbursements arising under the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable; provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) incurred after the Petition Date shall be subject to the provisions of Paragraph 18(a).    Upon their execution and delivery, the DIP Loan Documents and the New L/C Facility Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.    Each

officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents and the New L/C Facility Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Debtors.

(b)    <u>Authorization to Incur DIP Obligations and New L/C Obligations</u>.    To enable the Debtors to continue to operate their business, during the period from the entry of this Interim Order through and including the earlier of the entry of a Final Order or September ____, 2013 (the "**Interim Period**"), and subject to the terms and conditions of this Interim Order, the DIP Loan Documents and the New L/C Facility Documents, including, without limitation, Sections 3.17, 5.10 and 6.12 of the DIP Credit Agreement (as the same may be modified, supplemented or updated from time to time, the "**Budget Covenants**"), the Borrower is hereby authorized to (i) borrow DIP Loans under the DIP Facility in an aggregate outstanding principal amount not to exceed $40 million, and (ii) request the issuance of New Letters of Credit in an aggregate outstanding principal amount not to exceed $15 million.  Following the expiration of the Interim Period, the Borrower's authority to borrow further DIP Loans and request the issuance of New Letters of Credit will be governed by the terms of the Final Order.  All DIP Obligations of the Borrower shall be unconditionally guaranteed by each of the Guarantors on a joint and several basis as further provided in the DIP Loan Documents.    All New L/C Obligations of the Borrower shall be unconditionally guaranteed by each of the Guarantors on a joint and several basis, and shall be cash collateralized by the Borrower, using cash or proceeds of the DIP Loans, in an amount equal to 105% of the aggregate Stated Amount (as defined in the New L/C Facility Agreement) of New Letters of Credit issued, in each case as further provided in the New L/C Facility Documents.

(c)     <u>Syndication of DIP Loan</u>.  Following the entry of this Interim Order, the parties to the DIP Credit Agreement, including but not limited to the DIP Administrative Agent and the Initial DIP Lenders or their Affiliates, are authorized to syndicate the DIP Loans (those available upon entry of this Interim Order and those which shall become available upon entry of the Final Order) to the then holders of Prepetition First Lien Indebtedness.  Following this syndication process, which shall be completed prior to entry of the Final Order, the DIP Loans (those available upon entry of this Interim Order and those which shall become available upon entry of the Final Order) shall be reallocated among the Initial DIP Lenders and the Syndicated DIP Lenders, or their respective Affiliates, on a pro-rata basis in accordance with their then respective Commitments (as defined in the DIP Credit Agreement).

(d)     <u>Application of DIP Facility and DIP Collateral Proceeds</u>.  The proceeds of the DIP Facility and DIP Collateral (in each case net of any amounts used to pay fees, principal, interest, costs and expenses of the DIP Facility and the Prepetition First Lien Facility pursuant to, and in accordance with, the DIP Loan Documents and this Interim Order) shall be used in accordance with the terms and conditions of the DIP Loan Documents and this Interim Order, including, without limitation, the Budget Covenants, solely for (i) working capital; (ii) other general corporate purposes of the Debtors (including intercompany loans and investments solely to the extent permitted by the DIP Loan Documents and this Interim Order); (iii) the costs of administration of the Cases, and (iv) cash collateralizing the New Letters of Credit in accordance with the terms and conditions of the New L/C Facility Documents and this Interim Order. Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of any confirmed chapter 11 plan with respect to all of the Debtors, except with respect to the prepetition obligations as set

forth in this Interim Order or as otherwise provided in any "first day" order entered by the Court (which "first day" orders shall be in form and substance reasonably acceptable to the DIP Administrative Agent and the New Issuing Bank) or as otherwise provided in the DIP Credit Agreement. A copy of the initial approved Budget is attached as Exhibit 3.

(e)    Conditions Precedent. The DIP Secured Parties and the New Issuing Bank shall have no obligation to make any DIP Loan, issue any New Letters of Credit, or make any other extension of credit or financial accommodation in respect of the DIP Facility, the New L/C Facility or otherwise during the Interim Period unless and until all conditions precedent to the making of any such DIP Loan, New Letter of Credit or other extension of credit or financial accommodation under the DIP Loan Documents, the New L/C Facility Documents and this Interim Order have been satisfied in full or waived by the requisite DIP Secured Parties or the New Issuing Bank, as applicable, in accordance with the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, as applicable.

(f)    DIP Liens. Effective immediately upon the entry of this Interim Order, and subject to the relative priorities among the DIP Facility, the New L/C Facility and the Prepetition First Lien Credit Facility, in each case as set forth more fully in this Interim Order (including in Paragraphs 2(f) and (g)), the DIP Administrative Agent (as provided in the DIP Loan Documents and for itself and the ratable benefit of the other DIP Secured Parties) and the New Issuing Bank are hereby granted the following Liens (which shall immediately, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable and non-avoidable) on all property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Administrative Agent, the New Issuing Bank or otherwise), and any investment in such

cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries (subject to the restriction set forth below), tax refunds, insurance proceeds, commercial tort claims (without the need to comply with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any such commercial tort claim), membership interests and other equity ownership interests, in joint ventures (collectively, the **"Joint Venture Entities"**) (subject to the restrictions set forth below), all other Collateral (as defined in the DIP Credit Agreement) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing; provided, however, that notwithstanding any provision herein or in any DIP Loan Document or New L/C Facility Document to the contrary, no Debtor organized under U.S. law shall be required to pledge in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock of its indirect foreign subsidiaries (all of the foregoing collateral collectively referred to as the **"DIP Collateral,"** and all such Liens granted to (i) the DIP Administrative Agent as provided in the DIP Loan Documents and for the ratable benefit of the DIP Secured Parties in respect of the Secured Obligations under, and as defined in the DIP Credit Agreement, and (ii) the New Issuing Bank as provided in the New L/C

Facility Documents, each as pursuant to this Interim Order, the DIP Loan Documents, and the

New L/C Facility Documents, as applicable, the "**DIP Liens**"):

> (I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a
> perfected, binding, continuing, enforceable, non-avoidable, first
> priority Lien on all unencumbered DIP Collateral, including the
> proceeds of the Debtors' claims and causes of action under
> sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 and
> 724(a) of the Bankruptcy Code, and any other avoidance or similar
> action under the Bankruptcy Code or similar state law
> ("**Avoidance Actions**") (subject to entry of the Final Order),
> whether received by judgment, settlement or otherwise, but
> excluding the Avoidance Actions themselves;

> (II)      pursuant to section 364(c)(3) of the Bankruptcy Code, a
> perfected junior Lien upon all DIP Collateral (including, without
> limitation, Cash Collateral) that is subject to (x) valid, enforceable,
> non-avoidable and perfected Liens in existence on the Petition
> Date that, after giving effect to any intercreditor or subordination
> agreement, are senior in priority to the Prepetition First Liens, and
> (y) valid, enforceable and non-avoidable Liens in existence on the
> Petition Date that are perfected subsequent to the Petition Date as
> permitted by section 546(b) of the Bankruptcy Code and after
> giving effect to any intercreditor or subordination agreement, are
> senior in priority to the Prepetition First Liens, other than, in the
> case of clause (II)(x) or (II)(y), Liens which are expressly stated to
> be primed by the Liens to be granted to the DIP Administrative
> Agent and the New Issuing Bank described in clause (III) below
> (subject to such exception, the "**Prepetition Senior Liens**"); and

> (III)      pursuant to section 364(d)(1) of the Bankruptcy Code, a
> perfected first priority, senior priming Lien on all DIP Collateral
> that is senior to (x) the existing Prepetition First Liens in favor of
> the Prepetition First Lien Secured Parties and securing the
> Prepetition First Lien Indebtedness (including all Obligations as
> defined in the Prepetition First Lien Loan Documents), or (y) any
> existing Liens in favor of any other person or entity (other than the
> Prepetition Senior Liens), including, without limitation, all Liens
> junior to the Prepetition First Liens (the Liens referenced in clauses
> (x) and (y), collectively, the "**Primed Liens**"), which Primed
> Liens, together with any Liens granted on or after the Petition Date
> to provide adequate protection in respect of any Primed Liens,
> shall be primed by and made subject and subordinate to the
> perfected first priority senior priming DIP Liens.

(g)   <u>DIP Lien Priority</u>.  Notwithstanding anything to the contrary contained in this Interim Order, the other DIP Loan Documents or the New L/C Facility Documents, and for the avoidance of doubt, the DIP Liens granted to the DIP Administrative Agent (for the DIP Secured Parties) and the New Issuing Bank shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Senior Liens and to the extent provided in the provisions of this Interim Order, the DIP Loan Documents and the New L/C Facility Documents, shall also be subject to the Carve-Out, and (ii) except as provided in clause (i), are senior to all other prepetition and post-petition Liens of any other person or entity (including, without limitation, the Primed Liens and the Adequate Protection Liens).  The DIP Liens and the DIP Super-Priority Claims (i) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or, subject to the entry of the Final Order:  (a) section 506(c) of the Bankruptcy Code or (b) the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (y) any Liens arising after the Petition Date, including, without limitation, any Liens granted or ordered by the Court at any time in any of the Cases, or (z) any intercompany or affiliate Liens of the Debtors, and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Cases.

(h)   <u>Relative Lien Priority of DIP Facility and New L/C Facility</u>.  Notwithstanding anything to the contrary herein, the DIP Liens granted to the DIP Secured Parties in respect of the DIP Loans and to the New Issuing Bank in respect of the New L/C

Obligations shall be *pari passu* in priority; provided, however, that the DIP Liens of the DIP Secured Parties shall be immediately junior to the DIP Liens of the New Issuing Bank solely with respect to the L/C Account Collateral (as defined in the New L/C Facility Agreement).

(i)     Enforceable Obligations.   The DIP Loan Documents and the New L/C Facility Documents shall constitute and evidence the valid and binding DIP Obligations and New L/C Obligations, respectively, of the applicable Debtors, which DIP Obligations and New L/C Obligations shall be enforceable against such Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.   No obligation, payment, transfer or grant of security under the DIP Loan Documents, the New L/C Facility Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(j)     Super-Priority Administrative Expense Claim Status.   In addition to the DIP Liens granted herein, (1) effective immediately upon entry of this Interim Order, all of the DIP Obligations and New L/C Obligations authorized to be incurred by the Debtors pursuant to this Interim DIP Order and (2) effective immediately upon entry of the Final Order, all of the DIP Obligations and New L/C Obligations shall constitute allowed super-priority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority,

subject only to the payment of the Carve-Out to the extent specifically provided in the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super-Priority Claims), unsecured claims and all other claims against the applicable Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "**DIP Super-Priority Claims**").  The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof, including, without limitation, all Avoidance Actions (subject to the entry of the Final Order) and the proceeds thereof.  Other than as provided in the DIP Loan Documents, the New L/C Facility Documents and this Interim Order with respect to the Carve-Out, and, prior to the entry of a Final Order, any valid 506(c) claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, 331 and 363 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Super-Priority Claims, the DIP Obligations or the New L/C Obligations, or with any other claims of the DIP Secured Parties or the New Issuing Bank arising hereunder.  The DIP Super-Priority Claims granted hereunder to

the DIP Secured Parties in respect of the DIP Loans and to the New Issuing Bank in respect of the New L/C Obligations shall be *pari passu* in priority.

3.   **Authorization to Use Proceeds of DIP Facility and New L/C Facility, Including Cash Collateral.**

Subject to the terms and conditions of this Interim Order, the DIP Loan Documents and the New L/C Facility Documents, including without limitation, the Budget Covenants, (a) each applicable Debtor is authorized to use proceeds of DIP Loans and to request issuance of New Letters of Credit from and after the Effective Date (as defined in the DIP Credit Agreement and the New L/C Facility Agreement, as applicable), and (b) each applicable Debtor is authorized to use all Cash Collateral, and each Debtor shall be enjoined and prohibited from, at any time, using proceeds of DIP Loans and the New Letters of Credit or Cash Collateral except in accordance with the terms and conditions of this Interim Order, the DIP Loan Documents and the New L/C Facility Documents.  The applicable Debtors' right to use proceeds of DIP Loans, New Letters of Credit, DIP Collateral, Prepetition First Lien Collateral and Cash Collateral shall terminate (i) automatically upon the occurrence of the Maturity Date (under and as defined in the DIP Credit Agreement) or the Termination Date (under and as defined in the New L/C Facility Agreement), as applicable, or (ii) immediately upon notice to such effect by the DIP Administrative Agent or the New Issuing Bank to the Debtors after the occurrence and during the continuance of an Event of Default (the applicable termination date specified in clause (i) or (ii) above, the "**Termination Date**").

4.   **Adequate Protection for Prepetition First Lien Secured Parties**.  As adequate protection for the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral) for, and in an aggregate amount equal to, the diminution in value (collectively, "**Diminution in Value**") of such interests from and after the

Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a), the Prepetition First Lien Secured Parties shall receive the following adequate protection (collectively referred to as the "**Prepetition First Lien Secured Parties' Adequate Protections**"):

(a) <u>Adequate Protection Liens</u>. Solely to the extent of any aggregate post-petition Diminution in Value of the prepetition interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral, the Prepetition First Lien Secured Parties are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, valid, perfected and unavoidable senior Liens (including replacement Liens) upon all of the DIP Collateral (the "**Adequate Protection Liens**"), which Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Senior Liens, and the payment of the Carve-Out to the extent expressly provided in the DIP Loan Documents, the New L/C Facility Documents and this Interim Order.

(b) <u>Adequate Protection Super-Priority Claims</u>. Solely to the extent of any aggregate post-petition Diminution in Value, the Prepetition First Lien Secured Parties are hereby granted, subject to the payment of the DIP Super-Priority Claims and the Carve-Out to the extent provided herein, in the DIP Loan Documents and in the New L/C Facility Documents, allowed super-priority administrative expense claims (the "**Adequate Protection Super-Priority Claims**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior

to the DIP Super-Priority Claims and payable from and having recourse to all prepetition and post-petition property of the Debtors, including (subject to the entry of the Final Order) Avoidance Actions, and all proceeds thereof; provided, however, that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Super-Priority Claims unless and until (x) all DIP Obligations and New L/C Obligations have indefeasibly been paid in full in cash or, in the case of New Letters of Credit which survive termination, cash collateralized at 105% of face amount, and (y) all Commitments under the DIP Loan Documents have been irrevocably terminated, and the Issuance Period (as defined in the New L/C Facility Agreement) has terminated (the conditions described in clauses (x) and (y), collectively, "**Paid in Full**" or "**Payment in Full**").  Subject to the relative priorities set forth above, the Adequate Protection Super-Priority Claims against each Debtor shall be against each Debtor on a joint and several basis.

(c)     Adequate Protection Payments.    In addition to the foregoing, the Prepetition First Lien Secured Parties shall receive from the Debtors additional adequate protection in the forms of (i) payment-in-kind, accrued monthly in arrears, of all interest under the Prepetition First Lien Credit Agreement (at the applicable default interest rate for ABR Borrowings, as defined in the Prepetition First Lien Credit Agreement), and (ii) subject to the provisions and procedures contained in Paragraph 18(a) hereof, cash payment for all reimbursable fees, costs and expenses (including, without limitation, the fees and expenses of counsel and all fees and expenses for financial advisors), in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents and retention agreements permitted thereunder, during the period from and including the Petition Date through and including the Termination Date, and without the need to file (or for the applicable professionals

to file) any applications for payment of same (all payments referenced in this sentence, collectively, the "**Adequate Protection Payments**").

       (d)     <u>Right to Seek Additional Adequate Protection</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition First Lien Secured Parties. However, any Prepetition First Lien Secured Party may request further or different adequate protection, and the Debtors or any other party in interest may contest any such request (notwithstanding their agreement to otherwise consent to the terms of this Order); <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties and the New Issuing Bank granted under this Interim Order, the DIP Loan Documents and the New L/C Facility Documents.

       (e)     <u>Consent to Priming and Adequate Protection</u>.  The Prepetition First Lien Agent and the requisite Prepetition First Lien Lenders, on behalf of all Prepetition First Lien Secured Parties and each Secured Party as defined in the Prepetition First Lien Loan Documents, consent to the adequate protection and the priming provided for herein; <u>provided</u>, <u>however</u>, that the consent of the Prepetition First Lien Secured Parties to the priming of their Prepetition First Liens, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Facility provided under the DIP Loan Documents and the New L/C Facility provided under the New L/C Facility Documents; and <u>provided</u>, <u>further</u>, that such consent shall be of no force and effect in the event this Interim Order is not entered (or is entered and subsequently

vacated) and the DIP Loan Documents and New L/C Facility Documents as set forth herein are not approved; and provided, further, that in the event of the occurrence of the Maturity Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of Prepetition First Lien Collateral (including Cash Collateral) by the Debtors.

     5.     **Automatic Post-petition Lien Perfection**. This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, (b) obtaining consents from any landlord, licensor, or other party in interest, (c) complying with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any commercial tort claim, or (d) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Administrative Agent, the New Issuing Bank and Prepetition First Lien Agent may, each in their sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time of and on the Petition Date. Unless otherwise ordered by the Court, the applicable Debtors shall execute and deliver to the DIP Administrative Agent, the New Issuing Bank and/or the Prepetition First Lien Agent, as applicable, all such financing statements, mortgages, notices and other documents as such parties may reasonably

request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Administrative Agent, the New Issuing Bank and Prepetition First Lien Agent, each in its discretion, may file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of (i) the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order, and (ii) the New Issuing Bank in accordance with the terms of the New L/C Facility Documents and this Interim Order. To the extent that the Prepetition First Lien Agent is listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition First Lien Loan Document, the DIP Administrative Agent and the New Issuing Bank shall also be deemed to be the loss payee under the Debtors' insurance policies and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of

enforcement) and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties and the New Issuing Bank in accordance with the DIP Loan Documents, the New L/C Facility Documents and this Interim Order, and second, subsequent to indefeasible Payment in Full of all DIP Obligations and New L/C Obligations, for the benefit of the Prepetition First Lien Secured Parties.  The Prepetition First Lien Agent shall serve as agents for the DIP Administrative Agent and the New Issuing Bank for purposes of perfecting their respective Liens on all DIP Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

6.      **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.  The Debtors' Stipulations shall be binding upon the Debtors and any successor thereto (including any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) in all circumstances.  The Debtors' Stipulations shall be binding upon each other party in interest, including any Committee, unless such party in interest, including any Committee, obtains the requisite standing to commence, and commences, by (x) with respect to any Committee, 60 days after the initial appointment of the Committee, and (y) with respect to any other party in interest, 75 days after the date of entry of this Interim Order (such time period established by clauses (x) and (y) shall be referred to as the "**Challenge Period**," and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "**Challenge Period Termination Date**"), (i) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (ii) a contested matter or adversary proceeding against any or all of the Prepetition First Lien Secured Parties in connection with or related to the Prepetition First Lien Indebtedness, or the actions or

inactions of any of the Prepetition First Lien Secured Parties arising out of or related to the Prepetition First Lien Indebtedness or otherwise, including, without limitation, any claim against the Prepetition First Lien Secured Parties in the nature of a "lender liability" causes of action, setoff, counterclaim or defense to the Prepetition First Lien Indebtedness (including but not limited to those under sections 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (the objections, challenges, actions and claims referenced in clauses (a)(i) and (ii), collectively, the "**Claims and Defenses**"); provided that as to the Debtors, for themselves and not their estates, all such Claims and Defenses are irrevocably waived and relinquished as of the Petition Date.  If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then, upon the Challenge Period Termination Date, and for all purposes in these Cases and any Successor Case, (i) all payments made to the Prepetition First Lien Secured Parties pursuant to this Order or otherwise shall not be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Prepetition First Lien Indebtedness shall be deemed to be an allowed secured claim within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest, including any Committee.  Notwithstanding the foregoing, to the extent any Claims and Defenses are timely asserted in any such adversary proceeding or contested matter, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other

provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such adversary proceeding or contested matter. The Challenge Period in respect of the Prepetition First Lien Credit Facility may be extended by written agreement of the Prepetition First Lien Agent in its sole discretion. Nothing in this Interim Order vests or confers on any person or entity, including any Committee, standing or authority to pursue any cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claim and Defense or other claim against any Prepetition First Lien Secured Parties, the DIP Secured Parties or the New Issuing Bank. Up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral (including Cash Collateral), or proceeds of the DIP Facility may be used by any Committee to investigate the Prepetition First Lien Indebtedness and Prepetition First Liens.

7.      **Carve Out**. Subject to the terms and conditions contained in this Paragraph 7, each of the DIP Liens, DIP Super-Priority Claims, Prepetition First Liens, Adequate Protection Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below) solely in the event of the delivery of a Carve-Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents or the New L/C Facility Documents:

(a)      For purposes of this Interim Order, "**Carve-Out**" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. §1930(a)(6), whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) fees, disbursements, costs and expenses which are incurred after the Petition Date and before the delivery of a Carve-Out Trigger Notice in an amount not to exceed the amounts set forth in the Budget for each Professional (as defined below), less any

amount actually paid to each such Professional, retained by the Debtors and any Committee pursuant to Bankruptcy Code sections 327, 330, 363 and 1103 (collectively, the "**Professionals**"), to the extent allowed at any time by this Court and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs and expenses of Professionals in an aggregate amount not to exceed $2,000,000 that are incurred after the delivery of a Carve-Out Trigger Notice and which are ultimately allowed by this Court (the "**Carve-Out Cap**"). The term **"Carve-Out Trigger Notice"** shall mean a written notice delivered by either the DIP Administrative Agent or the New Issuing Bank to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to any Committee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents or the New L/C Facility Documents, expressly stating that the Carve-Out (and the Carve-Out Cap) is invoked.

(b)     Following the delivery of the Carve-Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents or the New L/C Facility Documents, any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103 or otherwise, to Professionals shall (i) not be paid from the proceeds of any DIP Loan, New Letter of Credit, DIP Collateral, Prepetition First Lien Collateral or Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (iii) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis.

(c)     Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, Cash Collateral, DIP Collateral, Prepetition First Lien Collateral, or

proceeds of the DIP Facility or the New L/C Facility shall be utilized for the payment of fees and disbursements of Professionals to the extent restricted under Paragraph 15 hereof.

(d)    Nothing herein shall be construed as consent to the allowance of any Professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party, the New Issuing Bank or any Prepetition First Lien Secured Party to object to the allowance and payment of such fees and expenses.

8.    **Waiver of Section 506(c) Claims**.    Subject to entry of the Final Order, as a further condition of the DIP Facility and the New L/C Facility and any obligation of the DIP Secured Parties and the New Issuing Bank to make credit extensions pursuant to the DIP Loan Documents and the New L/C Facility Documents, respectively, (and their consent to the payment of the Carve-Out to the extent provided herein), no costs or expenses of administration of the Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Secured Parties, the New Issuing Bank, the Prepetition First Lien Secured Parties, the DIP Collateral, the Prepetition First Lien Collateral and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Administrative Agent, the New Issuing Bank or the Prepetition First Lien Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties.

9.    **After-Acquired Property**.    Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity

resulting from any security agreement entered into by the Debtors prior to the Petition Date including, without limitation, in respect of the Prepetition First Lien Credit Facility (other than with respect to the replacement Liens that form a portion of the Adequate Protection Liens), except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

10.    **Protection of DIP Secured Parties' and the New Issuing Bank's Rights**.

(a)    Until such time that all DIP Obligations and New L/C Obligations have been Paid in Full, each Prepetition First Lien Secured Party shall (i) not exercise any right or remedy relating to the DIP Collateral, including without limitation, seeking relief from the automatic stay, seeking any sale, realization upon repossession or liquidation of any property, or taking any action to foreclose upon or recover in connection with the Liens granted in respect of the Prepetition First Lien Credit Facility (including, without limitation, the Prepetition First Liens and the Adequate Protection Liens), or otherwise exercise remedies against any DIP Collateral, (ii) be deemed to have consented to any and all releases of DIP Collateral authorized under the DIP Loan Documents and the New L/C Facility Documents or otherwise consented to by the requisite DIP Secured Parties and/or the New Issuing Bank, as applicable, (provided that the Liens of the Prepetition First Lien Secured Parties attach to the proceeds of any disposition of such released DIP Collateral with the same priorities as provided herein), and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of Lien or similar instruments, or otherwise take any action to perfect their Liens on the DIP Collateral unless, solely as to this clause (iii) and solely with respect to the Adequate Protection Liens, the

DIP Administrative Agent or the New Issuing Bank files financing statements or other documents to perfect the Liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable Liens as of the Petition Date.

(b)     Unless the requisite DIP Secured Parties and the New Issuing Bank under the DIP Loan Documents and the New L/C Facility Documents, respectively, shall have provided their prior written consent or all DIP Obligations and the New L/C Obligations have been indefeasibly Paid in Full (or will be indefeasibly Paid in Full upon entry of a final, non-appealable order approving indebtedness described in clause (i) of this subsection (b)), there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with (x) the DIP Liens, DIP Super-Priority Claims and other DIP Protections granted pursuant to this Interim Order to the DIP Secured Parties and the New Issuing Bank or (y) the Prepetition First Liens, the Adequate Protection Liens, the Adequate Protection Super-Priority Claims and the other Prepetition First Lien Secured Parties' Adequate Protections granted to the Prepetition First Lien Secured Parties; or (ii) the use of Cash Collateral for any purpose other than to indefeasibly Pay in Full the DIP Obligations and the New L/C Obligations or as otherwise permitted in the DIP Loan Documents, the New L/C Facility Documents and this Interim Order.

(c)     The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts to the extent and as

required by the DIP Loan Documents and the New L/C Facility Documents, (ii) cooperate, consult with, and provide to the DIP Administrative Agent and the New Issuing Bank all such information as required or allowed under the DIP Loan Documents, the New L/C Facility Documents or the provisions of this Interim Order, (iii) permit representatives of the DIP Administrative Agent and the New Issuing Bank such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as and to the extent required by the DIP Loan Documents and the New L/C Facility Documents, and (iv) permit representatives of the DIP Administrative Agent and the New Issuing Bank to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

11.    **Proceeds of Subsequent Financing**.    Without limiting the provisions and protections of Paragraph 10 above, if at any time prior to the indefeasible Payment in Full of all DIP Obligations and New L/C Obligations (including subsequent to the confirmation of a chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code (except 506(c) until entry of a Final Order) in violation of the DIP Loan Documents or the New L/C Facility Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Administrative

Agent and the New Issuing Bank, on a pro rata basis, until indefeasible Payment in Full of (i) the DIP Obligations in accordance with the DIP Loan Documents, and (ii) the New L/C Obligations in accordance with the New L/C Facility Documents.

12.    **Cash Collection**.  Cash collections (including, but not limited to, payments from customers with respect to accounts receivable) constituting proceeds of DIP Collateral shall be directed to lock-box and/or deposit accounts ("**Cash Collection Accounts**") under the sole dominion and control of the DIP Administrative Agent and the New Issuing Bank pursuant to a structure reasonably satisfactory to the DIP Administrative Agent and the New Issuing Bank and in compliance with the Cash Management Order (as defined below).  Upon the direction of the DIP Administrative Agent or the New Issuing Bank at any time after the occurrence of an Event of Default, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Administrative Agent and the New Issuing Bank, on a pro rata basis, until Payment in Full of the DIP Obligations and the New L/C Obligations, and the DIP Administrative Agent and New Issuing Bank shall take all action that is necessary or appropriate to effectuate the foregoing. Unless otherwise agreed to in writing by the DIP Administrative Agent and the New Issuing Bank, the Debtors shall maintain no accounts except those identified in any order of the Court approving the Debtors' cash management system (the "**Cash Management Order**").   The Debtors and the financial institutions where the Debtors' cash collection accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Administrative Agent or the New Issuing Bank.  The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including without limitation, overnight overdraft services, controlled disbursement, automated

clearinghouse transactions, return items, overdrafts and interstate depository network services provided on a post-petition basis by any financial institution at which any Cash Collection Account is maintained; provided, however, that (i) any Lien securing any such obligations shall be junior to the DIP Lien on the funds in the cash collection accounts at such financial institution, and (ii) except to the extent otherwise required by the Court, nothing herein shall require any DIP Secured Party, the New Issuing Bank or any Prepetition First Lien Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

13.     **Disposition of DIP Collateral.**   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents and the New Issuing Bank under the New L/C Facility Documents (and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Secured Party or the New Issuing Bank, or any order of this Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the DIP Loan Documents, the New L/C Facility Documents and this Interim Order and approved by the Court to the extent required under applicable bankruptcy law. Except to the extent otherwise expressly provided in the DIP Loan Documents or the New L/C Facility Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral shall be remitted to the DIP Administrative Agent and the New Issuing Bank, on a pro rata basis, until Payment in Full of (i) the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (ii) the New L/C Obligations in accordance with the terms of the New L/C Obligations.

14.    **Events of Default**.

        (a)    <u>Rights and Remedies Upon Event of Default</u>. Any automatic stay otherwise applicable to the DIP Secured Parties or the New Issuing Bank is hereby modified, without requiring prior notice to or authorization of, this Court, to the extent necessary to permit the DIP Secured Parties or the New Issuing Bank to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under this Interim Order, the DIP Loan Documents and the New L/C Facility Documents, other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days' prior written notice (the "**Enforcement Notice**") to the Debtors (with a copy to the United States Trustee, the respective lead counsel to any Committee, the Ad Hoc Committee of Senior Noteholders and the Prepetition First Lien Agent), all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents, the New L/C Facility Documents or applicable law (including, without limitation, the right to set off against accounts maintained by the Debtors with the DIP Administrative Agent, any other DIP Secured Party, the New Issuing Bank, any Prepetition First Lien Secured Party or any of their respective affiliates); <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in clause (ii) above, immediately following the giving of an Enforcement Notice by the DIP Administrative Agent or the Issuing Bank: any obligation otherwise imposed on any or all of the DIP Administrative Agent, the other DIP Secured Parties and the New Issuing Bank to provide any loan, advance New Letter of Credit or other financial accommodation to the Debtors pursuant to the DIP Facility or the New L/C Facility (other than to permit the Debtors to use Cash Collateral in accordance with the Budget) shall immediately be suspended. Following the giving of an Enforcement Notice by the

DIP Administrative Agent or the New Issuing Bank, the Debtors, the Ad Hoc Committee of Senior Noteholders and any Committee shall be entitled to an emergency hearing before this Court. Subject to any order of the Court that is entered during such five business-day period, the automatic stay, as to the DIP Secured Parties and the New Issuing Bank, shall automatically terminate at the end of such notice period.

(b)     Subject to the provisions of Paragraph 14(a), upon the occurrence of an Event of Default, the DIP Administrative Agent, the other DIP Secured Parties and the New Issuing Bank are authorized to exercise their rights and remedies and to proceed against any or all of the DIP Collateral under or pursuant to the DIP Loan Documents, the New L/C Facility Documents, this Interim Order and applicable law, including without limitation, exercising any of the Debtors' rights with respect to the Debtors' interests in the Joint Venture Entities and the Debtors' interests in leaseholds, including without limitation, selling, leasing or otherwise transferring any of the Debtors' interests in any Joint Venture Entity or leasehold notwithstanding any contractual provision that would otherwise prohibit, restrict, condition or delay any or all of the DIP Administrative Agent, the other DIP Secured Parties and the New Issuing Bank from taking any such action. All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties or the New Issuing Bank shall be turned over to the DIP Administrative Agent and the New Issuing Bank, on a pro rata basis, until indefeasible Payment in Full of (i) the DIP Obligations in accordance with the terms of the DIP Loan Documents, and (ii) the New L/C Obligations in accordance with the terms of the New L/C Obligations; provided, that in the event of the liquidation of the Debtors' estates after an Event of Default, the unused amount of the Carve-Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by the DIP

Administrative Agent prior to the distribution of any such Cash Collateral to any other parties in interest.

(c)     Subject to the limitations in this paragraph 14, the automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement and the New L/C Facility Agreement as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition First Lien Secured Parties, the DIP Secured Parties and the New Issuing Bank under the DIP Loan Documents, the DIP Facility, the New L/C Facility Documents, the New L/C Facility and this Interim Order, (ii) authorize the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order.

15.    **Restriction on Use of Proceeds**.    Notwithstanding anything herein to the contrary, no proceeds from the DIP Facility, the New L/C Facility, DIP Collateral or proceeds thereof, Cash Collateral, Prepetition First Lien Collateral or proceeds thereof (including any prepetition retainer funded by the Prepetition First Lien Collateral), or any portion of the Carve-Out may be used by any of the Debtors, any Committee, and any trustee or other estate representative appointed in the Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties and the New Issuing Bank; (b) investigate (except as set forth below), assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application,

motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the New Issuing Bank, the Prepetition First Lien Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses, any Avoidance Actions or other actions arising under chapter 5 or section 724(a) of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of the DIP Obligations, the New L/C Obligations and/or the Prepetition First Lien Indebtedness, or the validity, extent, and priority of the DIP Liens, the Prepetition First Liens, or the Adequate Protection Liens (or the value of any of the Prepetition First Lien Collateral or DIP Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition First Liens, the Adequate Protection Liens or the other Prepetition First Lien Secured Parties' Adequate Protections; (v) except as permitted in Paragraph 14(a), any action seeking, or having the effect of, preventing, hindering or otherwise delaying any or all of the DIP Secured Parties', the New Issuing Bank's and the Prepetition First Lien Secured Parties' assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Loan Documents, the New L/C Facility Documents, the Prepetition First Lien Loan Documents or this Interim Order; and/or (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties hereunder or under the DIP Loan Documents, the New L/C Facility Documents or the Prepetition First Lien Loan

Documents; provided, however, up to $50,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by a Committee to investigate the Prepetition First Lien Indebtedness and Prepetition First Liens.

16.    **Proofs of Claim**.    The DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties shall not be required to file proofs of claim evidencing the DIP Obligations, the New L/C Obligations, the DIP Protections, the Prepetition First Lien Indebtedness or the Prepetition First Lien Secured Parties' Adequate Protection, as applicable, in the Cases or in any Successor Case.

17.    **Preservation of Rights Granted under the Order**.

(a)    No Non-Consensual Modification or Extension of Interim Order.    Unless all DIP Obligations and New L/C Obligations shall have been indefeasibly been Paid in Full, the Debtors shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the Debtors' right to use Cash Collateral), if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Interim Order or (ii) an order converting or dismissing any of the Cases, in each case, without the prior written consent of the DIP Administrative Agent and the New Issuing Bank, and no such consent shall be implied by any other action, inaction or acquiescence.

(b)    Dismissal.    If any order dismissing any of the Cases (under section 1112 of the Bankruptcy Code or otherwise) is at any time entered, such order shall have no effect on the DIP Protections and the Prepetition First Lien Secured Parties' Adequate Protections, and the DIP Protections and the Prepetition First Lien Secured Parties' Adequate Protections shall continue in full force and effect and shall maintain their priorities as provided in this Interim

Order until all DIP Obligations and New L/C Obligations have been indefeasibly Paid in Full

and all Prepetition First Lien Secured Parties' Adequate Protections have been indefeasibly paid

in full in cash or otherwise satisfied in full (and that all DIP Protections, Prepetition First Lien

Secured Parties' Adequate Protections shall, notwithstanding such dismissal, remain binding on

all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal,

for the purposes of enforcing such DIP Protections and Prepetition First Lien Secured Parties'

Adequate Protections.

(c)     <u>Modification of Interim Order</u>.  Based on the findings set forth in this

Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is

applicable to the DIP Facility and the New L/C Facility contemplated by this Interim Order, in

the event any or all of the provisions of this Interim Order are hereafter reversed, modified,

vacated or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties

and the New Issuing Bank shall be entitled to the protections provided in section 364(e) of the

Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity,

priority or enforceability of any DIP Protections and Prepetition First Lien Secured Parties'

Adequate Protections granted or incurred prior to the actual receipt of written notice by the DIP

Administrative Agent, the New Issuing Bank or the Prepetition First Lien Agent, as the case may

be, of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or

enforceability of any Lien or priority authorized or created hereby or pursuant to the DIP Loan

Documents or the New L/C Facility Documents.   Notwithstanding any such reversal,

modification, vacatur or stay, any DIP Protections or Prepetition Secured Parties' Adequate

Protections incurred or granted by the Debtors prior to the actual receipt of written notice by the

DIP Administrative Agent, the New Issuing Bank or the Prepetition First Lien Agent, as

applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties shall be entitled to all of the DIP Protections and Prepetition Secured Parties' Adequate Protections, as the case may be, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents and the New L/C Facility Documents.

(d)    Survival of Interim Order.  The provisions of this Interim Order, the DIP Loan Documents and the New L/C Facility Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, Prepetition First Lien Secured Parties' Adequate Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections, Prepetition First Lien Secured Parties' Adequate Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, the New Issuing Bank, and the Prepetition First Lien Secured Parties, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections and Prepetition First Lien Secured Parties' Adequate Protections shall continue in

these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order. The DIP Obligations and the New L/C Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

18.    **Other Rights and Obligations**.

(a)    Expenses.  As provided in the DIP Loan Documents and the New L/C Facility Documents, the applicable Debtors will pay all reasonable expenses incurred by the DIP Administrative Agent and the New Issuing Bank (including, without limitation, the reasonable fees and disbursements of all counsel and financial advisors for the DIP Administrative Agent and the New Issuing Bank) in connection with the preparation, execution, delivery and administration of the DIP Loan Documents, the New L/C Facility Documents, this Interim Order, any Final Order and any other agreements, instruments, pleadings or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents or the New L/C Facilities are consummated.  Except as set forth in this paragraph, payment of such fees shall not be subject to allowance by this Court. Professionals for the DIP Administrative Agent, the New Issuing Bank and the Prepetition First Lien Agent (collectively, the "**Lender Professionals**") shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Court. Copies of invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the U.S. Trustee, counsel for any Committee, and such other parties as the Court may direct.  The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information).  If the Debtors, U.S. Trustee or

counsel for any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within 10 days of receipt of such invoices, the Debtors, U.S. Trustee or the Committee, as the case may be, shall file and serve on such Lender Professionals an objection with the Court (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses.   The Debtors shall timely pay the Lender Professionals' invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period.  If a Fee Objection is timely received, the Debtors shall only be required to pay the undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

        (b)    <u>Binding Effect</u>.   The provisions of this Interim Order, including all findings herein, the DIP Loan Documents and the New L/C Facility Documents shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the New Issuing Bank, the Prepetition First Lien Secured Parties, any Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; <u>provided</u>, <u>however</u>, that the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11

trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(c)    No Waiver.    Neither the failure of the Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition First Lien Loan Documents or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Secured Parties or the New Issuing Bank to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents, the New L/C Facility Documents or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.    Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition First Lien Secured Party, any DIP Secured Party or the New Issuing Bank, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).    Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Prepetition First Lien Secured Parties, the DIP Secured Parties or the New Issuing Bank under the Bankruptcy Code or under non-bankruptcy law, to (i) request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal,

equitable or otherwise) of the DIP Secured Parties, the New Issuing Bank or the Prepetition First Lien Secured Parties, respectively.  Except to the extent otherwise expressly provided in this Interim Order, neither the commencement of the Cases nor the entry of this Interim Order shall limit or otherwise modify the rights and remedies of the Prepetition First Lien Secured Parties with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition First Lien Credit Facility, applicable law or equity.

(d)    No Third Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.  In determining to make any loan or financial accommodation (whether under the DIP Credit Agreement, the New L/C Facility Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Loan Documents or the New L/C Facility Documents, the DIP Secured Parties, the New Issuing Bank and the Prepetition First Lien Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

(e)    No Marshaling.  None of the DIP Secured Parties, the New Issuing Bank or the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

(f)    Amendments.  The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents and the New L/C Facility Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement or waiver

(i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facility, (iii) changes the Maturity Date (under and as defined in the DIP Credit Agreement) or the Termination Date (under and as defined in the New L/C Facility Agreement), as applicable, or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default.  No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of all the Debtors, the DIP Administrative Agent (after having obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and the New Issuing Bank, and, except as provided herein, approved by this Court.

(g)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or the New L/C Facility Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(h)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

19.   **Final Hearing**.

(a)   The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility and the New L/C Facility is scheduled for _____, 2013, at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the District of Delaware. The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by this Court.

(b)   Final Hearing Notice.  On or before _____, 2013, the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the **"Final Hearing Notice"**) and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with this Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than \_\_\_\_\_, 2013, which objections shall be served so that the same are received on or before such date by:  (a) counsel for the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019; Attn: Matthew A. Feldman and Rachel C. Strickland; and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801; Attn: Edmon L. Morton and Maris J. Kandestin; (b) counsel for the DIP Administrative Agent, the New Issuing Bank, and the

Prepetition First Lien Agent, Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, New

York 10166; Attn: David M. Feldman and Matthew K. Kelsey; and Pepper Hamilton LLC,

Hercules Plaza, Suite 5100, 1313 N. Market Street, Wilmington,  Delaware 19899; Attn: David

B. Stratton; (c) counsel to any Committee; and (d) the Office of the United States Trustee for the

District of Delaware and shall be filed with the Clerk of the United States Bankruptcy Court for

the District of Delaware, in each case to allow actual receipt of the foregoing no later than

_____, 2013, at 4:00 p.m. (prevailing Eastern time).

      (c)    <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to

enforce this Interim Order according to its terms.

Dated: _____, 2013
      Wilmington, Delaware

 

_____

      UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

## DIP Credit Agreement

EXECUTION VERSION

SENIOR SECURED SUPER PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

dated as of

August 4, 2013,

among

WP ROCKET HOLDINGS INC.,
as Holdings,

RURAL/METRO CORPORATION,
as Borrower,

The Lenders Party Hereto

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

Error! No property name supplied.

# TABLE OF CONTENTS

**Page**

### ARTICLE I

### DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 2 |
| Section 1.02 | Classification of Loans | 25 |
| Section 1.03 | Terms Generally | 25 |
| Section 1.04 | Accounting Terms; GAAP | 25 |

### ARTICLE II

### THE CREDITS

| | | |
|---|---|---|
| Section 2.01 | Commitments | 26 |
| Section 2.02 | Loans and Borrowings | 26 |
| Section 2.03 | Requests for Borrowings | 27 |
| Section 2.04 | Reserved | 27 |
| Section 2.05 | Reserved | 27 |
| Section 2.06 | Funding of Borrowings | 27 |
| Section 2.07 | Interest Elections | 28 |
| Section 2.08 | Reserved | 29 |
| Section 2.09 | Repayment of Loans; Evidence of Debt | 29 |
| Section 2.10 | Repayment of Loans on the Maturity Date | 30 |
| Section 2.11 | Prepayment of Loans | 30 |
| Section 2.12 | Fees | 31 |
| Section 2.13 | Interest | 32 |
| Section 2.14 | Alternate Rate of Interest | 32 |
| Section 2.15 | Increased Costs | 33 |
| Section 2.16 | Break Funding Payments | 34 |
| Section 2.17 | Taxes | 34 |
| Section 2.18 | Payments Generally; Pro Rata Treatment; Sharing of Setoffs | 37 |
| Section 2.19 | Mitigation Obligations; Replacement of Lenders | 38 |
| Section 2.20 | Reserved | 39 |
| Section 2.21 | Reserved | 39 |
| Section 2.22 | Defaulting Lenders | 39 |
| Section 2.23 | Illegality | 40 |
| Section 2.24 | Application of Payments and Proceeds | 41 |
| Section 2.25 | Super Priority Nature of Obligations and Liens | 41 |
| Section 2.26 | Payment of Obligations | 41 |
| Section 2.27 | No Discharge; Survival of Claims | 41 |
| Section 2.28 | Release | 41 |
| Section 2.29 | Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral | 42 |

### ARTICLE III

### REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| Section 3.01 | Organization; Powers | 42 |

Error! No property name supplied.

Section 3.02    Authorization; Enforceability ...............................................................43
Section 3.03    Governmental Approvals; No Conflicts...................................................43
Section 3.04    [Reserved]................................................................................................43
Section 3.05    Properties .................................................................................................43
Section 3.06    Litigation and Environmental Matters ....................................................43
Section 3.07    Compliance with Laws and Agreements..................................................44
Section 3.08    Investment Company Status.....................................................................44
Section 3.09    Taxes ........................................................................................................44
Section 3.10    ERISA.......................................................................................................45
Section 3.11    Disclosure ................................................................................................45
Section 3.12    Subsidiaries..............................................................................................45
Section 3.13    Intellectual Property; Licenses, Etc.........................................................45
Section 3.14    Reserved....................................................................................................45
Section 3.15    Senior Indebtedness .................................................................................45
Section 3.16    Federal Reserve Regulations ...................................................................46
Section 3.17    Use of Proceeds........................................................................................46
Section 3.18    Labor Matters...........................................................................................46
Section 3.19    Reorganization Matters ............................................................................46

ARTICLE IV

CONDITIONS

Section 4.01    Effective Date ..........................................................................................47
Section 4.02    Final Order Entry Date and Final Funding Loans....................................49

ARTICLE V

AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Information ...........................................50
Section 5.02    Notices of Material Events.......................................................................53
Section 5.03    Information Regarding Collateral .............................................................53
Section 5.04    Existence; Conduct of Business................................................................54
Section 5.05    Payment of Taxes, etc. .............................................................................54
Section 5.06    Maintenance of Properties .......................................................................54
Section 5.07    Insurance ..................................................................................................54
Section 5.08    Books and Records; Inspection and Audit Rights....................................55
Section 5.09    Compliance with Laws.............................................................................55
Section 5.10    Use of Proceeds........................................................................................55
Section 5.11    Additional Subsidiaries............................................................................55
Section 5.12    Further Assurances....................................................................................56
Section 5.13    Case Milestones .......................................................................................56
Section 5.14    Certain Post-Closing Obligations.............................................................57
Section 5.15    Cash Management.....................................................................................57

ARTICLE VI

NEGATIVE COVENANTS

Section 6.01    Indebtedness; Certain Equity Securities...................................................57

Error! No property name supplied.

Section 6.02    Liens ........................................................................................................ 59
Section 6.03    Fundamental Changes ............................................................................... 61
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions ............................ 61
Section 6.05    Asset Sales .............................................................................................. 62
Section 6.06    Sale and Leaseback Transactions ............................................................... 63
Section 6.07    Swap Agreements ..................................................................................... 63
Section 6.08    Restricted Payments; Certain Payments of Indebtedness ............................... 63
Section 6.09    Transactions with Affiliates ...................................................................... 64
Section 6.10    Restrictive Agreements ............................................................................. 65
Section 6.11    Certain Amendments; Changes in Business .................................................. 65
Section 6.12    Financial Covenants ................................................................................. 65
Section 6.13    Changes in Fiscal Periods .......................................................................... 66
Section 6.14    Chapter 11 Claims ................................................................................... 66
Section 6.15    Critical Vendor and Other Payments ........................................................... 67

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01    Events of Default ..................................................................................... 67

ARTICLE VIII

ADMINISTRATIVE AGENT

Section 8.01    Appointment and Authority ........................................................................ 71
Section 8.02    Rights as a Lender .................................................................................... 71
Section 8.03    Exculpatory Provisions ............................................................................. 71
Section 8.04    Reliance by Administrative Agent ............................................................... 72
Section 8.05    Delegation of Duties ................................................................................. 72
Section 8.06    Resignation of Administrative Agent ............................................................ 73
Section 8.07    Non-Reliance on Administrative Agent and Other Lenders ............................... 73
Section 8.08    Reserved ................................................................................................ 73
Section 8.09    Reserved ................................................................................................ 73
Section 8.10    No Waiver; Cumulative Remedies; Enforcement ........................................... 73
Section 8.11    Withholding Taxes ................................................................................... 74

ARTICLE IX

MISCELLANEOUS

Section 9.01    Notices .................................................................................................. 75
Section 9.02    Waivers; Amendments .............................................................................. 77
Section 9.03    Expenses; Indemnity; Damage Waiver ........................................................ 78
Section 9.04    Successors and Assigns ............................................................................. 80
Section 9.05    Survival ................................................................................................. 83
Section 9.06    Counterparts; Integration; Effectiveness ...................................................... 84
Section 9.07    Severability ............................................................................................. 84
Section 9.08    Right of Setoff ........................................................................................ 84
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process ........................... 84
Section 9.10    WAIVER OF JURY TRIAL ...................................................................... 85

Error! No property name supplied.

Page

Section 9.11  Headings ........................................................................................... 85
Section 9.12  Confidentiality .................................................................................. 85
Section 9.13  USA Patriot Act ............................................................................... 87
Section 9.14  Reserved............................................................................................ 87
Section 9.15  Release of Liens and Guarantees ..................................................... 87
Section 9.16  No Advisory or Fiduciary Responsibility ........................................ 88
Section 9.17  Interest Rate Limitation ................................................................... 88
Section 9.18  Conflicts with Other Loan Documents, Interim Order or Final Order............................ 88

**Error! No property name supplied.**

SCHEDULES:

| | | |
|---|---|---|
| Schedule 2.01 | — | Commitments |
| Schedule 3.03 | — | Governmental Approvals; No Conflicts |
| Schedule 3.05 | — | Owned Real Properties |
| Schedule 3.06(a) | — | Litigation and Environmental Matters |
| Schedule 3.12 | — | Subsidiaries |
| Schedule 3.18 | — | Labor Matters |
| Schedule 5.14 | — | Certain Post-Closing Obligations |
| Schedule 6.01 | — | Existing Indebtedness |
| Schedule 6.02 | — | Existing Liens |
| Schedule 6.04(e) | — | Existing Investments |
| Schedule 6.07 | — | Swap Agreements |
| Schedule 6.09 | — | Existing Affiliate Transactions |
| Schedule 6.10 | — | Existing Restrictions |
| Schedule 9.01 | — | Notices |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | — | Form of Assignment and Assumption |
| Exhibit B | — | Form of Guarantee Agreement |
| Exhibit C | — | Form of Perfection Certificate |
| Exhibit D | — | Form of Collateral Agreement |
| Exhibit E | — | Form of Closing Certificate |
| Exhibit F | — | Form of Intercompany Note |
| Exhibit G-1 | — | Form of Tax Status Certificate 1 |
| Exhibit G-2 | — | Form of Tax Status Certificate 2 |
| Exhibit G-3 | — | Form of Tax Status Certificate 3 |
| Exhibit G-4 | — | Form of Tax Status Certificate 4 |
| Exhibit H | — | Interim Order |
| Exhibit I | — | Restructuring Support Agreement |

Error! No property name supplied.

SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT dated as of August 4, 2013 (this "Agreement"), among WP ROCKET HOLDINGS INC., a Delaware corporation ("Holdings"), RURAL/METRO CORPORATION, a Delaware corporation (the "Borrower"), the LENDERS party hereto and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Administrative Agent.

## RECITALS

WHEREAS, on August [ ], 2013 (the "Petition Date"), Holdings, the Borrower and each of their respective Subsidiaries (the "Debtors") commenced chapter 11 cases administratively consolidated as Chapter 11 Case No. [_____] (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, financing was provided to Borrower pursuant to that certain Credit Agreement dated as of June 30, 2011, among Holdings, the Borrower (as successor by merger to WP Rocket Merger Sub, Inc., a Delaware corporation), the lenders party thereto and Credit Suisse AG, as administrative agent (as amended, modified or supplemented through the Petition Date, the "Existing Credit Agreement");

WHEREAS, the Borrower has requested that Lenders provide a senior secured, super-priority term loan facility of Seventy Five Million Dollars ($75,000,000) in the aggregate to fund the working capital requirements, fees, costs and expenses of Holdings, the Borrower and its Subsidiaries during the pendency of the Chapter 11 Cases;

WHEREAS, Lenders are willing to make the certain post-petition loans described herein to Borrower of up to such amounts and upon the terms and conditions set forth herein;

WHEREAS, Borrower has agreed to secure all of its Loan Document Obligations under the Loan Documents by granting to the Administrative Agent and the Lenders a security interest in and lien upon all of its existing and after-acquired personal and real property, subject to the terms of the Interim Order and Final Order;

WHEREAS, Holdings and its Subsidiaries are willing to guarantee all of the Loan Document Obligations of Borrower under the Loan Documents and to secure all of their obligations under their guarantee by granting to the Administrative Agent and the Lenders a security interest in and lien upon all of their existing and after-acquired personal and real property including, without limitation, all of the Equity Interests of Borrower, subject to the terms of the Interim Order and Final Order; and

WHEREAS, each Subsidiary will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

01:13977139.1

Error! No property name supplied.

# ARTICLE I

# DEFINITIONS

**Section 1.01    Defined Terms**.  As used in this Agreement, the following terms have the meanings specified below:

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Adjusted LIBO Rate" means with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate *per annum* equal to (i) the LIBO Rate for such Interest Period multiplied by (ii) the Statutory Reserve Rate.

"Administrative Agent" means Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preamble.

"Alternate Base Rate" means, for any day, a rate *per annum* equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% and (c) the Adjusted LIBO Rate determined on such date (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1%; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the rate determined on such day at approximately 11 a.m. (London time) by reference to the British Bankers' Association Interest Settlement Rates for deposits in dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized vendor for the purpose of displaying such rates).  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  Notwithstanding the foregoing, the Alternate Base Rate will be deemed to be 2.50% *per annum* if the Alternate Base Rate calculated pursuant to the foregoing provisions would otherwise be less than 2.50% *per annum*.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Rate" means (i) 8.50% *per annum*, in the case of an ABR Loan, of which 7.50% shall be paid in cash and 1.00% shall be Paid-in-Kind or (ii) 9.50% *per annum* in the case of a Eurocurrency Loan, of which 8.50% shall be paid in cash and 1.00% shall be Paid-in-Kind.

Error! No property name supplied.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A or any other form reasonably approved by the Administrative Agent.

"Bankruptcy Code" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning assigned thereto in the recitals.

"Board of Directors" means, with respect to any Person, (a) in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board, (b) in the case of any limited liability company, the board of managers of such Person, (c) in the case of any partnership, the board of directors or board of managers of the general partner of such Person and (d) in any other case, the functional equivalent of the foregoing.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble.

"Borrower Materials" has the meaning assigned to such term in Section 5.01.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Budget" shall have the meaning set forth in Section 5.01(g), and such Budget shall not be modified without the prior written consent of the Administrative Agent.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that when used in connection with a Eurocurrency Loan, the term "Business Day" shall also exclude any day that is not a London Banking Day.

"Capital Expenditure Budget" means, for any period, the maximum amount of Capital Expenditures permitted to be made in such period pursuant to Section 6.12(e).

"Capital Expenditures" means, for any period, any expenditure which, in accordance with GAAP, is treated as a capital expenditure in the audited consolidated financial statements of the Borrower and its subsidiaries other than any expenditure made in connection with the replacement, substitution, restoration

or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, substituted, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, substituted, restored or repaired.   Capital Expenditures, for purposes of section 6.12 (e) of this agreement, shall also include any amounts which are included in the Capital Expenditure Budget which, pursuant to GAAP, would be required to be expensed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.  For purposes of Section 6.02, a Capital Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Carve-Out" has the meaning assigned thereto in the Interim Order and, when effective, the Final Order.

"Cash Disbursements" means, for any period, the amount of cash operating and non-operating disbursements for the Borrower and its Subsidiaries during such period, on a consolidated basis, as set forth in the applicable Budget or Variance Report for such period.

"Cash Receipts" means, for any period, the cumulative amount of cash receipts for Borrower and its Subsidiaries during such period, on a consolidated basis, as set forth in the applicable Budget or Variance Report for such period.

"Casualty Event" means any event that gives rise to the receipt by Holdings, the Borrower or any Subsidiary of any insurance proceeds or condemnation awards or in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"CHAMPVA" means that program established by 38 U.S.C. § 1701 et seq.

"Change in Control" means (a) the failure of Holdings, directly or indirectly through wholly owned subsidiaries, to own all of the Equity Interest of the Borrower, (b) the failure by the Permitted Holders to own, directly or indirectly through one or more holding company parents of Holdings, beneficially and of record, Equity Interests in Holdings representing at least a majority of the aggregate ordinary voting power for the election of directors of Holdings represented by the issued and outstanding Equity Interests in Holdings, unless the Permitted Holders otherwise have the right (pursuant to contract, proxy or otherwise), directly or indirectly, to designate or appoint (and do so designate or appoint) a majority of the Board of Directors of Holdings, (c) the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of Holdings by Persons who were neither (i) nominated, designated or approved by the Board of Directors of Holdings or the Permitted Holders nor (ii) appointed by directors so nominated, designated or approved or (d) the occurrence of a "Change of Control" (or similar event, however denominated), as defined in the documentation governing the Senior Notes or any Junior Financing.

"Change in Law" means: the adoption or taking effect of any rule, regulation, treaty or other law after the date of this Agreement, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority after the date of this Agreement or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided, that notwithstanding anything herein to the contrary, (A) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all rules, regulations, guidelines or directives thereunder or issued in connection therewith and (B) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning assigned thereto in the recitals.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"Collateral Agreement" means the Collateral Agreement among the Borrower, each other Loan Party and the Administrative Agent, substantially in the form of Exhibit D.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received from (i) Holdings, the Borrower and each of its Subsidiaries (other than any Excluded Subsidiary) either (x) a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (ii) Holdings, the Borrower and each Subsidiary Loan Party either (x) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Subsidiary Loan Party after the Effective Date (including by ceasing to be an Excluded Subsidiary), a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent, documents and opinions of the type referred to in Sections 4.01(b) and 4.01(c);

(b)    all outstanding Equity Interests of the Borrower and each Subsidiary (other than any Equity Interests constituting Excluded Assets) owned by or on behalf of any Loan Party, shall have been pledged pursuant to the Collateral Agreement, and the Administrative Agent shall have received certificates, if any, or other instruments representing all such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)    if any Indebtedness for borrowed money (including in respect of cash management arrangements) of Holdings, the Borrower or any Subsidiary is owing by such obligor to any Loan Party, such Indebtedness shall be evidenced by a promissory note that shall have been pledged pursuant to the Collateral Agreement, and the Administrative Agent shall have

received all such promissory notes, together with undated instruments of transfer with respect thereto endorsed in blank;

(d)     subject to Section 5.14, all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and account control agreements with respect to each deposit account, securities account and commodity account, required by the Security Documents, Requirements of Law and as reasonably requested by the Administrative Agent to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded or executed and delivered to the Administrative Agent, as applicable;

(e)     subject to Section 5.14, the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Owned Real Property duly executed and delivered by the record owner of such Owned Real Property, (ii) a policy or policies of title insurance in the amount equal to the fair market value of such Owned Real Property and fixtures, as determined by the Borrower in its reasonable discretion, issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent insuring the Lien of each such Mortgage as a first priority Lien on the Owned Real Property described therein, free of any other Liens except as expressly permitted by Section 6.02, together with such endorsements as the Administrative Agent may reasonably request, (iii) such affidavits, certificates, information (including financial data) and instruments of indemnification  as shall be reasonably required to induce the title company to issue the title policy/ies and endorsements contemplated above and which are reasonably requested by such title company, (iv) a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Owned Real Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating to such Owned Real Property), (v) if any Owned Real Property is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, evidence of such flood insurance as may be required under applicable law, including Regulation H of the Board of Governors and the other Flood Insurance Laws and as required under Section 5.07, and (vi) such legal opinions as the Administrative Agent may reasonably request with respect to any such Mortgage or Mortgaged Property, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and

(f)     if requested by the Administrative Agent pursuant to Section 5.12(c), the Administrative Agent shall have received evidence satisfactory to the Administrative Agent that the first priority security interests of the Administrative Agent and the Lenders in all Motor Vehicles of the Loan Parties have been perfected in each relevant jurisdiction, subject to no other Liens.

The Administrative Agent in its sole discretion may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee by any Subsidiary (including extensions beyond the Effective Date or in connection with assets acquired, or Subsidiaries formed or acquired, after the Effective Date).

"Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Loans hereunder on any Funding Date, expressed as an amount representing the maximum principal amount of Loans to be made by such Lender hereunder on such Funding Date or in the aggregate, as the

context may require, as such commitment may be (a) reduced upon the making of Loans pursuant to Section 2.01, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's Commitment, for each Funding Date and in the aggregate, as of the Effective Date is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as the case may be. The aggregate principal amount of the Commitments hereunder as of the Effective Date is $80,000,000.

"Compliance Certificate" means a Compliance Certificate required to be delivered pursuant to Section 5.01.

"Consolidated EBITDAR" means, with respect to Holdings and its Subsidiaries for any period (determined on a consolidated basis without duplication in accordance with GAAP) the sum of Consolidated Net Income; (i) plus each of the following, in each case, to the extent reducing such Consolidated Net Income: (a) total interest expense; (b) depreciation and amortization expense; (c) Federal, state and foreign income taxes expense; (d) professional fees and expenses incurred, amounts paid to the United States Trustee and Bankruptcy Court clerk's fees paid, in each case, in connection with the Chapter 11 Cases; (e) other non-recurring cash expenses reducing such Consolidated Net Income in an amount not to exceed $1,500,000 in any fiscal year; (f) losses on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business); (g) incremental audit and re-audit costs for financial statements in excess of $600,000 in any fiscal year; (h) Capital Expenditures permitted under the Capital Expenditure Budget to the extent required to be expensed pursuant to GAAP; (i) costs incurred to consolidate the three locations of the Loan Parties in Scottsdale, Arizona into one location, in an aggregate amount not to exceed $1,500,000; (j) retention payments to employees of the Loan Parties not to exceed an average of $10,000 per employee and to the extent approved by the Bankruptcy Court and limited to the "revenue cycle" employee base; and (k) other non-recurring, non-cash expenses reducing such Consolidated Net Income; (ii) minus each of the following, in each case, to the extent increasing such Consolidated Net Income:  (a) Federal, state and foreign income taxes credits; (b) gains on asset sales, disposals or abandonments (other than asset sales, disposals or abandonments in the ordinary course of business); and (c) other non-recurring, non-cash gains increasing such Consolidated Net Income.

"Consolidated Net Income" means for any period, the net income (or loss) of the Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, (a) extraordinary items for such period, (b) the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income, (c) any Transaction Costs incurred during such period, (d) any fees and expenses (including any transaction or retention bonus) incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, asset disposition, issuance or repayment of debt, issuance of equity securities, refinancing transaction or amendment or other modification of any debt instrument (in each case, to the extent permitted hereunder) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction, (e) any income (loss) for such period attributable to the early extinguishment of Indebtedness, hedging agreements or other derivative instruments (in each case, to the extent permitted hereunder), (f) accruals and reserves that are established or adjusted as a result of restructuring activities and the Transactions, in each case, in accordance with GAAP (including any adjustment of estimated payouts on existing earn-outs) or changes as a result of the adoption or modification of accounting policies during such period, (g) stock-based award compensation expenses to the extent permitted hereunder, (h) any income (loss) attributable to deferred compensation plans or trusts and (i) any income (loss) from Investments recorded using the equity method. There shall be included in Consolidated Net Income, without duplication, the amount of any cash tax benefits related to the tax amortization of intangible assets in such period.

"Contingent Lease Agreements" means agreements that permit a Governmental Authority to lease or purchase existing inventory and equipment used in connection with emergency service contracts between Borrower or any Subsidiary and such Governmental Authority upon the early termination of such contracts; provided that any such contingent lease agreement shall (i) be part of a contract with a Governmental Authority that has fair and reasonable terms, taken as a whole, no less favorable to Borrower or such Subsidiary than that which could be obtained by a similarly situated competitor in the industry and (ii) be in form and substance reasonably satisfactory to the Administrative Agent.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning assigned to such term in the recitals.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means, subject to Section 2.22(b), any Lender that (a) has failed to perform any of its funding obligations hereunder, including in respect of its Loans, within one Business Day of the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement or provided any written notification to any Person to that effect with respect to its funding obligations hereunder or under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by the Administrative Agent (whether acting on its own behalf or at the reasonable request of the Borrower (it being understood that the Administrative Agent shall comply with any such reasonable request)), to confirm in a manner satisfactory to the Administrative Agent and the Borrower that it will comply with its funding obligations, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority.

"Designated Non-Cash Consideration" means the fair market value of non-cash consideration received by Holdings, the Borrower or a Subsidiary in connection with a Disposition pursuant to Section 6.05(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of Holdings, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"Disclosure Statement" has the meaning assigned to such term in Section 5.13(c).

"Disposition" has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

(a)    matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

(b)    is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

(c)    is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments and (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of Holdings (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings (or any direct or indirect parent company thereof) or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person.

"Dollars", "dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than any Sponsor, Holdings, the Borrower or any of their Subsidiaries or Affiliates or any natural person).

"Environmental Laws" means the applicable common law and treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"Environmental Liability" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of

environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of Holdings, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation or storage treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with Holdings, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to an ERISA Plan (other than an event for which the 30-day notice period is waived); (b) prior to the effectiveness of the applicable provisions of the Pension Act, the existence with respect to any ERISA Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA) or, on and after the effectiveness of the applicable provisions of the Pension Act, any failure by any ERISA Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such ERISA Plan, in each case whether or not waived; (c) the filing pursuant to, prior to the effectiveness of the applicable provisions of the Pension Act, Section 412(d) of the Code or Section 303(d) of ERISA or, on and after the effectiveness of the applicable provisions of the Pension Act, Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any ERISA Plan; (d) on and after the effectiveness of the applicable provisions of the Pension Act, a determination that any ERISA Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan; (f) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any ERISA Plan or ERISA Plans or to appoint a trustee to administer any ERISA Plan; (g) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any ERISA Plan or Multiemployer Plan; or (h) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or, on and after the effectiveness of the applicable provisions of the Pension Act, in endangered or critical status, within the meaning of Section 305 of ERISA.

"ERISA Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

Error! No property name supplied.

"Eurocurrency" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Excess Cash" means, at any time, the amount of Unrestricted Cash in excess of $75,000,000 at such time.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Assets" means (a) voting Equity Interests constituting an amount greater than 65% of the voting Equity Interests of any Foreign Subsidiary, (b) any lease, license or other agreement with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, such lease, license or other agreement (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any Requirements of Law), (c) any intent-to-use trademark applications filed in the United States Patent and Trademark Office, (d) assets subject to capital leases, purchase money financing and cash to secure letter of credit reimbursement obligations to the extent such capital leases, purchase money financing or letters of credit are permitted hereunder and prohibit the granting of a lien including any asset owned by any Loan Party that is subject to a Lien of the type permitted by Section 6.02(iv) (whether or not incurred pursuant to such Section) or a Lien permitted by Section 6.02(xi), in each case if, to the extent and for so long as the grant of a Lien thereon hereunder to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party) to, any agreement pursuant to which such Lien has been created; provided that the security interest under the Collateral Agreement shall attach immediately to any such asset (x) at the time the provision of such agreement containing such restriction ceases to be in effect and (y) to the extent any such breach or default is not rendered ineffective by, or is otherwise unenforceable pursuant to the UCC or any other applicable Requirement of Law and (e) equity interests in Southwest General Services of Dallas, L.L.C., a Delaware limited liability company, to the extent not permitted by the terms of such entity's organizational or joint venture documents.

"Excluded Subsidiary" means (a) any Subsidiary that is prohibited by applicable Law from guaranteeing the Secured Obligations, and (b) any Foreign Subsidiary .

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document, (a) Taxes imposed on (or measured by) its net income (however denominated) and franchise Taxes imposed on it (in lieu of net income Taxes) by (i) the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, or (ii) any other jurisdiction as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than a connection arising solely from such recipient having executed, delivered, or become a party to, performed its obligations or received payments under, received or perfected a security interest under, sold or assigned an interest in, engaged in any other transaction pursuant to, or enforced, any Loan Documents), (b) any branch profits tax imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a) above, (c) any U.S. federal withholding Tax pursuant to FATCA, (d) any withholding Tax that is attributable to a Lender's failure to comply with Section 2.17(e), and (e) except in the case of an assignee pursuant to a request by the Borrower under Section 2.19 hereto, any

Error! No property name supplied.

U.S. federal withholding Taxes imposed due to a Requirement of Law in effect at the time a Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax under Section 2.17(a).

"Existing Agent" means Credit Suisse AG, as administrative agent for the Existing Lenders under the Existing Credit Agreement.

"Existing Credit Agreement" has the meaning assigned thereto in the recitals.

"Existing Credit Agreement Obligations" means the "Obligations" under (and as defined in) the Existing Credit Agreement.

"Existing Lenders" means the lenders party to the Existing Credit Agreement.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement (including any amended or successor provisions thereto to the extent substantially comparable thereto and any regulations or official interpretations thereof, provided, however, that the term shall not encompass any legislative changes to the Code to the extent such changes make the overall legislative and regulatory regime under FATCA substantially more onerous than it was prior to the effective date of such legislative changes).

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Order" has the meaning set forth in Section 4.02.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of Holdings.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Subsidiary" means any (i) Subsidiary that is a controlled foreign corporation within the meaning of Section 957(a) of the Code and (ii) any Domestic Subsidiary that is disregarded for U.S. federal income Tax purposes and has no material assets other than equity interests of one or more Subsidiaries that are controlled foreign corporations within the meaning of Section 957(a) of the Code.

"Funding Date" means (i) the Effective Date or (ii) the Final Order Entry Date (or such later date as designated by the Borrower on no less than five (5) Business Days' prior written notice to the Administrative Agent).

01:13977139.1

12

Error! No property name supplied.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time but subject to Section 1.04.

"Governmental Approvals" means all authorizations, consents, approvals, permits, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether federal, state, provincial, territorial, local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, Taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the Master Guarantee Agreement among the Loan Parties and the Administrative Agent, substantially in the form of Exhibit B.

"Guarantors" means, collectively, Holdings and each Subsidiary of Holdings (other than the Borrower) listed on Schedule 3.12, each other Subsidiary of Holdings that shall be required to execute and deliver a counterpart or supplement to the Guarantee Agreement pursuant to clause (a) of the Collateral and Guarantee Requirement.

"Hazardous Materials" means all substances, wastes, pollutants or contaminants, materials, constituents, chemicals or compounds in any form regulated under any Environmental Law, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"Holdings" has the meaning assigned to such term in the preamble.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person

01:13977139.1

13

evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business and any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; provided that the term "Indebtedness" shall not include (x) deferred or prepaid revenue and (y) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the seller.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means all Taxes, other than Excluded Taxes and Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 9.12(a).

"Intellectual Property" has the meaning assigned to such term in the Collateral Agreement.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.07.

"Interest Payment Date" means the last Business Day of each calendar month.

"Interest Period" means, with respect to any Eurocurrency Borrowing, the period commencing on the date such Borrowing is disbursed or converted to or continued as a Eurocurrency Borrowing and ending on the date that is one, two, three or six months thereafter as selected by the Borrower in its Borrowing Request (or, if agreed to by each Lender participating therein, twelve months thereafter as the Borrower may elect); provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month at the end of such Interest Period and (c) no Interest Period shall extend beyond the Maturity Date.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" means that certain interim order (a) authorizing each of the Loan Parties (A) to obtain post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3)(1)

and 364(e), (B) to utilize cash collateral pursuant to 11 U.S.C. § 363, (b) granting adequate protection to pre-petition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b), and (d) to be entered by the Bankruptcy Court in the Chapter 11 Cases in accordance with Section 4.01(n), substantially in the form of Exhibit H or otherwise satisfactory in form and substance to the Administrative Agent.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.

"Investor" means a holder of Equity Interests in Holdings (or any direct or indirect parent thereof).

"Junior Financing" means any Indebtedness that is subordinated in right of payment to the Loan Document Obligations, and any Permitted Refinancing in respect of any of the foregoing.

"LC Facility" means that certain facility for letters of credit for the benefit of the Borrower pursuant to that certain Senior Secured Super Priority Debtor In Possession Letter of Credit Reimbursement and Security Agreement, dated as of August __, 2013, by and between Rural/Metro Corporation, as applicant, and Credit Suisse, Cayman Islands Branch, as the issuer of letters of credit thereunder.

"LC Issuer" means Credit Suisse AG, Cayman Islands Branch, as the issuer of letters of credit under the LC Facility.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"LIBO Rate" means, for any Interest Period with respect to a Eurocurrency Borrowing, the rate *per annum* equal to (i) the British Bankers Association (or any successor service or entity thereto) LIBOR Rate ("LIBOR"), as published by Reuters (or such other commercially available source providing quotations of LIBOR as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period or (ii) if such published rate is not available at such time for any reason, then the "LIBO Rate" for such Interest Period shall be the rate *per annum* determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the Eurocurrency Borrowing being made, continued or converted by Credit Suisse AG and with a term equivalent to such Interest Period would be offered by Credit Suisse AG's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period; and

Error! No property name supplied.

Notwithstanding the foregoing, the LIBO Rate with respect to any applicable Interest Period will be deemed to be 1.50% *per annum* if the LIBO Rate for such Interest Period determined pursuant to this definition would otherwise be less than 1.50% *per annum*.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"Liquidity Reporting Date" means Friday of each week occurring after the Effective Date, or if any Friday is not a Business Day, the immediately preceding Business Day.

"Loan Document Obligations" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided herein (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to each of the Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, the Guarantee Agreement, the Collateral Agreement, the other Security Documents, any Notes and each other agreement, document, instrument or supplement executed and delivered in connection with any of the foregoing from time to time.

"Loan Parties" means Holdings, the Borrower and the Subsidiary Loan Parties.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"London Banking Day" means any day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Management Investors" means the directors, officers and employees of Holdings, the Borrower and/or its Subsidiaries who are (directly or indirectly through one or more investment vehicles) investors in Holdings (or any direct or indirect parent thereof) as of the Effective Date.

"Material Adverse Effect" means any event, circumstance or condition that has had, or would reasonably be expected to have, a materially adverse effect on (a) the business, financial condition, or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents or (c) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents.

"Maturity Date" means the earliest of (i) March 1, 2014, (ii) the effective date of any chapter 11 plan of the Debtors, (iii) the date that is forty-five (45) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (iv) the date of acceleration of the Loans and termination of the Commitments hereunder (including, without limitation, as a result of the occurrence of any Event of Default).

"Maximum Rate" has the meaning assigned to such term in Section 9.17.

"Medicaid" means that program established by Title XIX of the Social Security Act.

"Medicare" means that program established by Title XVIII of the Social Security Act.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property to secure the Secured Obligations. Each Mortgage shall be in form and substance satisfactory to the Administrative Agent.

"Mortgaged Property" means each Owned Real Property together with the improvements thereto with respect to which a Mortgage is granted pursuant to the Collateral and Guarantee Requirement, Section 5.11, Section 5.12 or Section 5.14.

"Motor Vehicles" means all owned ambulances, alternative transportation vehicles, fire vehicles, trucks, trailers, tractors, service vehicles, automobiles and other registered vehicles of the Loan Parties.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Municipal Contract Lien" means (i) any Lien expressly required by any of the Borrower's or its Subsidiaries' contracts providing for emergency 911 ambulance services with Governmental Authorities as in effect on the Effective Date, and (ii) any Lien consented to in writing by the Administrative Agent with respect to such contracts providing for emergency 911 ambulance services with Governmental Authorities from and after the Effective Date.

"Net Proceeds" means, with respect to any event, the proceeds received in respect of such event in cash or Permitted Investments, including (i) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (ii) in the case of a Casualty Event, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, minus the reasonable fees and out-of-pocket expenses paid by Holdings, the Borrower and the Guarantors in connection with such event.

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing Loans made by such Lender.

"Organizational Documents" means, with respect to any Person, the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

Error! No property name supplied.

"Other Taxes" means any and all present or future recording, stamp, documentary, excise, transfer, sales, property or similar Taxes arising from any payment made under any Loan Document or from the execution, performance, delivery, registration or enforcement of, from the receipt or perfect of a security interest under, or otherwise with respect to, any Loan Document.

"Owned Real Property" means each parcel of real property together with the improvements thereto owned by a Loan Party.

"Paid-in-Kind" means with respect to any interest payment, or any portion thereof, payable on any Interest Payment Date that such interest shall be automatically added to the principal amount of the Loans on and as of such Interest Payment Date and shall be treated as principal (and accrue further interest) for all purposes hereunder from and after such Interest Payment Date.

"Participant" has the meaning assigned to such term in Section 9.04(c)(ii).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"Patient Receivables"  with respect to any Guarantor, the patient accounts receivable of such Guarantor existing or hereafter created, any and all rights to receive payments due on such accounts receivable from any Governmental Authority payor under or in respect of such accounts receivable (including, without limitation, Medicare, Medicaid, CHAMPVA and TRICARE), and all proceeds of or in any way derived, whether directly or indirectly, from any of the foregoing (including, without limitation, all interest, finance charges and other amounts payable by any Governmental Authority obligor, directly or indirectly, in respect thereof).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Act" means the Pension Protection Act of 2006, as amended from time to time.

"Perfection Certificate" means a certificate substantially in the form of Exhibit C.

"Permitted Encumbrances" means:

(a)    Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(b)    Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

(c)    Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of

Error! No property name supplied.

(including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Guarantor;

(d)    Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases (including Liens in favor of Governmental Authorities on equipment purchased by a Loan Party for purposes of fulfilling its obligations under a contract with such Governmental Authorities or in the form of Contingent Lease Agreements), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(e)    easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(f)    Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(j);

(g)    Liens on goods the purchase price of which is financed by a documentary letter of credit issued for the account of the Borrower or any of its Subsidiaries; provided that such Lien secures only the obligations of the Borrower or such Subsidiaries in respect of such letter of credit to the extent such obligations are permitted by Section 6.01; and

(h)    Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by the Borrower or any of its Subsidiaries;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than Liens referred to in clause (c) above securing obligations under letters of credit or bank guarantees and in clause (g) above.

"Permitted Holders" means (a) the Sponsors, and (b) the Management Investors; provided that in no event shall the Management Investors constitute Permitted Holders of more than 15% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Holdings, as applicable, at any one time.

"Permitted Investments" means any of the following, to the extent owned by the Borrower or any Guarantor:

(a)    dollars, euro or such other currencies held by it from time to time in the ordinary course of business;

(b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States, having average maturities of not more than 12 months from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least

$250,000,000 (any such bank in the foregoing clause (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)    commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)    repurchase agreements entered into by any Person with an Approved Bank, a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of the United States, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)    marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $250,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's, respectively (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service);

(g)    securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(h)    investments with average maturities of 12 months or less from the date of acquisition in mutual funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's; and

(i)    investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (h) of this definition.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other amounts paid, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 6.01(a)(v), Indebtedness resulting from such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced,

refunded, renewed or extended, (c) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (d) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended.

"Permitted Senior Lien" means any valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date which is senior in priority to the Liens securing the Existing Credit Agreement Obligations under applicable law and after giving effect to any subordination or inter-creditor agreements and which is (i) permitted under the Existing Credit Agreement or (ii) has otherwise been approved in writing by the Administrative Agent.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the recitals.

"Plan" has the meaning assigned to such term in Section 5.13(c).

"Platform" has the meaning assigned to such term in Section 5.01.

"Post-Petition" shall mean the time period subsequent to the filing of the Chapter 11 Cases.

"Prepayment Event" means:

      (a)      the receipt by any Loan Party of the proceeds of any sale, transfer or other disposition of any property or asset of the Borrower or any of its Subsidiaries permitted by Section 6.05(k);

      (b)      the receipt by any Loan Party of the proceeds of any Casualty Event, loss of property or assets or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding; or

      (c)      the incurrence by the Borrower or any of its Subsidiaries of any Indebtedness, other than Indebtedness permitted under Section 6.01 or permitted by the Required Lenders pursuant to Section 9.02.

"Pre-Petition" shall mean the time period prior to the filing of the Chapter 11 Cases.

"Prime Rate" means the rate announced from time to time by Credit Suisse AG as its "prime rate." The Prime Rate is based upon various factors including Credit Suisse AG's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by Credit Suisse AG shall take effect at the opening of business on the day of announcement of such change.

"Pro Forma Financial Statements" has the meaning assigned to such term in Section 3.04(c).

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

Error! No property name supplied.

"Public Lender" has the meaning assigned to such term in Section 5.01.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, emptying, pumping, escaping, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, indoor air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Released Parties" has the meaning assigned to such term in Section 2.28.

"Required Lenders" means at any time, Lenders having outstanding Loans and unused Commitments representing more than 50% of the aggregate outstanding Loans and unused Commitments at such time; provided that to the extent set forth in Section 9.02, (a) whenever there are one or more Defaulting Lenders, the total outstanding Loans and unused Commitments of each Defaulting Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to clause (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower or any Subsidiary.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of August 4, 2013 (as amended, to the extent permitted hereunder) by and among (a) the Borrower, (b) Holdings, (c) all of the Borrower's direct and indirect subsidiaries, (d) the holders of claims under the Existing Credit Agreement party thereto, and (e) the holders of claims in respect of the Senior Notes party thereto, substantially in the form attached hereto as Exhibit I.

"Retained Rights" with respect to any Patient Receivable owing from any Governmental Authority, the rights of any payee granted by applicable law and regulation over such Patient Receivable, which in the absence of a court order in the manner expressly contemplated by applicable state and federal law are subject to restrictions on assignment, pledging or are otherwise encumbered by applicable law or regulation, including, without limitation, and as applicable, restrictions on the collection thereof and discretion over the transfer thereof, to any party and restrictions on any such party's ability to enforce the claim giving rise to such Patient Receivable against such Governmental Authority.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Secured Obligations" has the meaning assigned to such term in the Collateral Agreement.

"Security Documents" means the Collateral Agreement, the Mortgages and each other security agreement or pledge agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, Section 5.11, Section 5.12 or Section 5.14 to secure any of the Secured Obligations.

"Senior Notes" means the $200.0 million aggregate principal amount of senior notes due 2019 issued by the Borrower on June 30, 2011.

"Sponsors" means Warburg Pincus LLC and its Affiliates.

"Statutory Reserve Rate" means, with respect to any currency, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve, liquid asset or similar percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority of the United States or of the jurisdiction of such currency or any jurisdiction in which Loans in such currency are made to which banks in such jurisdiction are subject for any category of deposits or liabilities customarily used to fund loans in such currency or by reference to which interest rates applicable to Loans in such currency are determined. Such reserve, liquid asset or similar percentages shall include those imposed pursuant to Regulation D of the Board of Governors. Eurocurrency Loans shall be deemed to be subject to such reserve, liquid asset or similar requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any other applicable law, rule or regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" means any Junior Financing.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Holdings.

Error! No property name supplied.

"Subsidiary Loan Party" means each Subsidiary of Holdings that is a party to the Guarantee Agreement.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement or contract involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or the other Subsidiaries shall be a Swap Agreement.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, assessments, fees, charges or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Total Adjusted Operating Cash Flow" means, for any period, the amount of Cash Receipts during such period minus the amount of Cash Disbursements for such period, all on a consolidated basis, as set forth in the applicable Budget or Variance Report for such period.

"Transaction Costs" means all fees, costs and expenses incurred or payable by Holdings, the Borrower or any other Subsidiary in connection with the Transactions.

"Transactions" means (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans and the use of the proceeds thereof, (b) the Chapter 11 Cases and (c) the payment of the Transaction Costs.

"TRICARE" means that program established by 10 U.S.C. § 1071 et seq.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"United States Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(e)(ii)(C).

"Unrestricted Cash" means (x) at any time prior to the date on which account control agreements are required with respect to the Loan Parties' accounts in accordance with Section 5.14 (without giving effect to any extension of such date (the "Account Control Date")), the aggregate amount of unrestricted cash and Permitted Investments held at such time by the Loan Parties and the Subsidiaries and (y) from and after the Account Control Date, the aggregate amount of unrestricted cash and Permitted Investments subject to the Administrative Agent's Liens and held at such time by the Loan Parties in accounts subject to account control agreements in form and substance satisfactory to the Administrative Agent; provided, that Unrestricted Cash shall not include any cash or Permitted Investments held as cash collateral under the LC Facility.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"Variance Period" means a period of four (4) consecutive calendar weeks.

"Variance Report" means a variance report for any Variance Period ending three Business Days prior to such date (1) showing, for each week during the relevant Variance Period, actual results for Total Adjusted Operating Cash Flow, (2) showing actual results for cumulative Total Adjusted Operating Cash Flow for such Variance Period, noting therein the cumulative variance from values set forth for such Variance Period in the most recent relevant Budget, (3) showing, for each week during the relevant Variance Period, actual results for cash disbursements and (4) an explanation, in reasonable detail, for any variance, certified by a Financial Officer of Holdings or the Borrower.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly Owned Subsidiary" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02    Classification of Loans.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type (e.g., a "Eurocurrency Loan" or an "ABR Loan").

Section 1.03    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower

Error! No property name supplied.

requests an amendment to any provision (including any definitions) hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Codification No. 825— Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of Holdings, the Borrower or any Subsidiary at "fair value" as defined therein. Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any change in GAAP after the date hereof.

## ARTICLE II

## THE CREDITS

**Section 2.01**    **Commitments**. Subject to the terms and conditions set forth herein,

(a)    on and as of the Effective Date and subject to the conditions set forth in Section 4.01, each Lender agrees to make Loans to the Borrower denominated in dollars in a principal amount not exceeding the portion of its Commitment set forth on Schedule 2.01 to be available as of the Effective Date, up to an aggregate principal amount for all Lenders of $40,000,000 on such date; and

(b)    on and as the Final Order Entry Date (or such later Funding Date as may be designated by the Borrower on no less than five (5) Business Days' prior written notice to the Administrative Agent) and subject to the conditions set forth in Section 4.02, each Lender agrees to make Loans to the Borrower denominated in dollars in a principal amount not exceeding the portion of its Commitment set forth on Schedule 2.01 to be available as of the Final Order Entry Date, up to an aggregate principal amount for all Lenders of $35,000,000 on such date.

**Section 2.02**    **Loans and Borrowings**.

(a)    Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments. The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder, provided that the Commitments of the Lenders are several and other than as expressly provided herein with respect to a Defaulting Lender, no Lender shall be responsible for any other Lender's failure to make Loans as required hereby.

(b)    Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Eurocurrency Loans as the Borrower may request in accordance herewith; provided that all Borrowings made on the Effective Date must be made as ABR Borrowings unless the Borrower shall have given the notice required for a Eurocurrency Borrowing under Section 2.03, and executed and delivered an indemnity letter satisfactory in all respects to the Administrative

Agent extending the benefits of Section 2.16 to Lenders in respect of such Borrowings.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)       Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (6) Eurocurrency Borrowings outstanding.

**Section 2.03    Requests for Borrowings**.  To request a Borrowing as of any Funding Date, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurocurrency Borrowing, not later than 2:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, in the case of any Eurocurrency Borrowing to be made on the Effective Date, one Business Day) or (b) in the case of an ABR Borrowing, not later than 2:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information:

(i)        the aggregate amount of such Borrowing;

(ii)       the Funding Date of such Borrowing, which shall be a Business Day;

(iii)      whether such Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing;

(iv)      in the case of a Eurocurrency Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)       the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06; and

(vi)      that as of the date of such Borrowing, the conditions set forth in Sections 4.02(a) and 4.02(b) are satisfied.

If no election as to the Type of Borrowing is specified as to any Borrowing, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurocurrency Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

**Section 2.04    Reserved**.

**Section 2.05    Reserved**.

**Section 2.06    Funding of Borrowings**.

(a)       Each Lender shall make each Loan to be made by it hereunder on the proposed Funding Date thereof and in the amount for such Lender set forth on Schedule 2.01 for such

Error! No property name supplied.

Lender on such Funding Date by wire transfer of immediately available funds by 12:00 noon, New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(b)    Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance on such assumption and in its sole discretion, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender agrees to pay to the Administrative Agent an amount equal to such share on demand of the Administrative Agent. If such Lender does not pay such corresponding amount forthwith upon demand of the Administrative Agent therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower agrees to pay such corresponding amount to the Administrative Agent forthwith on demand. The Administrative Agent shall also be entitled to recover from such Lender or Borrower interest on such corresponding amount, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrower, the interest rate applicable to such Borrowing in accordance with Section 2.13. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

(c)    The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 9.03(c).

**Section 2.07    Interest Elections**.

(a)    Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request or designated by Section 2.03 and, in the case of a Eurocurrency Borrowing, shall have an initial Interest Period as specified in such Borrowing Request or designated by Section 2.03. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurocurrency Borrowing, may elect Interest Periods therefor, all as provided in this Section. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic

Error! No property name supplied.

Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery, facsimile or other electronic transmission to the Administrative Agent of a written Interest Election Request signed by the Borrower.

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurocurrency Borrowing; and

(iv)    if the resulting Borrowing is to be a Eurocurrency Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurocurrency Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurocurrency Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurocurrency Borrowing and (ii) unless repaid, each Eurocurrency Borrowing shall be converted to an ABR Borrowing.

**Section 2.08    Reserved**.

**Section 2.09    Repayment of Loans; Evidence of Debt**.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Sections 2.10 and 2.11.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

Error! No property name supplied.

(c)     The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)     The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)     Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form provided by the Administrative Agent and approved by the Borrower.

**Section 2.10     Repayment of Loans on the Maturity Date**.  To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.  Any prepayment of a Borrowing pursuant to Section 2.11 shall be applied to reduce the final repayments of the Borrowings on the Maturity Date. Repayments of any Borrowing shall be accompanied by accrued interest on the amount repaid and shall be applied in accordance with Section 2.24.

**Section 2.11     Prepayment of Loans**.

(a)     The Borrower may prepay outstanding Loans in whole or in part from time to time without premium or penalty; provided, that any Loan that is prepaid will be automatically and irrevocably cancelled and may not be reborrowed.  The Borrower shall make such prepayment at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m. (New York City time) on the date of prepayment and all such prepayments shall be applied to repay the Loans in full on a pro rata basis among the Lenders holding such Loans. Each Loan so prepaid shall be accompanied by all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the date of prepayment.

(b)     In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary in respect of any Prepayment Event, the Borrower shall, within two (2) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (c) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Borrowings in an aggregate amount equal to 100% of the amount of such Net Proceeds.  Notwithstanding the foregoing, (i) any Net Proceeds in respect of a Prepayment Event described in clause (a) of the definition of the term "Prepayment Event" shall not be required to be so applied to the extent that (A) such Net Proceeds are deposited with the LC Issuer as cash collateral under the LC Facility pursuant to the terms and conditions thereof, in an aggregate amount not to exceed $10,500,000 in the aggregate, or (B) the Borrower invests such Net Proceeds in new or existing properties or assets used in the Loan Parties' business and constituting Collateral hereunder, in accordance with the Budget, within 180 days after such Net Proceeds are received; and (ii) any Net Proceeds in respect of a Prepayment

Error! No property name supplied.

Event described in clause (b) of the definition of the term "Prepayment Event" in an aggregate amount not to exceed $10,000,000 shall not be required to be so applied to the extent that the Borrower invests such Net Proceeds to repair or replace the assets for which such proceeds were received, to the extent constituting Collateral hereunder, in accordance with the Budget, within 180 days after such Net Proceeds are received.

   (c)  Commencing with the calendar month ending November 30, 2013, the Borrower shall prepay Borrowings in an aggregate amount equal to 100% of Excess Cash as of the last Business Day of each calendar month, and such payment shall be due and payable no later than five (5) Business Days after the end of each calendar month for which Excess Cash is calculated.

   (d)  The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurocurrency Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied; provided further that, any notice of mandatory prepayment pursuant to Section 2.11(b) or (c) must be delivered not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment made pursuant to this Section 2.11 shall be accompanied by accrued interest on the amount repaid and shall be applied in accordance with Section 2.24.

**Section 2.12**  <u>Fees</u>.

   (a)  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

   (b)  The Borrower agrees to pay to each Lender party to this Agreement, as fee compensation for the funding of such Lender's Loan, a closing fee in an amount equal to 1.00% of the stated principal amount of such Lender's Loan.  Such closing fees shall be payable to each Lender out of the proceeds of such Lender's Loan as and when funded on the Effective Date and shall be treated (and reported) by the Borrower as a reduction in issue price of the Loans for U.S. federal, state and local income tax purposes.

   (c)  The Borrower agrees to pay to each Lender party to this Agreement as of the Effective Date, as a backstop fee compensation for the initial funding and syndication of such Lender's Loan, a backstop fee in an amount equal to 2.0% of the stated principal amount of such Lender's Loan.  Such fees shall be payable to each Lender in full in cash on the Effective Date.

01:13977139.1

Error! No property name supplied.

(d)      From and after the Final Order Entry Date, the Borrower agrees to pay to each Lender party to this Agreement at such time, a ticking fee in the amount of 3.0% *per annum* on the aggregate principal amount of such Lender's unused Commitments.  Such fees shall be payable to each Lender in full in cash on each Interest Payment Date occurring after the Final Order Entry Date until the earlier to occur of (x) the Funding Date and (y) the Maturity Date.

(e)      All fees under this Section 2.12 will be in all respects fully earned on the Effective Date and non-refundable and non-creditable thereafter.

**Section 2.13**      **Interest**.

(a)      (i) Each Eurocurrency Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate *per annum* equal to the Adjusted LIBO Rate for such Interest Period plus the Applicable Rate; and (ii) each ABR Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate *per annum* equal to the Alternate Base Rate plus the Applicable Rate.

(b)      Notwithstanding the foregoing, (i) if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate *per annum* equal to (x) in the case of overdue principal of any Loan, 2.00% *per annum* plus the rate otherwise applicable to such Loan as provided in the preceding paragraph of this Section or (y) in the case of any other amount, 2.00% *per annum* plus the rate applicable to ABR Loans as provided in clause (a) of this Section 2.13; and (ii) upon the request of the Required Lenders, while any Event of Default exists (other than as set forth in the foregoing clause (i)), the Borrower shall pay interest on all outstanding Loan Document Obligations hereunder at a fluctuating interest rate *per annum* at all times equal to 2.00% *per annum* plus the rate applicable to ABR Loans pursuant to clause (a)(ii) of this Section 2.13.

(c)      Accrued interest on each Loan shall be paid in cash or Paid-in-Kind, as provided hereunder,  in arrears on each Interest Payment Date for such Loan, provided that (i) interest accrued pursuant to paragraph (b) of this Section 2.13 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurocurrency Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(d)      All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

**Section 2.14**      **Alternate Rate of Interest**.  If at least two Business Days prior to the commencement of any Interest Period for a Eurocurrency Borrowing:

(a)      the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

Error! No property name supplied.

(b)      the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurocurrency Borrowing and shall be ineffective and (ii) if any Borrowing Request requests a Eurocurrency Borrowing, then such Borrowing shall be made as an ABR Borrowing; provided, however, that, in each case, the Borrower may revoke any Borrowing Request that is pending when such notice is received.

Section 2.15      **Increased Costs**.

(a)      If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)      subject any recipient of any payment under a Loan Document to any Taxes (other than (A) Indemnified Taxes, and (B) Taxes described in clauses (c) through (e) of the definition of Excluded Taxes)) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other recipient of making, converting to, continuing or maintaining any Eurocurrency Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or other recipient or to reduce the amount of any sum received or receivable by such Lender or other recipient hereunder (whether of principal, interest or otherwise), then, from time to time upon request of such Lender or other recipient, the Borrower will pay to such Lender or other recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other recipient, as the case may be, for such increased costs actually incurred or reduction actually suffered.

(b)      If any Lender determines that any Change in Law regarding capital requirements has the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then, from time to time upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction actually suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company in reasonable detail, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

**Section 2.16    Break Funding Payments**.  In the event of (a) the payment of any principal of any Eurocurrency Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurocurrency Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19 or Section 9.02(c), then, in any such event, the Borrower shall, after receipt of a written request by any Lender affected by any such event (which request shall set forth in reasonable detail the basis for requesting such amount), compensate each Lender for the loss, cost and expense attributable to such event.  For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 2.16, each Lender shall be deemed to have funded each Eurocurrency Loan made by it at the Adjusted LIBO Rate for such Loan by a matching deposit or other borrowing for a comparable amount and for a comparable period, whether or not such Eurocurrency Loan was in fact so funded.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 15 days after receipt of such demand.  Notwithstanding the foregoing, this Section 2.16 will not apply to losses, costs or expenses resulting from Taxes, as to which Sections 2.15(a)(ii) and 2.17 shall govern.

**Section 2.17    Taxes**.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any Taxes, provided that if the applicable withholding agent shall be required by applicable Requirements of Law (as determined in the good faith discretion of the applicable withholding agent) to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions have been made (including deductions applicable to additional amounts payable under this Section) the Administrative Agent or Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable withholding agent shall make such deductions and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     Without limiting the provisions of paragraph (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Requirements of Law.

(c)     The Borrower shall indemnify the Administrative Agent and each Lender, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender or required to be withheld or deducted from a payment to the Administrative Agent or such Lender, as the case may be, on or with respect to any payment by or on account of any obligation of any Loan Party under any Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Each Lender shall, at such times as are reasonably requested by Borrower or the Administrative Agent, provide Borrower and the Administrative Agent with any properly completed and executed documentation prescribed by law, or reasonably requested by Borrower or the Administrative Agent, certifying as to any entitlement of such Lender to an exemption from, or reduction in, any withholding Tax with respect to any payments to be made to such Lender under the Loan Documents.  Each such Lender shall, whenever a lapse in time or change in circumstances renders such documentation expired, obsolete or inaccurate in any material respect, deliver promptly to Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the applicable withholding agent) or promptly notify Borrower and the Administrative Agent of its inability to do so.  Notwithstanding anything to the contrary, the completion, execution and submission of such documentation (other than as expressly listed in (i), (ii) and (iii), below, but including (ii)(E)) shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender..

Without limiting the generality of the foregoing:

(i)     Each Lender that is a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement two properly completed and duly signed original copies of Internal Revenue Service Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding.

(ii)     Each Lender that is not a United States person (as defined in Section 7701(a)(30) of the Code) shall deliver to Borrower and the Administrative Agent on or before the date on which it becomes a party to this Agreement (and from time to time

Error! No property name supplied.

thereafter upon the reasonable request of Borrower or the Administrative Agent) whichever of the following is applicable:

        (A)      two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States of America is a party and such other documentation as required under the Code,

        (B)      two properly completed and duly signed copies of Internal Revenue Service Form W-8ECI (or any successor forms),

        (C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or Section 881(c) of the Code, (x) two properly completed and duly signed certificates, substantially in the form of Exhibit G (any such certificate a "United States Tax Compliance Certificate"), and (y) two properly completed and duly signed copies of Internal Revenue Service Form W-8BEN (or any successor forms),

        (D)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Lender is a partnership, or is a participating Lender), Internal Revenue Service Form W-8IMY (or any successor forms) of the Foreign Lender, accompanied by a Form W-8ECI, W-8BEN, United States Tax Compliance Certificate, Form W-9, Form W-8IMY (or other successor forms) or any other required information from each beneficial owner that would be required under this Section 2.17 if such beneficial owner were a Lender, as applicable (provided that, if the Lender is a partnership (and not a participating Lender) and one or more beneficial owners are claiming the portfolio interest exemption, the United States Tax Compliance Certificate may be provided by such Lender on behalf of such beneficial owner(s)), or

        (E)      any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower and the Administrative Agent to determine the withholding or deduction required to be made.

        (iii)      If a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of those Sections (including those contained in Section 1471(b) or 1472(b), as applicable) of the Code, such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine whether such Lender has or has not complied with such Lender's obligations under such Sections and, if necessary, to determine the amount to deduct and withhold from such payment.

Error! No property name supplied.

Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)    If the Administrative Agent or a Lender receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees promptly to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. The Administrative Agent or such Lender, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant taxing authority (provided that the Administrative Agent or such Lender may delete any information therein that the Administrative Agent or such Lender deems confidential). Notwithstanding anything to the contrary, this Section shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to Taxes which it deems confidential to any Loan Party or any other person).

(g)    The agreements in this Section 2.17 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**Section 2.18    Payments Generally; Pro Rata Treatment; Sharing of Setoffs**.

(a)    The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees or of amounts payable under Section 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, and except that payments pursuant to Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. If any payment on a Eurocurrency Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a

Error! No property name supplied.

Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)      Payments received by and available to the Administrative Agent shall be applied in accordance with the priorities set forth in Section 2.24.

(c)      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the Applicable Rate in respect of Loans of Lenders that have consented to any such extension.  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)      Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

**Section 2.19     Mitigation Obligations; Replacement of Lenders**.

(a)      If any Lender requests compensation under Section 2.15, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17 or any event gives rise to the operation of Section 2.23, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17 or mitigate the applicability of Section 2.23, as

Error! No property name supplied.

the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense reasonably deemed by such Lender to be material and would not be inconsistent with the internal policies of, or otherwise be disadvantageous in any material economic, legal or regulatory respect to, such Lender.

(b)    If (i) any Lender requests compensation under Section 2.15 or gives notice under Section 2.23, (ii) the Borrower is required to pay any additional amount to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.17 or (iii) any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consents, in each case, shall not unreasonably be withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued but unpaid interest thereon, accrued but unpaid fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (C) the Borrower or such assignee shall have paid (unless waived) to the Administrative Agent the processing and recordation fee specified in Section 9.04(b)(ii) and (D) in the case of any such assignment resulting from a claim for compensation under Section 2.15, or payments required to be made pursuant to Section 2.17 or a notice given under Section 2.23, such assignment will result in a material reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise (including as a result of any action taken by such Lender under paragraph (a) above), the circumstances entitling the Borrower to require such assignment and delegation cease to apply. Each party hereto agrees that an assignment required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

**Section 2.20**    **Reserved**.

**Section 2.21**    **Reserved**.

**Section 2.22**    **Defaulting Lenders**.

(a)    Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

(ii)    Reallocation of Payments. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that

Error! No property name supplied.

Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and fifth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash Collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders, whereupon that Lender will cease to be a Defaulting Lender; provided that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**Section 2.23    Illegality**. If any Lender determines that any law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to the Adjusted LIBO Rate, or to determine or charge interest rates based upon the Adjusted LIBO Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Loans or to convert ABR Loans denominated in dollars to Eurocurrency Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, (x) the Borrower shall, upon three Business Days' notice from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurocurrency Loans of such Lender to ABR Loans either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Loans, and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Adjusted LIBO Rate, the Administrative Agent shall during the period of such suspension compute the Alternate Base Rate applicable to such Lender without reference to the Adjusted LIBO Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Adjusted LIBO Rate. Each Lender agrees to notify the Administrative Agent and the Borrower in writing promptly upon becoming aware that it is no longer illegal for such Lender to determine or charge interest rates based upon the Adjusted LIBO Rate. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

01:13977139.1

Error! No property name supplied.

**Section 2.24    Application of Payments and Proceeds**.  Except as otherwise provided in the Interim Order or Final Order, as applicable, all payments, distributions or proceeds of Collateral received at any time by, or payable or distributable at any time to, the Administrative Agent or any Lender on account of any Loan Document Obligations shall be applied as follows:

<u>first</u>, to payment of fees and expenses of the Administrative Agent payable or reimbursable by the Loan Parties under this Agreement;

<u>second</u>, to payment of all accrued unpaid interest on the Loans;

<u>third</u>, to payment of principal on the Loans;

<u>fourth</u>, to payment of all other Loan Document Obligations then outstanding;

<u>fifth,</u> to payment of all other obligations and liabilities required by the terms of the Interim Order and Final Order, as then in effect; and

<u>sixth</u>, any remainder shall be for the account of and paid to whomever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided above until exhausted prior to the application to the next succeeding category and (ii) each of the Administrative Agent, Lenders or other Persons entitled to payment under any of the clauses above shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to such clauses above.

**Section 2.25    Super Priority Nature of Obligations and Liens**.  The priority of the Liens of the Administrative Agent and the Lenders on the Collateral owned by the Loan Parties shall be set forth in the Interim Order and the Final Order.  Notwithstanding anything in the Loan Documents to the contrary, the Liens held by the Administrative Agent on the Collateral shall be for the benefit of the Administrative Agent and the Lenders.

**Section 2.26    Payment of Obligations**.  Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Bankruptcy Court.

**Section 2.27    No Discharge; Survival of Claims**.  Each of Holdings and Borrower, on behalf of itself and its Subsidiaries, agrees that (a) the Loan Document Obligations hereunder shall not be discharged by the entry of an order confirming a chapter 11 plan in any Chapter 11 Case (and Borrower, on behalf of itself and its Subsidiaries, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Administrative Agent and the Lenders pursuant to the Interim Order and Final Order and described therein and the Liens granted to the Administrative Agent pursuant to the Interim Order and Final Order and described therein shall not be affected in any manner by the entry of an order confirming a chapter 11 plan in any Chapter 11 Case.

**Section 2.28    Release**.  Subject to the terms of the Interim Order and the Final Order, each of Holdings and Borrower, on behalf of itself and its Subsidiaries, hereby acknowledges that neither Holdings, Borrower nor any of its Subsidiaries has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate

Error! No property name supplied.

all or any part of the Loan Parties' liability to repay the Administrative Agent and the Lenders as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender.  Subject to the terms of the Interim Order and the Final Order, Holdings and Borrower, in their own right and with respect to its Subsidiaries and the Loan Parties' bankruptcy estates, and on behalf of all their respective successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Administrative Agent and each Lender and all of the Related Parties of any of them (collectively, the "Released Parties") of and from any and all past or present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 and 724(a) of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**Section 2.29    Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral**.
Upon the Effective Date, and for so long as any Loan Document Obligations shall be outstanding, each of Holdings and Borrower, on behalf of itself, its Subsidiaries and its estate, hereby irrevocably waives (i) any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Loan Document Obligations, or to approve a claim of equal or greater priority than the Loan Document Obligations, except as permitted under the Interim Order and Final Order, and (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any manner not permitted by the Loan Documents or otherwise without the consent of the Administrative Agent and the Required Lenders.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower hereby represents and warrants, on behalf of itself and each of its respective Subsidiaries, to the Lenders that:

**Section 3.01    Organization; Powers**.  Each Loan Party is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, has the corporate or other organizational power and authority to carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and to effect the Transactions and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

01:13977139.1

Error! No property name supplied.

**Section 3.02    Authorization; Enforceability**.  The Transactions to be entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests.  This Agreement has been duly executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party and upon entry of the Interim Order or the Final Order,  will constitute, a legal, valid and binding obligation of Holdings, the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03    Governmental Approvals; No Conflicts**.  Except as set forth in Schedule 3.03 and the entry of the Interim Order or the Final Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, Holdings, the Borrower or any Guarantor, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Holdings, the Borrower or any Guarantor or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Borrower or any Guarantor, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Borrower or any Guarantor, except Liens created under the Loan Documents, except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**Section 3.04    [Reserved]**.

**Section 3.05    Properties**.

(a)    Schedule 3.05 sets forth all of the Owned Real Properties of the Loan Parties as of the Effective Date.

(b)    Each of Holdings, the Borrower and the Guarantors has good title to all the Owned Real Properties, (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes.

(c)    No Mortgage encumbers any Owned Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.07.

**Section 3.06    Litigation and Environmental Matters**.

(a)    Except the Chapter 11 Cases and as set forth in Schedule 3.06(a), there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened in writing against or

affecting Holdings, the Borrower or any Subsidiary that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)        Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Guarantor (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of Holdings or the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability, (iv) has, to the knowledge of Holdings or the Borrower, any basis to reasonably expect that Holdings, the Borrower or any Guarantor will become subject to any Environmental Liability, (v) the properties currently or to the knowledge of Holdings, the Borrower or any Guarantor formerly owned leased or operated by Holdings, the Borrower or any Guarantor do not contain any Hazardous Materials in amounts or concentrations which constitute a violation of, require response or other corrective action by Holdings, the Borrower or any Guarantor under applicable Environmental Laws and (vi) to the knowledge of Holdings or the Borrower, all Hazardous Materials transported from any property currently or formerly owned or operated by any of Holdings, the Borrower or any Guarantor for off-site disposal have been disposed of in a manner which would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

**Section 3.07    Compliance with Laws and Agreements**.  Each of Holdings, the Borrower and its Subsidiaries is in material compliance with (a) its Organizational Documents, (b) all Requirements of Law applicable to it or its property and (c) all Post-Petition indentures and other agreements and instruments binding upon it or its property, except, in the case of clauses (b) and (c) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No party to any material agreement to which Holdings, the Borrower or any Guarantor is a party entered into after the date of commencement of the Chapter 11 Cases has defaulted, is in default or has breached its obligations thereunder.

**Section 3.08    Investment Company Status**.  None of Holdings, the Borrower or any Guarantor is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time.

**Section 3.09    Taxes**.  Holdings, the Borrower and each Guarantor (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all material Taxes levied or imposed on their properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, provided that Holdings, the Borrower or such Guarantor , as the case may be, has set aside on its books adequate reserves therefore in accordance with GAAP.

There is no material proposed Tax assessment, deficiency or other claim against Holdings, the Borrower or any Guarantor except those being actively contested by such Loan Party in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP.

Error! No property name supplied.

Section 3.10    **ERISA**.

(a)    Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each ERISA Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither Holdings nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any ERISA Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii) neither Holdings nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan and (iv) neither Holdings nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

Section 3.11    **Disclosure**.  None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date, it being understood that any such projected financial information may vary from actual results and such variations could be material.  The Loan Parties have not failed to disclose to the Administrative Agent or any Lender any material assumptions made with respect to, or in connection with, the Budget and all reports or other information contained in the Budget are true, correct, complete and accurate in all material respects.

Section 3.12    **Subsidiaries**.  Schedule 3.12 sets forth the name of, and the ownership interest of Holdings and each Subsidiary in, each Subsidiary of Holdings.

Section 3.13    **Intellectual Property; Licenses, Etc.**  Except as could not reasonably be expected to have a Material Adverse Effect, Holdings, the Borrower and the Guarantors own, license or possess the right to use, all Intellectual Property that is necessary for the operation of their businesses as currently conducted, without conflict in any material respect with the Intellectual Property of any Person. No material Intellectual Property used by Holdings, the Borrower or any Guarantor in the operation of its business as currently conducted infringes in any material respect upon any rights held by any Person.  No claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of Holdings and the Borrower, threatened against Holdings, the Borrower or any Guarantor.

Section 3.14    **Reserved**.

Section 3.15    **Senior Indebtedness**.  The Loan Document Obligations constitute "Senior Indebtedness" (or any comparable term) under and as defined in the documentation governing any other Subordinated Indebtedness.

Section 3.16    **Federal Reserve Regulations**.  None of Holdings, the Borrower or any other Guarantor is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

Section 3.17    **Use of Proceeds**.

(a)    The Borrower will use the proceeds of the Loans solely in accordance with the Budget to (i) pay Transaction Costs, (ii) provide for the ongoing working capital and capital expenditure needs of the Borrower during the pendency of the Chapter 11 Cases, (iii) cash collateralizing the letters of credit issued pursuant to the LC Facility, and (iv) provide for other general corporate purposes of the Borrower not prohibited hereby during the pendency of the Chapter 11 Cases.

(b)    No proceeds of the Loans, any Collateral or any cash of any Loan Party may be used for any fees or expenses incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Administrative Agent, the Lenders, the Existing Agent or any Existing Lenders or (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the Administrative Agent and the Lenders or the Existing Agent and Existing Lenders; provided that up to $50,000 may be used by any statutory committee of unsecured creditors appointed in the Chapter 11 Cases for purposes of investigating (but not challenging) liens, claims, interests and adequate protection of the Existing Agent and Existing Lenders.

Section 3.18    **Labor Matters**.  Except as set forth on Schedule 3.18, there are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Guarantor pending or, to the knowledge of Holdings or the Borrower, threatened.  The hours worked by and payments made to employees of Holdings, the Borrower and the Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters, except for such violations that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  All payments due from Holdings, the Borrower or any Guarantor, or for which any claim may be made against Holdings, the Borrower or any Guarantor, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Guarantor.

Section 3.19    **Reorganization Matters**.

(a)    The Chapter 11 Cases were commenced on the Petition Date and proper notice has been given of (x) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (y) the hearing for the approval of the Interim Order, and (z) promptly after the scheduling thereof, the hearing for the approval of the Final Order.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising,

Error! No property name supplied.

of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, 1114, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out, in the priorities set forth in the Interim Order and the Final Order.

(c)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

## ARTICLE IV

## CONDITIONS

**Section 4.01     Effective Date**.  The obligations of the Lenders to make the Loans set forth on Schedule 2.01 as to be made on and as of the Effective Date hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include facsimile or other electronic transmission of a signed counterpart of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received a written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of (i) Willkie Farr & Gallagher LLP, New York counsel for the Loan Parties, (ii) Young Conaway Stargatt & Taylor, LLP, Delaware counsel for the Loan Parties, and (iii) Squires Sanders and Dempsey LLP, Arizona counsel for the Loan Parties, in each case in form and substance satisfactory to the Administrative Agent and its counsel.  Each of Holdings and the Borrower hereby requests such counsel to deliver such opinions.

(c)     The Administrative Agent shall have received a certificate of each Loan Party, dated the Effective Date, substantially in the form of Exhibit E with appropriate insertions, executed by any Responsible Officer of such Loan Party, and including or attaching the documents referred to in paragraph (d) of this Section.

(d)     The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(e)     All material third party and governmental consents necessary in connection with the Transactions, the financing contemplated thereunder and all other related transactions contemplated thereby shall have been obtained.

Error! No property name supplied.

(f)     The Administrative Agent shall have received all fees and other amounts contemplated by the Loan Documents due and payable to the Lenders on or prior to the Effective Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party.

(g)     The Collateral and Guarantee Requirement (other than in accordance with Section 5.14) shall have been satisfied and the Administrative Agent and the Lenders shall have received a completed Perfection Certificate in form and substance satisfactory to the Administrative Agent and the Lenders three (3) days prior to the Effective Date (or such shorter period as determined by the Administrative Agent in its sole discretion) and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby.

(h)     Certificates of insurance, including without limitation flood insurance policies, shall be delivered to the Administrative Agent evidencing the existence of insurance to be maintained by Holdings, the Borrower and its Subsidiaries pursuant to Section 5.07 and, if applicable, the Administrative Agent shall be designated as an additional insured and loss payee or mortgagee endorsement as its interest may appear thereunder, or solely as the additional insured, as the case may be, thereunder (provided that if such endorsement as additional insured cannot be delivered by the Effective Date, the Administrative Agent may consent to such endorsement being delivered at such later date as it deems appropriate in the circumstances).

(i)     The Administrative Agent and the Lenders shall have received (i) the Budget, (ii) a forecast for the period of thirteen (13) months following the Effective Date, (iv) duly executed copies of all engagement letters and/or work letters for each of its financial advisors and/or legal counsels and (v) such additional information (financial or otherwise) reasonably requested by the Administrative Agent or the Lenders, any such item set forth in clauses (i) to (v) of this Section 4.01(i) to be in form and substance satisfactory to the Administrative Agent and the Lenders.

(j)     The Administrative Agent and the Lenders shall have received a fully executed copy of the Restructuring Support Agreement, in form and substance satisfactory to the Administrative Agent and the Lenders, and such Restructuring Support Agreement shall be in full force and effect;

(k)     No Default or Event of Default shall exist or would result from the extension of the Loans on the Effective Date.

(l)     The representations and warranties set forth in Article III shall be true and correct on and as of the Effective Date.

(m)     The Administrative Agent shall have received, at least five (5) days prior to the Effective Date, all documentation and other information about the Loan Parties as shall have been reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

(n)     The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the Administrative Agent, on such prior notice as may be reasonably satisfactory to the Administrative Agent, the Interim Order as to the Loans to be made on the Effective Date no later than three (3) Business Days after the date of commencement of the Chapter 11 Cases, approving and authorizing this Agreement and the other Loan Documents and

the priorities and liens granted under Bankruptcy Code section 364(c) and (d), as applicable, in form and substance satisfactory to the Administrative Agent and its counsel;

(o)      The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Administrative Agent and the Lenders.

(p)      The Loan Parties shall be in compliance in all respects with the Interim Order.

(q)      The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter but in no event later than three (3) Business Days after the Petition Date shall have been reviewed in advance by the Administrative Agent and the Lenders and shall be reasonably satisfactory in form and substance to the Administrative Agent and the Lenders.

(r)      No trustee or examiner shall have been appointed with respect to the Debtors or their respective properties.

(s)      A cash management order satisfactory to the Administrative Agent and the Lenders shall be in full force and effect, and cash management arrangements satisfactory to the Administrative Agent and the Lenders shall have been implemented.

(t)      No material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the commencement of the Chapter 11 Cases) shall have occurred.

(u)      All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions among the Loan Parties and the Lenders contemplated by the Loan Documents shall be satisfactory in form and substance to the Administrative Agent and the Lenders, and the Lenders shall have received all information and copies of all documents or papers requested by any of them.

**Section 4.02      Final Order Entry Date and Final Funding Loans**.  The obligations of the Lenders to make the Loans set forth on Schedule 2.01 as to be made on and as of the Final Order Entry Date hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)      The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing; provided that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be.

(b)      At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)      The Administrative Agent shall have received all fees and other amounts contemplated by the Loan Documents due and then payable to the Lenders as of the Final Order

Entry Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party.

(d)     The Lenders shall have received the required periodic updates of the Budget and Variance Reports, each in form and substance satisfactory to the Administrative Agent and the Lenders, and the Loan Parties shall be in compliance with the updated Budget.

(e)     No Default or Event of Default shall exist or result from the extension of any Loans on such Funding Date.

(f)     Not later than 45 days following the Interim Order Entry Date, the Final Order in form and substance satisfactory to the Administrative Agent including, without limitation, the provisions identified in Section 4.01(n) hereof, which Final Order shall have been entered on no less than three (3) Business Days' prior written notice to the Administrative Agent, approving and authorizing on a final basis the matters and containing the provisions described in the Interim Order (the "Final Order").

(g)     The Final Order shall not have been reversed, modified, amended, stayed or vacated.

(h)     The Loan Parties shall be in compliance in all respects with the Final Order.

Each Borrowing (provided that a conversion or a continuation of a Borrowing shall not constitute a "Borrowing" for purposes of this Section) shall be deemed to constitute a representation and warranty by Holdings and the Borrower on the date thereof as to each of the matters specified in this Section.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been indefeasibly paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

**Section 5.01     Financial Statements and Other Information**. Holdings or the Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)     if and when available with respect to any fiscal year of the Borrower, audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows of the Borrower as of the end of and for such year, and related notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by PricewaterhouseCoopers LLP or other independent public accountants of recognized national standing to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)     on or before the date that is 90 days after the end of the fiscal quarter ending June 30, 2013, and thereafter, commencing with the financial statements for the fiscal quarter ending

September 30, 2013, on or before the date that is 60 days after the end of each such fiscal quarter, unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the financial condition as of the end of and for such fiscal quarter and such portion of the fiscal year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to year-end adjustments (which may be material, include restatements and take into account the status of the reporting systems of Holdings and its Subsidiaries), implementation of SOP 90-7 and the absence of footnotes;

(c)     on or before the date that is 60 days after the month ending June 30, 2013, and thereafter, commencing with the financial statements for the month ending July 31, 2013, on or before the date that is 45 days after the end of each such month (provided that (i) with respect to any month that is the last month of a fiscal quarter, the deadline shall be 60 days after the end of such month, and (ii) for up to two such deliveries following written notice to the Administrative Agent of the start of conversion of the information technology systems, such deadline for up to such two deliveries may be extended with the approval of the Administrative Agent), monthly financial statements including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a financial officer as presenting fairly in all material respects the financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations and cash flows of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, year-end adjustments (which may be material, include restatements and take into account the status of the reporting systems of Holdings and its Subsidiaries), implementation of SOP 90-7 and the absence of footnotes;

(d)     not later than five (5) days after any delivery of financial statements under paragraph (a), (b) or (c) above, a certificate of a Financial Officer (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations (A) demonstrating compliance with the covenants contained in Section 6.12, (B) in the case of financial statements delivered under paragraph (c) above, of Excess Cash for such fiscal month and (iii) in the case of financial statements delivered under paragraph (c) above, setting forth a reasonably detailed calculation of the Net Proceeds received during the applicable period by or on behalf of Holdings, the Borrower or any of its Subsidiaries in respect of any event described in the definition of the term "Prepayment Event";

(e)     not later than five (5) days after any delivery of financial statements under paragraph (a) above, if any are delivered, a certificate of the accounting firm that reported on such financial statements stating whether it obtained knowledge during the course of its examination of such financial statements of any Default relating to Section 6.12 and, if such knowledge has been obtained, describing such Default (which certificate may be limited to the extent required by accounting rules or guidelines);

Error! No property name supplied.

(f)     not later than 90 days after the commencement of each fiscal year of the Borrower, a detailed consolidated budget for the Borrower and its Subsidiaries for such fiscal year (including a projected consolidated balance sheet and consolidated statements of projected operations, comprehensive income and cash flows as of the end of and for such fiscal year and setting forth the material assumptions used for purposes of preparing such budget);

(g)     not later than five (5) Business Days prior to the first Monday of each calendar month, a rolling 13-week budget (upon approval of the Administrative Agent, the "Budget" (the initial form of which is attached as Exhibit C to the Interim Order)) for the period commencing on the first Monday of such calendar month.  The rolling 13-week Budget shall set forth on a line-item basis the Loan Parties' anticipated Cash Receipts and expenditures on a weekly basis which the Loan Parties expect to incur during each week of the Budget starting on the Petition Date;

(h)     together with the delivery of the financial statements described in clause (c) above, reasonably detailed monthly reports, in form and substance satisfactory to the Administrative Agent and the Lenders, with respect to material contract wins and losses, changes to surety bonds and letters of credit, a report on material facility closures, asset sales, updates on status of material changes with collective bargaining agreements and labor negotiations, transport information (including actual transports and transports billed), accounts receivable information (by payor and region), and estimated backlog rollforward information for unbilled transports and other matters reasonably requested by the Administrative Agent;

(i)     not later than Wednesday of each week, (i) periodic updates of the Budget, (ii) weekly line-by-line variance reports, in form and substance acceptable to the Administrative Agent, for the preceding weekly period and on a cumulative basis for the first reporting week of each new Budget to the report date (with a reconciliation of the aggregate variance for the period from the Petition Date to the report date), comparing actual Cash Receipts and Cash Disbursements to amounts projected in the Budget and showing on a line-by-line basis any variance to the corresponding line item of the Budget together with an explanation for such variance, and (iii) a weekly business report, in form and substance satisfactory to the Administrative Agent and the Lenders;

(j)     no less than three (3) days prior to filing drafts of all pleadings, motions, applications, judicial information, financial information and any other documents  (including the Interim Order and the Final Order, each of which must be in form and substance satisfactory to the Administrative Agent and the Lenders) filed by or on behalf of the Borrower or the Guarantors with the Bankruptcy Court or delivered to the U.S. Trustee in the Chapter 11 Cases, or distributed by or on behalf of the Borrower or any Guarantor to any official committee in the Chapter 11 Cases (except in the case of any such documents filed on an expedited basis in connection with an emergency proceeding, which shall be delivered as soon as practicable and in any event prior to the filing thereof); and

(k)     promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of its Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic

01:13977139.1

52

Error! No property name supplied.

system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."  Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b), (c) and (d) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any material nonpublic information.

Section 5.02    **Notices of Material Events**.  Promptly after any Responsible Officer of Holdings or the Borrower obtains knowledge thereof, Holdings or the Borrower will furnish to the Administrative Agent (for distribution to each Lender through the Administrative Agent) written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    to the extent permissible by law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer of Holdings, the Borrower or any Subsidiary, affecting Holdings, the Borrower or any Subsidiary or the receipt of a notice of an Environmental Liability that could reasonably be expected to result in a Material Adverse Effect;

(c)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(d)    of the occurrence of any ERISA Event; and

(e)    of any material change in accounting policies or financial reporting practices by any Loan Party.

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of Holdings or the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.03    **Information Regarding Collateral**.

(a)    Holdings or the Borrower will furnish to the Administrative Agent written notice, no later than ten (10) Business Days prior to the occurrence of any such change, of any change

Error! No property name supplied.

(i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number.

(b)     Not later than five days after delivery of financial statements pursuant to Section 5.01(a) or (b), Holdings or the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of Holdings or the Borrower (i) setting forth the information required pursuant to Sections 1, 8, 9, 10(a) and 10(b) of the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section, and (ii) certifying that all notices required to be given prior to the date of such certificate by this Section 5.03 have been given.

Section 5.04     **Existence; Conduct of Business**.  Each of Holdings and the Borrower will, and will cause each Guarantor to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger permitted by Section 6.03 or any Disposition permitted by Section 6.05.

Section 5.05     **Payment of Taxes, etc.**  Each of Holdings and the Borrower will, and will cause each Guarantor to, pay its obligations and liabilities in respect of Taxes imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except to the extent any such Taxes are being contested in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP.

Section 5.06     **Maintenance of Properties**.  Each of Holdings and the Borrower will, and will cause each Guarantor to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.07     **Insurance**.

(a)     Each of Holdings and the Borrower will, and will cause each Guarantor to, maintain, with insurance companies that Holdings believes (in the good faith judgment of the management of Holdings) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which Holdings believes (in the good faith judgment of management of Holdings) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as Holdings believes (in the good faith judgment or the management of Holdings) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance shall (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or mortgagee endorsement that names the Administrative Agent, on behalf of the Lenders as the loss payee or mortgagee thereunder.

Error! No property name supplied.

(b)      If any portion of any Owned Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, as determined in the Borrower's reasonable discretion, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 5.08    **Books and Records; Inspection and Audit Rights**. Each of Holdings and the Borrower will, and will cause each Guarantor to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or any Subsidiary, as the case may be. Each of Holdings and the Borrower will, and will cause each Guarantor to, permit any representatives or advisors designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; provided that, when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. Upon request by the Administrative Agent or any Lender from time to time, the senior management and advisors of the Borrower and its Subsidiaries will agree to hold a conference with the Administrative Agent and the Lenders.

Section 5.09    **Compliance with Laws**. Each of Holdings and the Borrower will, and will cause each Guarantor to, comply with its Organizational Documents and all Requirements of Law (including Environmental Laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.10    **Use of Proceeds**. The Borrower will, and will cause each Guarantor to, use the proceeds of the Loans in accordance with Section 3.17.

Section 5.11    **Additional Subsidiaries**. If (i) any additional Subsidiary is formed or acquired after the Effective Date or (ii) if any Subsidiary ceases to be an Excluded Subsidiary, Holdings and the Borrower will, no later than three (3) Business Days prior to the date such newly formed or acquired Subsidiary is formed or acquired or such Subsidiary ceases to be an Excluded Subsidiary, notify the Administrative Agent thereof, and will cause such Person to satisfy the Collateral and Guarantee Requirement with respect to such Person and with respect to any Equity Interest in or Indebtedness of such Person owned by or on behalf of any Loan Party within ten (10) Business Days after the date of such formation or acquisition or the date such Subsidiary ceases to be an Excluded Subsidiary (or such longer period as the Administrative Agent shall reasonably agree and the Administrative Agent shall have received a completed Perfection Certificate with respect to such Person signed by a Responsible Officer, together with all attachments contemplated thereby).

Error! No property name supplied.

Section 5.12     **Further Assurances**.

(a)     Each of Holdings and the Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Lenders may reasonably request, to cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

(b)     If, after the Effective Date, any material assets (including any owned real property or improvements thereto or any interest therein with a fair market value in excess of $100,000) are acquired by the Borrower or any other Loan Party (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent thereof, and, if requested by the Administrative Agent, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement," at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement."

(c)     Within 90 days of any request by the Administrative Agent, the Loan Parties shall perfect the Liens of the Lenders in the Motor Vehicles of the Loan Parties in accordance with paragraph (f) of the term "Collateral and Guarantee Requirement."

Section 5.13     **Case Milestones**.  The Loan Parties shall comply with the following milestones with respect to the Chapter 11 Cases:

(a)     The Bankruptcy Court shall have entered an order approving the Restructuring Support Agreement on or before the date that is 35 days following the Petition Date., which order shall have become final and non-appealable within fifteen (15) days thereafter;

(b)     The disclosure statement (the "Disclosure Statement") shall have been filed pursuant to section 1125 of the Bankruptcy Code and a chapter 11 plan for all Debtors (the "Plan") on or prior to September 15, 2013, the terms of which Plan shall have the consent of the Administrative Agent, which consent shall not be unreasonably withheld; provided, however, that (i) the Debtors hereby agree that the Administrative Agent's refusal to consent to the terms of any Plan that seeks to provide a recovery in respect of all or any portion of the Existing Credit Agreement Obligations in the form of a new debt instrument shall be deemed "reasonable" for the purposes of this subsection (b), and (ii) the Administrative Agent and Lenders hereby agree that the Administrative Agent's refusal to consent to the terms of any Plan that seeks to (x) indefeasibly pay, in cash, in full, the outstanding Existing Credit Agreement Obligations (including, without limitation, all outstanding principal, accrued interest, fees and expenses), irrevocably terminates all of the Revolving Commitments (as defined in the Existing Credit Agreement), and cash collateralizes any Letters of Credit (as defined in the Existing Credit agreement) which survive termination or (y) implement the terms of the Restructuring set forth in the Restructuring Support Agreement, shall be deemed "unreasonable" for the purposes of this subsection (b);

Error! No property name supplied.

(c)    The Bankruptcy Court shall have entered an order approving the Disclosure Statement on or before November 8, 2013;

(d)    The Bankruptcy Court shall have entered an order confirming the Plan on or prior to December 20, 2013 (the "Confirmation Order");

(e)    The Confirmation Order shall have become final and non-appealable on or prior to December 31, 2013; and

(f)    The effective date of the Plan shall have occurred on or prior to (i) December 31, 2013 if the milestone in clause (e) shall have been waived in accordance with this Agreement on or prior to such date, or (ii) January 7, 2014  if such milestone shall not have been waived on or prior to December 31, 2013;

provided, that each of the foregoing deadlines may be extended in accordance with the terms of the Restructuring Support Agreement.

**Section 5.14    Certain Post-Closing Obligations**.  As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent agrees to in writing, including to reasonably accommodate circumstances unforeseen on the Effective Date, Holdings, the Borrower and each other Loan Party shall deliver the documents or take the actions specified on Schedule 5.14.

**Section 5.15    Cash Management**.  Subject to the orders of the Bankruptcy Court with respect to the Debtors' cash management, the Borrower and the Guarantors shall maintain their operating accounts with deposit banks reasonably acceptable to the Administrative Agent and, subject to Section 5.14, maintain at all times account control agreements in form and substance satisfactory to the Administrative Agent over such accounts.  The Borrower shall also maintain a cash collateral account with the Administrative Agent (the "Cash Collateral Account").  The proceeds of the Loans shall be maintained in the Cash Collateral Account, and upon the occurrence and during the continuance of any Default or Event of Default, all proceeds from any sales of Collateral shall be deposited immediately and directly into the Cash Collateral Account.  No Loan Party shall open, maintain or permit to exist any bank account, unless such Loan Party shall have provided the Administrative Agent with five (5) Business Days' prior written notice thereof and, unless otherwise consented to in writing by the Administrative Agent, shall have provided an account control agreement in form and substance satisfactory to the Administrative Agent over each such account.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than contingent amounts not yet due) under any Loan Document have been indefeasibly paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

**Section 6.01    Indebtedness; Certain Equity Securities**.

(a)    Holdings and the Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

Error! No property name supplied.

(i)     Indebtedness of the Borrower and any of the Guarantors under the Loan Documents;

(ii)     Indebtedness outstanding on the date hereof and listed on Schedule 6.01;

(iii)     Guarantees by the Borrower and the Guarantors in respect of Indebtedness of the Borrower or any Guarantor otherwise permitted hereunder; provided that such Guarantee is otherwise permitted by Section 6.04; provided further that (A) no Guarantee by any Guarantor of the Senior Notes or any Junior Financing shall be permitted unless such Guarantor shall have also provided a Guarantee of the Loan Document Obligations pursuant to the Guarantee Agreement and (B) if the Indebtedness being Guaranteed is subordinated to the Loan Document Obligations, such Guarantee shall be subordinated to the Guarantee of the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(iv)     Indebtedness of the Borrower owing to any Guarantor or of any Guarantor owing to any other Guarantor or the Borrower to the extent permitted by Section 6.04; provided that all such intercompany Indebtedness shall be subordinated to the Loan Document Obligations (but only to the extent permitted by applicable law and not giving rise to adverse tax consequences) on terms (i) at least as favorable to the Lenders as those set forth in the form of intercompany note attached as Exhibit F or (ii) otherwise satisfactory to the Administrative Agent;

(v)     (A) Indebtedness (including Capitalized Lease Obligations) of the Borrower or any Guarantors financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets, other than software; provided that such Indebtedness is incurred concurrently with or within 90 days after the applicable acquisition, construction, repair, replacement or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A); provided further that, at the time of any such incurrence or Permitted Refinancing of such Indebtedness and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) shall not exceed $5,000,000;

(vi)     Indebtedness in respect of Swap Agreements permitted by Section 6.07;

(vii)     Indebtedness evidenced by the Senior Notes;

(viii)     Indebtedness representing deferred compensation to employees of Holdings, the Borrower and any Guarantors incurred in the ordinary course of business;

(ix)     Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case in the ordinary course of business;

(x)     Indebtedness incurred by the Borrower or any of the Guarantors in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty

or liability insurance or self-insurance or other reimbursement-type obligations regarding workers compensation claims;

(xi)     obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of its Subsidiaries or obligations in respect of letters of credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(xii)     Indebtedness of the Borrower in the form of letters of credit issued (A) pursuant to the LC Facility in an aggregate principal amount not to exceed (i) prior to the Final Order Entry Date, $15,000,000 at any time outstanding, and (ii) from and after the Final Order Entry Date, $30,000,000 at any time outstanding; and (B) in respect of surety obligations of the Loan Parties by letter of credit issuers (other than the LC Issuer pursuant to the LC Facility) in an aggregate principal amount not to exceed $15,000,000 at any time outstanding; and

(xiii)     Other unsecured Indebtedness of the Borrower and the Guarantors; provided that the aggregate principal amount of unsecured Indebtedness outstanding in reliance on this clause (xiii) shall not exceed $2,000,000.

(b)     The Borrower will not, and will not permit any Guarantor to, issue any preferred Equity Interests or any Disqualified Equity Interests.

Section 6.02     Liens.  Holdings and the Borrower will not, and will not permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(i)     Liens created under the Loan Documents;

(ii)     Permitted Encumbrances;

(iii)     Liens existing on the date hereof and set forth on Schedule 6.02 and any modifications, replacements, renewals or extensions thereof; provided that (A) such modified, replacement, renewal or extension Lien does not extend to any additional property other than (1) after-acquired property that is affixed or incorporated into the property covered by such Lien and (2) proceeds and products thereof, and (B) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(iv)     Liens securing Indebtedness permitted under Section 6.01(a)(v); provided that (A) such Liens attach concurrently with or within 90 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (B) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for accessions to such property and the proceeds and the products thereof and (C) with respect to Capitalized Lease Obligations; such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capitalized Lease Obligations; provided further that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(v)      leases, licenses, subleases or sublicenses granted to others that do not (A) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (B) secure any Indebtedness;

(vi)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(vii)      Liens (A) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (B) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(viii)      Liens (A) on cash advances or escrow deposits in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 6.04 to be applied against the purchase price for such Investment or otherwise in connection with any escrow arrangements with respect to any such Investment or any Disposition permitted under Section 6.05 (including any letter of intent or purchase agreement with respect to such Investment or Disposition), or (B) consisting of an agreement to dispose of any property in a Disposition permitted under Section 6.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(ix)      any interest or title of a lessor under leases (other than leases constituting Capitalized Lease Obligations) entered into by any of the Borrower or any Guarantors in the ordinary course of business;

(x)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods by any of the Borrower or any Guarantors in the ordinary course of business;

(xi)      Liens deemed to exist in connection with Investments in repurchase agreements under clause (e) of the definition of the term "Permitted Investments";

(xii)      Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(xiii)      Liens that are contractual rights of setoff (A) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, (B) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Borrower or any Guarantor in the ordinary course of business;

(xiv)      ground leases in respect of real property on which facilities owned or leased by the Borrower or any of the Guarantors are located;

(xv)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

        (xvi)     Retained Rights;

        (xvii)    Municipal Contract Liens;

        (xviii)  the Permitted Senior Liens; and

        (xix)     Liens in respect of letters of credit issued pursuant to the LC Facility and permitted under Section 6.01(a)(xii).

**Section 6.03**    <u>**Fundamental Changes**</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that, upon five (5) Business Days' prior written notice to the Administrative Agent, any Subsidiary may merge with (a) the Borrower; provided that the Borrower shall be the continuing or surviving Person, or (b) any one or more other Subsidiaries; provided that when any Subsidiary Loan Party is merging with another Subsidiary, the continuing or surviving Person shall be a Subsidiary Loan Party.

**Section 6.04**    <u>**Investments, Loans, Advances, Guarantees and Acquisitions**</u>.  Holdings and the Borrower will not, and will not permit any Subsidiary to, make or hold any Investment, except:

        (a)     Permitted Investments;

        (b)     loans or advances to officers, directors and employees of Holdings, the Borrower and the Guarantors for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes in an aggregate principal amount outstanding at any time not to exceed $250,000;

        (c)     Investments by the Borrower or any Guarantor in any Loan Party other than Holdings;

        (d)     Investments consisting of extensions of trade credit and accommodation guarantees in the ordinary course of business;

        (e)     Investments existing or contemplated on the date hereof and set forth on Schedule 6.04(e);

        (f)     Investments in Swap Agreements permitted under Section 6.07;

        (g)     promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05;

        (h)     Reserved;

        (i)     Reserved;

        (j)     Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices;

        (k)     Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure

with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(l)     loans and advances to Holdings (or any direct or indirect parent thereof) not in excess of the amount of Restricted Payments to the extent permitted to be made to Holdings in accordance with Section 6.08(a)(vi);

(m)     advances of payroll payments to employees in the ordinary course of business;

(n)     [Reserved];

(o)     receivables owing to the Borrower or any Guarantor, if created or acquired in the ordinary course of business; and

(p)     Investments (A) for utilities, security deposits, leases and similar prepaid expenses incurred in the ordinary course of business and (B) trade accounts created, or prepaid expenses accrued, in the ordinary course of business.

**Section 6.05     Asset Sales**. Holdings and the Borrower will not, and will not permit any Subsidiary to, (i) sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it or (ii) issue any additional Equity Interest in such Guarantor (other than issuing Equity Interests to the Borrower or a Guarantor in compliance with Section 6.04(c)) (each, a "Disposition"), except:

(a)     Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)     Dispositions of inventory and other assets in the ordinary course of business;

(c)     [Reserved];

(d)     Dispositions of property to the Borrower or a Guarantor;

(e)     Dispositions constituting Investments permitted by Section 6.04, Restricted Payments permitted by Section 6.08 and Liens permitted by Section 6.02;

(f)     Dispositions of property acquired by Holdings, the Borrower or any of its Subsidiaries after the Effective Date pursuant to sale-leaseback transactions permitted by Section 6.06;

(g)     [Reserved];

(h)     [Reserved];

(i)     leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and that do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(j)     any disposition arising from foreclosure or similar action with respect to any property or assets subject to a Municipal Contract Lien; and

Error! No property name supplied.

(k)    Dispositions of property to Persons other than Guarantors (including the sale or issuance of Equity Interests of a Guarantor) not otherwise permitted under this Section 6.05 in an aggregate amount not to exceed $20,000,000; provided that (i) no Default shall exist at the time of, or would result from, such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default existed or would have resulted from such Disposition) and (ii) with respect to any Disposition pursuant to this clause (k), the Borrower or a Guarantor shall receive not less than 75% of such consideration in the form of cash; provided, however, that for the purposes of this clause (ii), any Designated Non-Cash Consideration received by the Borrower or such Guarantor in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (k), not in excess of $1,000,000 at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash.

provided that any Disposition of any property pursuant to this Section 6.05 (except pursuant to Sections 6.05(e) and except for Dispositions by a Loan Party to another Loan Party), shall be for no less than the fair market value of such property at the time of such Disposition.

Section 6.06    **Sale and Leaseback Transactions**.  Holdings and the Borrower will not, and will not permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale of any fixed or capital assets by the Borrower or any Guarantor that is made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within 90 days after the Borrower or such Guarantor, as applicable, acquires or completes the construction of such fixed or capital asset; provided that, if such sale and leaseback results in a Capital Lease Obligation, such Capital Lease Obligation is permitted by Section 6.01 and any Lien made the subject of such Capital Lease Obligation is permitted by Section 6.02.

Section 6.07    **Swap Agreements**.  Holdings and the Borrower will not, and will not permit any Subsidiary to, enter into any Swap Agreement, except the Swap Agreements described on Schedule 6.07, without the prior written consent of the Administrative Agent.

Section 6.08    **Restricted Payments; Certain Payments of Indebtedness**.

(a)    The Borrower will not, and will not permit any Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(i)    each Subsidiary Loan Party may make Restricted Payments to the Borrower and to any other Subsidiary Loan Parties;

(ii)    each Subsidiary Loan Party may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person to the Borrower and to any other Subsidiary Loan Parties;

(iii)    [Reserved];

(iv)    [Reserved];

(v)    [Reserved];

(vi)    the Borrower may make Restricted Payments in cash to Holdings, (A) the proceeds of which shall be used by Holdings to pay its Tax liability to the relevant jurisdiction in respect of consolidated, combined, unitary or affiliated returns attributable to the income of the Borrower and its Subsidiaries; provided that Restricted Payments made pursuant to this clause (a)(vi) shall not exceed the Tax liability that the Borrower and/or its Subsidiaries (as applicable) would have incurred were such Taxes determined as if such entity(ies) were a stand-alone taxpayer or a stand-alone group; and provided, further, that Restricted Payments under this clause (A) in respect of any Taxes attributable to the income of any Subsidiaries of the Borrower may be made only to the extent that such Subsidiaries have made cash payments for such purpose to Borrower or its Subsidiaries; and (B) the proceeds of which shall be used by Holdings to pay (or to make Restricted Payments to allow any direct or indirect parent of Holdings to pay) (1) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses payable to third parties) that are reasonable and customary and incurred in the ordinary course of business, in an aggregate amount not to exceed $200,000 in any fiscal year;

(b)    The Borrower will not, and will not permit any other Guarantor to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Junior Financing or any other Pre-Petition Indebtedness, except as expressly provided for herein or pursuant to "first day" or other orders entered upon pleadings in form and substance satisfactory to the Administrative Agent and the Lenders.

(c)    The Borrower will not, and will not permit any other Guarantor to, assert any right of subrogation or contribution against any other Loan Party until all Loan Document Obligations have been indefeasibly paid in full.

(d)    The Borrower will not, and will not permit any other Guarantor to, implement or adopt any employee stock option plan, deferred compensation plan, incentive plan, retention bonus plan or similar compensation arrangements that are outside the ordinary course of business without the prior written consent of the Administrative Agent.

**Section 6.09    Transactions with Affiliates**. Holdings and the Borrower will not, and will not permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (i) transactions with the Borrower or any Guarantor, (ii) on terms substantially as favorable to the Borrower or such Guarantor as would be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (iii) the payment of fees and expenses related to the Transactions, (iv) issuances of Equity Interests of the Borrower to the extent otherwise permitted by this Agreement, (v) employment and severance arrangements between the Borrower and the Guarantors and their respective officers and employees in the ordinary course of business or otherwise in connection with the Transactions (including loans and advances pursuant to Section 6.04(b)), (vii) the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers and employees of Holdings, the Borrower and the Guarantors in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Guarantors, (ix) transactions pursuant to permitted agreements in existence or contemplated on the Effective Date and set forth on Schedule 6.09 or any amendment thereto to the extent

Error! No property name supplied.

such an amendment is not adverse to the Lenders in any material respect, and (x) Restricted Payments permitted under Section 6.08.

**Section 6.10    Restrictive Agreements**.  Holdings and the Borrower will not, and will not permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any other Subsidiary Loan Party to create, incur or permit to exist any Lien upon any of its property or assets to secure the Secured Obligations or (b) the ability of the Borrower or any Subsidiary Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to any Guarantor or to Guarantee Indebtedness of any Guarantor; provided that the foregoing clauses (a) and (b) shall not apply to any such restrictions that (i)(x) exist on the date hereof and (to the extent not otherwise permitted by this Section 6.10) are listed on Schedule 6.10 and (y) any renewal or extension of a restriction permitted by clause (i)(x) or any agreement evidencing such restriction so long as such renewal or extension does not expand the scope of such restrictions, (ii)(x) are binding on a Subsidiary at the time such Subsidiary first becomes a Subsidiary, so long as such restrictions were not entered into solely in contemplation of such Person becoming a Subsidiary and (y) any renewal or extension of a restriction permitted by clause (ii)(x) or any agreement evidencing such restriction so long as such renewal or extension does not expand the scope of such restrictions, (iii) [reserved], (iv) are customary restrictions that arise in connection with any Disposition permitted by Section 6.05 applicable pending such Disposition solely to the assets subject to such Disposition, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 6.04, (vi) [reserved], (vii) are imposed by Requirements of Law, (viii) are customary restrictions contained in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto, (ix) comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 6.01(a)(v) to the extent that such restrictions apply only to the property or assets securing such Indebtedness, (x) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of Holdings, the Borrower or any Guarantor, (xi) are customary provisions restricting assignment of any license, lease or other agreement, (xii) are restrictions on cash (or Permitted Investments) or deposits imposed by customers under contracts entered into in the ordinary course of business (or otherwise constituting Permitted Encumbrances on such cash or Permitted Investments or deposits) or (xiii) are customary net worth provisions contained in real property leases or licenses of intellectual property entered into by the Borrower or any Guarantor, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its subsidiaries to meet their ongoing obligations.

**Section 6.11    Certain Amendments; Changes in Business**.  Holdings and the Borrower will not, and will not permit any Subsidiary to, (a) amend, modify, waive, terminate or release the documentation governing any other Junior Financing, in each case if the effect of such amendment, modification, waiver, termination or release is materially adverse to the Lenders, (b) amend or otherwise modify its organizational documents, except as required by the Bankruptcy Court or (c) change or modify the nature and type of its business or the manner in which such business is conducted from the business conducted by such Person as of the Effective Date, except as required by the Bankruptcy Court.

**Section 6.12    Financial Covenants**.

(a)    Cumulative Total Adjusted Operating Cash Flow.  Commencing with the Variance Period ending September 1, 2013 and for each consecutive Variance Period ending 4 weeks thereafter, the Company will not permit the actual results for cumulative Total Adjusted Operating Cash Flow for such Variance Period to have a variance in excess of (i) for each of the first three Variance Periods, $15,000,000, (ii) for each of the fourth through the tenth Variance

01:13977139.1
Error! No property name supplied.

Periods, $12,500,000 and (iii) for each subsequent Variance Period, $10,000,000, in each case, from the cumulative Total Adjusted Operating Cash Flow forecasted for such Variance Period in the Budget.

(b)     Minimum Cash Receipts. Commencing with the Variance Period ending September 1, 2013 and for each Variance Period ending thereafter, the Company will not permit the actual Cash Receipts reflected in the Variance Report for such Variance Period to have a variance in excess of (i) $15,000,000 for the first three Variance Periods after the Effective Date, and (ii) 12,500,000 for each Variance Period thereafter, in each case, from the cumulative Cash Receipts forecasted for such Variance Period in the Budget.

(c)     Minimum Liquidity. The Borrower shall not permit Unrestricted Cash to be less than $8,000,000 as of any Liquidity Reporting Date.

(d)     Minimum Consolidated EBITDAR. The Borrower shall not permit cumulative Consolidated EBITDAR with respect to any calendar month to be less than the amount set forth below for the corresponding calendar month:

| Calendar Month Ending | Cumulative Consolidated EBITDAR Amount |
| --- | --- |
| August 31, 2013 | $ 2,142,570 |
| September 30, 2013 | $ 4,233,285 |
| October 31, 2013 | $ 8,470,287 |
| November 30, 2013 | $11,120,545 |
| December 31, 2013 | $15,400,015 |
| January 31, 2014 | $18,311,848 |
| February 28, 2014 | $21,222,932 |

(e)     Capital Expenditures. Holdings and its Subsidiaries shall not make Capital Expenditures:

(i)     relating to information technology assets (x) during any fiscal quarter of Holdings and its Subsidiaries in an amount exceeding $6,000,000 in the aggregate or (y) during any period of four consecutive fiscal quarters of Holdings and its Subsidiaries in an amount exceeding $16,500,000 in the aggregate; or

(ii)     not included in clause (i) above (x) during any fiscal quarter of Holdings and its Subsidiaries in an amount exceeding $7,500,000 in the aggregate or (y) during any period of four consecutive fiscal quarters of Holdings and its Subsidiaries in an amount exceeding $23,500,000 in the aggregate.

Section 6.13    **Changes in Fiscal Periods**. Holdings and the Borrower will not, and will not permit any Subsidiary to, make any change in fiscal year without the prior written consent of the Administrative Agent.

Section 6.14    **Chapter 11 Claims**. Holdings and the Borrower will not, and will not permit any Subsidiary to, incur, create, assume, suffer to exist or permit any other superpriority administrative

Error! No property name supplied.

claim which is pari passu with or senior to the claims of the Administrative Agent and Lenders against the Loan Parties, except as set forth in the Interim Order and Final Order, as then in effect. **Critical Vendor and Other Payments**. Holdings and the Borrower will not, and will not permit any Subsidiary to, make (i) any Pre-Petition "critical vendor" payments or other payments on account of creditors' Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court and (b) are expressly permitted by the Budget.

## EVENTS OF DEFAULT

**Section 7.01    Events of Default**. If any of the following events (any such event, an "Event of Default") shall occur:

(a)    any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any of its Subsidiaries in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)    Holdings, the Borrower or any of its Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02, 5.04 (with respect to the existence of Holdings, the Borrower or such Guarantors), 5.10, 5.13, 5.14, 5.15 or in Article VI;

(e)    Holdings, the Borrower or any of its Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 10 days;

(f)    the occurrence of an "Event of Default" under, and as such term is defined in, the LC Facility;

(g)    except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach occurs under any agreement, document or instrument entered into either (x) Pre-Petition and which is assumed after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code, or (y) Post-Petition, to which any Loan Party is a party that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Loan Document

01:13977139.1

Error! No property name supplied.

Obligations) of any Loan Party in excess of $1,000,000 in the aggregate, or (ii) causes such Indebtedness, or permits any holder of such Indebtedness or a trustee to cause such Indebtedness, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment;

(h)    other than with respect to any Debtor, an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of Holdings, the Borrower or any Subsidiary or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    Holdings, the Borrower or any other Subsidiary (other than a Debtor) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(j)    other than with respect to a Debtor, one or more enforceable judgments for the payment of money in an aggregate amount in excess of $1,000,000 (to the extent not covered by insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) shall be rendered against Holdings, the Borrower and any of its Subsidiaries or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any judgment creditor shall legally attach or levy upon assets of such Loan Party that are material to the businesses and operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, to enforce any such judgment;

(k)    (i) an ERISA Event occurs that has resulted or could reasonably be expected to result in liability of any Loan Party in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a fair market value in excess of $100,000, with the priority required by the applicable Security Document;

(m)    any material provision of any Loan Document or any Guarantee of the Loan Document Obligations shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

Error! No property name supplied.

(n)      any Guarantees of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(o)      a Change in Control shall occur;

(p)      Holdings shall (i) engage in any material activities other than those activities incidental to its ownership of the Equity Interests of the Borrower and the Indebtedness referred to in clause (ii) of this paragraph or (ii) incur, create or assume any Indebtedness other than obligations pursuant to the Loan Documents to which it is a party;

(q)      entry of an order (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code, (ii) granting any Lien upon or affecting any Collateral other than Liens permitted under this Agreement, (iii) permitting the use of cash collateral, except as permitted hereby or with the prior written consent of the Administrative Agent, or (iv) authorizing or approving any other action adverse to the Administrative Agent or their rights and remedies or their interest in the Collateral, or any Loan Party seeking the entry of an order in furtherance of any of the foregoing if any proceeds of the Loans provided hereunder are proposed to be used in such additional financing;

(r)      entry of an order dismissing, or any Loan Party seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case;

(s)      entry of an order, or any Loan Party seeking the entry of an order, appointing a chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(t)      entry of an order granting, or any Loan Party filing a motion or any other pleading seeking the entry of an order granting, or any Person with the support of any Loan Party filing a motion or any other pleading seeking the entry of an order granting any other superpriority administrative expense claim, modifying the Loan Documents, the Interim Order or the Final Order, or granting relief from the automatic stay to permit any secured creditor (other than the Administrative Agent or any Lender) to enforce or otherwise take action with respect to any Collateral, or any breach by any Loan Party of any provision of either the Interim Order or Final Order, in each case, except as consented to in writing by the Administrative Agent and the Required Lenders in accordance with this Agreement;

(u)      the payment by any Loan Party of any Pre-Petition claim without the prior written consent of the Administrative Agent unless such payment is permitted by the Budget or made pursuant to any "first day" order entered by the Bankruptcy Court in form and substance acceptable to the Administrative Agent;

(v)      the payment by any Debtor of any Pre-Petition claim without the prior written consent of the Administrative Agent unless such payment is permitted by the Budget;

(w)      the commencement of any action against the Administrative Agent or any Lender or any Related Party of any of them or against the Existing Agent or any of the Existing Lenders by or on behalf of any Loan Party or any of its Affiliates, officers or employees;

Error! No property name supplied.

(x)      the Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Administrative Agent;

(y)      the Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 45 days after the entry of the Interim Order;

(z)      the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Administrative Agent and the Lenders;

(aa)      from and after entry of the Final Order, if a waiver of claims under Section 506(c) of the Bankruptcy Code is granted in the Final Order, allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender and the Collateral, or against the Existing Agent, any Existing Lender or the "Collateral" (as defined in the Existing Credit Agreement) securing the "Secured Obligations" (as defined in the Existing Credit Agreement);

(bb)      the filing of any chapter 11 plan or any amendment thereto or related disclosure statement, or the entry of an order confirming any such chapter 11 plan or approving any such disclosure statement or any such amendment, in each case that is not reasonably acceptable to the Administrative Agent and the Lenders, other than as provided in Section 5.13(b);

(cc)      any termination or modification of the exclusivity periods set forth in section 1121 of the Bankruptcy Code unless consented to by the Administrative Agent; or

(dd)      the Restructuring Support Agreement (i) shall cease to be in full force and effect or (ii) shall have been amended or otherwise modified in a manner without the prior written consent (including any consent given under the Restructuring Support Agreement) of the Administrative Agent and Required Lenders and, in each case, a period of 15 days has lapsed.

then, and in every such event (other than an event with respect to Holdings or the Borrower described in paragraph (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event described in paragraph (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Notwithstanding the forgoing, prior to the exercise of any enforcement or liquidation remedies against the Collateral, the Administrative Agent shall provide three (3) Business Days' prior written notice thereof to the Borrower.

## ARTICLE VIII

### ADMINISTRATIVE AGENT

**Section 8.01    Appointment and Authority**.

(a)    Each of the Lenders hereby irrevocably appoints Credit Suisse AG to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**Section 8.02    Rights as a Lender**. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**Section 8.03    Exculpatory Provisions**. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel,

may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law;

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d)    shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) or (ii) in the absence of its own gross negligence or willful misconduct; provided that the Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender; and

(e)    shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**Section 8.04    Reliance by Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 8.05    Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Error! No property name supplied.

**Section 8.06**    **Resignation of Administrative Agent**.  The Administrative Agent may resign at any time upon 30 days' notice to the Lenders and the Borrower.  If the Administrative Agent becomes a Defaulting Lender and is not performing its role hereunder as Administrative Agent, the Administrative Agent may be removed as the Administrative Agent hereunder at the request of the Borrower and the Required Lenders.  Upon receipt of any such notice of resignation or upon such removal, the Required Lenders shall have the right to appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent, which shall be an Approved Bank with an office in the United States, or any Affiliate of any such Approved Bank; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 8.07**    **Non-Reliance on Administrative Agent and Other Lenders**.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**Section 8.08**    **Reserved**.

**Section 8.09**    **Reserved**.

**Section 8.10**    **No Waiver; Cumulative Remedies; Enforcement**.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other

Error! No property name supplied.

Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Article VII for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.18), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.18, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

To the extent required by any applicable law, the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective, or for any other reason), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 2.17 and without limiting any obligation of the Borrower to do so pursuant to such Sections) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Article VIII. The agreements in this Article VIII shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations.

**Section 8.11    Withholding Taxes**. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Without limiting or expanding the provisions of Section 2.17, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within 30 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to

Error! No property name supplied.

notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

### ARTICLE IX

### MISCELLANEOUS

**Section 9.01**    **Notices**.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)    if to Holdings, the Borrower, the Administrative Agent to the address, fax number, e-mail address or telephone number specified for such Person on Schedule 9.01; and

(ii)    if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent

Error! No property name supplied.

at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of Holdings, the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto.  Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)     Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

**Section 9.02**    **Waivers; Amendments**.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan, or the date of any scheduled amortization payment of the principal amount of any Loan under Section 2.10 or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby, (iv) change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby, (v) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby, (vi) change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vii) release all or substantially all the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Guarantee Agreement) without the written consent of each Lender (other than a Defaulting Lender) (except as expressly provided in the Security Documents), or (viii) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender); provided further that (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent without the prior written consent of the

Administrative Agent, and (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by Holdings, the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

(c)     In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, so long as the Lender that is acting as Administrative Agent is not a Non-Consenting Lender, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse, provided that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d)     Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Commitments and Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders, all affected Lenders, or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

**Section 9.03    Expenses; Indemnity; Damage Waiver**.

(a)     Holdings and the Borrower agree, jointly and severally, to pay, on a monthly basis, all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent in connection with (i) the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made hereunder, including in each case the fees and disbursements of Gibson, Dunn & Crutcher LLP, counsel for the Administrative Agent and any financial advisor engaged by the Administrative Agent, and, in connection with any such enforcement or protection, the reasonable fees and disbursements of any counsel for the

Administrative Agent and one other transaction counsel acting on behalf of the Lenders, together with any other local and special counsel reasonably required in connection with such enforcement or protection and (ii) (A) the obtaining of approval of the Loan Documents by the Bankruptcy Court and (B) the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code.

(b)    The Borrower shall indemnify the Administrative Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by the Borrower, Holdings or any Subsidiary arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Owned Real Property or any other property currently or formerly owned or operated by Holdings, the Borrower or any Subsidiary, or any other Environmental Liability related in any way to Holdings, the Borrower or any Subsidiary, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)    To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or any Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans and unused Commitments at such time. The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply mutatis mutandis to the Lenders' obligations under this paragraph (c)).

(d)    To the extent permitted by applicable law, neither Holdings nor the Borrower shall assert, and each hereby waives, any claim against any Indemnitee (i) for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such

direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable not later than ten (10) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

**Section 9.04    Successors and Assigns.**

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, without the consent of the Borrower, assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (and integral multiples thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); ; provided that simultaneous assignments by or to two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (B) each

Error! No property name supplied.

partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of any Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent and Assignment and Assumption, and, in each case, together (unless waived or reduced by the Administrative Agent) with a processing and recordation fee of $3,500; provided that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, and (D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms required by Section 2.17(e) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.15, 2.16, 2.17 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and Holdings, the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.17(e) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)    (i)    Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons other than a natural person, a Defaulting Lender, a Sponsor, Holdings, the Borrower or any of the Borrower's Subsidiaries or Affiliates (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Holdings, the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that directly and adversely affects such Participant. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 (subject to the obligations and limitations of such Sections, including Section 2.17(e)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

(ii)    Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other obligations to any Person except to the extent that such disclosure is necessary to establish that such obligation is in registered form under Section 5f.103-1(c) of the United States Treasury

Error! No property name supplied.

Regulations.  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(iii)    A Participant shall not be entitled to receive any greater payment under Section 2.15 or Section 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(d)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(e)    No Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement to the Sponsors, Holdings, the Borrower or any of their respective Affiliates.

**Section 9.05    Survival**.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the

transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 9.06    **Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07    **Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 9.08    **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although (i) such obligations may be contingent or unmatured and (ii) such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender and their respective Affiliates may have.

Section 9.09    **Governing Law; Jurisdiction; Consent to Service of Process**.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York and to the extent applicable, the Bankruptcy Code.

(b)     Each party hereto hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any State or Federal court of competent jurisdiction sitting in New York County, New York., and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Loan Party or its respective properties in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**Section 9.10    WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.11    Headings**. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 9.12    Confidentiality**.

(a)     Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, and any numbering, administration or settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this

Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (ii) to the extent requested by any regulatory authority or self-regulatory authority, required by applicable law or by any subpoena or similar legal process; provided that solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and the Administrative Agent shall notify the Borrower as promptly as practicable of any such requested or required disclosure in connection with any legal or regulatory proceeding; provided further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary of Holdings, (iii) to any other party to this Agreement, (iv) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (v) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any actual or prospective counterparty (or its advisors) to any Swap Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (vi) if required by any rating agency; provided that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information or (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings or the Borrower.  For the purposes hereof, "Information" means all information received from Holdings or the Borrower relating to Holdings, the Borrower, any other Subsidiary or their business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings, the Borrower or any Subsidiary; provided that, in the case of information received from Holdings, the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

(c)    ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT

Error! No property name supplied.

MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

**Section 9.13**   **USA Patriot Act**. Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA Patriot Act.

**Section 9.14**   **Reserved**.

**Section 9.15**   **Release of Liens and Guarantees**.

(a)     A Subsidiary Loan Party shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Subsidiary Loan Party shall be automatically released, upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Loan Party ceases to be a Subsidiary (including pursuant to a merger with a Subsidiary that is not a Loan Party); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to Holdings, the Borrower or any Subsidiary Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or the release of Holdings or any Subsidiary Loan Party from its Guarantee under the Guarantee Agreement pursuant to Section 9.02, the security interests in such Collateral created by the Security Documents or such guarantee shall be automatically released.  Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Agreement.

(b)     The Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate the Administrative Agent's Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iv).

(c)     Each of the Lenders irrevocably authorizes the Administrative Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 9.15.  Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan Document, in each case in accordance with the terms of the Loan Document and this Section 9.15.

Section 9.16    **No Advisory or Fiduciary Responsibility**. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings, any of their respective Affiliates or any other Person and (B) none of the Administrative Agent or the Lenders has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Administrative Agent or the Lenders has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Administrative Agent or the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 9.17    **Interest Rate Limitation**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

Section 9.18    **Conflicts with Other Loan Documents, Interim Order or Final Order**. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Security Documents which imposes additional burdens on the Loan Parties or further restricts the rights of the Loan Parties or gives the Administrative Agent or Lenders additional rights, in each case, with respect to the Collateral, shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.  In the event of any inconsistency between the terms and conditions of this Agreement and the Interim Order or the Final Order (whichever is then in effect), the provisions of the Interim Order or the Final Order (whichever is then in effect) shall govern and control.

01:13977139.1

Error! No property name supplied.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

WP ROCKET HOLDINGS INC.

By: _____
      Name:  Stephen Farber
      Title:  Secretary

RURAL/METRO CORPORATION

By: _____
      Name:  Stephen Farber
      Title:  Chief Financial Officer

01:13977139.1

ARIZONA EMS HOLDING, INC.
BEACON TRANSPORTATION, INC.
BOWERS COMPANIES, INC.
COMTRANS AMBULANCE SERVICE, INC.
CORNING AMBULANCE SERVICE INC.
DONLOCK, LTD.
E.M.S. VENTURES, INC.
EASTERN AMBULANCE SERVICE, INC.
EASTERN PARAMEDICS, INC.
EMERGENCY MEDICAL TRANSPORT, INC.
EMS VENTURES OF SOUTH CAROLINA, INC
GOLD CROSS AMBULANCE SERVICE OF PA.,
   INC.
GOLD CROSS AMBULANCE SERVICES, INC.
LASALLE AMBULANCE INC.
MEDICAL EMERGENCY DEVICES AND
   SERVICES (MEDS), INC.
MERCURY AMBULANCE SERVICE, INC.
METRO CARE CORP.
NATIONAL AMBULANCE & OXYGEN
   SERVICE, INC.
NORTH MISS. AMBULANCE SERVICE, INC.
PACIFIC AMBULANCE, INC.
PROFESSIONAL MEDICAL TRANSPORT, INC.
R/M ARIZONA HOLDINGS, INC.
RMC CORPORATE CENTER, L.L.C.
R/M MANAGEMENT CO., INC.
R/M OF TENNESSEE G.P., INC.
R/M OF TENNESSEE L.P., INC.
RURAL/METRO (DELAWARE) INC.
RURAL/METRO CORPORATION (an Arizona
   corporation)
RURAL/METRO CORPORATION OF FLORIDA
RURAL/METRO CORPORATION OF
   TENNESSEE
RURAL/METRO FIRE DEPT., INC.
RURAL/METRO OF BREWERTON, INC.
RURAL/METRO OF CALIFORNIA, INC.
RURAL/METRO OF CENTRAL ALABAMA, INC.
RURAL/METRO OF CENTRAL COLORADO,
   INC.
RURAL/METRO OF CENTRAL OHIO, INC.
RURAL/METRO OF GREATER SEATTLE, INC.
RURAL/METRO OF NEW YORK, INC.

RURAL/METRO OF NORTHERN CALIFORNIA,
   INC.
RURAL/METRO OF NORTHERN OHIO, INC.
RURAL/METRO OF OHIO, INC.
RURAL/METRO OF OREGON, INC.
RURAL/METRO OF ROCHESTER, INC.
RURAL/METRO OF SAN DIEGO, INC.
RURAL/METRO OF SOUTHERN CALIFORNIA,
   INC.
RURAL/METRO OF SOUTHERN OHIO, INC.
RURAL/METRO OPERATING COMPANY, LLC
SAN DIEGO MEDICAL SERVICES ENTERPRISE,
   LLC
SIOUX FALLS AMBULANCE, INC.
SOUTHWEST AMBULANCE AND RESCUE OF
   ARIZONA, INC.
SOUTHWEST AMBULANCE OF CASA
   GRANDE, INC.
SOUTHWEST AMBULANCE OF NEW MEXICO,
   INC.
SOUTHWEST AMBULANCE OF
   SOUTHEASTERN ARIZONA, INC.
SOUTHWEST AMBULANCE OF TUCSON, INC.
SOUTHWEST GENERAL SERVICES, INC.
SW GENERAL, INC.
THE AID AMBULANCE COMPANY, INC.
THE AID COMPANY, INC.
TOWNS AMBULANCE SERVICE, INC.
VALLEY FIRE SERVICE, INC.
W & W LEASING COMPANY, INC.


RURAL/METRO MID-SOUTH, L.P.
   By: R/M OF TENNESSEE G.P., INC.,
   its General Partner

RURAL/METRO OF INDIANA, L.P.
   By: THE AID AMBULANCE COMPANY, INC.,
   its General Partner

RURAL/METRO OF TENNESSEE, L.P.
   By: R/M OF TENNESSEE G.P., INC.,
   its General Partner


By: _____
   Name: Stephen Farber
   Title:  Secretary of each of the foregoing entities

01:13977139.1

[DIP CREDIT AGREEMENT]

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as a Lender and as
Administrative Agent,

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

01:13977139.1

**EXHIBIT 2**

**New L/C Facility Agreement**

01:13977137.1

**SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION LETTER
OF CREDIT REIMBURSEMENT AND SECURITY AGREEMENT**

      This Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement, dated as of August 4, 2013, is by and between RURAL/METRO CORPORATION, a Delaware corporation ("Applicant"), and CREDIT SUISSE, CAYMAN ISLANDS BRANCH (together with its successors and assigns, "Issuer").

**RECITALS**

      WHEREAS, on August 4, 2013 (the "Petition Date"), WP Rocket Holdings Inc., a Delaware corporation ("Holdings"), Applicant and its subsidiaries (collectively, the "Debtors") commenced certain chapter 11 cases, as administratively consolidated as Chapter 11 Case No. [_____] (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

      WHERAS, as of August [ ], 2013, the Bankruptcy Court has entered an interim order in the Chapter 11 Cases (a) authorizing each of the Debtors (A) to obtain post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) to utilize cash collateral pursuant to 11 U.S.C. § 363, (b) granting adequate protection to pre-petition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 and (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b) and (c) (the "Interim Order");

      WHEREAS, upon the terms and subject to the conditions set forth herein, Issuer has agreed from time to time to issue one or more stand-by letters of credit in an aggregate principal amount of up to $15,000,000, or from and after the date on which the Bankruptcy Court enters the Final Order (as defined below) in the Chapter 11 Cases (the "Final Order Entry Date"), $30,000,000, which letters of credit shall be in a form satisfactory in all respects to Issuer in its sole discretion (each, as amended or otherwise modified from time to time, a "Letter of Credit"), for the account of Applicant and for the benefit of one or more Persons (as defined below) (including Argonaut, each, a "Beneficiary") for the purpose of (i) replacing any expiring letters of credit that are issued and outstanding under the Existing Credit Agreement (as defined below) or (ii) supporting surety and insurance obligations related to the Debtors' business;

      WHEREAS, Issuer has established, and is the owner of, Account No. 8900492627 (the "Collateral Account"), with The Bank of New York (the "Deposit Bank");

      WHEREAS, Applicant has agreed, pursuant to the terms and conditions set forth herein, to provide Issuer certain cash sums from time to time to be deposited in the Collateral Account as collateral for the obligations of Applicant incurred under, arising out of or in connection with this Agreement;

      WHEREAS, as of the date hereof, the Debtors have entered into that certain Senior Secured Super Priority Debtor in Possession Collateral Agreement (as amended or otherwise

- 2 -

modified from time to time, the "DIP Collateral Agreement") by and among the Debtors and Credit Suisse AG, as the Administrative Agent (the "DIP Agent") for the DIP Secured Parties (as defined below), which DIP Secured Parties include Issuer, pursuant to which the Debtors have granted a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the terms of the Interim Order and Final Order in connection with the Chapter 11 Cases, to secure the Secured Obligations (as defined therein), which Secured Obligations include all obligations of Applicant to Issuer under this Agreement (the "DIP Liens");

WHEREAS, Applicant and Issuer desire to set forth the terms and conditions that shall apply to the Letters of Credit and certain related matters in connection therewith.

NOW, THEREFORE, Applicant and Issuer hereby agree as follows:

1.      Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Agreement" means this Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement, as amended or otherwise modified from time to time in accordance with the terms hereof.

"Amendment" has the meaning specified in Section 3.

"Amendment Request" has the meaning specified in Section 3.

"Applicant" has the meaning specified in the preamble hereof.

"Authorized Act" has the meaning specified in Section 3(a).

"Authorized Officer" has the meaning specified in Section 3(a).

"Bankruptcy Code" has the meaning specified in the recitals hereof.

"Base Rate" means, with respect to any amount payable hereunder, a fluctuating interest rate per annum in effect from time to time, which rate per annum shall at all times be equal to the higher of:

(i)      the rate of interest per annum most recently announced or established by Issuer in New York, New York, from time to time, as Issuer's "prime rate for dollars loaned in the United States"; and

(ii)      ½ of 1% per annum above the Federal Funds Rate in effect from time to time.

The Base Rate is an index rate and is not necessarily intended to be the lowest or best rate of interest charged to other customers in connection with extensions of credit to customers or to other banks.

- 3 -

"Beneficiary" has the meaning specified in the recitals hereof.

"Business Day" means a day other than a Saturday, a Sunday or any other day on which banks are authorized or required by law to close in New York City.

"Certificate" has the meaning specified in Section 3(a).

"Change in Control" shall be deemed to have occurred if any change in control (or similar event, however denominated), as defined under any material post-petition Indebtedness of Applicant, shall have occurred.

"Collateral" has the meaning specified in Section 11(a).

"Collateral Account" has the meaning specified in the recitals hereof.

"Deposit Bank" has the meaning specified in the recitals hereof.

"DIP Collateral" has the meaning specified in Section 11(a).

"DIP Collateral Agreement" has the meaning specified in the recitals hereof, as amended or otherwise modified from time to time.

"DIP Credit Agreement" has the meaning specified in the DIP Collateral Agreement, as amended or otherwise modified from time to time.

"DIP Financing Orders" means the Interim Order or the Final Order, as applicable.

"DIP Liens" has the meaning specified in the recitals hereof.

"DIP Secured Parties" means the Secured Parties as defined in the DIP Credit Agreement.

"Effective Date" has the meaning specified in Section 3.

"Event of Default" has the meaning specified in Section 15(a).

"Existing Credit Agreement" means the Credit Agreement dated as of June 30, 2011 (as amended) among Holdings, WP Rocket Merger Sub Inc., Applicant, the lenders party thereto and Credit Suisse AG, as administrative agent.

"Federal Funds Rate" means, for any day, a fluctuating interest rate per annum equal for such day to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Issuer from three Federal funds brokers of recognized standing selected by it.

- 4 -

"Final Order" means a Final Order entered by the Bankruptcy Court in the Chapter 11 Cases of the Debtors, in form and substance satisfactory to Issuer, approving and authorizing on a final basis the matters and containing the provisions described in the Interim Order.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Order.

"Governing Body" has the meaning specified in Section 3(a).

"Indebtedness" means all loans, all obligations for money borrowed, any other obligations evidenced by notes, bonds, debentures or other similar instruments, and any guaranties by Applicant of any of the foregoing.

"Indemnified Parties" has the meaning specified in Section 10.

"Interim Order" has the meaning specified in the recitals hereof.

"Interim Order Entry Date" means the date on which the Bankruptcy Court enters the Interim Order.

"Issuance Period" means the period commencing on the Effective Date and ending on the Termination Date.

"Issuer" has the meaning specified in the preamble hereof.

"Issuer Costs" has the meaning specified in Section 8(c).

"L/C Account Collateral" has the meaning specified in Section 11(a).

"L/C Outstandings" means, at any time, an aggregate amount equal to the sum of (a) the Stated Amount of all outstanding Letters of Credit and (b) the aggregate amount of all unpaid L/C Reimbursement Amounts, in each case, at such time.

"L/C Reimbursement Amount" has the meaning specified in Section 4(a).

"Letter of Credit" has the meaning specified in the recitals hereof.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

"Maximum Stated Amount" means, (i) at any time from and after the Interim Order Entry Date until (and excluding) the Final Order Entry Date, $15,000,000, or (ii) from and after the Final Order Entry Date, $30,000,000.

"Minimum Collateral Base" means, on any date as of which it is determined hereunder, the product of (a) the L/C Outstandings on such date and any accrued interest thereon multiplied by (b) 1.05.

- 5 -

"Net Asset Value" has the meaning specified in Section 6(a).

"Non-Excluded Taxes" has the meaning specified in Section 9.

"Notice Date" has the meaning specified in Section 6(b).

"Obligations" has the meaning specified in Section 11.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (signed into law on December 26, 2001), as amended from time to time.

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Permitted Senior Liens" has the meaning set forth in the DIP Credit Agreement.

"Permitted Use" means, with respect to the use of proceeds of any Letter of Credit, (i) replacing any expiring letters of credit that are issued and outstanding under the Existing Credit Agreement or (ii) supporting surety and insurance obligations related to the Debtors' business

"Prime Brokerage Cash Rate" means a rate per annum equal to 30-day LIBOR (as determined by Issuer in a commercially reasonable manner) minus fifteen (15) basis points.

"Proceeding" has the meaning specified in Section 25.

"Request" has the meaning specified in Section 3.

"Required Supporting Documents" has the meaning specified in Section 3(a).

"Restructuring Support Agreement" has the meaning set forth in the DIP Credit Agreement.

"Shortfall Amount" has the meaning specified in Section 6(b).

"Shortfall Date" has the meaning specified in Section 6(b).

"Shortfall Notice" has the meaning specified in Section 6(b).

"Stated Amount" means, at any time, with respect to any Letter of Credit or Letters of Credit, the total amount then available to be drawn under such Letter of Credit or Letters of Credit.

"Termination Date" means March 1, 2014 unless earlier terminated pursuant to Section 30 hereof.

"UCC" has the meaning specified in Section 13.

- 6 -

2.      Applicability of Agreement.  This Agreement shall apply to each Letter of Credit (and any Amendments thereto) requested by Applicant and issued pursuant to the terms and conditions hereof.

3.      Issuance of Letters of Credit.  During the Issuance Period, within five (5) Business Days after receipt by Issuer of Applicant's written request, submitted substantially in the form of Exhibit A attached hereto (a "Request"), that Issuer issue a Letter of Credit or Letters of Credit to one or more Beneficiaries, or Applicant's written request, submitted substantially in the form of Exhibit B attached hereto (an "Amendment Request"), for an amendment to an existing Letter of Credit (in a form satisfactory to Issuer in its sole discretion) (an "Amendment"), Issuer shall issue such Letter of Credit or Amendment subject to the following conditions (the date on which each of such conditions has been satisfied, the "Effective Date"):

(a)      prior satisfaction by Applicant of its obligations set forth in Section 5(a),

(b)      payment in full of the fees and expenses described in Section 8 hereof and due and payable on the Effective Date,

(c)      delivery of a certificate (a "Certificate") executed by an Authorized Officer, in substantially the form attached hereto as Exhibit C, certifying *inter alia* that the representations and warranties set forth in this Agreement are true and correct as of such date and no Event of Default has occurred and is continuing and that no portion of the proceeds of such Letter of Credit shall be used for any purpose other than a Permitted Use, and

(d)      prior receipt by Issuer of the following items:

(i)      certified copy of the resolutions of the Board of Directors (or equivalent governing body) of Applicant (the "Governing Body") with respect to this Agreement, including, without limitation, (A) approving this Agreement, all matters contemplated hereby, the legal documentation relating to each transaction for which such Letter of Credit or Letters of Credit are to be issued, the issuance of Letters of Credit pursuant to this Agreement with an aggregate Stated Amount of up to the Maximum Stated Amount and all other matters contemplated in connection herewith and of all other documents evidencing any other necessary corporate action and (B) authorizing each applicable officer of Applicant (each, an "Authorized Officer") to take all such actions, to arrange for, execute and deliver any Request or Amendment Request with respect to Letters of Credit in an aggregate amount of up to the Maximum Stated Amount, supplemental agreements, instruments, amendments, extensions or other modification in the name and on behalf of Applicant, which the applicable Authorized Officer determines in his/her sole judgment to be necessary, proper or advisable in connection with or in order to perform Applicant's obligations hereunder or in connection with this Agreement (each such act, an "Authorized Act"), with the performance of any Authorized Act by any Authorized Officer to be conclusive evidence that the same

- 7 -

has been authorized and approved by Applicant and the Governing Body in every respect;

(ii)     a true and complete copy of any legal documentation relating to each transaction for which each Letter of Credit is to be issued (or an Amendment to be effected) that Issuer may request in its sole discretion;

(iii)    all documentation and other information requested by Issuer under applicable "know your customer" and anti-money-laundering rules and regulations, including without limitation, the Patriot Act; and

(iv)     Evidence satisfactory to Issuer that the DIP Credit Agreement and the DIP Collateral Agreement have been executed and delivered by all parties thereto and are in full force and effect as of the Effective Date.

(v)      A fully executed copy of the Restructuring Support Agreement, in form and substance satisfactory to Issuer, and such Restructuring Support Agreement shall be in full force and effect;

(e) The Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to Issuer.

Issuer, in its sole discretion, may issue any Letter of Credit through one or more of its branches or affiliates.

Notwithstanding anything to the contrary contained herein, (i) in no event may a Request or Amendment Request be submitted to Issuer, and no Letter of Credit (or Amendment thereto) shall be issued, after the Issuance Period unless expressly consented to in writing by Issuer, (ii) no Letter of Credit shall have an expiration date later than one (1) year after the date of issuance thereof (provided, that any Letter of Credit may, upon the request of Applicant, include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of one year or less unless Issuer notifies the beneficiary thereof within the time period specified in such Letter of Credit or, if no such time period is specified, at least 30 days prior to the then-applicable expiration date, that such Letter of Credit will not be renewed) and (iii) and no Letter of Credit (or Amendment thereto) shall be issued if after giving effect thereto, the aggregate Stated Amount of the Letters of Credit hereunder would exceed the Maximum Stated Amount.

4.     Reimbursement.

(a)     Applicant shall reimburse Issuer for the amount of any drawing honored under a Letter of Credit and paid by Issuer (and any taxes, fees, charges or other costs reasonably incurred by Issuer in connection with such payment) (the "L/C Reimbursement Amount"). Applicant shall reimburse Issuer under this Section 4(a) in immediately available funds (i) no later than 3 p.m. on the day (which shall be a Business Day) on which payment is made by Issuer under a Letter of Credit, provided that Issuer notifies Applicant by noon on such date that Issuer has made such payment under such Letter of Credit or (ii) if Issuer notifies Applicant after noon

on the date of such payment, then by 11 a.m. on the next Business Day following receipt of such notice by Applicant, provided that the failure of Issuer to so notify Applicant, and any delay in so notifying Applicant, shall not relieve, limit or otherwise affect any obligation of Applicant under this Agreement or any related document.  Applicant authorizes Issuer to charge the Collateral Account (i) upon and after the drawing of any Letter of Credit for the full amount of the L/C Reimbursement Amount and (ii) from time to time for any other Obligations.

(b)    Applicant shall pay to Issuer, on demand, all Issuer Costs as more specifically set forth in Section 8(c).

(c)    Applicant shall pay to Issuer the full L/C Reimbursement Amount in cash no later than the Termination Date.

5.    Covenants.

(a)    Prior to the issuance by Issuer of any Letter of Credit (or any Amendment thereto) hereunder and as a condition precedent thereto, Applicant shall provide Issuer a cash sum for deposit in the Collateral Account so that, when combined with the aggregate Net Asset Value of all cash from Applicant already on deposit in the Collateral Account, the Collateral Account, with respect to Applicant, contains assets with an aggregate Net Asset Value equal to or greater than the Minimum Collateral Base.

(b)    In the event that there is a decline or reduction in the Net Asset Value as determined in accordance with Section 6(a), Applicant shall provide Issuer additional amounts in cash to be deposited in the Collateral Account in such amounts and in the manner required pursuant to Section 6(c).

(c)    Applicant hereby agrees that it will (i) comply in all material respects with all U.S. and foreign laws, regulations and rules now or later applicable to any Letter of Credit or this Agreement and the transactions contemplated thereunder and hereunder, or Applicant's execution, delivery and performance under this Agreement, (ii) inform Issuer promptly upon Applicant becoming aware of the occurrence of an Event of Default, (iii) preserve and maintain in full force and effect its corporate existence and good standing under the laws of its jurisdiction of organization, and (iv) pay and discharge as the same shall become due and payable, all of its material obligations and liabilities, except any obligation and liabilities that are being contested in good faith by appropriate proceedings and for which adequate reserves are being maintained in accordance with U.S. generally accepted accounting principles.

(d)    Applicant hereby agrees that it will furnish to Issuer information relating to the business, operations, assets, liabilities or condition, financial or otherwise, of Applicant as Issuer may from time to time reasonably request.

(e)    Applicant shall use the proceeds of the Letters of Credit solely for the Permitted Uses.

6.    Collateral Account Monitoring and Shortfalls.

(a)     Applicant agrees that the value of assets on deposit in the Collateral Account will be monitored by Issuer according to Issuer's standard operating procedures, and that the value of assets in the Collateral Account, net of any applicable banking or brokerage fees and commissions (the "Net Asset Value"), will be calculated by Issuer on a daily basis in a commercially reasonable manner.

(b)     Issuer will, in the event that the aggregate Net Asset Value of the Collateral Account with respect to Applicant, as calculated on any day, is less than the Minimum Collateral Base, on such day (a "Notice Date"), notify Applicant of such shortfall by facsimile transmission with telephone confirmation (a "Shortfall Notice"). If a Shortfall Notice is given prior to 10:00 am on a Business Day, then such Business Day shall be the "Shortfall Date", provided that if such notice is given after 10:00 am on a Business Day or on a day that is not a Business Day, then the subsequent Business Day shall be the "Shortfall Date". The Shortfall Notice shall include (i) the aggregate Net Asset Value of the Collateral Account with respect to Applicant as of the Notice Date, (ii) the amount of the L/C Outstandings (and any accrued interest thereon) on the Notice Date, and (iii) a calculation showing the amount that Applicant is required to provide Issuer for contribution to the Collateral Account, as set forth in Section 6(c) (the "Shortfall Amount").

(c)     The Shortfall Amount shall be an amount equal to (i) the Minimum Collateral Base on the applicable Notice Date minus (ii) the aggregate Net Asset Value of the Collateral Account with respect to Applicant on such Notice Date. Applicant agrees to provide Issuer for contribution to the Collateral Account additional amounts in cash equal to the Shortfall Amount prior to 4:00 pm on the relevant Shortfall Date.

7.     Representations and Warranties. Applicant represents and warrants as follows on the date hereof and as of the date of issuance of each Letter of Credit (or as of the date of any Amendment thereto):

(a)     It is a corporation duly organized, validly existing and in good standing under the laws of Delaware and has all the requisite powers and all material government licenses, authorizations, consents and approvals required to carry on its business as now conducted. Issuer has received from Applicant certified copies of each of its constituent documents, as in full force and effect.

(b)     The (i) execution, delivery and performance by it of this Agreement, (ii) the granting of the Liens granted by it (including the first priority nature thereof) pursuant to Section 11 hereof, (iii) the perfection or maintenance of the Liens created by Section 11 hereof, and (iv) the granting of authority to Issuer with respect to the exercise of its rights hereunder or under any other related document or remedies in respect of the Collateral Account, are within its corporate powers, have been duly authorized by all necessary corporate action (including all Governing Body resolutions, true and correct copies of which have been or will have been delivered to Issuer on the date of the initial Request), require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of constituent documents of Applicant, as the case may be, or of any agreement, judgment, injunction, order, decree or other instrument binding upon Applicant, as the case may be, or any of its subsidiaries, or result in the

creation or imposition of any Lien on any asset of Applicant or any of its subsidiaries, except the Liens created by Section 11 hereof.

(c)    This Agreement has been duly executed and delivered by Applicant. This Agreement constitutes a legal, valid and binding agreement of Applicant, enforceable against it in accordance with its terms.

(d)    Issuer has a valid, perfected security interest in and lien on all of the Collateral, subject to no other Lien (other than the DIP Liens and the Permitted Senior Liens in the manner set forth in the DIP Financing Orders) securing all Obligations hereunder and all filings and other actions necessary or desirable to perfect and protect such security interests have been duly taken. All funds provided by Applicant to Issuer hereunder is free and clear of any Lien, except for the liens and security interests created hereunder, the DIP Liens and the Permitted Senior Liens (in the manner set forth in the DIP Financing Orders), and Applicant was the legal and beneficial owner thereof at the time provided to Issuer.

(e)    Both before and after the issuance of each Letter of Credit (or Amendment thereto), no Event of Default shall have occurred and be continuing.

(f)    Applicant is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended. Neither the issuance of the Letters of Credit (or any Amendment thereto) nor the transactions contemplated hereunder will violate any provision of such Act or any rule, regulation or order of the Securities and Exchange Commission thereunder.

(g)    There is no action, suit, investigation, litigation or proceeding (other than the Chapter 11 Cases) against Applicant pending or, to the knowledge of Applicant, threatened, before any court, tribunal, arbitrator or any other governmental authority, or any industry regulatory organization (including the National Association of Securities Dealers, Inc.) or national securities exchange, that purports to affect the legality, validity or enforceability of this Agreement or that has a reasonable likelihood of having a material adverse effect on Applicant's business, operations, assets, liabilities or condition, whether financial or otherwise or prospects.

(h)    There is no Shortfall Amount.

All representations and warranties made or deemed made in this Agreement shall survive the execution and delivery of this Agreement and the issuance of any Letter of Credit (or any Amendment thereto).

8.    Issuance Fee/Issuer Costs.

(a)    So long as any Letter of Credit then remains undrawn, an issuance fee shall be deemed to accrue upon the total outstanding principal amount of such Letter of Credit at a rate per annum equal to 0.50% (or such other percentage subsequently agreed to by Issuer and Applicant), payable quarterly (i.e., every 90 days) in advance, it being understood that the first such quarterly period shall commence on the date of the first issuance of a Letter of Credit hereunder.

(b)    Reserved;

(c)    Applicant agrees to pay to Issuer, on demand, all reasonable costs and expenses (including attorney's fees) (collectively, the "Issuer Costs") that Issuer may pay or incur, or has already paid or incurred on or prior to the date hereof, in connection with the issuance of any Letter of Credit (or any Amendment thereto) and the negotiation, preparation, execution, performance and delivery of this Agreement and the transactions contemplated hereby and thereby, as well as in connection with the enforcement of, and preservation of Issuer's rights hereunder and thereunder, including, without limitation:

(i)    increased costs to Issuer or any entity controlling Issuer arising from the imposition or modification or effectiveness after the date hereof of any reserve, special deposit, insurance, or similar requirement or from a change in the basis of taxation (other than by a change in taxation of the overall net income of Issuer or such entity) including fees or charges with respect to any Letters of Credit issued by Issuer;

(ii) directly or indirectly increased costs to Issuer or any entity controlling Issuer for issuing or maintaining any Letter of Credit, arising from any change in any applicable law, rule, regulation or request or directive (whether or not having the force of law) imposed or becoming effective after the date hereof by any governmental authority or agency imposing on Issuer or such entity or any other condition affecting this Agreement or any Letter of Credit (or any Amendment thereto) or its issuance (including as to capital adequacy); and

(iii)    all sums expended by Issuer, including, without limitation, reasonable attorney's fees, disbursements and court costs, in connection with the exercise of any right or remedy provided for herein, the preservation of the Collateral and Issuer's interest therein and the defense or prosecution of any actions, suits or proceedings arising out of or relating to the Collateral.

(d)    Applicant also agrees to pay Issuer, on demand, an amount equal to any and all costs (including breakage costs) and expenses related to investments in the Collateral Account, including by reason of the early liquidation or realization of investments therein, incurred in connection with this Agreement.

(e)    If Issuer becomes entitled to claim any additional amount pursuant to Section 8(c) or (d), it shall promptly notify Applicant of the event by reason of which it has become so entitled. A certificate as to any additional amount payable pursuant to Section 8(c) or (d), showing in reasonable detail the determination of the additional amount claimed, submitted by Issuer to Applicant shall be conclusive in the absence of manifest error. The agreements in this Section 8 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

9.    Taxes. All payments made by Applicant under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or

- 12 -

withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on Issuer as a result of a present or former connection between Issuer and the jurisdiction of the governmental authority imposing such tax or political subdivision or taxing authority thereof or therein (other than any such connection arising solely from Issuer having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or a Letter of Credit). If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to Issuer hereunder, the amounts so payable to Issuer shall be increased to the extent necessary to yield to Issuer (after payment of all Non-Excluded Taxes) amounts payable hereunder at the rates or in the amounts specified in this Agreement. Whenever any Non-Excluded Taxes are payable by Applicant, as promptly as possible Applicant shall send to Issuer a certified copy of an original official receipt received by Applicant showing payment thereof (or if such document is not reasonably available to Applicant, other documentary evidence of payment). If Applicant fails to pay any Non-Excluded Taxes when due to the appropriate taxing authority or fails to remit to Issuer the required receipts or other required documentary evidence, Applicant shall indemnify Issuer for any incremental taxes, interest or penalties that may become payable by it as a result of any such failure. The agreements in this Section 9 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

10.    Indemnity. Applicant hereby agrees to indemnify and hold harmless Issuer and its affiliates and their respective directors, officers, employees, agents and advisors ("Indemnified Parties"), on demand and to the fullest extent legally permissible, and hold each of them harmless from and in respect of any and all losses, damages, liabilities, expenses (including, without limitation, expenses of investigation and defense and reasonable fees and disbursements of counsel), claims, liens or other obligations of any nature whatsoever (including, without limitation, the costs of enforcing this provision) that may arise out of any claim in any connection whatsoever with this Agreement or a Letter of Credit, whether or not Issuer or such other Indemnified Parties are party to any such action and whether or not brought by third parties or Applicant or its affiliates, other than losses, damages, liabilities, expenses, claims, liens or other obligations that may arise out of Issuer's gross negligence, bad faith or willful misconduct, as determined by a court of competent jurisdiction in a non-appealable final judgment. The agreements in this Section 10 shall survive the termination of this Agreement and the payment of all other amounts payable hereunder.

11.    Security Interest.

(a)    To secure all of Applicant's contingent and absolute obligations to Issuer under, arising out of or in connection with this Agreement (the "Obligations"), Applicant pledges to Issuer, and grants to Issuer a first priority continuing security interest in, all of Applicant's right, title and interest (whether now owned or hereafter acquired) in, under and to (i) the funds provided by Applicant to Issuer hereunder and deposited or held (or to be deposited or held) in the Collateral Account, all security entitlements with respect to all financial assets from time to time credited to the Collateral Account, all cash from time to time deposited or held in or credited to the Collateral Account, and all financial assets, dividends, distributions, return of capital, interest, cash, instruments and other property from time to time received, receivable or

Case 13-11952-KJC    Doc 11    Filed 08/04/13    Page 209 of 228

- 13 -

otherwise distributed in respect of or in exchange for any or all of such security entitlements or financial assets and all warrants, rights or options issued thereon or with respect thereto, and all proceeds thereof (including any interest earned on funds on deposit in the Collateral Account, which shall be credited to, and retained in the Collateral Account) in respect of such funds (the "L/C Account Collateral"), and (ii) the "Collateral" granted under, and as such term is defined in, the DIP Collateral Agreement (the "DIP Collateral" and together with the L/C Account Collateral, the "Collateral"); provided that Issuer's Liens with respect to the L/C Account Collateral shall be senior to the Liens of the other DIP Secured Parties, and Issuer's Liens with respect to the DIP Collateral shall be *pari passu* with the Liens of the other DIP Secured Parties. Applicant agrees that the Collateral shall be released from the Liens created hereby only upon (A) the expiration or termination of all Letters of Credit in accordance with their respective terms, (B) payment in full in cash of all Obligations, and (C) in the case of the L/C Account Collateral, so long as no Event of Default is continuing, in the event the amount of the funds in the Collateral Account exceeds the Minimum Collateral Base and there is no Shortfall Amount, the funds equal to such excess shall be paid to Applicant upon its request to Issuer, provided that Applicant shall bear any and all costs (including breakage costs) and expenses related to investments in the Collateral Account, including by reason of the early liquidation or realization of investments therein, incurred in connection with such lien release.

(b)     This Agreement secures the payment of all Obligations of Applicant now or hereafter existing hereunder, under any Letter of Credit and under any other related documents, whether direct or indirect, absolute or contingent.

(c)     Until each Letter of Credit has expired or been terminated in accordance with its terms and all Obligations have been paid in full in cash, it is agreed that: (i) some or all of the funds, assets and property in the Collateral Account may be invested or reinvested from time to time at the sole direction or instruction of Issuer to the Deposit Bank, and in any form or manner designated by Issuer in its sole discretion; provided that interest shall accrue on cash provided by Applicant for deposit in the Deposit Account at a rate per annum equal to the Federal Funds Rate minus the Prime Brokerage Cash Rate; (ii) Applicant shall not, and shall have no right to, deliver or make any entitlement orders or other directions concerning the L/C Account Collateral or the Collateral Account; (iii) Issuer shall have exclusive control over the Collateral Account and the funds, assets and properties therein; provided that amounts shall be withdrawn from the Collateral Account solely to satisfy the Obligations of Applicant in accordance with the terms of this Agreement; and (iv) Applicant will not create, incur, assume or suffer to exist any Lien on or with respect to the Collateral (except the Liens created by this Section 11, the DIP Liens and the Permitted Senior Liens).

(d)     Applicant shall do all such acts, and shall execute and deliver to Issuer, as applicable, all such financing statements, certificates, instruments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as Issuer may reasonably request from time to time for the purpose of effectively perfecting, maintaining and preserving Issuer's security interest and the benefits intended to be granted to Issuer hereunder.

(e)     Applicant warrants and shall defend the right, title and interest of Issuer in and to all Collateral against all adverse claims and demands.

- 14 -

(f)     Applicant shall not sell, assign, transfer or otherwise dispose of, or grant any option with respect to, pledge or otherwise encumber any of (i) the L/C Account Collateral or any interest therein without the prior written consent of Issuer, and (ii) the DIP Collateral, except as permitted by the DIP Credit Agreement and the DIP Collateral Agreement.

(g)     Anything herein to the contrary notwithstanding, (i) Applicant shall remain liable under any contracts and agreements related to the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by Issuer of any of the rights hereunder shall not release Applicant from any of its duties or obligations under the contracts and agreements relating to the Collateral, and (iii) Issuer shall not have any obligation or liability under the contracts and agreements relating to the Collateral by reason of this Agreement or any Letter of Credit, nor shall Issuer be obligated to perform any of the obligations or duties of Applicant thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(h)     Applicant agrees that at any time and from time to time, at the expense of Applicant, Applicant will, as applicable, promptly execute and deliver all further instruments and documents, and take all further action that Issuer may reasonably request, in order to perfect and protect the security interest granted or purported to be granted hereby or to enable Issuer to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality of the foregoing, Applicant will, upon the reasonable request of Issuer execute any instruments or notices, as may be necessary or desirable, or as Issuer may request, in order to perfect and preserve the security interest granted or purported to be granted by Applicant hereunder.

(i)     Applicant hereby authorizes Issuer to file one or more UCC-1 or UCC-3 or other financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral without the signature of Applicant where permitted by law.  A photocopy or other reproduction of this Agreement, or any financing statement covering the Collateral or any part thereof, shall be sufficient as a financing statement where permitted by law.

(j)     Expenses incurred by Issuer in connection with the taking of any action permitted by this Section 11 to enforce, protect or perfect its security interest and Lien in the Collateral shall be payable by Applicant on demand and shall constitute Obligations secured hereby.

(k)     Applicant hereby irrevocably appoints Issuer as Applicant's attorney-in-fact, with full authority in the place and stead of Applicant and in the name of Applicant or otherwise,  to take any action and to execute any instrument that Issuer may deem necessary or reasonably advisable to accomplish the purposes of this Agreement or to continue or enforce its security interest in the Collateral, including, without limitation, (i) to receive, endorse and collect all instruments made payable to Applicant representing any payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same, (ii) to invest and reinvest the L/C Account Collateral (including any proceeds from Collateral that matures) as it may deem appropriate, all of such investments, reinvestments and proceeds to remain in the Collateral Account until a release is authorized in accordance with the last sentence of Section 11(a) above, and (iii) to file any claims or take any action or institute any proceedings that Issuer

may deem necessary or reasonably desirable for the collection of any of the Collateral or otherwise to enforce compliance with the rights of Issuer with respect to any of the Collateral.

(l)    The powers conferred on Issuer hereunder are solely to secure the payment and performance of the Obligations, and shall not impose any duty upon it to exercise any such powers. Issuer shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which an ordinary person accords its own property, it being understood that Issuer shall not have any responsibility for taking any necessary steps to preserve rights against any parties with respect to any Collateral other than (i) the safe custody of any Collateral under its control or dominion, (ii) the accounting for monies actually received by it hereunder, and (iii) the application of monies in accordance with this Agreement.

12.    Obligation Absolute. To the fullest extent permitted by applicable law, the obligations of Applicant under this Agreement shall be absolute, unconditional and irrevocable, and shall be paid or performed strictly in accordance with the terms of this Agreement under any and all circumstances, including, without limitation, the following circumstances:

(a)    any lack of validity or enforceability of any Letter of Credit;

(b)    any amendment or waiver of or any consent to depart from the terms of this Agreement or any Letter of Credit (except to the extent of such amendment, waiver, consent or departure);

(c)    the existence of any claim, set-off, defense or other right which Applicant may have at any time against any Beneficiary or any transferee of any Letter of Credit (or any Persons for whom such Beneficiary or any such transferee may be acting), Issuer, or any other Person, whether in connection with this Agreement or otherwise;

(d)    any statement or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(e)    payment by Issuer under any Letter of Credit against presentation of a draft or certificate which does not conform to the terms of such Letter of Credit;

(f)    the failure by Issuer to honor any drawing under any Letter of Credit, or to make any payment demanded under such Letter of Credit, on the ground that the demand for such payment does not conform to the terms and conditions of such Letter of Credit, provided that such failure shall not have constituted the gross negligence or willful misconduct of Issuer;

(g)    any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit or a related draft or documents, except for errors or omissions caused by Issuer's gross negligence or willful misconduct;

(h)    any dispute or claim between or involving Applicant and any Beneficiary;

- 16 -

(i)     any lack of validity or enforceability of the obligation of Applicant to any Beneficiary for which a Letter of Credit has been provided as security; or

(j)     any other circumstances or happening whatsoever, whether or not similar to any of the foregoing, provided that such circumstances or happening shall not have constituted the gross negligence or willful misconduct of Issuer;

provided that any determination of Issuer's gross negligence or willful misconduct shall have been made by a court of competent jurisdiction in a non-appealable final judgment.

13.     Standard of Care.  Notwithstanding other provisions of this Agreement or applicable law, Issuer shall not be liable to Applicant for any action taken or omitted by Issuer under or in connection with this Agreement, any Letter of Credit (or any Amendment thereto) or a related draft or documents, if done in the absence of gross negligence and willful misconduct and in accordance with any mandatory standard of care applicable under the Uniform Commercial Code of the State of New York (the "UCC") and the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500 (provided that in the event of a conflict, the applicable provisions of the UCC shall govern to the extent of such conflict), as in effect from time to time, and, in any event, Issuer shall under no circumstances be liable for any special, exemplary, punitive or consequential damages.

14.     Payments.

(a)     Any payments not made by Applicant when due under this Agreement shall bear interest for each day until paid at a rate per annum equal to the sum of (i) the Base Rate plus (ii) 2.00% (two percent) per annum.

(b)     All amounts due from Applicant hereunder to Issuer shall be paid to Issuer by wire transfer to the following account (or such other account notified to Applicant by Issuer in writing) in U.S. Dollars and in same day funds:

> The Bank of New York, New York
> ABA Number 021000018
> Credit Suisse AG
> Account Number 8900492627

15.     Events of Default.

(a)     Each of the following shall be an "Event of Default" hereunder:

(i)     Applicant shall fail to pay, or cause to be paid, any amount payable under Section 4(a) in full when due, or shall fail to pay, or cause to be paid, within three (3) Business Days after the due date thereof any other amount payable hereunder;

(ii)    Applicant shall fail to observe or perform any term of any of its covenants or agreements contained in this Agreement (other than those covered by Section 15(a)(i) above);

- 17 -

(iii)    any representation, warranty, certification or statement made (or deemed made) by Applicant in this Agreement shall prove to have been incorrect or misleading in any material respect when made (or deemed made);

(iv)    any Lien created by Section 11 shall at any time for any reason not constitute a valid and perfected Lien, subject to no other Lien (other than the DIP Liens and the Permitted Senior Liens), or Applicant shall so assert in writing;

(v)    a Change in Control shall occur, or Applicant shall sell, convey, transfer, dispose of, suffer to occur or exist, or otherwise alienate, substantially all of its assets, whether voluntarily, by operation of law, or otherwise, or executes a contract to do any of the foregoing;

(vi)    Applicant shall fail to contribute funds to the Collateral Account in an amount equal to the Shortfall Amount on any Shortfall Date, in accordance with Section 6 hereof;

(vii)    Applicant shall fail to maintain and preserve all material rights, permits, licenses, approvals, privileges and franchises necessary in the maintenance of its operations and corporate existence;

(viii)    Any provision of this Agreement shall at any time for any reason cease to be valid and binding on Applicant, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by Applicant, or a proceeding shall be commenced by any governmental agency or authority having jurisdiction over Applicant seeking to establish the invalidity or unenforceability thereof, or Applicant shall deny that it has any or further liability or obligation under this Agreement.

(ix)    The occurrence of an "Event of Default" under, and as such term is defined in, the DIP Credit Agreement.

(x)    The Restructuring Support Agreement (i) shall cease to be in full force and effect or (ii) shall have been amended or otherwise modified in a manner without the prior written consent of Issuer and, in each case, a period of 15 days has lapsed.

(b)    Upon the occurrence of an Event of Default, and upon every such occurrence, in addition to all rights and remedies set forth in this Agreement and/or otherwise available under applicable law:

(i)    Issuer may declare all amounts (whether direct or contingent) payable hereunder to be, and such amounts shall thereupon become, immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Applicant.

- 18 -

    (ii)    Issuer shall be entitled to apply, sell or otherwise liquidate and realize upon any and all funds, assets or property in the Collateral Account in satisfaction of the Obligations.

    (iii)    Issuer shall be entitled to set off against any or all the Obligations any amounts then owing by Issuer to Applicant (whether or not matured, whether or not contingent, and regardless of the currency, place of payment and booking office), including, without limitation, any and all deposits then held by Issuer to or for the credit or the account of Applicant.

    (iv)    Issuer may do any acts which it deems proper to protect the Collateral as security hereunder, and collect and sue upon the Collateral and receive any payments due thereon or any damages thereunder, and apply all sums received in connection with the Collateral to the payment of the Obligations in such order as Issuer shall determine.

    (v)    Issuer shall be entitled to require Applicant to deliver to Issuer all documents in the possession of Applicant relating to the Collateral, and Applicant shall promptly take such actions and furnish to Issuer such documents as Issuer deems necessary or appropriate, in its sole discretion, to enforce its rights with respect to the Collateral.

    (vi)    Issuer shall be entitled to direct the Deposit Bank to make all payments and deliveries under the L/C Account Collateral directly to Issuer or its designee, and Applicant shall, upon request by Issuer and as applicable, execute and consent to all notices and directions given by Issuer to the Deposit Bank, including transferring all L/C Account Collateral to accounts maintained solely in the name of Issuer.

    (vii)    Issuer shall be entitled to exercise, or cause the exercise of, Applicant's rights under or in respect of any Collateral.

    (viii)    Issuer shall be entitled to exercise or cause the exercise of any other rights or remedies provided herein, in any document or instrument delivered pursuant hereto, under any other agreement or under applicable law (including, without limitation, any rights or remedies under the UCC).

Notwithstanding the forgoing, prior to the exercise of any enforcement or liquidation remedies against the Collateral, Issuer shall provide three (3) Business Days' prior written notice thereof to Applicant.

    (c)    Issuer may enforce its rights and remedies hereunder without prior judicial process or hearing, and Applicant hereby expressly waives, to the fullest extent permitted by law, any right Applicant might otherwise have to require Issuer to enforce its rights by judicial process. Applicant also waives, to the fullest extent permitted by law, any defense Applicant might otherwise have to the Obligations secured hereby arising from use of nonjudicial process,

enforcement and sale of all or any portion of the Collateral or from any other election of remedies.

(d)     If the Collateral is insufficient to cover the payment in full of all Obligations, Applicant shall remain liable for any deficiency.

(e)     The powers conferred on Issuer hereunder are solely for its benefit and do not impose any duty on Issuer to exercise any such powers. Following an Event of Default, Issuer shall have no duty of care as a secured party hereunder to Applicant as to any Collateral or with respect to the taking of any necessary steps to preserve rights against other parties or any other obligations pertaining to the Collateral, other than as may be expressly required by the UCC. Applicant waives all rights whatsoever against Issuer for any loss, expense, liability or damage suffered by Applicant as a result of actions taken by Issuer as secured party pursuant to this Agreement, except to the extent caused by the gross negligence or willful misconduct of Issuer, as determined by a court of competent jurisdiction in a non-appealable final judgment.

(f)     Applicant hereby expressly waives, to the fullest extent permitted by law, every statute of limitation, right of redemption, any moratorium or redemption period, any limitation on a deficiency judgment, and any right which it may have to direct the order in which any of the Collateral shall be disposed of in the event of any disposition pursuant hereto.

16.     Amendments; Waivers. Any provision of this Agreement may be amended, supplemented or waived if, but only if, such amendment, supplement or waiver is in writing and signed by each of Applicant and Issuer. In the case of any waiver, Applicant and Issuer shall be restored to their former positions and rights hereunder and any Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Event of Default or impair any right consequent thereon.

17.     Notices. All notices, requests and demands to or upon the respective parties hereto shall be in writing (including by facsimile transmission) and shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered or (b) in the case of delivery by facsimile transmission, when sent and receipt has been confirmed, addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

(i)     Address for communications to Applicant:

9221 E. Via De Ventura, Scottsdale, Arizona 85258
Attention: Stephen Farber, Chief Financial Officer
Facsimile No.:
E-mail: stephen.farber@rmetro.com

(ii)    Address for communications to Issuer:

Credit Suisse
Eleven Madison Avenue, 23rd Floor
New York, New York 10010
Attention:  Trade Finance/Services Dept.
Facsimile No.: 212-325-8315

- 20 -

E-Mail: list.ib-lettersofcredit-ny@credit-suisse.com

provided, however, that Applicant shall also deliver to Issuer all original Requests or Amendment Requests by mail following the delivery of such Requests or Amendment Requests by facsimile transmissions.

18.     Costs and Expenses.  Applicant agrees to pay, from time to time, on demand and on the date hereof, all reasonable costs and expenses of Issuer (including reasonable fees and disbursements of Issuer's counsel), in connection with the negotiation, preparation, execution and delivery of this Agreement and all Letters of Credit, as well as in connection with the enforcement of, and preservation of rights under, and ongoing advice, administration, and any modifications or amendments with respect to, this Agreement.

19.     No Waiver; Remedies Cumulative.  No failure to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  The rights, remedies, powers and privileges provided under this Agreement are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law or in equity.

20.     Successors and Assigns.  This Agreement shall be binding upon each party and its successors and permitted assigns and shall inure to the benefit of and be enforceable by each party, its successors and permitted assigns.  Applicant shall not transfer or otherwise assign any of its obligations under this Agreement and any assignment in violation of this Section 20 shall be null and void.  Issuer may transfer or otherwise assign its rights and obligations under this Agreement to any affiliate of Issuer, any assignee or successor pursuant to operation of law or any assignee or successor pursuant to a merger, consolidation or amalgamation with or into, or transfer of all or substantially all of Issuer's assets to, another entity.

21.     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

22.     Right of Set-off.  Issuer is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set-off and apply any and all deposits (general or special, time or demand, provisional or final, including, without limitation, any amount held by Issuer pursuant to this Agreement or otherwise) at any time held and other indebtedness at any time owing by Issuer to or for the credit or the account of Applicant against any and all of the Obligations (now or hereafter existing) that are due and payable hereunder or under any related document.  The rights of Issuer under this Section 22 are in addition to other rights and remedies (including, without limitation, other rights of set-off) that Issuer may have.

23.     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile

transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

24.     Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

25.     Submission to Jurisdiction. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS ("PROCEEDING") RELATING TO THIS AGREEMENT OR ANY LETTER OF CREDIT, EACH OF APPLICANT AND ISSUER IRREVOCABLY SUBMITS TO THE TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY AND WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDINGS BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT SUCH PROCEEDINGS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE ANY JURISDICTION OVER SUCH PARTY. EACH PARTY HEREBY AGREES THAT PROCESS SHALL BE DEEMED SERVED IF SENT TO ITS ADDRESS GIVEN FOR NOTICES UNDER THIS AGREEMENT AND THAT NOTHING IN THIS AGREEMENT SHALL AFFECT ISSUER'S RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. APPLICANT HEREBY AGREES THAT FINAL JUDGMENT AGAINST IT IN ANY ACTION OR PROCEEDING SHALL BE ENFORCEABLE IN ANY OTHER JURISDICTION WITHIN OR OUTSIDE THE UNITED STATES BY SUIT ON THE JUDGMENT.

26.     Waiver of Jury Trial. APPLICANT AND ISSUER EACH HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY PROCEEDING RELATING TO THIS AGREEMENT OR ANY LETTER OF CREDIT OR ANY COUNTERCLAIM THEREIN.

27.     Waiver of Special, Punitive or Exemplary Damages. Each party waives, to the maximum extent not prohibited by law, any right it may have to claim or recover any special, exemplary, punitive or consequential damages in any Proceeding relating to this Agreement or any Letter of Credit.

28.     Patriot Act. Issuer hereby notifies Applicant that pursuant to the requirements of the Patriot Act, Issuer is required to obtain, verify and record information that identifies Applicant and any applicable Beneficiary, which information includes the name and address of Applicant and such Beneficiary and other information that will allow Issuer to identify Applicant and such Beneficiary in accordance with the Patriot Act. Applicant shall, and shall cause each of its subsidiaries to, provide to the extent commercially reasonable, such information and take such actions as are reasonably requested by Issuer in order to assist Issuer in maintaining compliance with the Patriot Act.

- 22 -

29.    Time.  All references in this Agreement to a time of day refer to the time in New York City.

30.    Termination.  Issuer may terminate this Agreement on ten (10) days' prior notice to Applicant and Applicant may terminate this Agreement on ten (10) days' prior notice to Issuer if there are no L/C Outstandings, provided that in any event, sections 8, 9, 10, 11, 13, 14, 15(c)-(f), 16, 17, 18, 19, 21, 24, 25, 26 and 27 shall survive the termination of this Agreement. Upon termination of this Agreement, an amount equal to the excess of (a) cash provided by Applicant on deposit in the Collateral Account (including all interest thereon) on the date of such termination, over (b) any outstanding Obligations of Applicant, including, without limitation, L/C Outstandings and outstanding fees and expenses, shall be promptly returned to Applicant.

31.    Conflicts.  In the event of any inconsistency between the terms and conditions of this Agreement and the Interim Order or the Final Order (whichever is then in effect), the provisions of the Interim Order or the Final Order (whichever is then in effect) shall govern and control.

32.    Entire Agreement.  This Agreement, together with the exhibits hereto and all documents delivered pursuant to Section 3, as the case may be, represents the agreement of the parties hereto with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by Issuer or Applicant relative to subject matter hereof not expressly set forth or referred to herein.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be duly executed, all as of the day and year first above written.

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**,
as Issuer


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


**RURAL/METRO CORPORATION**,
as Applicant


By:_____
    Name:
    Title:

**EXHIBIT A**

**FORM OF REQUEST FOR LETTER OF CREDIT**

Credit Suisse, Cayman Islands Branch
One Madison Avenue, 2nd Floor
New York, New York 10010
Attention: Trade Finance/Services Department
Facsimile No.: 212-325-8315

[INSERT DATE]

Ladies and Gentlemen:

Reference is hereby made to the Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of _____, 2013, by and between Credit Suisse, Cayman Islands Branch ("Issuer"), and Rural/Metro Corporation, a Delaware corporation ("Applicant"). All capitalized terms used but not defined herein have the respective meaning assigned thereto in the Agreement.

Pursuant to Section 3 of the Agreement, the undersigned hereby requests that Issuer (or any of Issuer's affiliates or branches) issue for the account of Applicant [__][1] Letter(s) of Credit, in the aggregate principal amount of $[_____] and in the form(s) attached hereto, for the benefit of the Beneficiary(ies) and in the amount set forth in such form(s).

Applicant hereby agrees and acknowledges that Issuer may elect to issue such Letter(s) of Credit in a form satisfactory in all respects to Issuer in its sole discretion, and that Issuer's obligation to effect such issuance shall be subject in all events to satisfaction of the conditions precedent set forth in Section 3 of the Agreement, including without limitation, satisfaction of Applicant's obligation set forth in Section 5(a) of the Agreement.

This notice shall be deemed part of the Agreement and shall be subject to all the terms and conditions set forth therein.

[signature page follows]

---

[1] Insert number of Letters of Credit being requested.

**RURAL/METRO CORPORATION,**
as Applicant


By:_____
    Name:
    Title:

## EXHIBIT B

## FORM OF REQUEST FOR AMENDMENT
## TO EXISTING LETTER OF CREDIT

Credit Suisse, Cayman Islands Branch
One Madison Avenue, 2nd Floor
New York, New York 10010
Attention: Trade Finance/Services Department
Facsimile No.: 212-325-8315

[INSERT DATE]

Ladies and Gentlemen:

Reference is hereby made to:

     (a)     the Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of _____, 2013, by and between Credit Suisse, Cayman Islands Branch ("Issuer"), and Rural/Metro Corporation, a Delaware corporation ("Applicant"); and

     (b)     Letter of Credit No. [_____], issued on [_____] in the aggregate principal amount of $[_____] for the benefit of [ADD BENEFICIARY INFORMATION] [, as amended on [_____]][2] (the "Letter of Credit").

    Pursuant to Section 3 of the Agreement, the undersigned hereby requests that Issuer (or any of Issuer's affiliates or branches) amend the Letter of Credit as follows:

[INSERT REQUESTED AMENDMENTS]

Applicant hereby agrees and acknowledges that such amendment shall be in a form satisfactory in all respects to Issuer in its sole discretion, and that Issuer's obligation to effect such amendment shall be subject in all events to satisfaction of the conditions precedent set forth in Section 3 of the Agreement, including without limitation, satisfaction of Applicant's obligation set forth in Section 5(a) of the Agreement.

All capitalized terms used but not defined herein have the meaning assigned thereto in the Agreement.

This notice shall be deemed part of the Agreement and shall be subject to all the terms and conditions set forth therein.

[signature page follows]

---

[2] Include this information if the referenced Letter of Credit has been previously amended.

01:13977140.1

**RURAL/METRO CORPORATION**,
as Applicant


By:_____
    Name:
    Title:

## EXHIBIT C

## FORM OF CERTIFICATE

Dated:  [INSERT DATE][3]

The undersigned hereby certifies that:

1.    He is a duly authorized _____ of Rural/Metro Corporation, a Delaware corporation ("**Applicant**").

2.    This certificate (this "**Certificate**") is being furnished pursuant to Section 3(b)(ii) of the Letter of Credit Agreement (as defined below) to CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as Issuer (in such capacity, "**Issuer**") under the Senior Secured Super Priority Debtor in Possession Letter of Credit Reimbursement and Security Agreement (as amended or otherwise modified from time to time, the "Agreement"), dated as of _____, 2013, between Applicant and Issuer (as amended or otherwise modified from time to time, the "**Letter of Credit Agreement**").

3.    [Since the Effective Date there have been no amendments made to the [INSERT NAME OF CONSTITUENT DOCUMENT] of Applicant, certified by the Secretary of State of _____ as of [INSERT DATE].] [Attached hereto as Annex A is a true, complete and correct copy of the [INSERT NAME OF CONSTITUENT DOCUMENT] of Applicant, certified by the Secretary of State of _____ as of [INSERT DATE] and in full force and effect as of and on the date hereof.][4]

4.    [INSERT NAME] is authorized to act on behalf of Applicant with respect to the Letter of Credit Agreement and any other document delivered by Applicant in connection with the Letter of Credit Agreement to be executed by Applicant, and the signature of such person appearing on the Letter of Credit Agreement and any other document delivered by Applicant in connection with the Letter of Credit Agreement to be executed by Applicant is his genuine signature.

6.    Each of the representations and warranties of Applicant set forth in the Letter of Credit Agreement (both before and after giving effect to the issuance of or Amendment to the Letter of Credit or Letters of Credit proposed to be issued or amended in connection with the submission of this Certificate) is true and correct on and as of the date hereof.

7.    Applicant has complied with all of its covenants and fulfilled all of its obligations in the Letter of Credit Agreement required to be complied with or fulfilled prior to the date hereof.

---

[3] Insert the date on which the Letter of Credit is to be issued.

[4] Use this option for the initial Request.

8.      Both before and after giving effect to the issuance of or Amendment to the Letter of Credit or Letters of Credit proposed to be issued or amended in connection with the submission of this Certificate, no event has occurred and is continuing which constitutes an Event of Default.

9.      [Other, as may be required by Issuer.]

10.     Capitalized terms used herein but not defined shall have the meanings assigned to them in the Letter of Credit Agreement.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, I have signed this Certificate as of the date first above written.

**RURAL/METRO CORPORATION,**
as Applicant

By:_____
     Name:
     Title:

01:13977140.1

## EXHIBIT 3

### Budget

# CASH BUDGET

| Rural/Metro Corporation | Week Ended 28-Jul Actual | 1 Week Ended 4-Aug Projected | 2 Week Ended 11-Aug Projected | 3 Week Ended 18-Aug Projected | 4 Week Ended 25-Aug Projected | 5 Week Ended 1-Sep Projected | 6 Week Ended 8-Sep Projected | 7 Week Ended 15-Sep Projected | 8 Week Ended 22-Sep Projected | 9 Week Ended 29-Sep Projected | 10 Week Ended 6-Oct Projected | 11 Week Ended 13-Oct Projected | 12 Week Ended 20-Oct Projected | 13 Week Ended 27-Oct Projected | 14 Week Ended 3-Nov Projected | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Beginning Cash Balance | $ 14,145 | $ 16,190 | $ 4,526 | $ 44,678 | $ 34,401 | $ 40,352 | $ 7,141 | $ 43,335 | $ 37,494 | $ 44,325 | $ 34,317 | $ 37,397 | $ 28,508 | $ 33,888 | $ 25,905 | $ 16,190 |
| 2 (Less: Float estimate) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) | (4,500) |
| 3 Available Cash | 9,645 | 11,690 | 26 | 40,178 | 29,901 | 35,852 | 2,641 | 38,835 | 32,994 | 39,825 | 29,817 | 32,897 | 24,008 | 29,388 | 21,405 | 11,690 |
| 4 Cash Receipts | 11,722 | 12,747 | 12,865 | 12,865 | 12,865 | 12,865 | 11,348 | 14,185 | 14,185 | 14,185 | 13,011 | 10,175 | 12,718 | 12,718 | 13,151 | 179,880 |
| 5 Working Capital Items | | | (650) | (650) | (700) | (700) | (750) | (800) | (900) | (900) | (900) | (1,063) | (1,063) | (1,063) | (396) | (11,083) |
| 6 Net Cash Receipts | 11,722 | 12,747 | 12,215 | 12,215 | 12,165 | 12,165 | 10,598 | 13,385 | 13,285 | 13,285 | 12,111 | 9,112 | 11,656 | 11,656 | 12,755 | 168,797 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| 7 Payroll | (996) | (12,342) | (1,135) | (12,813) | (1,135) | (12,813) | (1,127) | (12,764) | (1,142) | (12,664) | (1,136) | (12,643) | (1,335) | (12,557) | (1,202) | (96,810) |
| 8 Employee Benefits/Health Insurance | (1,333) | (763) | (912) | (759) | (912) | (759) | (885) | (935) | (935) | (782) | (795) | (1,063) | (912) | (759) | (956) | (11,973) |
| 9 Insurance Casualty/WC | (418) | (1,337) | (498) | (539) | (273) | (273) | (516) | (296) | (749) | (296) | (555) | (235) | (791) | (938) | (351) | (7,155) |
| 10 General A/P | (4,704) | (7,155) | (4,026) | (5,404) | (2,865) | (4,243) | (3,857) | (4,450) | (2,949) | (3,249) | (3,780) | (3,445) | (2,413) | (2,838) | (2,661) | (53,292) |
| 11 Working Capital Items | | | (500) | (500) | (550) | (3,000) | | | | (3,000) | | | | | | (7,550) |
| 12 Total Disbursements | (7,451) | (21,596) | (7,071) | (20,016) | (5,734) | (21,088) | (6,385) | (18,246) | (5,775) | (19,991) | (6,267) | (17,477) | (5,453) | (16,492) | (5,170) | (176,760) |
| 13 Adjusted Operating Cash Flow | 4,271 | (8,850) | 4,594 | (7,801) | 6,430 | (8,923) | 4,212 | (4,861) | 7,510 | (6,706) | 5,845 | (8,365) | 6,204 | (4,837) | 7,585 | (7,963) |
| 14 Capital Expenditures | (276) | (723) | (479) | (479) | (479) | (479) | (679) | (679) | (679) | (679) | (420) | (524) | (524) | (524) | (3,563) | (10,912) |
| 15 Secured Lender - Interest | | | | (1,852) | | (1,852) | | | | (1,852) | | | | (1,852) | | (7,408) |
| 16 Secured Lender - LC Interest | | | | (145) | | (145) | | | | (145) | | | | (145) | | (581) |
| 17 DIP Fees | | (3,613) | | | | | | | | | | | | | | (3,613) |
| 18 DIP Interest (Cash Portion) | | | | | | (625) | | | | (625) | | | | (625) | | (1,875) |
| 19 DIP LC Overcollateralization / fees | | | | | | (1,102) | | | | | | | | | | (1,102) |
| 20 DIP Draw (Repayment) | | | 40,000 | | | | 35,000 | | | | | | | | | 75,000 |
| 21 Other | (940) | | | | | | | | | | | | | | | |
| 22 Non-Operating Items | (1,216) | (723) | 35,908 | (2,476) | (479) | (4,203) | 34,321 | (679) | (679) | (3,301) | (420) | (524) | (524) | (3,146) | (3,563) | 49,510 |
| 23 Net Cash Flow before Restructuring | 3,055 | (9,573) | 40,502 | (10,277) | 5,951 | (13,127) | 38,533 | (5,540) | 6,830 | (10,007) | 5,425 | (8,889) | 5,680 | (7,983) | 4,022 | 41,547 |
| **Chapter 11 Items** | | | | | | | | | | | | | | | | |
| 24 Professional Fees/Restructuring | (446) | (2,091) | (350) | | | (50) | (2,340) | (300) | | | (2,345) | | (300) | | (2,090) | (9,866) |
| 25 Surety Bond Exposure | (564) | | | | | (20,034) | | | | | | | | | | (20,034) |
| 26 Chapter 11 Items | (1,010) | (2,091) | (350) | | | (20,084) | (2,340) | (300) | | | (2,345) | | (300) | | (2,090) | (29,900) |
| 27 Change in Cash | 2,045 | (11,664) | 40,152 | (10,277) | 5,951 | (33,211) | 36,193 | (5,840) | 6,830 | (10,007) | 3,080 | (8,889) | 5,380 | (7,983) | 1,932 | 11,647 |
| 28 Ending Cash | 11,690 | 26 | 40,178 | 29,901 | 35,852 | 2,641 | 38,835 | 32,994 | 39,825 | 29,817 | 32,897 | 24,008 | 29,388 | 21,405 | 23,337 | 23,337 |