IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------x
In re                                          :    Chapter 11
                                               :
Rural/Metro Corporation, et al.,[1]            :    Case No. 13-11952 (   )
                                               :
            Debtors.                           :    (Joint Administration Pending)
------------------------------------------------------x

**DECLARATION OF BRANDON AEBERSOLD IN SUPPORT OF DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364 AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

I, Brandon Aebersold, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1. I am a Director in the Restructuring Group at Lazard Frères & Company LLC ("**Lazard**"). I submit this declaration in support of the Debtors' Motion For Interim And Final Orders (I) Authorizing Debtor (A) To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection To Prepetition Secured Parties Pursuant To 11 U.S.C. § 361, 362, 363, And 364 And (III) Scheduling Final Hearing Pursuant To Bankruptcy Rules 4001(b) and (c) (the "**DIP Motion**").[2]

2. I have a broad range of experience in financial advisory assignments, including extensive experience with chapter 11 restructurings. I have been providing advice

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are listed in Schedule 1. The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

[2] Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the DIP Motion.

01:13977145.1

regarding restructurings, reorganizations, workouts and a wide variety of other transactions including refinancing and distressed mergers and acquisitions at Lazard for the past seven years. Prior to joining Lazard, I worked at the law firm of Simpson Thacher & Bartlett LLP, where I focused on leverage finance and merger and acquisition transactions. During the course of my career, I have participated in structuring, arranging and obtaining over thirty-five financings, a number of which were debtor in possession loans.

3. All facts set forth in this declaration are based on my personal knowledge. If I were called to testify, I would testify competently to the facts set forth herein.

A. **The Debtors' Current Capital Structure**

4. Because the Debtors' current capital structure is explained in the Farber Declaration and the DIP Motion, I will not repeat it here in detail. To summarize, however, the Debtors have over $735 million in funded indebtedness and related obligations, consisting of (a) the Revolving Facility — approximately $109 million (including issued and outstanding, but undrawn, letters of credit of approximately $41 million); (b) the Term Loan Facility — approximately $318.5 million; and (c) the Notes — approximately $308 million in aggregate principal amount.

5. As explained in the Farber Declaration, the Debtors faced significant challenges leading to the commencement of their chapter 11 cases. The Company has a highly levered capital structure resulting from various challenges affecting its level of profitability. As such, the Company has significant interest payment obligations in addition to significant recurring capital expenditure and cash obligations relative to its cash flow. Together, these essentially fixed obligations approximate $70 to $80 million annually. The Company has experienced significant challenges and disruptions operating its billing and collection functions, which have resulted in reduced revenue and delayed cash collections. Furthermore, the

01:13977145.1

Company has had great difficulty appropriately estimating and accounting for revenue, which has resulted in negative adjustments to revenue in the past year of approximately $50 to $60 million. As a result, the Company has a deficiency of cash receipts compared with cash expenditures, and has nearly exhausted its liquidity.

6. On June 25, 2013, the Company retained Lazard to evaluate the Company's strategic alternatives and financing options. On July 15, 2013, Rural/Metro did not make its scheduled interest payment on the Notes in the amount of $15.6 million. The Company's liquidity situation forced a compressed time frame for out-of-court restructuring negotiations. Upon the advice of its advisors, including Lazard, the Company simultaneously pursued a consensual out-of-court restructuring and, in the event an out-of-court financing or other transaction could not be reached in time, DIP financing. When it became clear that out-of-court financing was not available and an out-of-court restructuring with the Company's stakeholders was not feasible before the Company's cash reserves were exhausted, the Company decided to file these chapter 11 cases.

B. **The DIP Financing Marketing Process**

7. Soon after being engaged, and in parallel with exploring out-of-court options with the Company, Lazard and the Company designed a financing marketing process. To promote competition and obtain financing on the best terms available, Lazard and the Company designed a marketing process to attract multiple financing proposals, while limiting the breadth of the process in order to balance concerns regarding confidentiality and the practical timing considerations. Lazard, in consultation with the Company and its other advisors, began by identifying four third-party potential financing sources, with a focus on institutions familiar with the Company or institutions that have a degree of sophistication in providing financing in

distressed situations that have the ability to enter into a complex financing arrangement on an expedited basis.

8. Three of the potential outside sources that Lazard contacted entered into confidentiality agreements with the Company and were provided an overview of the situation and due diligence information. While simultaneously reaching out to third parties, Lazard, with the assistance of the Company's management and other advisors, engaged in a dialogue with the Company's prepetition senior secured lenders (the "**Bank Group**"). In addition, around the same time, certain of the holders of the Company's Notes (the "**Noteholders**") signed confidentiality agreements and investigated a possible financing transaction.

9. Each potential lender was given a presentation regarding the Company's financing needs, and was briefed on the Company's operational performance. The Company also offered the potential lenders access to additional information or its senior management and advisors. The process confirmed that none of the potential lenders were willing to provide the Company with financing outside of a chapter 11 case. As such, Lazard and the Company shifted the focus of the financing market process to DIP financing in order to secure the funding necessary to facilitate a comprehensive restructuring in chapter 11 in the event an out-of-court transaction was not possible.

10. To facilitate a dialogue over DIP financing terms, Lazard provided each lender with the Company's estimate of its anticipated cash needs during a chapter 11 filing. The Company based such funding requirement on assumed EBITDA of approximately $62 million in fiscal year 2013, $50 million in fiscal year 2014 and $61 million in fiscal year 2015, and made certain adjustments to expenses and working capital that could result from a filing. To encourage the lenders to consider a variety of financing alternatives, Lazard emphasized the

Company's flexibility and willingness to consider any structure that would achieve the Company's goals. For example, various collateral structures were explored as certain of the Debtors' property, specifically the Debtors' vehicles (including its ambulances), may be subject to unperfected liens. Despite this, given the cash needs of the Company, potential lenders raised questions as to whether there was enough available unencumbered collateral (or collateral subject to unperfected liens) to lend at a level that could support the Debtors' operations through their chapter 11 cases. Indeed, no party that was not one of the Debtors' current lenders was willing to lend on a junior basis, and at a sufficient level, secured only by the Debtors' vehicles on a first lien basis.

11. Significantly, the Bank Group advised the Debtors that they would not consent to the granting of senior or *pari passu* liens to a new third party debtor-in-possession lender. The Bank Group was also not willing to amend the Prepetition First Lien Credit Facility to permit the incurrence of junior secured debt. On July 11, the Bank Group provided the Company with a term sheet for a DIP term loan. As it had with the other potential lenders, the Company proceeded to engage in additional diligence and negotiations with the Bank Group and its advisors.

12. The Company continued its dialogue with those Noteholders that agreed to become restricted for a period of time to review material non-public information in connection with evaluating whether to provide the Company with DIP financing. On July 20, 2013, the Company received both a detailed DIP financing term sheet and a term sheet outlining a restructuring proposal from the Noteholders. At that time, the Noteholders were willing to provide a modestly sized DIP financing if the Company executed a plan support agreement and committed itself to an expedited case and a specific restructuring plan. However, there were two

problems with the Noteholders' initial proposal; it did not contain sufficient liquidity to provide the time necessary to negotiate the terms of the restructuring, and the Company believed the sizing of the Noteholders' proposal was insufficient to support the Company's chapter 11 cases and ensure a successful reorganization. The Bank Group also received the restructuring term sheet from the Noteholders, and a three-party negotiation was initiated to see if a consensual deal was possible.

13. For approximately the following two weeks, Lazard engaged in extensive, virtually non-stop, multi-track negotiations with the Bank Group and the Noteholders. This effort involved simultaneous revisions to multiple term sheets and credit agreements, responding to rounds of diligence requests, and discussions about the terms of the proposed DIP financings. Essentially, the Company and its advisors, including Lazard, simultaneously negotiated three separate deals: (a) a standalone DIP financing from the Bank Group; (b) a consensual restructuring which was initially contemplated to be a possible out-of-court restructuring, and then morphed into a pre-arranged bankruptcy plan; and (c) a standalone DIP financing from the Noteholders. There were advantages and disadvantages to each potential deal, and through the course of the three-party negotiations, there were times when any one of the three appeared to be the most likely outcome.

14. The negotiations culminated in the execution of the Restructuring Support Agreement, which commits the Debtors, the Bank Group and the Noteholders to a pre-negotiated plan designed to de-lever the Debtors by partially paying down the Prepetition First Lien Indebtedness and converting the Notes to equity. Moreover, the Noteholders have committed to invest $135 million of new capital in the form of new preferred equity upon exit from chapter 11.

All in all, the consensual restructuring will reduce the Debtors' funded indebtedness by approximately 50% and its cash interest expenses by approximately 45%.

15. The three-party negotiations also had the additional benefit of allowing the Debtors to negotiate favorable DIP financing. I believe, based on my involvement in the process, that these negotiations were arms' length at all times and were characterized by good-faith, hard bargaining by all interested parties. Ultimately, the Debtors, with the consent of the Noteholders, decided to pursue a financing transaction with the DIP Lenders designed to support the restructuring set forth in the Restructuring Support Agreement.

16. On August 4, 2013, Lazard made a formal presentation to the Company's board of directors that analyzed the details of the competing standalone proposals from the Bank Group and the Noteholders, along with the consensual restructuring and the DIP Facility, answered numerous questions posed by directors, and made various observations concerning the strengths and weaknesses of each proposal. Among the many factors in choosing among the proposals were the advantages of filing with a consensual deal with the Company's two largest creditors, thereby reducing the risk of a protracted bankruptcy and contentious litigation.

## C. The Debtors Enter Into the DIP Credit Agreement

17. After having engaged in negotiations with the Bank Group and the Noteholders, and based on the Debtors' and their advisors' in-depth analysis of both the standalone proposals as well as the DIP Facility proposal as part of the consensual restructuring under the Restructuring Support Agreement, the Debtors have determined to move for court approval of the DIP Facility. I believe the DIP Motion should be granted for a variety of reasons.

18. First, the DIP Facility, and the consensual restructuring it supports, is the best result to emerge from extensive negotiations and a competitive process that resulted in much

01:13977145.1

more favorable terms than originally contemplated. For example, the Bank Group's original standalone proposal included a "roll-up" feature, which the competitive process forced the Bank Group to concede. In addition, the DIP Facility contains better pricing and fees than the initial standalone proposals initially contemplated. I am confident that the back and forth negotiations, dueling proposals and the agreement to enter into a consensual restructuring produced favorable financing terms for the Debtors.

19. Second, based on my experience and review of comparable DIP financing transactions, the terms of the DIP Facility are reasonable under the circumstances. I believe the fees and other obligations under the DIP Loan Documents were negotiated at arms' length and represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facilities available. Furthermore, I believe the proposed adequate protection of the Prepetition Secured Parties' interests, including the grant of replacement liens, payment of interest on prepetition debt, payment of fees and expenses (including fees and expenses of attorneys and financial advisors), and the grant of a superpriority claim, is reasonable under the circumstances.

20. Third, the consensual nature of the DIP facility avoids potential litigation that could have occurred with either standalone DIP financing proposal. Such litigation could drain the Debtors' resources and distract management and the Company's advisors from reorganization efforts. The ability for the Company to enter chapter 11 with stable DIP financing to reassure its customer base that operations will continue as normal was an important consideration of the Company and its board of directors. I believe that the DIP Facility, together with the Restructuring Support Agreement, offers the Debtors the softest landing into chapter 11,

which will allow the Debtors to pursue a consensual balance sheet restructuring with the support of the Debtors' largest creditor constituents.

D. **The DIP Facility Should Be Approved**

21. I believe, based on my experience and involvement in the marketing and negotiation of the DIP financing in this matter, the negotiations with all potential lenders were conducted at arm's length and in good faith. The marketing process was also successful, as the Debtors were able to improve upon the initial standalone offers of both the Bank Group and the Noteholders.

22. In my view, the value of entering into these chapter 11 cases with agreed terms for a pre-arranged plan cannot be overlooked. Furthermore, I believe the fees and expenses in the proposed DIP Facility are reasonable, and on the whole, the financing is the best available option available to the Debtors.

23. I also believe that, based on the Company's projections, the DIP Facility should allow the Debtors to effectuate the pre-negotiated restructuring by providing the Debtors with necessary liquidity to fund and continue operations during these chapter 11 cases, and sends a strong signal to employees, customers and other parties of the Company's viability. Accordingly, if approved, the DIP Facility provides capital to preserve the value of the Debtors' businesses and liquidity to reorganize and, as such, is in the best interests of the Debtors' estates and creditors.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.
Dated: August 4, 2013

/s/ Brandon Aebersold
Brandon Aebersold