## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                             :   Chapter 11
                                                   :
Rural/Metro Corporation, *et al.*,[1]              :   Case No.  13-11952 (KJC)
                                                   :
                    Debtors.                       :   Jointly Administered
                                                   :
                                                   :   **Objection Deadline: August 21, 2013 at 4:00 p.m. (ET)**
                                                   :   **Hearing Date: August 28, 2013 at 1:00 p.m.**

------------------------------------------------------------- x

### MOTION OF THE DEBTORS FOR AN ORDER, PURSUANT TO SECTIONS 105(a) AND 365(a) OF THE BANKRUPTCY CODE, AUTHORIZING THE ASSUMPTION OF RESTRUCTURING SUPPORT AGREEMENT

The debtors and debtors in possession in the above captioned cases (collectively, the "**Debtors**") hereby move (the "**Motion**") for entry of an order (the "**Proposed Order**"), substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105(a) and 365(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors to assume that certain restructuring support agreement, dated as of August 2, 2013 (together with all exhibits thereto, the "**RSA**"),[2] entered into by and among the Debtors, the Consenting Lenders and the Consenting Noteholders (the "**Parties**").  In support of this Motion, the Debtors rely upon, and incorporate herein by reference, the Declaration of Stephen Farber in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 2] (the "**Farber Declaration**").  In support of the Motion, the Debtors respectfully represent as follows:

---

[1]    A list of the Debtors in these chapter 11 cases and the last four digits of each of Debtor's taxpayer identification number is attached as Schedule 1 to the Declaration of Stephen Farber in Support of Chapter 11 Petition and First Day Pleadings [Docket No. 2] and www.donlinrecano.com/rmc.  The Debtors' headquarters are located at 9221 E. Via de Ventura, Scottsdale, AZ 85258.

[2]    A copy of the RSA is attached to the Proposed Order as Exhibit 1.  Unless otherwise noted, capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA.

## PRELIMINARY STATEMENT

1.      The RSA is the lynchpin of the Debtors' consensual restructuring.  Prior to filing these cases, the Debtors vigorously negotiated with the Consenting Lenders and the Consenting Noteholders, who together represent the majority of the Debtors' institutional prepetition debt holders.  Signed by holders of greater than 60% of the Debtors' prepetition secured bank debt and holders of greater than 75% of the Debtors' prepetition unsecured bonds, the RSA serves as the roadmap for the Debtors' successful emergence from chapter 11.  The RSA has been made possible by the Debtors' and their stakeholders' collective realization that: the company is in need of a balance sheet restructuring; and a chapter 11 without a consensual deal risks erosion of the value of the estates.  The Debtors provide emergency ambulance services, fire protection, and inter-facility transports to municipalities and healthcare institutions that face constant pressure to ensure seamless emergency response.  Both the Debtors' prepetition lenders and bondholders feared that a free-fall into bankruptcy would disrupt the expectations of the Debtors' customer base and hamper the prospects for a successful reorganization.  Instead, the Parties negotiated the RSA, because it maximizes the opportunity to capture the value of the Debtors' underlying business — something all of the Parties believe in.  Moreover, the Parties have put their money where their mouths are:  the Consenting Lenders have agreed to provide the Debtors with a $75 million debtor-in-possession facility, and the Consenting Noteholders have agreed, in the RSA, to invest $135 million of new equity into the reorganized Debtors upon emergence from chapter 11.  The collective goal of the Parties is that the Debtors can effectuate a financial restructuring with virtually no impact on day-to-day operations.  The relief granted at the first day hearing was the first step towards that goal, and the assumption of the RSA is the second.

## JURISDICTION

2.     The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 1334(b) and 157, and the Amended Standing Order of Reference from the United States

District Court for the District of Delaware dated as of February 29, 2012.  This is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28

U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicates for the relief sought herein are sections

105(a) and 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

## RELIEF REQUESTED

4.     By this Motion, the Debtors seek the entry of an order (a) authorizing the

Debtors to assume the RSA and (b) granting such other relief as is just and proper.

## BACKGROUND

**A.     Introduction**

5.     On August 4, 2013 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.     The Debtors continue to operate their business and manage their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The

Debtors' chapter 11 cases are being jointly administered and have been consolidated for

procedural purposes only.  No trustee, examiner or official committee of unsecured creditors has

been appointed in these cases.

**B.     The Debtors' Restructuring Efforts**

7.     In the months prior to the Petition Date, the Debtors diligently evaluated,

in consultation with their advisors, a number of options to address the Debtors' financial issues.

The Debtors had to de-lever their balance sheet in order to bring the business in line with a more

3

realistic view of the Company's revenue collection levels. As chapter 11 became a more likely outcome, the Debtors began the marketing process for a debtor-in-possession loan to finance an in-court restructuring. That marketing process was ultimately successful, because it brought substantially all of the Debtors' stakeholders to the table. When the prospects of securing outside financing dimmed, the Debtors focused their negotiating efforts on two groups — the eventual Consenting Lenders and Consenting Noteholders. In that vein, the Debtors and the advisors simultaneously negotiated on three tracks. First, they entertained the Consenting Lenders' offer of a standalone financing. Second, the Debtors' considered the Consenting Noteholders' junior financing proposal. And third, the Debtors' engaged in a three-party negotiation of a consensual restructuring that eventually yielded the RSA — an agreement that outlines the terms and mechanics of a pre-arranged restructuring.

8.       As negotiations progressed, it became clear that both groups, believing in the future prospects of the business, had a vested interest in seeing the Debtors' balance sheet right sized. Accordingly, the best way to preserve the value of the business was to allow both the Consenting Lenders and the Consenting Noteholders the opportunity to protect their investments in the Debtors by facilitating the contribution of the liquidity necessary to address the Debtors' balance sheet issues. After weeks of good faith negotiations, the Debtors, the Consenting Lenders and the Consenting Noteholders have reached the agreement memorialized in the RSA, and the Debtors respectfully request that the Court authorize the Debtors to assume the agreement.

## C.      Overview of the RSA

9.       The RSA commits the Debtors, the Consenting Lenders and the Consenting Noteholders to a pre-negotiated plan of reorganization designed to implement a comprehensive balance sheet restructuring that will solve the Debtors' liquidity issues by

reducing the Debtors' funded indebtedness by approximately 50% and cutting interest payments

in half. The Debtors have commenced these cases to pursue the Plan, the consummation of

which will sufficiently de-lever the Debtors' capital structure to allow the reorganized company

to operate effectively and return to its competitive position in the emergency services industry.

The Debtors believe that the transactions contemplated by the Plan will position the company to

be a profitable enterprise going forward.

10.     The RSA contemplates, among other things, the following:[3]

(a)     A DIP Loan to be provided by certain of the Secured Lenders or their affiliates in an amount equal to $75 million; and

(b)     Upon emergence:

(i)     An investment by some or all of the members of the Noteholder Group of $135 million dollars of new preferred equity into the reorganized company;

(ii)     A paydown of the funded prepetition senior secured credit facility by $50,000,000;

(iii)     The necessary amendments to the prepetition senior secured credit facility to provide financing for the reorganized company, including but not limited to (i) an increase in the interest rate, (ii) a requirement that the reorganized Debtors make an amortization payment of $25 million in respect of funded obligations no later than eight quarters after the effective date of the Plan, (iii) the termination of all revolving commitments under the senior secured credit facility, and (iv) an adjustment to the financial and other covenants to reflect the financial status of the reorganized Debtors;

(iv)     The entry into a post-bankruptcy Letter of Credit Facility in the amount of approximately $42 million, which will refinance or replace all existing letters of credit issued under the prepetition senior secured credit facility, which letters of credit issued thereunder will be cash collateralized using the proceeds of a back-

---

[3]     The summary of the terms of the RSA contained herein is qualified in its entirety by reference to the RSA. If there are any inconsistencies between this summary and the terms of the RSA, the RSA shall govern in all respects.

to-back term loan which will be senior in payment and lien priority to the prepetition senior secured credit facility, as amended;

(v)　The conversion of the Notes, on the Effective Date, into 100% of the common stock of Holdings (subject to dilution by (i) the Warrants issued to those Noteholders providing the exit financing, and (ii) the management incentive plan); and

(vi)　The cancellation of the prepetition equity holders' interests.

11.　The RSA further provides that each of the Parties agree and covenant that:

(a)　It will negotiate in good faith the agreements and forms of proposed orders contemplated by the Restructuring;

(b)　It shall use commercially reasonable efforts to achieve each of the Milestones;

(c)　It shall vote all Claims held by such Party to accept the Plan;

(d)　It shall use commercially reasonable efforts to support the Debtors' efforts to obtain confirmation of, and consummate, the Plan;

(e)　Subject to limited exceptions, it shall not directly or indirectly seek, solicit, support, or vote in favor of any other sale, proposal, offer or plan of dissolution, winding up, liquidation, reorganization, merger or restructuring of any of the Debtors (each, an "**Alternative Plan**");

(f)　It shall not engage in any negotiations regarding any Alternative Plan;

(g)　It shall not object to or otherwise commence any proceeding opposing any of the terms of the DIP Loan;

(h)　It shall not take any action that is inconsistent with the RSA or that would delay any Milestone; and

(i)　It will use commercially reasonable efforts to take all actions to confirm and consummate the Plan.

12.　The Milestones were a central point of the three-party negotiation and include the following:

(a)　Entry of the order authorizing the assumption of the RSA within thirty-five (35) days of the Petition Date;

6

(b)      The filing of the Plan and Disclosure Statement by September 15, 2013;

(c)      The entry of an order of the Court approving the Disclosure Statement by November 8, 2013;

(d)      The entry of an order of the Court confirming the Plan by December 20, 2013; and

(e)      The Effective Date occurring on or before December 31, 2013, or if the requirement for the Confirmation Order becoming final is not waived, January 7, 2014.

13.      The Milestones are incorporated into the DIP Loan as an affirmative covenant, and create an event of default if they are not met.

14.      Each of the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders has the option to terminate the RSA if individual members of a counterparty group breach such that the non-breaching Consenting Lenders or Consenting Noteholders hold less than 51% of the obligations under the prepetition credit facility, or 66.66% of the Notes, respectively.  Each of the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders may also terminate if:  (a) any of Debtors' cases are converted to cases under chapter 7 of the Bankruptcy Code; (b) the RSA (or any material portion thereof) is found to be unenforceable; or (c) any of the Debtors' cases are dismissed.  The Consenting Lenders or the Consenting Noteholders may terminate if:

(a)      a Milestone has not been met;

(b)      the Debtors materially breach their obligations under the RSA or the Restructuring Term Sheet;

(c)      the Exit Preferred Holders are relieved of their obligation to fund the Exit Issuance in accordance with terms of the Restructuring Term Sheet;

(d)      the Debtors file, or publicly announce their intention to file, a plan of reorganization that is inconsistent with the Restructuring Term Sheet, or the agreements and forms of proposed orders

7

contemplated by the Restructuring are not consistent with the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Parties;

(e)    a trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors is appointed;

(f)    a debtor-in-possession financing order or agreement other than the Interim DIP Order or Final DIP Order shall have been entered or approved, or if the terms of the DIP, the Interim DIP Order or the Final DIP Order are amended without the consent of the Required Consenting Noteholders; or

(g)    an Event of Default under the DIP occurs and the administrative agent under the DIP declares that the Loans then outstanding are due and payable in whole.

15.    The RSA may also be terminated by the Parties' mutual written agreement.

16.    Importantly, the RSA does not purport to vitiate the Debtors' fiduciary duties in administering the Chapter 11 cases.  Specifically, the RSA provides:

(a)    Notwithstanding anything to the contrary in the RSA, (i) nothing requires the Debtors or their respective boards of directors to breach any fiduciary obligations they have under applicable law; and (ii) in the event the Debtors or their boards of directors reasonably determine, consistent with their fiduciary obligations and in consultation with their legal advisors, that the conditions to effectiveness of the Plan cannot be satisfied, or if they receive an alternative offer that maximizes value of the Debtors' estates, they may terminate the RSA without incurring any liability to any Party under the RSA.

## BASIS FOR RELIEF REQUESTED

17.    The Debtors seek authority, pursuant to section 365(a) of the Bankruptcy Code, to assume the RSA.  Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  As noted by the United States Court of Appeals for the Second Circuit, "[t]he purpose behind allowing the assumption or rejection of

8

executory contracts is to permit the trustee or debtor in possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 Collier on Bankruptcy ¶ 365.01[1] (15th ed. 1993)).

18.    The assumption or rejection of an executory contract or unexpired lease is subject to review under the business judgment standard.  If a debtor has exercised "reasonable" business judgment, the court should approve the proposed assumption or rejection.  See, e.g., NLRB v. Bildisco and Bildisco, 465 U.S. 513, 523 (1984); Group of Inst. Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib., 872 F.2d 36, 39-40 (3d Cir. 1989); Glenstone Lodge, Inc. v. Buckhead Am. Corp (In re Buckhead Am. Corp.), 180 B.R. 83, 88 (D. Del. 1995).  Debtors are given significant discretion when requesting to assume or reject an executory contract.  Stanziale v. Nachtomi (In re Tower Air, Inc.), 416 F.3d 229, 238 (3d Cir. 2005).

19.    In addition, the Debtors seek approval of the assumption of the RSA pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code, providing, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re

Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may

fashion an order or decree that helps preserve or protect the value of a debtor's assets.  See, e.g.,

Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section

105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the

purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531,

537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has

a duty to protect whatever equities a debtor may have in property for the benefit of its creditors

as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

             20.     The Debtors' decision to assume the RSA is an exercise of their sound

business judgment.  First, the terms of the RSA are the result of extensive, arms'-length

negotiations between the Debtors, the Consenting Lenders and the Consenting Noteholders.

Second, assumption of the RSA will ensure the support of a majority of the Debtors' institutional

lenders and bondholders throughout the Plan process, and, thus, will help expedite and facilitate

the Debtors' restructuring efforts during these cases.  Indeed, the RSA and related agreements

contemplate debtor-in-possession financing and exit financing, both to fund the Debtors' cases

and their exit from bankruptcy.  Third, the Debtors' obligations under the RSA remain subject to

their fiduciary duties as debtors and debtors in possession.  Finally, failure to assume the RSA

will trigger a default under the Debtors' DIP Loan, which could get these cases materially off

track.

             21.     From the perspective of the Debtors and the prepetition creditor

constituencies with the greatest financial stake in the outcome of these cases, the RSA is

designed to ensure that the Debtors can emerge with a healthier balance sheet in short order.  By

this Motion, the Debtors seek to keep these cases on track and achieve their next important case milestone.

22.     Courts in this District have approved the assumption of restructuring support agreements in other cases.  See, e.g., In re Bicent Holdings LLC, Case No. 12-11304 (KG) (Bankr. D. Del. May 15, 2012); In re William Lyons Homes, Case No. 11-14019 (CSS) (Bankr. D. Del. Dec. 29, 2011); In re Satelites Mexicanos, S.A. DE C.V., Case No. 11-11035 (CSS) (Bankr. D. Del. April 13, 2011); In re HMP Servs. Holding Sub III, LLC, Case No. 10-13618 (BLS) (Bankr. D. Del. Jan. 20, 2011); In re NextMedia Group, Inc., Case No. 09-14463 (PJW) (Bankr. D. Del. Jan. 22, 2010); In re MES Int'l, Inc., Case No. 09-14109 (PJW) (Bankr. D. Del. Oct. 18, 2009).

23.     For the foregoing reasons, the RSA is a critical component of the Debtors' proposed restructuring efforts and the Debtors' decision to assume the RSA represents a sound exercise of the Debtors' business judgment.

## NOTICE

24.     Notice of this Motion has been provided to:  (i) the United States Trustee; (ii) Credit Suisse, AG, as the administrative agent under the Debtors' prepetition secured credit agreement; (iii) counsel to Wells Fargo, indenture trustee for the Debtors' senior unsecured notes; (iv) counsel to the Consenting Lenders; (v) counsel to the Consenting Noteholders; (vi) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; and (vii) all parties who have requested notice in these cases pursuant to Bankruptcy Rule 2002 as of the date of the filing of this Motion.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order granting the relief requested herein and such other and further relief as may be just and proper.

Dated: August 7, 2013
      Wilmington, Delaware

            YOUNG CONAWAY STARGATT & TAYLOR, LLP

            */s/ Maris J. Kandestin*
            Edmon L. Morton (No. 3856)
            Maris J. Kandestin (No. 5294)
            Rodney Square
            1000 North King Street
            Wilmington, DE  19801
            (302) 571-6600
            (302) 571-1253 (Fax)
            emorton@ycst.com
            mkandestin@ycst.com

                  -and-

            WILLKIE FARR & GALLAGHER LLP
            Matthew A. Feldman
            Rachel C. Strickland
            Daniel I. Forman
            787 Seventh Avenue
            New York, New York 10019
            (212) 728-8000
            (212) 728-8111 (Fax)
            mfeldman@willkie.com
            rstrickland@willkie.com
            dforman@willkie.com

            *Proposed Co-Counsel to the Debtors and Debtors in Possession*