## EXHIBIT B

**Engagement Letter**

PRIVILEGED & CONFIDENTIAL

June 29, 2013

Rachel C. Strickland
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019

Mr. Stephen Farber
Executive Vice President & CFO
Rural/Metro Operating Company, LLC
8521 East Princess Drive
Scottsdale, AZ 85255

Re: Financial Advisory Services

Dear Ladies and Gentlemen:

1.  **Introduction**

    This letter confirms that we, FTI Consulting, Inc. ("FTI"), have been retained by you, Willkie Farr & Gallagher LLP ("Counsel"), as counsel to Rural Metro Corporation, Rural/Metro Operating Company, LLC and their controlled subsidiaries (collectively with any entity formed or used for the purposes set forth herein, the "Company"), to provide certain financial advisory and consulting services (the "Services") set out below (the "Engagement"). This letter of engagement (the "Engagement Letter") and the related Standard Terms and Conditions constitute the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2.  **Scope of Services**

    Our work will be limited to the procedures (the "Services") outlined on Exhibit II.

    The Services may be performed by FTI or by any subsidiary of FTI, as FTI shall determine. FTI may also provide Services through its or its subsidiaries' agents or independent contractors. References herein to FTI and its employees shall be deemed to apply also, unless the context shall otherwise indicate, to employees of each such subsidiary and to any such agents or independent contractors and their employees.

    The Services are subject to change as mutually agreed between us in writing.

    Notwithstanding anything to the contrary herein, it is expressly understood that FTI is hereby engaged by Counsel. Counsel confirms that it has been expressly authorized by the Company to execute this Engagement Letter. For purposes of the Engagement, and with respect to the scope of its retention, FTI will report its views and conclusions only to Counsel and the Company and will take direction only from Counsel, which shall act upon instruction from the Company. Counsel shall not be liable for the fees, charges, disbursements or any indemnification amounts payable to FTI under the Engagement Contract, which shall be

Willkie Farr & Gallagher LLP
6/29/13

obligations of the Company. FTI is being retained on behalf of, and will report solely to, Counsel, notwithstanding that FTI's fees and expenses will be paid by the Company, and that certain covenants and representations are made by the Company herein. To the extent that any of the foregoing may create a conflict of interest in respect of FTI's Engagement, the Company waives any right to claim that such a conflict of interest may now or hereafter exist.

FTI is engaged to provide financial advisory and consulting services only. Accordingly, while we may from time to time suggest options which may be available to the Company and further give our professional evaluation of these options, the ultimate decision as to which, if any, of these options to implement rests with the Company, its management and board of directors. FTI and its employees will not make any management decisions for the Company and will not be responsible for communicating information concerning the Company to the public, the Company's shareholders or others.

As part of the Services, FTI may be requested to assist the Company (and its legal or other advisors) in negotiating with the Company's creditors and equity holders and with other interested parties. In the event that we participate in such negotiations, the representations made and the positions advanced will be those of the Company and its management, not FTI or its employees.

If cases under the Bankruptcy Code are commenced and our retention is approved, our role will include serving as professional advisors in those cases under a general retainer, subject to court approval. Our role also will encompass all out-of-court planning and negotiations attendant to these tasks.

The services we will provide in connection with the Engagement will encompass all services normally and reasonably associated with this type of engagement that we are requested and are able to provide and that are consistent with our ethical obligations. With respect to all matters of our Engagement, we will coordinate closely with Counsel, which shall act upon instruction from the Company, as to the nature of the services that we will render and the scope of our Engagement.

As usual, our Engagement is to advise Counsel on behalf of the Company and not to advise individual directors, officers, employees or shareholders. However, we anticipate that in the course of the Engagement, we may provide information or advice relevant to directors, officers or employees in their corporate capacities.

3. **Fees and Cash on Account**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

**United States**

| | Per Hour (USD) |
|---|---|
| Senior Managing Directors | $780-895 |
| Directors / Managing Directors | 560-745 |
| Consultants/Senior Consultants | 280-530 |
| Administrative / Paraprofessionals | 115-230 |

Willkie Farr & Gallagher LLP
6/29/13

Hourly rates are generally revised periodically. To the extent the Engagement requires services of our International divisions or personnel, the time will be multiplied by our standard hourly rates applicable on International engagements. Note that we do not provide any assurance regarding the outcome of our work and our fees will not be contingent on the results of such work.

In addition to the fees outlined above, FTI will bill the Company for reasonable allocated and direct expenses which are likely to be incurred on the Company's behalf during this Engagement. Allocated expenses include the cost of items which are not billed directly to the Engagement, including administrative support and other overhead expenses that are not billed through as direct reimbursable expenses, and are calculated at 6.0% of FTI's standard professional rates. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the Engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the Engagement. Further, if FTI and/or any of its employees are required to testify or provide evidence at or in connection with any judicial or administrative proceeding relating to this matter, FTI will be compensated by the Company at its regular hourly rates and reimbursed for reasonable allocated and direct expenses (including counsel fees) with respect thereto.

### Cash on Account

Initially, the Company will forward to us the amount of $400,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Initial Cash on Account"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion. The Company agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, charges, and disbursements to be incurred.

We will send the Company periodic invoices (not less frequently than monthly) for services rendered and charges and disbursements incurred on the basis discussed above, and in certain circumstances, an invoice may be for estimated fees, charges and disbursements through a date certain. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. Upon transmittal of the invoice, we may immediately draw upon the Initial Cash on Account (as replenished from time to time) in the amount of the invoice. The Company agrees upon submission of each such invoice to promptly wire the invoice amount to us as replenishment of the Initial Cash on Account (together with any supplemental amount to which we and the Company mutually agree), without prejudice to the Company's right to advise us of any differences it may have with respect to such invoice. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

The Company agrees to promptly notify FTI if the Company or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of FTI involved in this Engagement and agrees that FTI has earned and

Willkie Farr & Gallagher LLP
6/29/13

is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to FTI's former principal or employee that the Company or any of it subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by FTI with respect to this Engagement.

In a case under the Bankruptcy Code, fees and expenses may not be paid without the express prior approval of the bankruptcy court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. The Company agrees that, if asked to do so by us, the Company will request the bankruptcy court to establish a procedure for the payment of interim fees during the case that would permit payment of interim fees. If the bankruptcy court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

In preparation for the filing of any cases under the Bankruptcy Code, we also may require an additional on account payment to supplement the Initial Cash on Account to cover fees, charges and disbursements to be incurred during the initial phase of the chapter 11 cases (the "Additional Cash on Account"). We will hold the Additional Cash on Account, as we have the Initial Cash on Account. Of course, the reasonableness of the Additional Cash on Account remains subject to review by the court in any ensuing case.

If any of the Company's entities become a debtor in one or more cases under the Bankruptcy Code, some fees, charges, and disbursements (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Initial Cash on Account and the Additional Cash on Account will be applied to any such unpaid pre-petition fees, charges and disbursements. Any requisite court permission will be obtained in advance. We will then hold any portion of the Initial Cash on Account and the Additional Cash on Account not otherwise properly applied for the payment of any such unpaid pre-filing fees, charges and disbursements (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

Post-petition fees, charges and disbursements will be due and payable immediately upon entry of an order containing such court approval or at such time thereafter as instructed by the court. The Company understands that while the arrangement in this paragraph may be altered in whole or in part by the bankruptcy court, the Company shall nevertheless remain liable for payment of court approved post-petition fees and expenses. Such items are afforded administrative priority under 11 U.S.C. § 503(b)(1). The Bankruptcy Code provides in pertinent part, at 11 U.S.C. § 1129(a)(9)(A), that a plan cannot be confirmed unless these priority claims are paid in full in cash on the effective date of any plan (unless the holders of such claims agree to different treatment). It is agreed and understood that the unused portion, if any, of the Initial Cash on Account (as may be supplemented from time to time) and the Additional Cash on Account shall be held by us and applied against the final fee application filed and approved by the court.

4.   **Terms and Conditions**

Willkie Farr & Gallagher LLP
6/29/13

The attached Standard Terms and Conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and shall supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services.

5.  **Conflicts of Interest**

    Based on the list of interested parties (the "Potentially Interested Parties"), provided by you, we have undertaken a limited review of our records to determine FTI's professional relationships with the Company. As you may be aware, FTI is regularly retained by the administrative agent and/or other members of your lending group (or law firms retained by the administrative agent or lending group members). However, such representations are in matters unrelated to this Engagement.

    From the results of such review, we were not made aware of any conflicts of interest or additional relationships that we believe would preclude us from performing the Services. However, as you know, we are a large consulting firm with numerous offices throughout the United States. We are regularly engaged by new clients, which may include one or more of the Potentially Interested Parties. The FTI professionals providing services hereunder will not accept an engagement that directly conflicts with this Engagement without your prior written consent.

6.  **Acknowledgement and Acceptance**

    Please acknowledge your acceptance of the terms of this Engagement Contract by signing this Engagement Letter and the attached Standard Terms and Conditions and returning a copy of each to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact Scott Bingham at 404-460-6294.

Yours faithfully,

FTI CONSULTING, INC.

By: _____
Scott Bingham
Senior Managing Director

Willkie Farr & Gallagher LLP
6/29/13

AGREED TO AND ACCEPTED
as of the date first written above:

WILLKIE FARR & GALLAGHER LLP

By: /s/ Rachel Strickland
Rachel Strickland


RURAL/METRO OPERATING COMPANY, LLC, on behalf of itself
and its controlled subsidiaries

By._____
Stephen Farber
Executive Vice President and Chief Financial Officer

-6-

Willkie Farr & Gallagher LLP
6/29/13

AGREED TO AND ACCEPTED
as of the date first written above:


WILLKIE FARR & GALLAGHER LLP

By._____
      Rachel Strickland



RURAL/METRO OPERATING COMPANY, LLC, on behalf of itself
and its controlled subsidiaries

By._____
      Stephen Farber
      Executive Vice President and Chief Financial Officer

# FTI CONSULTING, INC.

## STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Willkie Farr & Gallagher LLP and Rural/Metro Operating Company, LLC, on behalf of itself and its controlled subsidiaries dated June 29, 2013.[1] The Engagement Letter and the Standard Terms and Conditions (collectively the "Engagement Contract") form the entire agreement between the parties relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract.

1. **Reports and Advice**

    1.1 **Use and purpose of advice and reports** – Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party, or refer to us or the Services, without our prior written consent, which shall be conditioned on the execution of a third party release letter in the form provided by FTI. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

2. **Information and Assistance**

    2.1 **Provision of information and assistance** – Our performance of the Services is dependent upon the Company providing us with such information and assistance as we may reasonably require from time to time.

    2.2 **Punctual and accurate information** – The Company shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. The Company shall also notify us if it subsequently learns that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

    2.3 **No assurance on financial data** – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.4 **Prospective financial information** - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Engagement Letter.

-1-

otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3   Additional Services**

3.1   **Responsibility for other parties** – The Company shall be solely responsible for the work and fees of any other party engaged by the Company to provide services in connection with the Engagement regardless of whether such party was introduced to you by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

**4.   Confidentiality**

4.1   **Restrictions on confidential information** – The parties agree that any confidential information received from the other parties shall only be used for the purposes of providing or receiving Services under this or any other contract between and/or among the parties. Except as provided below, the parties will not disclose the other parties' confidential information to any third party without the affected party's consent. Confidential information shall not include information that:

    4.1.1   is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

    4.1.2   is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

    4.1.3   is or has been independently developed by the recipient.

4.2   **Disclosing confidential information** – Notwithstanding Clause 1.1 or 4.1 above, the parties will be entitled to disclose confidential information of the other parties to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable not less than 2 business days' notice in writing is first given to the affected party.

4.3   **Citation of engagement** – Without prejudice to Clause 4.1 and Clause 4.2 above, to the extent our engagement is or becomes known to the public, we may cite the performance of the Services to our clients and prospective clients as an indication of our experience, unless we and you specifically agree otherwise in writing.

4.4   **Internal quality reviews** – Notwithstanding the above, we may disclose any information referred to in this Clause 4 to any other FTI entity or use it for internal quality reviews.

4.5   **Maintenance of workpapers** – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

5. **Termination**

5.1 **Termination of Engagement with notice** – Any party may terminate the Engagement Contract for whatever reason upon written notice to the other parties. Upon receipt of such notice, we will stop all work immediately. The Company will be responsible for all fees and expenses incurred by us through the date termination notice is received.

5.2 **Continuation of terms** – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract, including but not limited to, Clauses 3 and 4 of the Engagement letter, and Clauses 1.1, 4, 6 and 7 of the Standard Terms and Conditions, are intended to survive such termination or expiration and shall continue to bind all parties.

6. **Indemnification, Liability Limitation, and Other Matters**

6.1 **Indemnification** - The Company agrees to indemnify and hold harmless FTI and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to the Engagement, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the fraud, gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted (an "Adverse Determination"). The Company shall pay damages and expenses, including reasonable legal fees and disbursements of counsel as incurred in advance. FTI agrees that it will reimburse any amounts paid in advance to the extent they relate directly to an Adverse Determination.

6.2 **Limitation of liability** - The Company agrees that no Indemnified Person shall be liable to the Company, or the Company's successors, affiliates or assigns for damages in excess of the total amount of the fees paid to FTI under this Engagement Contract. Without limiting the generality of the foregoing, in no event shall any Indemnified Person be liable for consequential, indirect or punitive damages, damages for lost profits or opportunities or other like damages or claims of any kind.

7. **Governing Law, Jurisdiction and WAIVER OF JURY TRIAL**

7.1 **Governing Law** - The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of New York, without giving effect to the choice of law provisions thereof.

7.2 **Jurisdiction** - The United States District Court for the Southern District of New York and the appropriate Courts of the State of New York sitting in the Borough of Manhattan, City of New York shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it (except that during the pendency of the Company's bankruptcy cases, if any, the bankruptcy court presiding over the Company's bankruptcy cases shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it). The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.

7.3 **WAIVER OF JURY TRIAL** – TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, THE COMPANY AND FTI IRREVOCABLY AND UNCONDITIONALLY

-4-

AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

FTI CONSULTING, INC

By: _____
    Scott Bingham
    Senior Managing Director


WILLKIE FARR & GALLAGHER LLP

By. _____
    Rachel Strickland


RURAL/METRO OPERATING COMPANY, LLC, on behalf of itself and its controlled subsidiaries

By. _____
    Stephen Farber
    Executive Vice President and Chief Financial Officer

-4-

AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

FTI CONSULTING, INC

By: _____
Scott Bingham
Senior Managing Director


WILLKIE FARR & GALLAGHER LLP

By. *[signature]* _____
Rachel Strickland


RURAL/METRO OPERATING COMPANY, LLC, on behalf of itself and its controlled subsidiaries

By. _____
Stephen Farber
Executive Vice President and Chief Financial Officer

AGREE TO WAIVE A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR THIS ENGAGEMENT CONTRACT.

FTI CONSULTING, INC

By: _____
    Scott Bingham
    Senior Managing Director


WILLKIE FARR & GALLAGHER LLP

By: _____
    Rachel Strickland


RURAL/METRO OPERATING COMPANY, LLC, on behalf of itself and its controlled subsidiaries

By: _____
    Stephen Farber
    Executive Vice President and Chief Financial Officer

# EXHIBIT II – WORKPLAN

This is a schedule of Services referred to in the Engagement Contract dated June 29, 2013 by and among Willkie Farr & Gallagher LLP ("Counsel"), as counsel to Rural Metro Corporation, Rural/Metro Operating Company, LLC and their controlled subsidiaries (collectively with any entity formed or used for the purposes set forth herein, the "Company"), the Company and FTI Consulting, Inc ("FTI"). This workplan shall be effective immediately after the Engagement Contract is signed by Counsel, the Company and FTI.

**Description of Services**

FTI shall provide the following advisory services. Such advisory services will be limited in scope and will focus on the areas discussed in detail below and other areas as identified and agreed to with Counsel, which shall act upon instruction from the Company.

**Detailed Services**

- Revenue cycle management
  - Identify weaknesses in billing office support
  - Improve efficiency in pre-bill and post-bill processes
  - Assist in implementation of improvements

- Revenue recognition
  - Assist the Company to develop new revenue recognition model using payor analytics
  - Advise the Company during monthly closing procedures on revenue methodology

- Financial accounting and historical forensic review assistance
  - Revenue recognition and accounts receivable
  - Intercompany accounts and transactions
  - Purchase accounting for the entity itself as well as any subsequent acquisitions
  - Equity transactions (preferred stock/warrants and options) and related fair value issues.
  - Balance sheet accounts (cash, payables, accruals, etc)
  - Prior unrecorded audit adjustments (affecting both restated and non-restated accounts)

- *Ad hoc additional services as requested by Counsel, which shall act upon instruction from the Company.*